WILLIAM B. ROSTOV, State Bar No. 184528
KEVIN GOLDEN, State Bar No. 233378
Center for Food Safety
2601 Mission St., Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Emails: wrostov@icta; kgolden@icta.org

PAUL H. ACHITOFF (Applicant for Admission Pro Hac Vice)
Earthjustice
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: achitoff@earthjustice.org

GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR FOOD SAFETY, *et al.*,<br><br>        Plaintiffs,<br><br>    vs.<br><br>CHARLES CONNOR, in his official capacity as Acting Secretary of the United States Department of Agriculture, *et al.*,<br><br>        Defendants. | Case No.: 3:08-cv-00484-JSW<br><br>REPLY TO INTERVENOR-DEFENDANTS' RESPONSE TO MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED |

The Center for Food Safety *et al.* (collectively, the "Center") submit this brief reply to correct a factual inaccuracy in the Intervenor-Defendants' Response to Motion to Consider Whether Cases Should Be Related (Doc. 278) ("Response"). In footnote 2 of their Response, Intervenor-Defendants misrepresent to the Court that the Center "filed [its] complaint first at 8:57 a.m., then filed the 'related case' motion at 1:19 p.m., after the court's lottery system had randomly selected a judicial assignment." Response at 1, n.2. In fact, the Center filed its related case motion, which is file-stamped "9:15 a.m.," simultaneously with its complaint, which is file-stamped "9:13 a.m." and

attached hereto as Exhibit A. As required by the local rules, undersigned counsel for the Center also filed the related case motion electronically in *Geertson Seed Farms, et al. v. Johanns*, *et al.*, No. C 06-1075 CRB (N.D. Cal.), immediately upon returning to the office in Oakland.

As set forth in the Center's related case motion, the instant case and *Geertson Seed Farms* concern substantially the same parties, and both cases challenge the deregulation of a crop that has been genetically engineered by Monsanto Company to resist Roundup. The legal claims in both cases are the same, and they turn on extremely similar factual issues having to do with genetic contamination and the development of Roundup resistant weeds. As is required by Civil Local Rule 3-12, the Center respectfully requests that this Court consider the likelihood that there will be an unduly burdensome duplication of labor and expense, as well as the possibility of conflicting results, if the cases are conducted before different judges.

Respectfully submitted,

WILLIAM B. ROSTOV, State Bar No. 184528
KEVIN GOLDEN, State Bar No. 233378
Center for Food Safety
2601 Mission St., Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Emails: wrostov@icta; kgolden@icta.org

PAUL H. ACHITOFF (Pro Hac Vice Applicant)
Earthjustice
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: achitoff@earthjustice.org

Dated: January 25, 2008        /s/ Gregory C. Loarie
GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

*Counsel for Plaintiffs*

Reply to Intervenor-Defendants' Response to Motion to Consider Whether Cases Should be Related      2

**CERTIFICATE OF SERVICE**

I am a citizen of the United States of America and a resident of the City and County of San Francisco; I am over the age of 18 years and not a party to the within entitled action; my business address is 426 17th Street, 5th Floor, Oakland, California.

I am a citizen of the United States of America and a resident of the City and County of San Francisco; I am over the age of 18 years and not a party to the within entitled action; my business address is 426 17th Street, 5th Floor, Oakland, California.

I hereby certify that on January 25, 2008, I served by U.S. first class mail one true copy of the REPLY TO INTERVENOR-DEFENDANTS' RESPONSE TO MOTION TO CONSIDER WHETHER CASES ARE RELATED on the persons listed below:

| | |
|---|---|
| Stanley H. Abramson<br>Arent Fox LLP<br>1050 Connecticut Avenue, NW<br>Washington, DC 20036 | J. Thomas Carrato<br>Monsanto Company<br>Mail Zone E1NH<br>800 N. Lindbergh Blvd.<br>St. Louis, MO 63167-0001 |

I certify under penalty of perjury that the foregoing is true and correct. Executed on January 25, 2008 in Oakland, California.

_____
Jessie Baird

Certificate of Service

1  WILLIAM B. ROSTOV, State Bar No. 184528
   KEVIN GOLDEN, State Bar No. 233378
2  Center for Food Safety
   2601 Mission St., Suite 803
3  San Francisco, CA 94110
   T: (415) 826-2770 / F: (415) 826-0507
4  Emails: wrostov@icta; kgolden@icta.org

5  PAUL H. ACHITOFF (Applicant for Admission Pro Hac Vice)
   Earthjustice
6  223 South King Street, Suite 400
   Honolulu, Hawai'i 96813
7  T: (808) 599-2436 / F: (808) 521-6841
   Email: achitoff@earthjustice.org
8
   GREGORY C. LOARIE, State Bar No. 215859
9  Earthjustice
   426 17th Street, 5th Floor
10 Oakland, CA 94612
   T: (510) 550-6725 / F: (510) 550-6749
11 Email: gloarie@earthjustice.org

12 *Counsel for Plaintiffs*

13                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                         SAN FRANCISCO DIVISION

15 CENTER FOR FOOD SAFETY, ORGANIC        )   Case No. 08 0484
   SEED ALLIANCE, SIERRA CLUB, and HIGH   )
16 MOWING ORGANIC SEEDS,                  )
                                          )   COMPLAINT FOR DECLARATORY AND
17             Plaintiffs,                )   INJUNCTIVE RELIEF
                                          )
18      vs.                               )
                                          )
19 CHARLES CONNOR, in his official        )
   capacity as Acting Secretary of the United States )
20 Department of Agriculture; and CINDY SMITH, )
   in her official capacity as Administrator of the )
21 Animal and Plant Health Inspection Service, )
                                          )
22             Defendants.                )
                                          )

Complaint for Declaratory and Injunctive Relief

# INTRODUCTION

1. This lawsuit challenges a decision by the United States Department of Agriculture ("USDA") to deregulate a variety of sugar beet that has been genetically engineered by Monsanto Company to resist glyphosate, the active ingredient in the herbicide Roundup. As a result of deregulation, these "Roundup Ready" sugar beets will be grown and distributed on a commercial scale throughout the United States for the first time this year.

2. The environmental impacts associated with growing genetically engineered ("GE") Roundup Ready crops are well documented. Wind-blown pollen from GE sugar beets will contaminate conventional sugar beets and other closely related crops, such as chard and table beets. Such biological contamination is costly to detect and detrimental to farmers and consumers of conventional and organic varieties.

3. In addition, scientific studies have shown that large-scale cultivation of Roundup Ready crops results in a significant increase in Roundup use, because there is no need to be precise and judicious in applying Roundup to such crops. Roundup contains a potent mix of chemicals that can be toxic to consumers, workers, birds, insects, aquatic organisms and plants. Moreover, just as overuse of antibiotics eventually breeds drug-resistant bacteria, overuse of Roundup eventually breeds Roundup-resistant weeds. To control these "super weeds," farmers must resort to ever more toxic and hazardous herbicides despite their ill effect on the environment, workers and consumers.

4. USDA's decision to deregulate Roundup Ready sugar beets violated federal law. As set forth below, the environmental assessment prepared by USDA in connection with its deregulation determination is cursory and wholly inadequate, in violation of the National Environmental Policy Act ("NEPA"). In addition, USDA's deregulation determination violates the Administrative Procedure Act and the Plant Protection Act.

5. Plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club and High Mowing Organic Seeds ask this Court to vacate USDA's deregulation determination, order USDA to prepare a full environmental impact statement in connection with any future deregulation determination, and enjoin any planting, sale or dissemination of Roundup Ready sugar beets pending USDA's compliance with all applicable federal laws.

Complaint for Declaratory and Injunctive Relief                                                                                          1

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201-02 (declaratory relief), and 5 U.S.C. § 702 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

7. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e), because one of the plaintiffs resides in this district.

## INTRADISTRICT ASSIGNMENT

8. Pursuant to Local Rule 3-2(c) and (d), assignment of this action to the San Francisco or Oakland Divisions is appropriate because one of the plaintiffs resides in San Francisco.

## PARTIES

9. Plaintiff Center for Food Safety ("CFS") brings this action on behalf of itself and its members. CFS is a Washington, D.C., nonprofit corporation that has offices in San Francisco, CA and Washington, D.C. CFS and its members are being, and will be, adversely affected by USDA's actions complained of herein.

10. Since the organization's founding in 1997, CFS has sought to address the adverse impacts of industrial farming and food production systems on human health, animal welfare, and the environment. CFS is a national non-profit membership organization with members in almost every state across the country, including members in states and locations where sugar beets are grown.

11. CFS seeks to protect human health and the environment by ensuring that GE products are thoroughly safety-tested prior to any marketing; that such products are tested in a manner that minimizes any risk of contaminating non-GE seeds, organic seeds, food supplies or the environment; and that such products and foods created through genetic engineering, if on the market, are appropriately labeled. CFS also seeks to provide consumers with a means of identifying GE foods on the market and to encourage full public participation in defining and addressing the issues presented by GE crops. To this end, CFS sends out action alerts to its True Food Network, a 57,000 member network. These action alerts generate letters to governmental officials concerning genetic engineering and other issues affecting a sustainable food system.

Complaint for Declaratory and Injunctive Relief                                                              2

12. To achieve its goals, CFS disseminates to government agencies, members of Congress, and the general public a wide array of educational and informational materials addressing the introduction of GE crops into the environment and food supply. These materials include, but are not limited to, reprints of news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets. Collectively, the dissemination of this material has made CFS an information clearinghouse for public involvement and governmental oversight of the use of genetic engineering in our nation's food supply.

13. The interests of CFS and its members are being, and will be, adversely affected by USDA's actions complained of herein. USDA's decision to deregulate Roundup Ready sugar beets ensures that CFS members are, and will be, aesthetically, economically, and physically injured by the spread of GE food. In particular, CFS' members grow organic seed crops related to sugar beets and consume products made with sugar derived from sugar beets. CFS' members also regularly eat organic foods and desire foods that are free of GE material and chemical pesticides. The proliferation of Roundup Ready sugar beets will contaminate non-GE sugar beet seeds, organic and conventional non-GE related seeds lines such as chard and table beets, and reduce the supply of sugar and food processed with sugar that is not contaminated with GE material. The cultivation of Roundup Ready sugar beets will also greatly increase the use of Roundup on sugar beets, and therefore increase Roundup residues in foods made with sugar from such sugar beets. USDA's actions in allowing the introduction of GE sugar beets into the environment will make it more difficult for CFS' members to produce, sell, and eat foods not contaminated by GE material.

14. CFS and its members are also concerned about the proliferation of GE crops without adequate environmental analysis and without labeling. USDA's deregulation of Roundup Ready sugar beets adversely affects CFS and its members because the action will allow GE sugar beets to be placed in the stream of commerce without labeling, adequate environmental review, or any other appropriate limitations.

15. The agricultural, environmental and economic interests, as well as the health, well-being and enjoyment, of CFS and its members have been, and continue to be, threatened by USDA's deregulation of Roundup Ready sugar beets.

1    16.    Plaintiff Organic Seed Alliance ("OSA") brings this action on behalf of itself and its partners, the farmers it serves. OSA and its partners are being, and will continue to be, adversely affected by USDA's actions complained of herein. OSA is a Port Townsend, WA-based nonprofit corporation, founded in 1975 as Abundant Life Seed Foundation, with a name change to Organic Seed Alliance in 2003. OSA promotes the ethical development and stewardship of the genetic resources of agricultural seed, and accomplishes its goals through collaborative education and research programs with organic farmers and other seed professionals.

17.    OSA's primary mission is the development and stewardship of organic seed varieties, and it is concerned that the commercialization of GE sugar beets will contaminate organic seed varieties of related species. When such contamination occurs, OSA and its partners are harmed, because the seed lines they breed and protect are compromised and they must increase efforts to try to prevent further contamination. USDA's decision to allow the introduction of Roundup Ready sugar beets into the environment makes it more difficult, if not impossible, for OSA's partner farmers to continue to grow and sell related crops not contaminated by GE material.

18.    The agricultural, environmental and interrelated economic interests, as well as the health, well-being and enjoyment, of OSA and its partners have been, and continue to be, threatened by USDA's deregulation of Roundup Ready sugar beets.

19.    Plaintiff Sierra Club brings this action on behalf of itself and its more than 1.3 million members and supporters. Sierra Club and its members are being, and will be, adversely affected by USDA's actions complained of herein. The Sierra Club is a national nonprofit organization dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is a California nonprofit corporation headquartered in San Francisco, CA.

20.    The Sierra Club's interests encompass endangered species, habitat protection, pollution, genetic engineering, and industrial agriculture. The Sierra Club's Genetic Engineering Committee educates the public and advocates for regulatory reform to protect the natural

1  environment and human health from the threats posed by the release of novel GE organisms, including Roundup Ready crops such as the sugar beets that are the subject of USDA's deregulation determination at issue herein.

21. The Sierra Club's members are, and will be, aesthetically, physically and spiritually injured by the spread of GE sugar beets. Sierra Club has members in every state across the country, including members in states and locations where sugar beets are grown. The Sierra Club's members include farmers, ranchers, rural residents who live in agricultural locations where Roundup Ready sugar beets will be grown and who will be affected by the GE sugar beet crop, as well as others who enjoy the farmland and the surrounding natural environment, including native plants and aquatic organisms. Members who grow sugar beets, or related species of chard and table beets, may lose their ability to grow their organic and/or conventional crop of choice and suffer from a reduced market if such crops are contaminated with GE sugar beets. Members who enjoy the farmland and natural environment where or near where GE sugar beets are grown, will be aesthetically injured if the increased herbicides used on GE sugar beets drifts and adversely affects native plant species, aquatic organisms and other non-targets species. Sierra Club members also regularly eat organic foods and desire foods that are free of GE materials and chemical herbicides, and may lose their ability to choose to eat GE-free organic and/or conventional foods.

22. USDA's deregulation of Roundup Ready sugar beets adversely affects Sierra Club and its members, because deregulation will allow GE sugar beets to be placed in the stream of commerce without labeling, adequate environmental review, or any other limitations.

23. Plaintiff High Mowing Organic Seeds brings this action on behalf of itself. High Mowing Organic Seeds, a Vermont-based corporation, is a premier organic seed company in the U.S., supplying primarily commercial growers with 100% certified organic vegetable, flower and herb seeds. High Mowing Organic Seeds and has expanded greatly since its founding in 1996 to meet the growing demand for high quality organic seed.

24. High Mowing Organic Seeds is different from most other seed companies in several key ways: 1) it offers only 100% certified organic seeds; 2) it works directly with its seed growers to ensure genetic purity and highest quality seed; 3) it is involved in all aspects of the seed industry,

Complaint for Declaratory and Injunctive Relief                                                             5

from breeding and research and seed production, to seed cleaning, testing and distribution. Through this level of oversight and industry involvement, High Mowing Organic Seeds is able to offer the highest quality seed available.

25. High Mowing Organic Seeds distributes nine varieties of table beets and five varieties of chard. Contamination from GE sugar beets threatens the purity of these seed lines and status of these seed varieties as organic. USDA's decision to deregulate Roundup Ready sugar beets will change fundamentally the nature of the beet and chard seed industry. The environmental effects of the decision will cause economic and aesthetic injury to High Mowing Organic Seeds.

26. Defendant Charles F. Conner is the Acting Secretary of USDA and is being sued in his official capacity.

27. Defendant Cindy Smith is the Administrator for the USDA's Animal and Plant Health Inspection Service ("APHIS") and is being sued in her official capacity.

28. Defendants Conner and Smith are collectively referred to herein as USDA.

## STATUTORY BACKGROUND

*The Plant Protection Act*

29. The Plant Protection Act authorizes USDA, through APHIS, to issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States." 7 U.S.C. § 7711(a).

30. Pursuant to this authority, APHIS regulates "organisms and products altered or produced through genetic engineering that are plant pests or are believed to be plant pests." 7 C.F.R. § 340.0(a)(2), n. 1. Specifically, the regulations make it unlawful for any person to introduce without a permit any organism that has been genetically engineered from one or more enumerated organisms that are considered plant pests. 7 C.F.R. § 340.2(a).

31. Anyone may petition APHIS to de-regulate a GE crop. However, before a GE crop may be de-regulated, APHIS must review an applicant's deregulation petition and make a determination that the particular GE crop does not present a plant pest risk and should not be regulated. 7 C.F.R. § 340.6.

28. After APHIS issues a deregulation determination with respect to a GE crop, APHIS

1  claims it has no further legal authority to regulate that crop and the GE crop can be commercially
2  propagated, cultivated and sold without restriction or conditions.

### *The National Environmental Policy Act*

4  33.    NEPA is "our basic national charter for protection of the environment." 40 C.F.R.
5  § 1500.1(a). NEPA emphasizes the importance of comprehensive environmental analysis to ensure
6  that federal agencies carefully examine the environmental consequences of their actions before they
7  take such actions. The statute also ensures that the public is made aware of the environmental
8  effects of agencies' decisions, and is allowed to participate in the process of preparing
9  environmental reviews. One of NEPA's goals is to preserve and maintain "an environment which
10 supports diversity and variety of individual choice." 42 U.S.C. § 4331(a)(4).

11 34.    To help ensure that agencies make informed decisions, NEPA requires that they
12 prepare a detailed environmental impact statement ("EIS") before undertaking "major Federal
13 actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

14 35.    An agency may prepare an environmental assessment ("EA") to decide whether the
15 environmental impact of a proposed action warrants the preparation of an EIS. 40 C.F.R. § 1508.9.
16 An EA must provide sufficient evidence and analysis to determine whether an EIS or a finding of no
17 significant impact ("FONSI") should be prepared. If an agency decides not to prepare an EIS, it
18 must provide a convincing statement why a project's impacts are insignificant. If substantial
19 questions are raised about whether a project may have a significant effect on the environment, an
20 EIS must be prepared. An impact that is both beneficial and adverse may create a significant effect
21 "even if the Federal agency believes that on balance the effect will be beneficial." 40 CFR §
22 1508.27(b)(1).

23 36.    An agency must evaluate the "[u]nique characteristics of the geographic area such as
24 proximity to . . . prime farmlands." 40 CFR § 1508.27(b)(3). Moreover, if the proposed action's
25 effects are likely to be highly controversial, or are highly uncertain or involve unique or unknown
26 risks, or may be cumulatively significant, NEPA regulations provide that the action's effects should
27 be considered significant and an EIS should be prepared. 40 CFR § 1508.27(b)(4), (5), (7).

28 37.    An agency also must evaluate potential adverse economic effects that are interrelated

with natural or physical environmental effects.  40 C.F.R. § 1508.14.

## FACTUAL BACKGROUND

*Background on Sugar Beets*

38. Sugar beets are grown on approximately 1.3 million acres, with a value of $21.1 billion annually to the U.S. economy.  In 2003, the U.S. produced 30,624,000 tons of sugar beets.

39. Sugar beets are grown in temperate climates where the soil is rich and the growing season is approximately five months long.  In the U.S., sugar beets are grown in 13 states (California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Ohio, Oregon, Texas, Washington, and Wyoming) and account for a little more than half of all refined sugar produced domestically.

40. Sugar beets are grown in the Imperial Valley of California, where there occurs a related weedy species (*Beta macrocarpa*) that can cross-pollinate with sugar beets.

41. Most sugar beet seed in the United States is produced in Oregon's Willamette Valley. On information and belief, most of the sugar beet seed production during the winter of 2007-2008 will be Roundup Ready.  This sudden, broad-scale planting of GE sugar beet seed will likely cause contamination of organic seed lines of related crops such as chard and table beets.

*Deregulation of Roundup Ready Sugar Beets*

42. The Roundup Ready sugar beets at issue in this case, known as "Event H7-1," have been engineered by Monsanto and the German corporation KWS SAAT AG ("KWS") to include a gene that confers tolerance to glyphosate, the active ingredient in Monsanto's Roundup herbicide. According to APHIS, "Event H7-1 was engineered to be glyphosate tolerant by inserting a gene that codes for the enzyme 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) into the sugar beet genome.  The gene is from the common soil bacterium *Agrobacterium sp*. strain CP4 and was introduced into these sugar beets via an *Agrobacterium*- mediated transformation protocol." USDA/APHIS Environmental Assessment and Finding of No Significant Impact ("EA") at 2.

43. Because regulations adopted by APHIS pursuant to the Plant Protection Act list *Agrobacterium* as a plant pest, 7 C.F.R. § 340.2(a), Event H7-1 Roundup Ready sugar beets qualified as a "regulated article" and could not be introduced into the environment without a permit

from APHIS. 7 C.F.R. §§ 340.0(a), 340.1.

44. On November 19, 2003, APHIS received a petition from Monsanto and KWS to deregulate Event H7-1 Roundup Ready sugar beets.

45. In 1998, APHIS granted a previous petition from Monsanto to deregulate a different variety of Roundup Ready sugar beets, known as "Event GTSB77." However, Event GTSB77 sugar beets were never grown commercially.

46. On April 14, 1999, EPA increased glyphosate residue tolerance levels 125-fold, from 0.2 parts per million ("ppm") to 25 ppm for sugar beet dried pulp, and the glyphosate residue tolerance on sugar beet roots, from which the sugar is extracted, from just 0.2 to 10 parts per million (ppm). This represents a 50-fold or 5,000% increase in allowable toxic glyphosate residues on sugar beets for sugar production. 64 Fed. Reg. 18360, 18367.

47. On October 19, 2004, APHIS made available for public comment an EA for a proposed "determination of nonregulated status" with respect to the Event H7-1 Roundup Ready sugar beets at issue in this case. 69 Fed. Reg. 61466, 61467.

48. The Center for Food Safety and others submitted extensive comments on the EA. These comments raised several issues including but not limited to, biological contamination to related species, development of weeds resistant to Roundup, increased herbicide use, adverse impacts on organic production, and adverse economic impacts interrelated to the environmental impacts caused by the deregulation.

49. On March 17, 2005, APHIS announced a "Deregulation Determination and Finding of No Significant Impact" for Event H7-1 Roundup Ready sugar beets. APHIS concluded that deregulation "would not present a risk of plant pest introduction or dissemination." 70 Fed. Reg. 13007, 13008. APHIS made six findings, *inter alia*, that deregulation ". . . (3) is unlikely to increase the weediness potential of any other cultivated or wild species with which it can interbreed . . . (4) will not cause damage to raw or processed agricultural commodities; . . . and (6) should not reduce the ability to control pests and weeds in sugar beet or other crops." *Id*. According to APHIS, the effect of its deregulation determination "is that Monsanto/KWS' H7-1 sugar beet is no longer considered a regulated article under APHIS regulations in 7 CFR part 340. Therefore, the

requirements pertaining to regulated articles under those regulations no longer apply to the subject sugar beet or its progeny." *Id*.

50.     APHIS arbitrarily restricted, in a number of ways, the scope of its analysis of the environmental impacts of deregulating Event H7-1 Roundup Ready sugar beets. For example, APHIS failed to evaluate the impacts of increased use of glyphosate that predictably occurs in connection with growing glyphosate-tolerant crops. Instead, APHIS acknowledged that its EA "specifically addresses the potential for impacts to the human environment through the use in agriculture" and "does not address the separate issue of the potential use of the herbicide glyphosate in conjunction with these plants." EA at 2.

51.     The EA prepared by APHIS evaluated only three alternatives with respect to the petition: (1) a "no action" decision that would maintain the GE sugar beets as regulated articles (i.e., denying the petition in its entirely); (2) a determination that the GE sugar beets are no longer regulated. (*i.e.*, granting the petition in its entirety); and (3) a determination that the GE sugar beets are no longer regulated articles, in part, which could result in approval of the petition with geographic restrictions. *Id*. at 5-6. APHIS arbitrarily and capriciously failed to consider additional reasonable alternatives that might mitigate the adverse impacts of deregulation.

*The Effects of Deregulation*

52.     When event H7-1 Roundup Ready sugar beets were first deregulated in 2005, there was broad market rejection of the new variety. Thus, there was no commercial production of GE sugar beets following the 2005 deregulation. Recently, information became available that commercial scale planting of GE sugar beets would begin in the spring of 2008.

53.     The cultivation of Roundup Ready sugar beets will increase the use of Roundup. However, USDA, through APHIS, has not analyzed how Roundup use will increase, nor examined the corresponding environmental impacts.

54.     Herbicide tolerance develops in weeds when chemical pressure encourages gene mutations that confer herbicide tolerance. Increased glyphosate use on Roundup Ready sugar beets will result in the development of glyphosate-resistant weeds. Adoption of Roundup Ready corn and soybeans, and consequent increased use of glyphosate on those crops, has already led to weeds in

many locations having developed resistance to glyphosate. Widespread planting of Roundup Ready sugar beets will worsen this problem, especially where sugar beets are used in rotation with other Roundup Ready crops. These "super weeds" will spread to agricultural lands in the surrounding areas. However, USDA did not analyze the cumulative effects on the development of glyphosate resistant weeds caused by the commercialization of yet another Roundup-tolerant crop.

55. Increasing Roundup resistance in weeds leads to increased use of other, more toxic, persistent herbicides and increased costs to both farmers who grow the herbicide-tolerant sugar beets and those who do not.

56. The cultivation of Roundup Ready sugar beets will likely cause cross-pollination that will spread the glyphosate-tolerant genes into related weeds and crops. Because of the wide area over which beet pollen can be spread, there is an imminent and significant potential for Roundup Ready sugar beets to contaminate related weeds, in particular *Beta macrocarpa,* a sexually compatible weed found in California, including the Imperial Valley where sugar beets are grown. Such cross pollination will breed weeds that are resistant to Roundup.

57. Roundup Ready sugar beets can also cross-pollinate with non-GE sugar beets and other related crops, such as chard and table beets, thereby affecting the ability of organic farmers to cultivate crops free of genetic contamination and maintain their organic status. This threatens the ability of farmers to choose to grow related organic seeds and the ability of consumers to choose to consume food from non-GE crops. There is an imminent and significant potential for GE sugar beet seed to contaminate non-GE sugar beet seed and seed of other related crops, because sugar beet seed production is primarily concentrated in the Oregon State Willamette Valley, and because sugar beet pollen can be spread over a wide area.

58. The unregulated use of Roundup Ready sugar beets in the U.S. significantly threatens the ability of sugar beet farmers to choose to convert to growing organic sugar beets, because there will be little or no seed that is free of genetic contamination.

59. USDA's decision to deregulate Roundup Ready sugar beets allows commercial cultivation with no restrictions and inadequate environmental review. USDA failed to establish or even analyze possible rules that would require farmers who plant Roundup Ready seeds to create

refuge or buffer areas to avoid cross-pollination with neighbors' crops or surrounding weeds.

60.  Allowing unregulated commercialization of GE sugar beets will be detrimental to organic producers of related seed varieties and non-GE sugar beets for producing sugar for food use. By regulation, organic farmers must use organic seed if it is commercially available, and use of seed known to be contaminated with GE traits is prohibited. 7 C.F.R. § 205.204.

61.  Natural food consumers are wary of potential contamination from GE organisms, and will reject organic products that are contaminated with GE material. For example, food products such as chard and table beets that are contaminated by Roundup Ready sugar beets will be unattractive to organic consumers preferring GE-free foods. Also, food products containing sugar beet sugar contaminated by Roundup Ready sugar beets will be unattractive to consumers preferring foods made without genetically modified sugar. Farmers who market their products as organic and/or non-GE will be forced to test their sugar beet stocks or related seed stocks to prove their marketing claims, raising production costs. Biological contamination of conventional non-GE sugar beets, and organic and conventional related species of chard and table beets, could adversely effect market prices of these crops at potentially substantial market losses.

62.  USDA's decision to deregulate GE sugar beets may change fundamentally the nature of the sugar beets grown in the United States. Roundup Ready crops that have been deregulated by USDA have become a significant portion of the individual crops grown. For example, in 2004, a substantial portion of the corn (10.5 million acres or 13% of the total), upland cotton (4.2 million acres or 30% of the total) and soybean (63.6 million acres or 85% of the total) grown in the U.S. was genetically engineered to be herbicide-tolerant (primarily glyphosate tolerant). (EA at 9). Sugar beets currently comprise over half the U.S. sugar market. This fundamental shift to GE sugar beets could have adverse consequences on the U.S. sugar market.

63.  The introduction of Roundup Ready sugar beets will eventually contaminate many non-GE related varieties, including non-GE sugar beets, chard, and table beets. It is reasonably foreseeable that contamination from Roundup Ready sugar beets will contaminate the purity of germplasm of related species, potentially destroying these related varieties used by conventional and organic farmers and plant breeders. This may fundamentally change the nature and type of seed

varieties grown in the U.S.

64. No agency of the federal government tests GE foods for their effects on human health. For example, the FDA only reviews data voluntarily submitted by the company with the economic interest in marketing the GE product. The FDA conducted no independent tests with respect to Roundup Ready sugar beets. Thus, it is particularly important that USDA prepare an EIS analyzing in detail all the potential environmental impacts of any decision to deregulate GE sugar beets.

65. USDA failed to analyze the potential significant environmental effects that may be caused by the deregulation of Roundup Ready sugar beets. Since USDA began its regulatory program for GE crops more than ten years ago, USDA has yet to issue an EIS assessing any individual action concerning any GE crop. In response to court order, USDA is finally in the process of preparing an EIS examining the impacts of deregulating GE Roundup Ready alfalfa. Additionally, USDA is preparing an EIS for the deregulation of Roundup Ready Bentgrass. Under NEPA, USDA must prepare an EIS analyzing the potential environmental and related economic and socio-economic costs of its deregulation of Roundup Ready sugar beets, but it has failed to do so.

66. Pursuant to NEPA, USDA must prepare an EIS in connection with any deregulation of Roundup Ready sugar beets that examines, *inter alia*, the environmental and interrelated economic effects of increased use of glyphosate, increased incidence of glyphosate-resistant "super weeds," increased use of more toxic and persistent herbicides, cross-pollination and contamination of organic and conventional crops resulting from planting Roundup Ready sugar beets, and whether, how, and at what cost Roundup Ready sugar beets can be kept separate from conventional, organic sugar beets and other related varieties.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the National Environmental Policy Act
and Administrative Procedure Act)**

67. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in the preceding paragraphs.

68. USDA failed to take a hard look at the environmental effects of its decision to

deregulate Roundup Ready sugar beets, improperly narrowed the analysis that it performed in the EA, and failed to consider the broad array of deregulation's potential environmental impacts.

69. USDA failed to analyze the environmental and health consequences of the potential fundamental change in the type of sugar beet grown in the United States. More specifically, it failed to consider the environmental and related economic and socio-economic impacts of genetic contamination resulting from Round Ready sugar beets.

70. USDA further failed to take a hard look at the affect of deregulation on prime farmland, including the contamination of such farmland with GE sugar beet traits, increased application of the herbicide glyphosate, and the development of glyphosate-tolerant weeds, which will make farming on such prime farmland more difficult.

71. USDA failed to take a hard look at the significant cumulative effects of glyphosate use; the economic impacts of its deregulation determination on non-GE beet farmers, growers of non-GE and organic seeds such as chard and table beets; the potentially significant harm to threatened and endangered species and their critical habitats; the potentially significant harm to native plant species, aquatic organisms, birds, insects and other non-targets species; the alternatives other than the proposed deregulation action; and potential mitigations of the effects of deregulation.

72. The EA prepared by USDA in connection with its decision to deregulate Roundup Ready sugar beets is inadequate and flawed, and USDA's reliance on it was and is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law, and without observance of procedures required by law, in violation of NEPA and the APA.

**SECOND CLAIM FOR RELIEF**

**(Violation of the National Environmental Policy Act
and Administrative Procedure Act)**

73. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in the preceding paragraphs.

74. Each federal agency must prepare an EIS with respect to each major action of such agency that may significantly affect the quality of the human environment.

75. USDA's decision to deregulate Roundup Ready sugar beets may cause significant and reasonably foreseeable direct, indirect and cumulative environmental and related economic

impacts. For the reasons alleged, considered both individually and collectively, USDA's finding that deregulation of Roundup Ready sugar beets will have no significant impact was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, and without observance of procedures required by law, in violation of NEPA and the APA.

76. Pursuant to NEPA, USDA must prepare an EIS to address significant environmental and related economic impacts that will result from the deregulation of Roundup Ready sugar beets.

### THIRD CLAIM FOR RELIEF

**(Violation of the Plant Protection Act and Administrative Procedure Act)**

77. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in the preceding paragraphs.

78. USDA made six findings in connection with its deregulation of Roundup Ready sugar beets. USDA determined:

> that H7-1 sugar beet: (1) Exhibits no plant pathogenic properties; (2) is no more likely to become weedy than the nontransgenic parental line or other cultivated sugar beet; (3) is unlikely to increase the weediness potential of any other cultivated or wild species with which it can interbreed; (4) will not cause damage to raw or processed agricultural commodities; (5) will not harm threatened or endangered species or organisms that are beneficial to agriculture; and (6) should not reduce the ability to control pests and weeds in sugar beets or other crops.

79. USDA's decision to deregulate Roundup Ready sugar beets is unsupported by the evidence in the record and is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law, and without observance of procedures required by law, in violation of the Plant Protection Act and the APA.

### PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully request that the Court:

A. Issue a declaratory judgment that the EA prepared by USDA in connection with its decision to deregulate Roundup Ready sugar beets violated and is violating NEPA and the Administrative Procedure Act;

B. Issue a declaratory judgment that USDA's deregulation of Roundup Ready sugar beets is a major federal action that may have a significant impact on the human environment;

1  C. Issue a declaratory judgment that USDA's deregulation of Roundup Ready sugar
2  beets violated and is violating the Plant Protection Act and the Administrative Procedure Act;
3  D. Vacate USDA's decision to deregulate Roundup Ready sugar beets;
4  E. Order USDA to prepare a full EIS for any decision to deregulate Roundup Ready
5  sugar beets;
6  F. Enter appropriate preliminary and permanent injunctive relief to ensure that USDA
7  complies with NEPA, the Plant Protection Act and the Administrative Procedure Act and avoids
8  irreparable harm to the environment until such time as USDA is in full compliance with the law;
9  G. Award plaintiffs the costs of this litigation, including reasonable attorney's fees; and
10 grant such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: January 17, 2008

WILLIAM B. ROSTOV, State Bar No. 184528
KEVIN GOLDEN, State Bar No. 233378
Center for Food Safety
2601 Mission St., Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Emails: wrostov@icta; kgolden@icta.org

PAUL H. ACHITOFF (Pro Hac Vice Applicant)
Earthjustice
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: achitoff@earthjustice.org

GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

*Counsel for Plaintiffs*