1  DANIEL M. ABUHOFF (*pro hac vice* pending)
   dabuhoff@debevoise.com
2  HARRY ZIRLIN (*pro hac vice* pending)
   hzirlin@debevoise.com
3  DEBEVOISE & PLIMPTON LLP
   919 Third Avenue
4  New York, NY 10022
   Telephone:    212.909.6381
5  Facsimile:    212.909.6836

6  DANIEL MURPHY (SBN 141006)
   dmurphy@loeb.com
7  W. ALLAN EDMISTON (SBN 228246)
   aedmiston@loeb.com
8  LOEB & LOEB LLP
   10100 Santa Monica Boulevard, Suite 2200
9  Los Angeles, California 90067-4120
   Telephone:    310-282-2000
10 Facsimile:    310-282-2200

11 Attorneys for Intervenor
   BETASEED, INC.
12

13              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
14              SAN FRANCISCO DIVISION

15

16 CENTER FOR FOOD SAFETY, et al.,           )
                                             )
17         Plaintiffs,                        )   Case No.  C 08-00484 JSW
                                             )
18    vs.                                     )
                                             )
19 CHARLES CONNOR, in his official capacity   )
   as Acting Secretary of the United States  )
20 Department of Agriculture, and CINDY       )   **DECLARATION OF E. JOE  DAHMER IN**
   SMITH, in her official capacity as         )   **SUPPORT OF MOTION TO INTERVENE**
21 Administrator of the Animal and Plant Health)  **OF BETASEED, INC.**
   Inspection Service,                        )
22                                            )
           Defendants.                        )
23                                            )
                                             )
24 and·                                       )
                                             )
25                                            )
   BETASEED, INC.,                           )   Judge: The Honorable Jeffrey S. White
26                                            )
           Proposed Intervenor-Defendant.    )
27 _____  )

28

I, E. Joe Dahmer, declare:

1.    I am the president of Betaseed, Inc. ("Betaseed"), a position I have held for over seventeen years. I have personal knowledge of the matters set forth herein and if necessary could competently testify thereto.

**About Betaseed, Inc. and KWS SAAT AG**

2.    Betaseed, Inc. was founded in Minnesota in January 1970 to develop, produce, and market sugar beet seed in the United States and Canada. Betaseed is the leading company in the North American sugar beet seed industry, accounting for nearly one half of all sugar beet seed sales. Betaseed actively markets sugar beet seed in all growing regions of the United States and also sells sugar beet seed in several international markets including Canada, France, the United Kingdom, Italy, Spain, Ukraine, Russia, Syria, and Morocco. Betaseed has three research centers, a production facility, and an administrative headquarters and employs 109 full time employees and approximately 150 seasonal part-time employees.

3.    Betaseed undertakes extensive greenhouse and in-field research to develop its own varieties of sugar beets meeting the varying requirements of each growing region. These varieties are marketed directly to growers (approximately 75 percent of sales) or indirectly to growers through sugar processors (approximately 25 percent of sales) who serve as dealers for Betaseed and other sugar beet seed suppliers.

4.    Betaseed is a wholly-owned subsidiary of KWS SAAT AG (Germany) ("KWS").

5.    KWS is one of the world's leading plant breeding companies, represented in more than sixty-five countries, and has been breeding sugar beet varieties for 150 years. The KWS Group embraces more than forty subsidiaries and associate companies worldwide with more than 2,700 employees and is the largest breeder and supplier of sugar beet seed in the world.

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

**About Sugar Beets**

6.      Sugar beets (*beta vulgaris*) are grown commercially for the root, which is processed into sugar. (By contrast, crops such as corn and soybeans are actually grown for their seed, which is used for food, feed, or further processing.) They are planted in spring and harvested in the autumn of the same year. In the United States, sugar beets are grown in California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, and Wyoming.

7.      Sugar beet seed production is a specialized, separate practice from commercial production of sugar beets for sugar, and encompasses less than 0.3% of the acreage devoted to total sugar beet cultivation. United States sugar beet seed production is heavily concentrated in two states that have a particular climate conducive to successful commercial seed production, Oregon and Washington.

**Development, Deregulation, and Production of Roundup Ready Sugar Beets**

8.      KWS and Monsanto Company ("Monsanto") entered into a Research Agreement in 1988 to develop glyphosate-resistant sugar beets ("Roundup Ready sugar beets"). Glyphosate is the active ingredient in Roundup, an herbicide manufactured by Monsanto. Monsanto owns the intellectual property around the gene for glyphosate tolerance and, pursuant to a licensing agreement with Monsanto, KWS inserted that gene into sugar beets using both proprietary technical knowledge and knowledge licensed from others. The particular type of Roundup Ready sugar beet, event H7-1, was developed through the *Agrobacterium*-mediated transformation of a KWS proprietary sugar beet line. KWS then conducted field and laboratory studies to determine the molecular characteristics and the inheritance patterns of the glyphosate-resistant gene and information on growth characteristics, agronomic performance, and responses to diseases and

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

1    pests. KWS and Monsanto have continued to partner together to commercialize and seek

2    regulatory approval of Roundup Ready sugar beets.

3        9.    KWS and Monsanto petitioned the Animal and Plant Health Inspection Service

4    ("APHIS") of the United States Department of Agriculture ("USDA") to deregulate Roundup

5    Ready Sugar Beet Event H7-1 on November 17, 2003. KWS assisted in the preparation of

6    responses to questions posed by USDA scientists during the petition review. The petition was

7    granted on March 4, 2005.

8

9        10.    KWS also actively participated in preparing submissions to and obtaining approval

10   from regulatory agencies in Canada, Japan, Mexico, Russia, Australia, New Zealand, China,

11   Colombia, Philippines, South Korea, Taiwan, Singapore, Indonesia, and the European Union for

12   the sale of sugar and byproducts made from Roundup Ready sugar beets in each respective

13   country. This was an essential step to enable the United States growers and processors to export

14   Roundup Ready sugar beet products and byproducts to these countries.

15

16       11.    KWS and Betaseed have invested over $25 million researching, developing, and

17   seeking regulatory approval of Roundup Ready sugar beets over the past twenty years and

18   acquiring the intellectual property licenses necessary to sell Roundup Ready sugar beet seed in the

19   United States.

20

21       12.    The first commercial crop of Roundup Ready sugar beets was planted in the 2006

22   season. In the 2008 season, it is estimated that Roundup Ready sugar beets will be planted on

23   over 700,000 acres (nearly 60% of total United States sugar beet acreage) in Colorado, Idaho,

24   Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, and Wyoming with a predicted

25   retail value of $700 million. Demand for Roundup Ready sugar beets continues to increase.

26       13.    Between one-half and two-thirds of all United States sugar beet growers have

27   ordered Roundup Ready sugar beet seed from Betaseed for the 2008 season. These orders for

28

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

1    Roundup Ready sugar beet seed account for roughly 65% of all orders currently being filled by

2    Betaseed.

3    **Roundup Ready Sugar Beet Stewardship Practices**

4
        14.    I have been informed by counsel that plaintiffs allege that Roundup Ready sugar
5
     beets will cross-pollinate with non-Roundup Ready sugar beets and other closely related crops,
6
     including chard and table beets. Sugar beets grown for sugar production are produced from hybrid
7
8    seeds and harvested in their first year, before the plants flower and produce any pollen. Therefore,

9    the chance of cross-pollination by this crop is extremely remote. Sugar beets grown for seed are

10   subject to management practices specifically designed to eliminate cross-pollination.

11   Sugar Beets Grown for Sugar Production
12
        15.    Sugar beets do not typically flower and produce any pollen during their first year,
13
     when they are harvested for sugar production. If they have not yet flowered, there is no possibility
14
15   of cross-pollination.

16       16.    There are rare instances where individual plants in a commercial field flower

17   prematurely, known as bolting. The sugar beet industry has a long history of dealing with bolting
18
     quite apart from any concerns about gene flow because bolting decreases sugar yields, resulting in
19
     decreased income to growers. These "bolters" are easily detectable because they rise above the
20
     existing sugar beet crop, and can be cut before pollen is produced. Even if left uncut, the flowers
21
22   produce little, if any, fertile pollen because of the biological systems used to produce hybrid sugar

23   beet seed.

24       17.    Moreover, Roundup Ready sugar beet growers are required by contract to remove

25   or cut bolters. These growers must sign the Monsanto Technology Agreement ("the MTA"),
26
     which requires adherence to certain agronomic guidelines, including mandatory removal or cutting
27
     of bolters, detailed in Monsanto's Technology Use Guide ("the TUG"). A true and correct copy of
28

                                                          DECLARATION OF E. JOE DAHMER
                                                          Case No. C 08-00484 JSW

22696387v1

the relevant portions of Monsanto's 2008 TUG is attached hereto as Exhibit A. The TUG clearly specifies that "[b]olting sugarbeets must be rogued or topped in Roundup Ready sugarbeet fields." (*See* Ex. A at 47.)

18.    I have been informed by counsel that plaintiffs express concern about the cross-pollination of Roundup Ready sugar beets with a related weedy species (*Beta macrocarpa*) that is present in the Imperial Valley of California. Betaseed does not sell Roundup Ready sugar beet seed to growers in California and it is my understanding that other seed companies do not either.

Sugar Beets Grown for Seed

19.    Commercial sugar beet seed production is a specialized process in which the sugar beet plant is purposely made to flower and produce pollen. As detailed below, stewardship practices are being practiced that are designed to eliminate cross-pollination.

20.    Betaseed has a strong commercial interest in preventing the cross-pollination of its own seed crop. This is because Betaseed makes substantial investments researching and developing new varieties of sugar beets with certain characteristics that may be lost or altered if their seeds are contaminated by other varieties of sugar beets or other related plant species. The same stewardship practices that successfully prevent Betaseed's varieties of sugar beets from being pollinated by another grower's varieties will likewise prevent other growers' varieties from being pollinated by Betaseed's varieties. Betaseed has a thirty-five year history of successfully managing gene flow and avoiding cross-pollination.

21.    The primary method to prevent the cross-pollination of seed production fields is the use of isolation distances between fields. Isolation guidelines have been developed through the cooperative efforts of seed companies, growers, state university extension agencies, and state seed certifying agencies and have been implemented in both of the regions where Betaseed produces sugar beet seed. A true and correct copy of the Isolation Guidelines of the Willamette Valley

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

Specialty Seed Association ("WVSSA") in Oregon, of which Betaseed is a founding member, is attached hereto as Exhibit B. A true and correct copy of the Isolation Guidelines of the Columbia Basin Vegetable Seed Association in Washington is attached hereto as Exhibit C.

22.     Betaseed goes one step further, requiring its growers to maintain isolation distances even more rigorous than those established by the Isolation Guidelines of seed associations. By contract, growers of Roundup Ready sugar beet seed for Betaseed in both the Willamette Valley and Columbia Basin must maintain isolation distances of four miles instead of three. True and correct copies of Betaseed's Sugarbeet Seed Growing Contracts for Oregon and Washington are attached hereto as Exhibits D and E.

23.     To give effect to isolation guidelines, growers use a process of "pinning." Pinning involves marking the location and type of a seed crop on a map so that appropriate isolation distances can be calculated and other growers are aware of what has been planted. A true and correct copy of the WVSSA Pinning Rules and photographs of the north and south Oregon pinning maps are attached hereto as Exhibits F and G. Betaseed's Growing Contracts require growers to "pin" in accordance with the specifications mandated by the respective seed associations.

24.     Betaseed has been harvesting sugar beet seed in Oregon and Washington for over thirty years. To my knowledge, Betaseed has never received a single complaint from a vegetable seed grower about cross-pollination by a sugar beet seed field.

**Inability to Supply Non-Roundup Ready Sugar Beet Seed for 2008**

25.     If growers were prevented from selling their 2008 crop of Roundup Ready sugar beets, there would not be enough time for Betaseed to process and deliver non-Roundup Ready sugar beet seed to them in time for the 2008 growing season.

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

26.     The following steps must be taken before sugar beet seed can be shipped to a grower.  First, Betaseed must coordinate with each grower as to what type of seed they require. Betaseed has different varieties of seed that produce sugar beet plants with unique disease and insect tolerances suitable to different growing areas.  It also has different sizes of seed compatible with various planting equipment used by growers.  Ordinarily, it takes Betaseed roughly eight to ten weeks to take orders from each grower.  If done as quickly as possible, it would likely take at least three to four weeks.

27.     Second, the seed must be processed, which includes removing most of the "cork" outer layer, separating out seeds that have no or poorly developed embryos, separating out the very large and very small seeds that are not plantable by mechanical equipment because of size, and separating the remaining seeds into narrow size ranges.

28.     Third, a coating of inert material is added to the seed to make the seed somewhat spherical so that it will flow easily and be plantable by mechanical equipment.  The coating also is a carrier of fungicides and insecticides necessary to protect the seed and resulting plant from certain diseases and insects.

29.     Fourth, much of the seed must be primed, which means that the seed goes through a procedure that starts the germination process.  Priming is requested by growers because it promotes faster emergence of a plant from the ground.  Emergence of the plant from the soil is a major challenge in sugar beet production, and speed of emergence is an important consideration by the grower when choosing what variety of sugar beet to plant.

30.     Betaseed's quality assurance tests further add to the time required to complete the steps detailed above.  Not infrequently, a seed lot will need to go through a certain step more than once before it meets Betaseed's standards of quality.  Moreover, a final quality test is run after the

1    seed is packaged in boxes for shipment to growers.  This final quality test can take up to ten days

2    or more from sampling until results are known and the seed can be released for shipment.

3        31.    When Betaseed's production facility is operating at capacity, it takes approximately

4    sixty days from the time processing begins on a seed lot until the results of the final quality

5

6    assurance test are known and the seed lot can be released for shipment.

7        32.    Betaseed worked over six straight months to be ready to ship seed to growers for

8    the 2008 season.  The first shipments by Betaseed of Roundup Ready sugar beet seed for planting

9    in 2008 were made in early February 2008, and nearly all shipments will be delivered to growers

10   by April 10, 2008.  Growers began planting this seed in early March and, weather permitting, most

11   Roundup Ready sugar beet seed will be planted by late April to early May.

12

13       33.    Any disruption this late in the 2008 growing season will have devastating economic

14   consequences for Betaseed, KWS, and the sugar beet industry.

15   **Inability to Supply Non-Roundup Ready Sugar Beet Seed for 2009**

16       34.    An injunction against planting Roundup Ready sugar beet seed would also be

17   harmful to Betaseed because it would have inadequate non-Roundup Ready sugar beet seed

18   available for the 2009 growing season.

19

20       35.    Producing sugar beet seed is a two year process.  The parent seed that will produce

21   the sugar beet seed crop for the 2009 season was planted in autumn 2007.  Over 90% of this 2009

22   seed crop will be Roundup Ready, leaving less than 10% of the seed crop available for sale to

23   growers should growers be prevented by the Court from planting Roundup Ready sugar beet seed.

24       36.    Betaseed can try to mitigate its damages by offering seed from its current

25   inventory, but the seed available will be inadequate for two reasons.  First, the quantity of seeds

26   available with the correct properties (e.g. disease and insect tolerance; size; agronomic fit) would

27   be insufficient to meet growers' needs.  Second, seeds two years of age or older are generally of

28

9

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

1  lower quality because of their age, and seed currently in inventory, although of satisfactory quality

2  now, may not be marketable when it is needed by the growers one year from now.

3          37.    If Betaseed were not permitted to sell Roundup Ready sugar beet seed in 2009, it

4  estimates that its lost income would be $21 to $25 million.

5  **Unavailability of Roundup Ready Sugar Beet Seed for 2010**

6

7          38.    The parent seed that will produce the sugar beet seed crop for the 2010 season will

8  be planted from July to September 2008. To meet growing demand, Betaseed intends to plant

9  parent seed for the 2010 growing season that is almost entirely Roundup Ready.

10         39.    If Betaseed were enjoined from planting Roundup Ready sugar beet seed in 2008

11 for seed production, it would have insufficient Roundup Ready sugar beet seed available for the

12 2010 growing season. Growers would not have the option to plant Roundup Ready sugar beet

13

14 seed in the quantities demanded even if the injunction were lifted before the 2010 growing season.

15         40.    If an injunction were to issue subsequent to the planting of Roundup Ready sugar

16 beet seed in 2008 for seed production, but still be in effect for the 2010 growing season, then

17 Betaseed would have almost no new seed crop for growers in 2010. Betaseed would have to use

18 carryover inventory that, having aged another year, would be of even poorer quality and less likely

19

20 to meet the demands of growers.

21

22         I declare under penalty of perjury under the laws of the State of California and the United

23 States of America that the foregoing is true and correct. Executed this 4th day of April 2008 at

24 Shakopee, Minnesota.

25

26

27 E. Joe Dahmer

28

10

DECLARATION OF E. JOE DAHMER
Case No. C 08-00484 JSW

22696387v1

# Exhibit A





MONSANTO
imagine



# 2008

TECHNOLOGY
USE GUIDE









MONSANTO

# Introduction

This 2008 Technology Use Guide (TUG) provides a concise source of technical information about Monsanto's current portfolio of technology products, and sets forth the requirements and guidelines for the use of these products. As a user of Monsanto Technology, it is important that you are familiar with and follow certain management practices. Please read all of the information pertaining to the technology you will be using, including stewardship and related information.

This technical bulletin is not a pesticide product label. It is intended to provide additional information and to highlight approved uses from the product labeling. Read and follow all precautions and use instructions in the label booklet and separately published supplemental labeling for the Roundup® agricultural herbicide product you are using.

| Included in this guide is information on the following: | Pages |
| --- | --- |
| Stewardship Overview | 1-2 |
| Insect Resistance Management and Monitoring Program | 3 |
| Weed Resistance Management | 4 |
| Corn Grain Stewardship | 5-6 |
| Coexistence and Identity Preserved Production | 7-8 |
| YieldGard® and YieldGard VT™ Insect-Protected Corn Family | 9-10 |
| YieldGard Corn Borer Corn Refuge Requirements | 11-12 |
| YieldGard Rootworm and YieldGard VT Rootworm/RR2™ Corn Refuge Requirements | 13-14 |
| YieldGard Plus and YieldGard VT Triple™ Corn Refuge Requirements and Configuration Options | 15-16 |
| YieldGard Corn Refuge Requirements Summary | 17 |
| YieldGard Corn Borer with Roundup Ready® Corn 2 | 18 |
| YieldGard Rootworm with Roundup Ready Corn 2 | 18 |
| YieldGard VT Rootworm/RR2 | 18 |
| YieldGard Plus with Roundup Ready Corn 2 | 18 |
| YieldGard VT Triple | 19 |
| Roundup Ready Corn 2 | 19-22 |
| Bollgard® and Bollgard II® Cotton | 23-24 |
| Bollgard and Bollgard II Cotton IRM Configurations | 25-26 |
| Bollgard with Roundup Ready Cotton and Bollgard II with Roundup Ready Cotton | 27 |
| Roundup Ready Cotton | 28-30 |
| Roundup Ready Flex Cotton | 31-34 |
| Bollgard II with Roundup Ready Flex Cotton | 35 |
| Roundup Ready Soybeans | 36-39 |
| Roundup Ready Alfalfa | 40-42 |
| Roundup Ready Spring Canola | 43-44 |
| Roundup Ready Winter Canola | 45-46 |
| Roundup Ready Sugarbeets | 47-49 |

If you have any questions, contact your Authorized Retailer or Monsanto at 1-800-ROUNDUP.



▣ Plains
▣ California/Arizona/Florida
▣ North Central
■ Southern

To help you find information quickly each listing in the table of contents is a link to that section within the TUG.



# STEWARDSHIP OVERVIEW

## A Message About Stewardship

### SEED AND TRAITS

Monsanto Company is committed to enhancing grower productivity and profitability through the introduction of new modern agricultural biotechnology seed trait technologies (traits). These new technologies bring enhanced value and benefits to growers, and growers assume new responsibilities for proper management of those traits. Growers planting seed with biotech traits agree to implement good stewardship practices, including, but not limited to:

- Reading and signing a Monsanto Technology/Stewardship Agreement (MTSA) and reading all annual license terms updates before purchase or use of any seed containing a trait. Growers must sign their own Stewardship Agreement.
- Reading and following the directions for use on all product labels and following applicable stewardship practices as outlined in this TUG and IRM guides.
  - Observing regional planting restrictions such as those for Bollgard® or Bollgard II® in certain Texas counties, South Florida, Hawaii, Puerto Rico and the U.S. Virgin Islands.
  - Comply with any additional stewardship requirements, such as grain or feed use agreements or geographical planting restrictions, that Monsanto deems appropriate or necessary to implement for proper stewardship or regulator compliance.
- Following the Weed Resistance Management Guidelines to minimize the risk of resistance development.
- Complying with the applicable Insect Resistance Management (IRM) practices for specific biotech traits as *mandated* by the Environmental Protection Agency (EPA) and set forth in this TUG.
- Utilizing all seed with biotech traits for planting a single crop.
- Selling harvested corn with biotech traits not yet fully approved by the European Union (E.U.) to grain handlers that confirm their acceptance, or using that grain as on-farm feed.
- Not moving material containing biotech traits across boundaries into nations where import is not permitted.
- Not selling, promoting and/or distributing within a state where the product is not yet registered.

If you have questions about seed stewardship or become aware of individuals utilizing biotech traits in a manner other than as noted above, please call 1-800-768-6387. Letters reporting unacceptable or unauthorized use of biotech traits may be sent to:

Monsanto Trait Stewardship
800 N. Lindbergh Boulevard C3ND
St. Louis, MO 63167

Provide confidential or anonymous reports as below:

"Anonymous" reporting results when a person reports information to Monsanto in such a way that the identity of the person reporting the information cannot be identified. This kind of reporting includes telephone calls requesting anonymity and unsigned letters.

"Confidential" reporting results when a person reports information to Monsanto in such a way that the reporting person's identity is known to Monsanto. Every effort will be made to protect a person's identity, but it is important to understand that a court may order Monsanto to reveal the identity of people who are "known" to have supplied relevant information.

### TECHNOLOGY/STEWARDSHIP AGREEMENT

Growers who purchase Monsanto's traited seed for planting are required to execute an MTSA and are required to refer to Monsanto's current TUG for information on crop stewardship.

Weed control recommendations as of 5/11/07.
For subsequent updates, refer to www.cdms.net or www.greenbook.net or contact your local Monsanto representative.

< RETURN TO TABLE OF CONTENTS

# STEWARDSHIP OVERVIEW

## Why is Stewardship Important?

Each component of stewardship offers benefits to growers:

- Signing an MTSA provides growers access to Monsanto's biotech-trait seed technology.
- Following IRM guidelines guards against insect resistance to *B.t.* technology and therefore enables the long-term viability of this technology, and meets EPA requirements.
- Good grain and processed products stewardship helps to preserve a continuous open export market for U.S. grain products.
- Proper weed management maintains the long-term effectiveness of glyphosate-based weed control solutions.
- Utilizing biotech seed only for planting a single-commercial crop allows investment for future biotech innovations which will even further improve farming technology.

Practicing these stewardship activities will enable biotechnology's positive agricultural contributions to continue.

Since 1996, biotech crops have delivered over a decade of environmental and economic benefits to both growers and consumers.

Biotech crops have:

- Been grown by millions of growers on more than one billion acres worldwide.
- Reduced pesticide applications equivalent to a 15 mile-long train of railcars filled with pesticide active ingredient*.
- Been instrumental in the adoption of no-till or reduced tillage practices—saving billions of tons of topsoil, 465 million gallons of diesel fuel, and reducing greenhouse gas emissions equivalent to removing nearly 5 million cars from the road for one year.
- Increased net farm income for U.S. farmers by $10.8 billion through reduced costs and/or higher yields.
- Been included as ingredients in more than one trillion meals.
- Zero scientifically-documented, negative health effects.

To learn more, go to: www.biotech-gmo.com.

Growers' attitudes and adoption of sound stewardship principles, coupled with biotechnology benefits, provide for the sustainability of our land resources, biotechnology and farming as a preferred way of life.



*Pesticides registered by the U.S. EPA will not cause unreasonable adverse effects to man or the environment when used in accordance with label directions.



# Roundup Ready Sugarbeets



## PRODUCT DESCRIPTION

Roundup Ready Sugarbeet varieties have in-plant tolerance to Roundup agricultural herbicides, enabling growers to apply labeled Roundup agricultural herbicides from planting through 30 days prior to harvest for unsurpassed weed control, excellent crop safety, and preservation of yield potential.

## ROUNDUP AGRICULTURAL OVER-THE-TOP HERBICIDE PRODUCTS

Herbicide products sold by Monsanto for use over the top of Roundup Ready Sugarbeets for the 2008 crop season are as follows:

• Roundup WeatherMAX
• Roundup Original MAX
• Other labeled Roundup branded agricultural herbicides

Certain Roundup agricultural herbicides referred to above may not be labeled for this application in your specific state. Please contact the manufacturer of this product, the local retailer, or the local extension agent for confirmation that this is an approved application.

For complete information about the use of Roundup agricultural herbicides over the top of Roundup Ready Sugarbeets, refer to the appropriate Monsanto product label booklet, or to supplemental labeling or fact sheets published separately by Monsanto. To learn more about applicable supplemental labels or fact sheets, call 1-800-ROUNDUP.

Tank-mixtures of Roundup agricultural herbicides with insecticides, fungicides, micronutrients or foliar fertilizers are not recommended as they may result in reduced weed control, crop injury, reduced pest control or antagonism. Refer to the Roundup agricultural herbicide product label, supplemental labeling, or fact sheets published separately by Monsanto for tank-mix recommendations.

Sugarbeets are very sensitive to herbicide injury from phenoxy and other classes of herbicides. It is important to follow recommendations found on the herbicide product labels for cleaning spray tanks prior to adding Roundup agricultural herbicides to them.

You may use another glyphosate herbicide, but only if it has federally approved label instructions for use over Roundup Ready Sugarbeets, and the product and the use label for Roundup Ready Sugarbeets have been approved by your specific state. Contact the product manufacturers, the local retailers, or the local extension agents for confirmation that the products carry EPA and state approved labeling for this use. MONSANTO DOES NOT MAKE ANY REPRESENTATIONS, WARRANTIES OR RECOMMENDATIONS CONCERNING THE USE OF GLYPHOSATE PRODUCTS SUPPLIED BY OTHER COMPANIES THAT ARE LABELED FOR USE OVER ROUNDUP READY SUGARBEETS. MONSANTO SPECIFICALLY DENIES ALL RESPONSIBILITY AND DISCLAIMS ANY LIABILITY FOR ANY DAMAGE FROM THE USE OF THESE PRODUCTS IN ROUNDUP READY SUGARBEETS. ALL QUESTIONS AND COMPLAINTS CAUSED BY THE USE OF GLYPHOSATE PRODUCTS SUPPLIED BY OTHER COMPANIES SHOULD BE DIRECTED TO THE SUPPLIER OF THE PRODUCT IN QUESTION.

## MANAGEMENT PRACTICES

Sugarbeets are extremely sensitive to weed competition for light, nutrients and soil moisture. Research on sugarbeet weed control suggests that sugarbeets need to be kept weed-free for the first eight weeks of growth to protect yield potential. Therefore, weeds must be controlled when they are small and before they compete with Roundup Ready Sugarbeets, that is 2" to 4" in height, to preserve sugarbeet yield potential. *More than one in-crop herbicide application will be required* to control weed infestations to protect yield potential as Roundup agricultural herbicides have no soil residual activity. Bolting sugarbeets must be rogued or topped in Roundup Ready Sugarbeet fields.

Roundup Ready Sugarbeet varieties have excellent tolerance to over-the-top applications of labeled Roundup agricultural herbicides. A postemergence weed control program using Roundup WeatherMAX or Roundup Original MAX will provide excellent weed control in most situations. A residual herbicide labeled for use in sugarbeet may also be applied preemergence, preplant, or postemergence in Roundup Ready Sugarbeets. Contact a Monsanto Representative, local crop advisor, or extension specialist to determine the best option for your situation.

15

## *Roundup Ready® Sugarbeets*



### WEED RESISTANCE MANAGEMENT FOR ROUNDUP READY SUGARBEETS

Follow the guidelines below to minimize the risk of developing glyphosate-resistant weed populations in a Roundup Ready® Sugarbeet system.

- Start clean with tillage and follow up with a burndown herbicide, such as Roundup® agricultural herbicides, if needed prior to planting.
- Early season weed control is critical to protect sugarbeet yield potential. Apply the first in-crop application of Roundup WeatherMAX® at a minimum of 22 oz/acre while weeds are less than 2" in height.
- Follow with additional postemergence in-crop application of Roundup WeatherMAX at a minimum of 22 oz/acre for additional weed flushes before they exceed 4" in height.

- Always add spray grade ammonium sulfate at a rate of 17 lbs/100 gallons of spray solution with Roundup agricultural herbicides to maximize product performance.
- Use mechanical weed control/cultivation and/or residual herbicides where appropriate in your Roundup Ready Sugarbeets.
- Use additional herbicide modes of action/residual herbicides and/or mechanical weed control in other Roundup Ready crops you rotate with Roundup Ready Sugarbeets.
- Report repeated non-performance of Roundup agricultural herbicides to Monsanto or your local retailer.

### AGRONOMIC PRINCIPLES IN SUGARBEETS

Sugarbeet yield is very sensitive to early season weed competition. It is important to select the appropriate herbicide product, application rate and timing to minimize weed competition to protect yields. The Roundup Ready Sugarbeet system provides a mechanism to control weeds at planting and once Roundup Ready Sugarbeets emerge. Failure to control weeds with the right rate, at the right time, and with the right product, can lead to increased weed competition, weed escapes, and the potential for decreased yields. Tank-mixtures of Roundup agricultural herbicides with fungicides, insecticides, micronutrients or foliar fertilizers may result in crop injury and reduced pest control or antagonism and are not recommended.



In certain areas, populations of ryegrass, marestail, common ragweed, giant ragweed and waterhemp are known to be resistant to glyphosate. For control recommendations for resistant biotypes of these weeds, refer to www.weedresistancemanagement.com or call 1-800-ROUNDUP. When approved, supplemental labeling for specific herbicide products can also be viewed on www.cdms.net or www.greenbook.net.



*Roundup Ready Sugarbeets*



WEED CONTROL RECOMMENDATIONS

| PROGRAM | INSTRUCTIONS AND USE RATES | ADDITIONAL INFORMATION |
|---------|---------------------------|------------------------|
| Preplant Burndown | After preplant tillage or bedding operations have been completed, a preplant burndown application of Roundup WeatherMAX at 22 to 44 oz/acre may be applied to control weeds that have germinated after tillage and prior to planting.<br><br>See the label for appropriate rates by weed species and weed size. | Always utilize tillage to start with a weed-free field. |
| Over-The-Top Applications up to eight-leaf Roundup Ready Sugarbeet | Up to two applications of Roundup agricultural herbicides may be made prior to the 8-leaf stage of Roundup Ready Sugarbeets.<br><br>The first application of 22 to 32 oz/acre of Roundup WeatherMAX should be made when weeds are less than 2" in height to protect yield potential.<br><br>Make an additional application of 22 to 32 oz/acre of Roundup WeatherMAX before weeds exceed 4" in height.<br><br>Maximum in-crop Roundup WeatherMAX prior to 8-leaf stage *must not exceed* 56 oz/acre. | Sugarbeets are sensitive to weed competition and can lose yield rapidly if weeds are not controlled early. More than one in-crop Roundup WeatherMAX application will be required to control weed infestations to protect yield potential as Roundup agricultural herbicides have no soil residual activity.<br><br>Always add ammonium sulfate at a rate of 17 lbs/100 gallons of spray solution with Roundup agricultural herbicides to maximize product performance. Tank-mixtures of Roundup agricultural herbicides with fungicides, insecticides, micronutrients or foliar fertilizers are not recommended.<br><br>Sequential applications should be at least 7 days apart. |
| Over-The-Top Applications to greater than eight-leaf Roundup Ready Sugarbeets | Up to two additional applications of 22 oz/acre of Roundup WeatherMAX can be made after the eight-leaf stage up to 30 days prior to harvest.<br><br>Maximum in-crop Roundup WeatherMAX from 8-leaf stage up until 30 days prior to harvest must not exceed 44 oz/acre. | Always add ammonium sulfate at a rate of 17 lbs/100 gallons of spray solution with Roundup agricultural herbicides to maximize product performance. Tank-mixtures of Roundup agricultural herbicides with fungicides, insecticides, micronutrients or foliar fertilizers are not recommended.<br><br>Sequential applications should be at least 7 days apart. |
| Maximum Use Rates | In-Crop:<br>• Two applications of Roundup WeatherMAX prior to the 8-leaf stage of Roundup Ready Sugarbeets<br>  - 32 oz/acre per single application up to the 8-leaf stage.<br>  - Combined maximum of 56 oz/acre in-crop prior to the 8-leaf stage<br>• Two applications of Roundup WeatherMAX after the 8-leaf stage up to 30 days prior to harvest<br>  - 22 oz/acre per single application after the 8-leaf stage.<br>  - Combined maximum of 44 oz/acre in-crop after the 8-leaf stage until 30 days prior to harvest | Total Per Year:<br>The combined total per year for all Roundup WeatherMAX applications including pre-plant must not exceed 5.3 qt/acre.<br><br>Total in-crop application must not exceed 3 qt/acre.<br><br>Always add ammonium sulfate at a rate of 17 lbs/100 gallons of spray solution with Roundup agricultural herbicides to maximize product performance. Tank-mixtures of Roundup agricultural herbicides with fungicides, insecticides, micronutrients or foliar fertilizers are not recommended. |

*If using another Roundup agricultural herbicide, you must refer to the label booklet or separately published Roundup Ready Sugarbeets supplemental label for that brand to determine appropriate use rates. If using Roundup Original MAX , application rates are the same as for Roundup WeatherMAX

17

# Exhibit B

Version 04, 7/2007

# WVSSA
## Specialty seed Production
### Isolation Guidelines

**Beta species (Beets and Swiss chard)**
      **Four Separate Groups: Sugar beets, Table beets, Fodder beets, Swiss chard**

| | |
|---|---|
| Between one O.P. and another of the same color and group | 1 mile |
| Between Hybrid of the same color and group | 1 mile |
| Between Hybrid and O.P. of the same color and group | 2 mile |
| Between different colors within a group | 3 mile |
| Between stock-seed and a Hybrid within a group | 2 mile |
| Between stock-seed and O.P. within a group | 3 mile |
| Between Hybrids of different groups | 3 mile |
| Between Hybrid and O.P. of different groups | 4 mile |
| | |
| Between GMO's and any other Beta species no closer than | 3 mile |
|     (And is excluded from exception to lessen this distance) | |

**Brassica species (Fall types – 9 chromosomes)**
    Includes; Cabbage, Kale, Kohlrabi, Brussel Sprouts, etc.

| | |
|---|---|
| Between O.P. of the same color and group | 1 mile |
| Between O.P. of different color | 2 mile |
| Between O.P. cabbage and non-heading cultivars | 2 mile |
|     (Savoy, Kale, Brussel Sprouts, Collards and Cauliflower) | |
| | |
| Between Hybrids and Hybrids and O.P. of the same color and group | 2 mile |
| Between Hybrids and O.P. of different colors or group | 3 mile |
| Between Hybrid cabbage and non-heading cultivars | 3 mile |

**Brassica species (Spring types – 6 groups)**

1 Turnip types – 10 chromosomes (Japanese type, purple top, strap leaf, Shogoin)
2 Chinese Mustard types – 10 chromosomes (komatsuna, mizuna, mibuna, tatsoi)
3 Chinese Cabbage types – 10 chromosomes (heading, semi-heading, non-heading)
4 Pak Choi types – 10 chromosomes
5 Choi Sum types – 10 chromosomes
6 Indian Mustard types – 18 chromosomes (Florida broadleaf, southern giant curled,
              red mustard, Chinese mustard, leaf mustard)

SPECIAL ATTENTION MUST BE PAID TO THESE CROPS AS THERE IS A VERY WIDE
RANGE OF PHENOTYPES THAT CAN CROSS. IF THERE IS ANY DOUBT, CHECK
WITH THE OTHER COMPANY REP. BEFORE PINNING & PLANTING.

| | |
|---|---|
| Between any 10 chromosome and any 18 chromosome types | Physical separation |
| Between O.P. of the same group | 1 mile |
| Between O.P. of different groups | 1.5 mile |
| Between Hybrids or Hybrids and O.P. of same group and phenotype | 2 mile |
| Between Hybrids of different groups or phenotype | 2.5 mile |
| Between Hybrids and O.P. of different groups or phenotype | 3 mile |

18

Version 04, 7/2007

## Brassica species Canola

Must be grown under permit from Oregon Department of Agriculture
GMO type Canola or Rapeseed is not allowed to be grown.

Between any other specialty seed crops                           3 mile

## Allium cepa species (Onion)
Male parent used to pin hybrids

**Onion Hybrid**
Between Hybrid and O.P. of different color                       3 mile
Between Hybrid and O.P. of same color, different shape           2 mile
Between Hybrid and O.P. of same color, shape and type            2 mile
Between Hybrid of same color, shape and type                     1 mile

**Onions Open Pollinated**
Between Hybrid and O.P. of different color or shape              3 mile
Between O.P. of different color                                  3 mile
Between O.P. of same color, but different shape                  2 mile
Between Hybrid of same color and shape                           2 mile
Between O.P. of same color, type and shape                       1 mile

## Allium fistulosum species (Bunching Onions)

Between another variety of fistulosum                            1 mile

## Allium porrum or ampleoprasum species (Leek)

Between another variety of Leek                                  2 mile

## Allium other species (Chives)                                 no distance

## Umbelliferous other species (Parsley, Dill, Parsnips, etc.)

Between same types                                               1 mile
Between Hybrid and O.P. of similar types                         2 mile
Between different types                                          3 mile

## Rhaphanus sativus species (Radish)

Between O.P. varieties of same color and or shape                1 mile
Between Hybrids or Hybrid and O.P. type                          2 mile
Between Hybrid and O.P. of different colors and or shape          3 mile
Between Red globes or from White tip type                        1 mile
Between Long Red from any other Red type                         2 mile
Between Any Red from any other White type                        3 mile

19

Version 04, 7/2007

**Spinacia species (Spinach)**
      Male parent used to pin hybrids

| | |
|---|---|
| Between O.P. of the same leaf shape type | 1 mile |
| Between O.P. of different leaf shape type | 3 mile |
| Between Hybrid and O.P. type | 3 mile |

**Cichorium intybus (Chicory)**
      **Includes: raddichio, chicory, whitloof, fodder, root**

| | |
|---|---|
| Between O.P. type or endiva species | 1 mile |
| Between Hybrids or Hybrid and O.P. type | 2 mile |

**Cichorium endiva (Endive)**
      **Includes: endive, escarole, frizze**

| | |
|---|---|
| Between O.P. type or intybus species | 1 mile |

**Cucumis sativus (Cucumber)**
      **Types: Slicer, Pickle, White spine, Black spine, Beta alpha.**

| | |
|---|---|
| Between O.P. of the same type | 1 mile |
| Between O.P. of different type or spine color | 2 mile |
| Between Hybrid and O.P. type | 3 mile |
| Between Hybrid of different type or spine color | 3 mile |

**Cucurbita species (Squash)**
      **Includes: pepo, moshchata, mixta, maxima**

| | |
|---|---|
| Between Similar types, shape and color | 1 mile |
| Between Same or Different species | 1 mile |
| Between another Hybrid of similar variety | 1 mile |
| Between Hybrid and O.P. of similar type and shape | 1.5 mile |
| Between O.P. or Hybrid of different type, shape or color | 2 mile |

**Flowers**

| | |
|---|---|
| All Flowers need to be pinned | |
| Between ones that cross pollinate | 1 mile |

      Includes: Chrysanthemums, Sunflowers, Helianthus, Poppies, etc.
Multiple non-crossing flowers at one location can be pinned with one pin denoting flowers
      Consult company representatives on general pinned flower locations

**All other seed crops need to be pinned.**

For isolation distances consult company representatives

# Exhibit C

# COLUMBIA BASIN VEGETABLE SEED FIELD ISOLATION DATES[1]

With a valid "release"[2] vegetable seed company representatives may reserve fields for vegetable seed production as follows:

| | |
|---|---|
| Annuals and carryover onions[3] | February 1 or closest weekday thereafter |
| Onion and other biennials (except carrots) | March 1 or closest weekday thereafter |
| Carrots and fall planted annuals | June 1 or closest weekday thereafter |

*Sugar Beets* (handwritten annotation)

---

1. These dates for crops are as per agreement at the January 21, 2005 meeting of the Columbia Basin Vegetable Seed Field Representatives Association.

2. A release must include the production company, crop and crop year for placement in Columbia Basin production and either the number of fields or number of acres.

3. Carryover onion corps may be repined with priority between February 1 and March 1, after which priority is lost.

Revised 01/05

21

Sent By: QAL;                          5097874966;              Dec-20-07  5:44PM;              Page 3

# COLUMBIA BASIN VEGETABLE SEED FIELD ISOLATION STANDARDS*

## All genetically modified crops will be designated as GMO

### CARROT FAMILY (Apiaceae)

**CARROT** (Pinned by Group and Type)

Groups:  Hybrid and Open Pollinated

Types:   Chantenay (Danvers, Red Cored, Royal, etc.)
         American Market (Imperator, etc.)
         Early (Amsterdam, Baby Carrot, etc.)
         Medium (Nantes, etc.)
         Late (Flakkee, Berlicum, etc.)
         Round and Odd Shapes (Paris Forcing, etc.)
         Oriental (Usually short Chantenay shape)

Distance: Between Hybrids .......................................................................2 miles
         Between Hybrids and Open Pollinated ........................................2 miles ▲
         Between Types within Groups ....................................................1 mile
         Between Varieties of same Type ................................................½ mile
         Between same Varieties for different companies........................¼ mile

Off-color carrots should be grown outside main production area and pinned by color with a minimum isolation distance of 5 miles from other colors.

▲ Note: A 3 mile isolation will be permitted between Hybrid and Open Pollinated carrots where requested.

**PARSLEY**    Between all types and varieties............................1 mile

**CORIANDER** (cilantro or Chinese parsley) Between all types and varieties...............½ mile

### MUSTARD FAMILY (Cruciferae)

**RADISH** (Pinned by Group and/or Type... Understood to be O.P. unless otherwise noted)

Groups:  Hybrid and Open Pollinated

Types:   Round Red
         Round Red Forcing
         Crimson Giant
         Round Red White Tip
         Half Long White Tip
         Long Red
         Icicle (and related forms)
         Round White
         Purple
         Black
         Other
         Daikon (assumed to be white rooting type unless specified)
         Daikon, Sprouting
         Daikon, Red
         Daikon, Green

Distance:  Between Hybrid and Open Pollinated .........................................2 miles ▲
          Between any red Type and any white Type ................................2 miles
          Between any round white, Icicle Type, purple,
          black or any Daikon Types and any other radish..........................2 miles
          Between Round Red, Crimson Giant, Long Red,
          round Red White Tip and Half Long White Tip ............................1 mile

Between Daikon, Sprouting and any other Daikon
of same color
Between Round Red and Round-Red Forcing...............................................................½ mile
Between Round Red varieties...................................................................................½ mile
(unless negotiated between companies)

**RAPESEED**

Canola and other Oilseed types.............................................................................3 miles

Genetically modified Canola and other Oilseed types will be designated as GMO

**OTHER CRUCIFERS**    (Pinned by crop name and chromosome number)

All Groups or Types.................................................................................................2 miles

# ONION FAMILY (Alliaceae)

**ONION**    (Pinned by Group and Type)

*(Allium cepa)*

Groups: Hybrid and Open Pollinated

<u>Hybrid:</u>  (Should be posted as male parent)
From Hybrid or O.P. of different color .....................................................................3 miles
From Hybrid or O.P. of same color, but different shape ..........................................2 miles
      (i.e. Globe vs. Flat)
From O.P. of same color and shape ........................................................................2 miles
From Hybrid of same color, but different shape ......................................................2 miles
From Hybrid of same color, shape and Type............................................................1 mile
      (i.e. Yellow Spanish vs. Yellow Spanish)
From *Allium fistulosum*, Chives, or Leek .................................................................None

<u>Open Pollinated</u>
From Hybrid or O.P. of different color or shape ......................................................3 miles
From O.P. of same color, but different shape ..........................................................2 miles
      (i.e. Yellow Globe vs. Yellow Ebenezer)
From Hybrid of same color and shape .....................................................................2 miles
From O.P. of same color, but different Type............................................................1½ miles
      (i.e. Yellow Spanish vs. Yellow Globe)
From O.P. of same color, Type, and shape .............................................................1 mile
      (i.e. Yellow Spanish vs. Yellow Spanish)
From *Allium fistulosum*, Chives, or Leek .................................................................None

*(Allium fistulosum)*

<u>Open Pollinated:</u>
From *Allium cepa*, Chives or Leek .........................................................................None
From another variety of *Allium fistulosum* .............................................................1 mile
      (i.e. Tokyo Long White vs. He-Shi-Ko)

<u>Hybrid</u>
From any O.P. or Hybrid *A. fistulosum* ..................................................................2 miles

*(Allium cepa-fistulosum cross)* CFC
      tetraploid double chromosome

<u>Open Pollinated:</u>
From *Allium cepa* or *Allium fistulosum* of the same color ...................................None
From *Allium cepa* or *Allium fistulosum* of a different color .................................None
From another variety of CFC of the same color .......................................................1 mile
From another variety of CFC of a different color ......................................................3 miles

**CHIVES**

From *Allium cepa*, *Allium fistulosum*, or Leek ...................................................None

Sent By: QAL;                    5097874966;           Dec-20-07 5:45PM;        Page 5/5

**LEEK**

From *Allium cepa, Allium fistulosum*, Chives .................................................................None
From another variety of Leek.................................................................................1 mile

## GOOSEFOOT FAMILY (Chenopodiaceae)

**BEETS**

Between all Beets, Swiss Chard and Mangels...............................................................3 miles

Sugar Beet Types:
        Diploid
        Tetraploid

From Sugar Beets of the same or different type.......................................................2 miles

Genetically modified Sugar Beets will be designated as GMO

*Standards as of March 1, 2006 as agreed upon by the Columbia Basin Seed Field Representatives Association

*Revised: 03/06*

# Exhibit D



# BETASEED

# 2007 OREGON
## SUGARBEET SEED GROWING CONTRACT

Contract made on ___, 2007, between BETASEED INC., a Minnesota corporation, of 1788 Marschall Road, P.O. Box 195, Shakopee, Minnesota 55379 ("Betaseed"), and _____, of _____("Grower")._____ **Oregon**

## R E C I T A L S

**A.    Location #1**--Grower is the owner or tenant entitled to possession, as the case may be, of the following described land, consisting of ____ acres, more or less, located on ___, near the city of _____, ____ County, Washington, latitude _____ and longitude _____ ("Premises").

**Location #2**-- Grower is the owner or tenant entitled to possession, as the case may be, of the following described land, consisting of ____ acres, more or less, located on ___, near the city of _____, ____ County, Washington, latitude _____ and longitude _____ ("Premises").

**B.**    Betaseed is engaged in the general business of propagation, growing, cultivating, distributing, and selling sugarbeet seeds to farmers, dealers and sugarbeet processors.

**C.**    The purpose of this agreement is for Grower to transplant, grow, cultivate and harvest sugarbeet plants owned by Betaseed for the production of sugarbeet seed in accordance with Betaseed's specifications.

In consideration of the mutual covenants set forth in this Contract, the parties agree as follows:

**1.    Sugarbeet Plants for Transplanting.**

All stock of sugarbeet plants for transplanting, commonly known in the industry as stecklings, required to be used hereunder, shall be furnished by Betaseed, with any portion thereof remaining unused after planting by Grower to be returned to Betaseed. Title to, and all other incidents of ownership of, all sugarbeet plants, and the seed crop resulting therefrom, shall be and remain in Betaseed. Grower acknowledges and understands that the sugarbeet plants and the seed crop resulting therefrom is proprietary and Grower must not make it available to any other person.

**2.    Production of Sugarbeet Seed Crop.**

Page 1 -  **2007 SUGARBEET SEED GROWING CONTRACT**

25

2.1    **Grower agrees to make the Premises available for the growing season of January 20TH, 2008, through SEPTEMBER 1ST, 2008.** Grower shall be required to provide the Premises, equipment, labor and supervision required to: prepare the soil, transplant the sugarbeet plants, cultivate, irrigate, hand weed, apply all necessary chemicals, pesticides and fertilizers to the transplanted sugarbeet crop, and to harvest the sugarbeet seed crop, including swathing, combining and delivery of the harvested sugarbeet seed crop to a location to be specified by Betaseed.

2.2    Grower agrees that it will keep the transplanted sugarbeet crop specified hereunder separated by a distance of four (4) miles from any other crop of sugarbeet, tablebeet, chard, mangel, or any other plant that may cross-pollinate with beets. Grower shall use the pinning information from the Willamette Valley Specialty Seed Association (WVSSA) to assist in determining isolation distances. Grower agrees not to allow any volunteer beets, or any other plants that may cross-pollinate with beets, to bloom on the Premises or on adjacent fields owned and/or leased by Grower within a distance of four (4) miles from the boundaries of the Premises. Grower further agrees to destroy all sugarbeet stubble in such manner as recommended by Betaseed so as to prevent volunteer beets in the seed growing area. Grower agrees to leave with the cleaning plant all screenings from the sugarbeet seed crop to be disposed of by Betaseed in such manner as Betaseed may elect, without obligation to Grower.

2.3    Grower agrees not to transplant the sugarbeet seed plants nor harvest the sugarbeet seed crop until directed to do so by Betaseed or its authorized representative. This includes the cutting of the transplanted sugarbeet seed crop for harvest as well as the combining of the sugarbeet seed crop.

2.4    Grower agrees to transplant two (2) rows of pollinator sugarbeets between every six (6) rows of receiver (female) parent transplanted sugarbeets. Grower agrees to destroy the pollinator rows as directed by Betaseed.

2.5    Grower agrees to obtain all chemicals, pesticides and fertilizers to be used with and applied to the Premises and to the transplanted sugarbeet crop pursuant to this Contract according to the terms and conditions as specified in Sections 3.2 and 3.3 below.

2.6    Grower shall harvest the sugarbeet seed crop and clean it as well as possible with ordinary farm machinery appropriate for swathing and combining of sugarbeet seed, and to deliver all of the sugarbeet seed produced therefrom, as specified herein, as soon as possible after harvest. All equipment used in swathing and combining shall be cleaned of all seed prior to being used to harvest the sugarbeet seed crop.

2.7    Grower shall perform all agricultural services hereunder according to good husbandry and farmer-like manner and practices.

2.8    Grower assumes all risk of damage to, or loss of, said transplanted sugarbeet plants, the transplanted sugarbeet crop, and the sugarbeet seed from any cause while said transplanted sugarbeet plants, transplanted sugarbeet crop, and sugarbeet seed are under Grower's care, custody and control.

Page 2 -  **2007 SUGARBEET SEED GROWING CONTRACT**

**2.9**    Grower agrees to allow Betaseed to manipulate or remove the tops from the sugarbeet plants, as determined appropriate by Betaseed, to improve nicking, yield and quality.

**2.10**    Upon termination of this Contract, Grower shall plow up the Premises or otherwise destroy any remaining sugarbeet seed crops as directed by Betaseed.

### 3.    Furnishing Sugarbeet Plants

**3.1**    Betaseed agrees to furnish to Grower sugarbeet plants sufficient to transplant the sugarbeet crop on the Premises at the rate of ▮▮▮▮ **STECKS per planted acre.** The following information shall be used to identify such crop and the seed produced therefrom:

**Location #1=**

Item #_____    Pedigree Code _____    Lot # _____

Item #_____    Pedigree Code _____    Lot #.. _____

**Location #2=**

Item #_____    Pedigree Code _____    Lot # _____

Item #_____    Pedigree Code _____    Lot #.. _____

**3.2**    Grower will purchase and then invoice Betaseed for all pesticides and other chemicals used for purposes of this Contract. All pesticides and other chemicals obtained by Grower are to be used exclusively for the production of the sugarbeet seed crop specified in this Contract.

**3.3**    Grower will purchase and then invoice Betaseed for all Lime and fertilizer products used for purposes of this Contract. All fertilizer obtained by Grower will be used exclusively for the production of the sugarbeet seed crop specified in this Contract.

**3.4**    Betaseed gives no warranty, expressed or implied, as to the quality and efficacy or environmental consequences of said pesticides, chemicals or fertilizers, or the application and use thereof, and Grower agrees to hold Betaseed harmless and indemnify Betaseed from all damages that may result directly or indirectly from the use and/or application thereof and therefrom.

**3.5**    A Betaseed employee and/or authorized representative of Betaseed will be assigned to monitor the planting, growing and harvesting of the sugarbeet seed crop. Betaseed's agent will give instructions to the grower on how to prepare the soil of the Premises, plant stecklings, grow the sugarbeet seed crop, and when to swath and harvest the sugarbeet seed crop. If in Betaseed's opinion, Grower is not complying with the terms and conditions of this Contract, and/or any specific requests made by Betaseed's agent are not completed within two (2) days of such request, Betaseed has the option of performing the work

Page 3 -  **2007 SUGARBEET SEED GROWING CONTRACT**

or hiring a third party to perform the work on the Premises. The cost of any such labor and/or equipment to do this work will be deducted from any future payment to Grower pursuant to this Contract and such costs may exceed the dollar amount specified below for payment to Grower for such services to be performed pursuant to this Contract, and shall include cost of transportation of equipment and/or personnel to and from the Premises in order to perform such services. Any such actions taken by Betaseed will not relieve Grower of any other duties and responsibilities under this Contract. Betaseed shall not instruct Grower to apply, or cause to be applied, fertilizers, pesticides and other chemicals that are not approved under all relevant regulations and laws for use on the Premises and the sugarbeet crop.

     **3.6**    If a late application of water, pesticides, chemicals or fertilizers or other actions or inactions by Grower, not in accordance with this Contract and not at the direction of Betaseed, will, in the opinion of Betaseed, damage and/or lower sugarbeet seed quality below Betaseed's specifications, the sugarbeet seed crop can be abandoned by Betaseed and Betaseed shall have the right to direct Grower to terminate all or a portion of the production prior to harvest by tilling and destroying the crop. In such case, Grower shall not receive any compensation under Sections 4.3 and 4.4 or be compensated for any costs incurred after the date of the notification of abandonment with respect to the portion of the Planted Premises so abandoned. Grower shall not terminate production nor destroy the sugarbeet seed crop prior to harvest without first obtaining written permission from Betaseed.

     **3.7**    Betaseed reserves the right, at its expense, to enter upon the Premises to inspect the fields and sugarbeet seed crop and make examinations, elections, or rejections as it deems desirable for the betterment of the sugarbeet seed crop for seed purposes, and Betaseed shall not be liable for damages, if any, to the sugarbeet seed crop resulting therefrom. It is expressly understood and agreed that Betaseed is entering into a large number of these contracts and that its agents will not be available at all times for supervision and direction and that Betaseed shall not in any way be responsible or liable for failure of or injury to the sugarbeet crop as a result of Betaseed's failure to furnish supervision and direction.

**4.**    **Payments to Grower.**

     **4.1**    As consideration for the work and services to be performed by Grower specified in this Contract, Betaseed agrees to pay to Grower:

     **4.1.1A Fall Seed bed preparation:** ▮ per acre of the Planted Premises (See definition in Section 4.8 below).

     **4.1.1B Transplanting:** ▮ per acre of the Planted Premises (See definition in Section 4.8 below).

     **4.1.2  Pesticide Costs:** Betaseed shall pay for such pesticides and other chemicals used by Grower pursuant to Betaseed Purchase Order as specified above.

     **4.1.3  Fertilizer Costs:** Betaseed shall pay for such fertilizer products used by Grower pursuant to Betaseed Purchase Order as specified above.

     **4.1.3A Lime Costs:** Betaseed shall pay for ▮ of Lime products used by Grower pursuant to Betaseed Purchase Order as specified above.

**4.1.4  Irrigation Costs:** ▇ per irrigated acre of the Planted Premises per occurrence or a maximum of ▇ per irrigated acre per year.

**4.1.5  Pesticide, Chemical and Fertilizer Application Charges:** ▇ per treated acre of the Planted Premises per occurrence.  Grower may use the services of a subcontractor to perform this work.  However, payment of the subcontractor fees and costs are to be paid by Grower.

**4.1.6  Hand weeding:** Grower's reasonable labor costs incurred for hand weeding the Planted Premises, but not to exceed ▇ per acre of the Planted Premises.  Grower shall notify Betaseed if hand weeding labor costs are likely to exceed this amount.  Grower may use the services of a subcontractor to perform this work.  However, payment of the subcontractor fees and costs are to be paid by Grower.

**4.1.6A  Separation of Pollinator Strips:** ▇ per acre per occurrence of planted Pollinators strips or ▇ of planted  Premises, which ever is the largest

**4.1.6B  Removal of Pollinator Strips:** ▇ per acre of planted Pollinators strips or ▇ of planted  Premises, which ever is the largest

**4.1.7  Swathing Costs:** ▇ per acre of the Planted Premises swathed.  Grower may use the services of a subcontractor to perform this work.  However, payment of the subcontractor fees and costs are to be paid by Grower.

**4.1.8  Combining Costs:** The lesser of ▇ per hour or ▇ per acre of the Planted Premises combined.  Grower may use the services of a subcontractor to perform this work. However, payment of the subcontractor's fees and costs are to be paid by Grower.

**4.2**      Grower shall submit to Betaseed an itemized invoice for the above amounts at the end of each calendar month beginning at the end of April and continuing each subsequent calendar month through September of the growing season.  Betaseed will pay Grower for such amounts within twenty (20) days following Betaseed's receipt of the invoice.  Such invoices shall be mailed to Betaseed at 34303 Hwy. 99E, Tangent, OR 97379.

**4.3**      In addition, Betaseed will pay to Grower the additional sum of ▇ per acre of the Planted Premises within 20 days of receipt of the total crop of sugarbeet seed produced under this Contract at the location specified by Betaseed.

**4.4**      In addition, Betaseed will pay to Grower the sum of ▇ per acre if the Planted Premises is ten (10) acres or less.

**4.5**      In addition, if the sugarbeet seed grown and harvested pursuant to this Contract, and after cleaning by Betaseed with removal of unwanted material such as dirt, dust, other crops, weeds and plant stems as specified by Betaseed (hereinafter "clean sugarbeet seed"), is found to be free of noxious weeds and the germination rate is ▇▇▇▇▇▇ or higher, as determined by Oregon State University Seed Lab, Betaseed will pay to Grower:

**4.5.1  The sum of** ▇ per acre of the Planted Premises; and

Page 5 -  **2007 SUGARBEET SEED GROWING CONTRACT**

**4.5.2  The sum of** ███████████████ **per pound for the clean sugarbeet seed in excess of** ████ **pounds of clean sugarbeet seed per acre planted with receiver (female) parent transplanted sugarbeets** as specified in Section 2.4 above.  The applicable acreage for this Section 4.5.2 shall be the Planted Premises acreage.

The payment under this Section 4.5 shall be made by December 31 of the year in which seed was produced under this Contract.

**4.6**    Grower shall submit to Betaseed a final invoice for payment of the amounts stated in Sections 4.1.1 through 4.1.9 (if not already invoiced at the end of September) within Ninety (_90__) days after the total crop of sugarbeet seed produced under this Contract is harvested and delivered at the location specified by Betaseed.

**4.7**    Betaseed shall have the right to withhold from any such payments to Grower the amount of any costs incurred and/or paid by Betaseed pursuant to Section 3.5.

**4.8**    Betaseed will make every attempt to make early requests for the Premises intended to be planted with the sugarbeet seed crop.  Betaseed reserves the option not to plant the Premises contracted in this Contract. *If Betaseed decides not to permit Grower to plant the sugarbeet seed crop on the Premises or a portion thereof, Grower shall receive as payment* ████ *per acre for each acre of the Premises not so planted, plus payment for services performed pursuant to Section 4.1.5.  As used herein, "Planted Premises" shall mean that part of Premises planted with sugarbeet plants.*

**4.9**    *In the event of damage to or loss of the sugarbeet plants, the sugarbeet crop, and/or the sugarbeet seed by an act of God or some other cause beyond the control of Grower, Betaseed shall only be required to pay to Grower those amounts specified above for services performed and/or costs incurred by Grower prior to such loss.*

**5.    Disclaimer of Warranties.**

Except for the provisions of Section 3.1 above, Betaseed gives no warranty, express or implied, as to the description, quality, productiveness or any other matter, of the sugarbeet plants delivered or to be delivered by Betaseed to Grower, and Betaseed is not, and will not be, in any manner, responsible for the quality or abundance of any sugarbeet crop or any sugarbeet seeds produced by such sugarbeet plants.

**6.    Status of Grower; Indemnification; Waiver of Subrogation.**

**6.1**    Grower is an independent contractor.  Grower is not an employee and/or partner of Betaseed, and Grower is solely responsible for its operations and liabilities incurred herein. The work to be performed by Grower is to be performed by Grower as an independent contractor, and Grower is to perform such work with the necessary crews, tools, machinery and equipment furnished and maintained by Grower at Grower's own cost and expense.  All

Page 6 -  **2007 SUGARBEET SEED GROWING CONTRACT**

work done by Grower shall meet the specifications set forth in this Contract, and the detailed method of doing the work shall be under the sole control and management of Grower.

6.2    Grower shall indemnify and hold Betaseed harmless from all liabilities (including reasonable attorneys fees and costs) in defending against claims (arising out of claims by third parties) relating to acts or occurrences on, at, or with respect to the Premises and services performed by Grower under this Contract. Grower agrees to indemnify Betaseed against any expense, loss or liability incurred as a result of carelessness or negligence on the part of Grower or his servants, agents, or employees. Grower further agrees to save and hold harmless Betaseed from any and all liability arising out of workman's compensation laws or any state or federal statutes relating to employer/employee relationships.

6.3    Grower hereby releases Betaseed from any liability or responsibility to Grower or anyone claiming through or under Grower by way of subrogation or otherwise for any loss or damage, including without limitation, environmental damage suffered by Grower or the Premises subject to this Contract as a result of the action(s) or inaction(s) taken by the parties hereto in the performance of this Contract.

7.    Title.

Title to all sugarbeet plants, growing sugarbeet crops, and sugarbeet seed produced hereunder shall be and remain with Betaseed, and Grower shall acquire no title therein or lien thereon. Grower shall not sell, assign, or otherwise transfer any portion of the sugarbeet plants, growing sugarbeet crop, and/or sugarbeet seed production, nor shall Grower permit any third party to acquire a lien thereon. Grower guarantees that the sugarbeet seed crop to be grown pursuant to this Contract shall be kept free of all claims and encumbrances and Grower shall deliver a release of Grower's landlord's right to any lien on the sugarbeet seed crop.

8.    Miscellaneous Provisions.

8.1    Binding Effect. This Contract shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, successors, and, to the extent permitted by Section 8.2, assigns.

8.2    Assignment. This Contract shall be freely assignable by Betaseed. Grower may not assign any rights or delegate any duties (except as permitted in Sections 4.1.5, 4.1.6, 4.1.7, and 4.1.8) under this Contract without the prior written consent of Betaseed.

8.3    Notices.. Except for Grower's invoices submitted to Betaseed, any notice or other communication required or permitted to be given under this Contract shall be in writing and shall be mailed by certified mail, return receipt requested, postage prepaid, addressed to the parties as follows:

8.4    Betaseed:

34303 Hwy. 99E
Tangent OR 97389
ATTN: Bruce Peters, Director of Operations

Page 7 -  2007 SUGARBEET SEED GROWING CONTRACT

31

**Grower:**

_____

_____

ATTN: _____

Any such notice or communication shall be deemed to be given at the expiration of the second day after the date of deposit in the United States mail. The addresses to which notices or other communication shall be mailed may be changed from time to time by giving written notice to the other party as provided in this Section 8.3.

**8.4    Attorney Fees.** If any suit or action is filed by any party to enforce this Contract or otherwise with respect to the subject matter of this Contract, the prevailing party shall be entitled to recover reasonable attorney fees incurred in preparation or in prosecution or defense of such suit or action as fixed by the trial court, and if any appeal is taken from the decision of the trial court, reasonable attorney fees as fixed by the appellate court.

**8.5    Amendments.** This Contract may be amended only by an instrument in writing executed by all the parties.

**8.6    Headings.** The headings used in this Contract are solely for convenience of reference, are not part of this Contract, and are not to be considered in construing or interpreting this Contract.

**8.7    Entire Agreement.** This Contract sets forth the entire understanding of the parties with respect to the subject matter of this Contract and supersedes any and all prior understandings and agreements, whether written or oral, between the parties with respect to such subject matter.

**8.8    Counterparts.** This Contract may be executed by the parties in separate counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

**8.9    Severability.** If any provision of this Contract shall be invalid or unenforceable in any respect for any reason, the validity and enforceability of any such provision in any other respect and of the remaining provisions of this Contract shall not be in any way impaired.

**8.10    Waiver.** A provision of this Contract may be waived only by a written instrument executed by the party waiving compliance. No waiver of any provision of this Contract shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. Failure to enforce any provision of this Contract shall not operate as a waiver of such provision or any other provision.

**8.11    Further Assurances.** From time to time, each of the parties shall execute, acknowledge, and deliver any instruments or documents necessary to carry out the purposes of this Contract.

Page 8  -  **2007 SUGARBEET SEED GROWING CONTRACT**

**8.12    Time of Essence.**  Time is of the essence for each and every provision of this Contract.

**8.13    No Third-Party Beneficiaries.**  Nothing in this Contract express or implied, is intended to confer on any person, other than the parties to this Contract, any right or remedy of any nature whatsoever.

**8.14    Expenses.**  Each party shall bear its own expenses in connection with this Contract and the transactions contemplated by this Contract.

**8.15    Governing Law.**  This Contract shall be governed by and construed in accordance with the laws of the state of Oregon.

**8.16    Venue; Arbitration.**  Betaseed may specifically enforce this Contract by suit for injunction and/or specific performance in the state where the Premises are located.  Otherwise any controversy or claim arising out of or relating to this Contract, including, without limitation, the making, performance by Betaseed, or interpretation of this Contract shall be settled by arbitration in Linn County, Oregon, in accordance with the rules and procedures then in effect for mandatory arbitration in Linn County, Oregon, Circuit Court.  If the parties are unable to agree on an arbitrator within forty-five (45) days of a party's notice of demand for arbitration, then the Linn County, Oregon, Circuit Court Chief Judge shall appoint an arbitrator.  Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.  The parties agree that the arbitrator shall have no jurisdiction to consider evidence with respect to or render an award or judgment for punitive damages (or any other amount awarded for the purpose of imposing a penalty).  The parties agree that all facts and other information relating to any arbitration arising under this Contract shall be kept confidential to the fullest extent permitted by law.

| BETASEED: | GROWER: |
|---|---|
| BETASEED | _____ |
| By:_____ | |
| | By:_____ |
| Printed Name: _____ | |
| | Printed Name: _____ |
| Title: _____ | |
| | Title: _____ |
| | Social Security Number or Federal EIN: |
| | _____ |

# Exhibit E



**BETASEED**

# 2007
## SUGARBEET SEED GROWING CONTRACT

Contract made on __, 2007, between BETASEED INC., a Minnesota corporation, of 1788 Marschall Road, P.O. Box 195, Shakopee, Minnesota 55379 ("Betaseed"), and ___, of ___ ("Grower"). **Washington**

## RECITALS

**A.    Location #1**—Grower is the owner or tenant entitled to possession, as the case may be, of the following described land, consisting of ____ acres, more or less, located on ___, near the city of _____, ____ County, Washington, latitude _____ and longitude _____ ("Premises").

**Location #2**— Grower is the owner or tenant entitled to possession, as the case may be, of the following described land, consisting of ____ acres, more or less, located on ___, near the city of _____, ____ County, Washington, latitude _____ and longitude _____ ("Premises").

**B.**    Betaseed is engaged in the general business of propagation, growing, cultivating, distributing, and selling sugarbeet seeds to farmers, dealers and sugarbeet processors.

**C.**    The purpose of this agreement is for Grower to transplant, grow, cultivate and harvest sugarbeet plants owned by Betaseed for the production of sugarbeet seed in accordance with Betaseed's specifications.

In consideration of the mutual covenants set forth in this Contract, the parties agree as follows:

**1.    Sugarbeet Plants for Transplanting.**

All stock of sugarbeet plants for transplanting, commonly known in the industry as stecklings, required to be used hereunder, shall be furnished by Betaseed, with any portion thereof remaining unused after planting by Grower to be returned to Betaseed. Title to, and all other incidents of ownership, of all sugarbeet plants, and the seed crop resulting therefrom, shall be and remain in Betaseed. Grower acknowledges and understands that the sugarbeet plants and the seed crop resulting therefrom is proprietary and Grower must not make it available to any other person.

**2.    Production of Sugarbeet Seed Crop.**

Page 1 -  **2007 SUGARBEET SEED GROWING CONTRACT**

**2.1**    Grower agrees to make the Premises available for the growing season of MARCH 20TH, 2007, through SEPTEMBER 1ST,2007. Grower shall be required to provide the Premises, equipment, labor and supervision required to:  prepare the soil, transplant the sugarbeet plants, cultivate, irrigate, hand weed, apply all necessary chemicals, pesticides and fertilizers to the transplanted sugarbeet crop, and to harvest the sugarbeet seed crop, including swathing, combining and delivery of the harvested sugarbeet seed crop to a location to be specified by Betaseed.

**2.2**    Grower agrees that it will keep the transplanted sugarbeet crop specified hereunder separated by a distance of four (4) miles from any other crop of sugarbeet, tablebeet, chard, mangel, or any other plant that may cross-pollinate with beets. Grower shall use the pinning information from the Columbia Basin Vegetable Seed Association (CBVSA) to assist in determining isolation distances. Grower agrees not to allow any volunteer beets, or any other plants that may cross-pollinate with beets, to bloom on the Premises or on adjacent fields owned and/or leased by Grower within a distance of four (4) miles from the boundaries of the Premises. Grower further agrees to destroy all sugarbeet stubble in such manner as recommended by Betaseed so as to prevent volunteer beets in the seed growing area. Grower agrees to leave with the cleaning plant all screenings from the sugarbeet seed crop to be disposed of by Betaseed in such manner as Betaseed may elect, without obligation to Grower.

**2.3**    Grower agrees not to transplant the sugarbeet seed plants nor harvest the sugarbeet seed crop until directed to do so by Betaseed or its authorized representative. This includes the cutting of the transplanted sugarbeet seed crop for harvest as well as the combining of the sugarbeet seed crop.

**2.4**    Grower agrees to transplant two (2) rows of pollinator sugarbeets between every six (6) rows of receiver (female) parent transplanted sugarbeets. Grower agrees to destroy the pollinator rows as directed by Betaseed.

**2.5**    Grower agrees to obtain all chemicals, pesticides and fertilizers to be used with and applied to the Premises and to the transplanted sugarbeet crop pursuant to this Contract according to the terms and conditions as specified in Sections 3.2 and 3.3 below.

**2.6**    Grower shall harvest the sugarbeet seed crop and clean it as well as possible with ordinary farm machinery appropriate for swathing and combining of sugarbeet seed, and to deliver all of the sugarbeet seed produced therefrom, as specified herein, as soon as possible after harvest. All equipment used in swathing and combining shall be cleaned of all seed prior to being used to harvest the sugarbeet seed crop.

**2.7**    Grower shall perform all agricultural services hereunder according to good husbandry and farmer-like manner and practices.

**2.8**    Grower assumes all risk of damage to, or loss of, said transplanted sugarbeet plants, the transplanted sugarbeet crop, and the sugarbeet seed from any cause while said transplanted sugarbeet plants, transplanted sugarbeet crop, and sugarbeet seed are under Grower's care, custody and control.

Page 2 -  **2007 SUGARBEET SEED GROWING CONTRACT**

**2.9**    Grower agrees to allow Betaseed to manipulate or remove the tops from the sugarbeet plants, as determined appropriate by Betaseed, to improve nicking, yield and quality.

**2.10**    Upon termination of this Contract, Grower shall plow up the Premises or otherwise destroy any remaining sugarbeet seed crops as directed by Betaseed.

**3.        Furnishing Sugarbeet Plants**

**3.1**    Betaseed agrees to furnish to Grower sugarbeet plants sufficient to transplant the sugarbeet crop on the Premises at the rate of ▮▮▮▮ **STECKS per planted acre.** The following information shall be used to identify such crop and the seed produced therefrom:
**Location #1=**

      Item #_____    Pedigree Code _____    Lot # _____

      Item #_____    Pedigree Code _____    Lot #.. _____

**Location #2=**

      Item #_____    Pedigree Code _____    Lot # _____

      Item #_____    Pedigree Code _____    Lot #.. _____

**3.2**    Grower will purchase and then invoice Betaseed for all pesticides and other chemicals used for purposes of this Contract. All pesticides and other chemicals obtained by Grower are to be used exclusively for the production of the sugarbeet seed crop specified in this Contract.

**3.3**    Grower will purchase and then invoice Betaseed for all fertilizer products used for purposes of this Contract. All fertilizer obtained by Grower will be used exclusively for the production of the sugarbeet seed crop specified in this Contract.

**3.4**    Betaseed gives no warranty, expressed or implied, as to the quality and efficacy or environmental consequences of said pesticides, chemicals or fertilizers, or the application and use thereof, and Grower agrees to hold Betaseed harmless and indemnify Betaseed from all damages that may result directly or indirectly from the use and/or application thereof and therefrom.

**3.5**    A Betaseed employee and/or authorized representative of Betaseed will be assigned to monitor the planting, growing and harvesting of the sugarbeet seed crop. Betaseed's agent will give instructions to the grower on how to prepare the soil of the Premises, plant stecklings, grow the sugarbeet seed crop, and when to swath and harvest the sugarbeet seed crop. If in Betaseed's opinion, Grower is not complying with the terms and conditions of this Contract, and/or any specific requests made by Betaseed's agent are not completed within two (2) days of such request, Betaseed has the option of performing the work

or hiring a third party to perform the work on the Premises. The cost of any such labor and/or equipment to do this work will be deducted from any future payment to Grower pursuant to this Contract and such costs may exceed the dollar amount specified below for payment to Grower for such services to be performed pursuant to this Contract, and shall include cost of transportation of equipment and/or personnel to and from the Premises in order to perform such services. Any such actions taken by Betaseed will not relieve Grower of any other duties and responsibilities under this Contract. Betaseed shall not instruct Grower to apply, or cause to be applied, fertilizers, pesticides and other chemicals that are not approved under all relevant regulations and laws for use on the Premises and the sugarbeet crop.

     **3.6**   If a late application of water, pesticides, chemicals or fertilizers or other actions or inactions by Grower, not in accordance with this Contract and not at the direction of Betaseed, will, in the opinion of Betaseed, damage and/or lower sugarbeet seed quality below Betaseed's specifications, the sugarbeet seed crop can be abandoned by Betaseed and Betaseed shall have the right to direct Grower to terminate all or a portion of the production prior to harvest by tilling and destroying the crop. In such case, Grower shall not receive any compensation under Sections 4.3 and 4.4 or be compensated for any costs incurred after the date of the notification of abandonment with respect to the portion of the Planted Premises so abandoned. Grower shall not terminate production nor destroy the sugarbeet seed crop prior to harvest without first obtaining written permission from Betaseed.

     **3.7**      Betaseed reserves the right, at its expense, to enter upon the Premises to inspect the fields and sugarbeet seed crop and make examinations, elections, or rejections as it deems desirable for the betterment of the sugarbeet seed crop for seed purposes, and Betaseed shall not be liable for damages, if any, to the sugarbeet seed crop resulting therefrom. It is expressly understood and agreed that Betaseed is entering into a large number of these contracts and that its agents will not be available at all times for supervision and direction and that Betaseed shall not in any way be responsible or liable for failure of or injury to the sugarbeet crop as a result of Betaseed's failure to furnish supervision and direction.

     **4.**      **Payments to Grower.**

     **4.1**      As consideration for the work and services to be performed by Grower specified in this Contract, Betaseed agrees to pay to Grower:

     **4.1.1 Transplanting:** ▮▮▮ per acre of the Planted Premises (See definition in Section 4.8 below).

     **4.1.2 Pesticide Costs:** Betaseed shall pay for such pesticides and other chemicals used by Grower pursuant to Betaseed Purchase Order as specified above.

     **4.1.3 Fertilizer Costs:** Betaseed shall pay for such fertilizer products used by Grower pursuant to Betaseed Purchase Order as specified above.

     **4.1.4 Irrigation Costs:** ▮▮▮ per irrigated acre of the Planted Premises per occurrence or a maximum of ▮▮▮ per irrigated acre per year.

Page 4 - **2007 SUGARBEET SEED GROWING CONTRACT**

**4.1.5  Pesticide, Chemical and Fertilizer Application Charges:** ▮▮ per treated acre of the Planted Premises per occurrence.  Grower may use the services of a subcontractor to perform this work.  However, payment of the subcontractor fees and costs are to be paid by Grower.

**4.1.6  Hand weeding:** Grower's reasonable labor costs incurred for hand weeding the Planted Premises, but not to exceed ▮▮▮▮ per acre of the Planted Premises.  Grower shall notify Betaseed if hand weeding labor costs are likely to exceed this amount.  Grower may use the services of a subcontractor to perform this work.  However, payment of the subcontractor fees and costs are to be paid by Grower.

**4.1.6A  Removal of Pollinator Strips:** ▮▮ per acre of planted Pollinators strips or ▮▮ of planted  Premises, which ever is the largest

**4.1.7  Swathing Costs:** ▮▮ per acre of the Planted Premises swathed.  Grower may use the services of a subcontractor to perform this work.  However, payment of the subcontractor fees and costs are to be paid by Grower.

**4.1.8  Combining Costs:**  The lesser of ▮▮ per hour or ▮▮ per acre of the Planted Premises combined.  Grower may use the services of a subcontractor to perform this work. However, payment of the subcontractor's fees and costs are to be paid by Grower.

**4.1.9  Delivery Costs:** ▮▮ per farm truck [two and one-half (2 1/2) ton minimum truck size] or semi-truck load of seed delivered to a location specified by Betaseed. If the round-trip mileage to such location exceeds forty (40) miles, the parties agree to negotiate and Betaseed will pay Grower the Grower's reasonable costs for the portion of the round- trip mileage in excess of forty (40) miles.

**4.2**    Grower shall submit to Betaseed an itemized invoice for the above amounts at the end of each calendar month beginning at the end of April and continuing each subsequent calendar month through September of the growing season. Betaseed will pay Grower for such amounts within twenty (20) days following Betaseed's receipt of the invoice.  Such invoices shall be mailed to Betaseed at 34303 Hwy. 99E, Tangent, OR 97379.

**4.3**    In addition, Betaseed will pay to Grower the additional sum of ▮▮ per acre of the Planted Premises within 20 days of receipt of the total crop of sugarbeet seed produced under this Contract at the location specified by Betaseed.

**4.4**    In addition, Betaseed will pay to Grower the sum of ▮▮ per acre if the Planted Premises is ten (10) acres or less.

**4.5**    In addition, if the sugarbeet seed grown and harvested pursuant to this Contract, and after cleaning by Betaseed with removal of unwanted material such as dirt, dust, other crops, weeds and plant stems as specified by Betaseed (hereinafter "clean sugarbeet seed"), is found to be free of noxious weeds and the germination rate is ▮▮▮▮▮▮ or higher, as determined by Oregon State University Seed Lab, Betaseed will pay to Grower:

Page 5 -  **2007 SUGARBEET SEED GROWING CONTRACT**

**4.5.1**   The sum of ▆▆▆ per acre of the Planted Premises; and

**4.5.2**   The sum of ▆▆▆▆▆▆▆▆▆▆ per pound for the clean sugarbeet seed in excess of ▆▆▆ pounds of clean sugarbeet seed per acre planted with receiver (female) parent transplanted sugarbeets as specified in Section 2.4 above. The applicable acreage for this Section 4.5.2 shall be the Planted Premises acreage less the actual acreage containing rows of pollinator sugarbeets and blank rows.

The payment under this Section 4.5 shall be made by December 31 of the year in which seed was produced under this Contract.

**4.6**   Grower shall submit to Betaseed a final invoice for payment of the amounts stated in Sections 4.1.1 through 4.1.9 (if not already invoiced at the end of September) within Ninety (_90__) days after the total crop of sugarbeet seed produced under this Contract is harvested and delivered at the location specified by Betaseed.

**4.7**   Betaseed shall have the right to withhold from any such payments to Grower the amount of any costs incurred and/or paid by Betaseed pursuant to Section 3.5.

**4.8**   Betaseed will make every attempt to make early requests for the Premises intended to be planted with the sugarbeet seed crop. Betaseed reserves the option not to plant the Premises contracted in this Contract. If Betaseed decides not to permit Grower to plant the sugarbeet seed crop on the Premises or a portion thereof, Grower shall receive as payment ▆▆▆ per acre for each acre of the Premises not so planted, plus payment for services performed pursuant to Section 4.1.5. As used herein, "Planted Premises" shall mean that part of Premises planted with sugarbeet plants.

**4.9**   In the event of damage to or loss of the sugarbeet plants, the sugarbeet crop, and/or the sugarbeet seed by an act of God or some other cause beyond the control of Grower, Betaseed shall only be required to pay to Grower those amounts specified above for services performed and/or costs incurred by Grower prior to such loss.

**5.**   **Disclaimer of Warranties.**

Except for the provisions of Section 3.1 above, Betaseed gives no warranty, express or implied, as to the description, quality, productiveness or any other matter, of the sugarbeet plants delivered or to be delivered by Betaseed to Grower, and Betaseed is not, and will not be, in any manner, responsible for the quality or abundance of any sugarbeet crop or any sugarbeet seeds produced by such sugarbeet plants.

**6.**   **Status of Grower; Indemnification; Waiver of Subrogation.**

**6.1**   Grower is an independent contractor. Grower is not an employee and/or partner of Betaseed, and Grower is solely responsible for its operations and liabilities incurred herein. The work to be performed by Grower is to be performed by Grower as an independent contractor, and Grower is to perform such work with the necessary crews, tools, machinery

and equipment furnished and maintained by Grower at Grower's own cost and expense. All work done by Grower shall meet the specifications set forth in this Contract, and the detailed method of doing the work shall be under the sole control and management of Grower.

**6.2** Grower shall indemnify and hold Betaseed harmless from all liabilities (including reasonable attorneys fees and costs) in defending against claims (arising out of claims by third parties) relating to acts or occurrences on, at, or with respect to the Premises and services performed by Grower under this Contract. Grower agrees to indemnify Betaseed against any expense, loss or liability incurred as a result of carelessness or negligence on the part of Grower or his servants, agents, or employees. Grower further agrees to save and hold harmless Betaseed from any and all liability arising out of workman's compensation laws or any state or federal statutes relating to employer/employee relationships.

**6.3** Grower hereby releases Betaseed from any liability or responsibility to Grower or anyone claiming through or under Grower by way of subrogation or otherwise for any loss or damage, including without limitation, environmental damage suffered by Grower or the Premises subject to this Contract as a result of the action(s) or inaction(s) taken by the parties hereto in the performance of this Contract.

**7.    Title.**

Title to all sugarbeet plants, growing sugarbeet crops, and sugarbeet seed produced hereunder shall be and remain with Betaseed, and Grower shall acquire no title therein or lien thereon. Grower shall not sell, assign, or otherwise transfer any portion of the sugarbeet plants, growing sugarbeet crop, and/or sugarbeet seed production, nor shall Grower permit any third party to acquire a lien thereon. Grower guarantees that the sugarbeet seed crop to be grown pursuant to this Contract shall be kept free of all claims and encumbrances and Grower shall deliver a release of Grower's landlord's right to any lien on the sugarbeet seed crop.

**8.    Miscellaneous Provisions.**

**8.1    Binding Effect.** This Contract shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, successors, and, to the extent permitted by Section 8.2, assigns.

**8.2    Assignment.** This Contract shall be freely assignable by Betaseed. Grower may not assign any rights or delegate any duties (except as permitted in Sections 4.1.5, 4.1.6, 4.1.7, and 4.1.8) under this Contract without the prior written consent of Betaseed.

**8.3    Notices.** Except for Grower's invoices submitted to Betaseed, any notice or other communication required or permitted to be given under this Contract shall be in writing and shall be mailed by certified mail, return receipt requested, postage prepaid, addressed to the parties as follows:

**Betaseed:**

34303 Hwy. 99E
Tangent OR 97389

Page 7 -  **2007 SUGARBEET SEED GROWING CONTRACT**

ATTN: Bruce Peters, Director of Operations

**Grower:**

_____

_____

_____
ATTN: _____

Any such notice or communication shall be deemed to be given at the expiration of the second day after the date of deposit in the United States mail. The addresses to which notices or other communication shall be mailed may be changed from time to time by giving written notice to the other party as provided in this Section 8.3.

     **8.4    Attorney Fees.** If any suit or action is filed by any party to enforce this Contract or otherwise with respect to the subject matter of this Contract, the prevailing party shall be entitled to recover reasonable attorney fees incurred in preparation or in prosecution or defense of such suit or action as fixed by the trial court, and if any appeal is taken from the decision of the trial court, reasonable attorney fees as fixed by the appellate court.

     **8.5    Amendments.** This Contract may be amended only by an instrument in writing executed by all the parties.

     **8.6    Headings.** The headings used in this Contract are solely for convenience of reference, are not part of this Contract, and are not to be considered in construing or interpreting this Contract.

     **8.7    Entire Agreement.** This Contract sets forth the entire understanding of the parties with respect to the subject matter of this Contract and supersedes any and all prior understandings and agreements, whether written or oral, between the parties with respect to such subject matter.

     **8.8    Counterparts.** This Contract may be executed by the parties in separate counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

     **8.9    Severability.** If any provision of this Contract shall be invalid or unenforceable in any respect for any reason, the validity and enforceability of any such provision in any other respect and of the remaining provisions of this Contract shall not be in any way impaired.

     **8.10    Waiver.** A provision of this Contract may be waived only by a written instrument executed by the party waiving compliance. No waiver of any provision of this Contract shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. Failure to enforce any provision of this Contract shall not operate as a waiver of such provision or any other provision.

**8.11    Further Assurances.** From time to time, each of the parties shall execute, acknowledge, and deliver any instruments or documents necessary to carry out the purposes of this Contract.

**8.12    Time of Essence.** Time is of the essence for each and every provision of this Contract.

**8.13    No Third-Party Beneficiaries.** Nothing in this Contract express or implied, is intended to confer on any person, other than the parties to this Contract, any right or remedy of any nature whatsoever.

**8.14    Expenses.** Each party shall bear its own expenses in connection with this Contract and the transactions contemplated by this Contract.

**8.15    Governing Law.** This Contract shall be governed by and construed in accordance with the laws of the state of Oregon.

**8.16    Venue; Arbitration.** Betaseed may specifically enforce this Contract by suit for injunction and/or specific performance in the state where the Premises are located. Otherwise any controversy or claim arising out of or relating to this Contract, including, without limitation, the making, performance by Betaseed, or interpretation of this Contract shall be settled by arbitration in Linn County, Oregon, in accordance with the rules and procedures then in effect for mandatory arbitration in Linn County, Oregon, Circuit Court. If the parties are unable to agree on an arbitrator within forty-five (45) days of a party's notice of demand for arbitration, then the Linn County, Oregon, Circuit Court Chief Judge shall appoint an arbitrator. Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. The parties agree that the arbitrator shall have no jurisdiction to consider evidence with respect to or render an award or judgment for punitive damages (or any other amount awarded for the purpose of imposing a penalty). The parties agree that all facts and other information relating to any arbitration arising under this Contract shall be kept confidential to the fullest extent permitted by law.

**BETASEED:**                                    **GROWER:**

BETASEED                                        _____

By:_____                    By:_____
Printed Name: _____                   Printed Name: _____
Title: _____                  Title: _____
                                                Social Security Number or Federal EIN:

                                                _____

# Exhibit F

Version 04, 7/07

# WVSSA
## Specialty Seed Production
## Pinning Rules

To facilitate communication and protect the specialty seed industry in the Willamette Valley of Oregon, isolation mapping procedures have been drafted and agreed upon by the Willamette Valley Specialty Seed Association (WVSSA). The procedures and isolation distances as established by the "Isolation Guidelines" have been set up to ensure quality seed production of all vegetable and other specialty seed in the designated areas from potential cross pollination. The isolation control area of interest referred to as the Willamette Valley includes the counties of; Multnomah, Washington, Clackamas, Yamhill, Polk, Marion, Benton, Linn, and Lane.

## Maps

The association has two separate maps for the purpose of pinning and maintaining appropriate isolation distances. The maps are divided by the North and South valley isolation areas. They are established at two different locations as follows:

### Two Locations

#### Map1 - North Valley Pinning

<u>OSU Extension Service Marion County</u>  Phone: 503-588-5301
At: 3180 Center NE, Salem, Oregon 97301 Room 1361

#### Map 2 - South Valley Pinning

<u>OSU Extension Service Linn County</u>     Phone: 541-967-3871
At: 104 4th Ave SW, Albany, Oregon 97321 Room 102

The non-Beta types are to be pinned in respect to their valley area.
The North map is for pinning isolations: <u>Including and North of Township 9 South</u>.
The South map is for pinning isolations: <u>Including and South of Township 9 South</u>.
Fields located within Township 9 S. must be pinned on both North and South maps.

The Beta types are to be pinned in respect to their valley area.
The North map is for pinning isolations: <u>Including and North of Township 11 South</u>.
The South map is for pinning isolations: <u>Including and South of Township 12 South</u>.

## Pinning Procedures

Only WVSSA members are allowed to use the maps. Members using the maps must follow the WVSSA rules. Fields must be currently identified for the designated crop year by use of the two maps at each location.

The map cannot be pinned until an established agreement has been made with the grower for planting the crop. The map cannot be pinned on a speculative basis in order to reserve isolation. Upon cancellation of an intended production prior to planting the pin must be removed within 5 days. Upon abandonment of an established production, the pin must be marked failed. Record the failure by use of pinning cards. Failure to mark and/or pull pins may result in a penalty under the WVSSA of $50.00 if in violation and payment is required to remain a member in good standing.

43

Version 04, 7/07

To identify production fields for crop isolation on the map, pins and flags are used to mark the location. On the maps, different color flags are used to separate the major crop types.

1. Must have approved pinning rights and abide by the Isolation Guidelines of the WVSSA.
2. Observe the dates covered under the priority pinning.
3. Check for acceptable isolation distance on the maps.
4. Check any companies involved if isolation guidelines are in question.
5. Use the proper colored flag to pin the field.
    Write on each flag: Party name, Crop type, Hybrid or O.P., Legal location.
6. Fill out pinning card at time of pinning.
7. Hand the card to an Extension personal for posting. At Marion Co., they date stamp card and place in a lock box. At Linn Co, they post in log book and secure card in order received.

Pins are to be placed as close to the center of the field to be planted as possible. This will be done to facilitate proper isolation distances to other fields. The crop isolation is only valid after posting it with the extension office. The isolation is not valid if that isolation is pinned incorrectly.

## Pinning Priority

The WVSSA allows the grower to hold the right to the isolation in his perspective farming area for the following year, to produce the same crop within a one-mile radius to the prior year's isolation. The grower maintains the right to elect the contracting company. The isolation right, known as a prior year's priority can only be held for the specific grower until the dates specified below.

A prior year's priority is only valid until the following dates:
**For non-Beta species:     Annuals – March 1st          Biennials – August 1st**
**For Beta species:          Transplants – February 1st   Direct seeded – August 1st**
After these dates, all isolations are available on a first come basis.

## Pinning Rights

The contracting company or responsible seed representative, who is a member of the WVSSA, may do the pinning. The intent is for the contracting company or responsible seed representative to do the pinning. The representative appointed by a company may also do the pinning if the company is a member of the WVSSA. Oregon State University is considered here as a non-due paying member that has pinning privileges.

The contracting company or responsible seed representative with a grower agreement acts as the grower's appointed representative in establishing the isolation. Individual growers are to allow their contracting company or responsible seed representative who is a member of the WVSSA, to establish the isolation. Growers are allowed to be members of the WVSSA and would be considered as a responsible seed representative and as a member would be allowed to pin isolations for their farms under their own agreements. The contracting company or responsible seed representative agrees to abide by the pinning and isolation guidelines of the WVSSA.

New pinning parties need to contact an officer of the WVSSA for eligibility approval a membership is required prior to pinning. The responsible party may be required to have membership approval by the association. The association may elect to appoint a representative to meet with the new parties at the appropriate isolation map to clarify pinning practices.

44

Version 04, 7/07

## Membership and Pinning Fees

The member or responsible party for the seed is subject to fees as established by the WVSSA. Fees are inclusive of the WVSSA annual membership dues of $150.00 per year, or a Homestead membership fee of $5.00 per year. The pinning fees are; $10.00 per OP crop, $25.00 per Hybrid crop, and $25.00 Multi-crop fee. Annual dues are assessed at the beginning of each year in January, and the pinning fees for the prior year's pinning are assessed after clearing of the maps in June of each year. If dues and pinning fees are not received, pinning rights may be revoked.

A multi-crop fee may apply when producing multiple crop species of an OP in one location, and one acre or less. Only one per member is allowed and is intended for research farms, and small commercial farms used for seed production. The multi-crop fee is a "fee", not a "pin". Crop pins must be used to pin different species, and "multi-crop" must be designated on each card turned in.

A Homestead membership fee and no pinning fees may apply for a Homestead non-voting member when producing in one location non commercial Open Pollinated seed crops. Intended for the seed saver this member is not eligible for the pinning priority and is required to follow WVSSA rules and to be accompanied by a designated appointee when pinning the map. Crop pins must be used to pin different species, and Homestead must be designated on each card turned in.

## Exceptions Agreements

There are two exception agreements, the Isolation Distance Encroachment, and the One Year Isolation Deferral. The Encroachment exception applies to an established crop isolation where one company agrees to allow another company to produce a like crop under less than the set isolation distance. The deferral applies to an established crop isolation where one grower and company agrees to allow another grower and company to produce a like crop for one year, and the established grower retains the isolation priority. The parties involved prior to planting a specific crop must agree upon any exception to the established isolation for the specific crop year. The exception agreement needs to be in writing annually and to include the right to the isolation the following year. There are exception agreement forms available for this use. All parties must agree and all other WVSSA isolation rules must be followed.

## Securing Isolations

At both maps a system of cards will be used to secure the posting of the isolation. A representative from two different company members of the WVSSA, in addition to an Extension Agent, is required to be present to review the cards. The non current crop year cards will be separated by two members of the WVSSA annually when the prior crop year's map is cleared in June of each year. The non current crop year pinning cards for will be archived up to three years at the Extension office.

The purpose of securing the cards is: 1.To use as the archive and formal record of posting of pins. 2. To review established pinning priority rights. 3. To be used for pinning dispute resolutions. Any discrepancies over pinning locations will be solved through the cards. The cards will be used for accuracy of pinning and in case of arbitration.

## Arbitration

Should all precautions fail in preventing potential cross-pollination problems between seed companies or responsible seed representative, and or growers, the WVSSA suggests the following system or arbitration: Fields not pinned will be considered at fault in event of arbitration. If the parties agree to arbitration by the three-person committee, they agree to abide by the committee's recommendation. The two contesting seed companies or responsible seed representative, in consultation with their growers, each chooses an outside field representative from the WVSSA. The arbitrators, A and B, are suggested to a neutral facilitator who notifies them of their role. They do not know whom they represent and together choose a third committeeman. Arbitrators A, B and C agree to hear the facts of each seed company. Maximum would be two representatives on each side of the issue. After both parties present the facts, only the arbitration committee, A, B and C, remain in the room to discuss the facts fully. They agree to a solution before leaving the room and the chairman will deliver the recommendation immediately to both parties.

# Exhibit G



North pinning map



Pinning map south
All Beta species in orange
Flag contains details such
as crop, type etc.

## PROOF OF SERVICE

I, Victoria Garza, the undersigned, declare that:

I am employed in the County of Los Angeles, State of California, over the age of 18, and not a party to this cause. My business address is 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, California 90067-4120.

On April 17, 2008, I served a true copy of the **DECLARATION OF E. JOE DAHMER IN SUPPORT OF MOTION TO INTERVENE OF BETASEED, INC.** on the parties in this cause

[X]    *(VIA OVERNIGHT DELIVERY)* by placing the above named document in a sealed envelope addressed as set forth below, or on the attached service list and by then causing said envelope to be deposited for collection and overnight delivery via Federal Express in accordance with Loeb & Loeb LLP's ordinary business practices.

## SEE ATTACHED SERVICE LIST

I am readily familiar with Loeb & Loeb LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service and Overnight Delivery Service. That practice includes the deposit of all correspondence with the United States Postal Service and/or Overnight Delivery Service the same day it is collected and processed.

I certify that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2008, at Los Angeles, California.

Victoria Garza/

LA1760366.1
212564-10001

1      _CENTER FOR FOOD SAFETY v. CHARLES CONNOR, etc., et al._
       _U.S.D.C. Case No. C 08-00484 JSW_
2
                              SERVICE LIST
3

4      Lori Caramanian
       U.S. Department of Justice
5      1961 Stout Street, 8th Floor
       Denver, CO  80294
6      (303) 844-1499
       Fax:  (303) 844-1350
7      Email:  lori.caramanian@ussdoj.gov

8
       John Robert Coleman
9      Civil Division, USDOJ
       20 Massachusetts Avenue, NW
10     Room 6118
       Washington, DC  20530
11     202-514-4505
       Email:  John.Coleman3@usdoj.gov
12

13     Gregory C. Loarie
       Earthjustice
14     426 Seventeenth Street
       5th Floor
15     Oakland, CA  94612
       510-550-6725
16     Fax:  510-550-6749
       Email:  gloarie @earthjustice.org
17
       Paul Henry Achitoff
18     Earthjustice
       223 S. King Street
19     Suite 400
       Honolulu, Hawaii 96813-4501
20     808-599-2436
       Email:  ACHITOFF@EARTHJUSTICE.ORG
21

22     Kevin Scott Golden
       The Center for Food Safety
23     2601 Mission Street
       Suite 803
24     San Francisco, CA  94110
       415-826-2770
25     Fax:  415-826-0507
       Email:  kgolden@icta.org
26

27

28

       LA1760366.1
       212564-10001