1  KEVIN Z. GOLDEN, State Bar No. 233378
   Center for Food Safety
2  2601 Mission Street, Suite 803
   San Francisco, CA 94110
3  T: (415) 826-2770 / F: (415) 826-0507
   Email: kgolden@icta.org
4
   PAUL H. ACHITOFF (*Pro Hac Vice*)
5  Earthjustice
   223 South King Street, Suite 400
6  Honolulu, HI 96813
   T: (808) 599-2436 / F: (808) 521-6841
7  Email: achitoff@earthjustice.org

8  GREGORY C. LOARIE, State Bar No. 215859
   Earthjustice
9  426 17th Street, 5th Floor
   Oakland, CA 94612
10 T: (510) 550-6725 / F: (510) 550-6749
   Email: gloarie@earthjustice.org
11
   *Counsel for Plaintiffs*
12

13             UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                SAN FRANCISCO DIVISION

15 CENTER FOR FOOD SAFETY, ORGANIC        ) Case No.:  3:08-cv-00484-JSW
   SEED ALLIANCE, SIERRA CLUB, and HIGH   )
16 MOWING ORGANIC SEEDS,                  )
                                          ) NOTICE OF MOTION AND MOTION FOR
17            Plaintiffs,                  ) SUMMARY JUDGMENT
                                          )
18      vs.                               ) AND
                                          )
19 EDWARD T. SCHAFER, in his official capacity ) MEMORANDUM IN SUPPORT THEREOF
   as Secretary of the United States Department of )
20 Agriculture; and CINDY SMITH, in her official )
   capacity as Administrator of the Animal and ) Date:   September 19, 2008
21 Plant Health Inspection Service,        ) Time:   9:00 a.m.
                                          ) Place:  Courtroom 2
22            Defendants.                  ) Judge:  Hon. Jeffrey S. White
                                          )
23
24
25
26
27
28

## NOTICE OF MOTION

Please take notice that the following Motion for Summary Judgment will be heard by the Honorable Jeffrey S. White, United States District Judge, on September 19, 2008, at 9:00 a.m. in Courtroom 2, 17th Floor, Philip E. Burton Courthouse and Federal Building, 450 Golden Gate Avenue, San Francisco, California.

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and the proposed briefing schedule submitted by plaintiffs and federal defendants on April 9, 2008, *see* Joint Case Management Statement (Doc. 16) at 7, plaintiffs hereby move for summary judgment on all issues raised in their January 23, 2008 Complaint for Declaratory and Injunctive Relief, on the grounds that there is no genuine issue as to any material fact and plaintiffs are entitled to judgment as a matter of law.

This motion is based upon the administrative record filed by defendants on April 18, 2008, the following memorandum of points and authorities, and the Declarations of Neil Carmen, Donna Hoffman, Frank Morton, Bernard Macdonald, Erica Martenson, Tom Stearns, Matthew Dillon, Andrew Kimbrell, Lori Ann Burd, Mark Des Marets, and Don Tipping, submitted herewith.  This motion is accompanied by a proposed order granting summary judgment in favor of plaintiffs.

Respectfully submitted,

Dated:  June 2, 2008

   /s/ Gregory C. Loarie
GREGORY C. LOARIE
PAUL H. ACHITOFF
Earthjustice

KEVIN Z. GOLDEN
Center for Food Safety

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ...............................................i

TABLE OF AUTHORITIES .............................................................................................................iii

INTRODUCTION ............................................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................................. 2

LEGAL BACKGROUND ................................................................................................................... 5

STANDARD OF REVIEW ................................................................................................................. 8

ARGUMENT ....................................................................................................................................... 8

I.      APHIS Violated NEPA by Failing to Prepare an Environmental Impact Statement
        in Connection With Its Decision to Deregulate Roundup Ready Sugar Beets. ...................... 9

        A.      Deregulation Will Result in the Biological Contamination of Non-GE
                Crops. ........................................................................................................................ 9

                1.      Roundup Ready Sugar Beets Are Likely to Cross-Pollinate with
                        Non-GE Crops and Cause them to Become Contaminated with GE
                        Material. ......................................................................................................... 9

                2.      Contamination Will Have a Significant Impact on Farmers and
                        Consumers of Non-GE Crops. ..................................................................... 11

        B.      Deregulation Will Exacerbate the Proliferation of Glyphosate-Resistant
                Weeds. ...................................................................................................................... 13

                1.      The Commercial Production of Roundup Ready Sugar Beets Will
                        Breed Glyphosate-Resistant Weeds. ............................................................ 13

                2.      Glyphosate-Resistant Weeds Have a Significant Impact on
                        Agriculture. .................................................................................................. 16

        C.      Deregulation Will Result in an Increase in the Use of Glyphosate. ........................ 17

II.     The Deregulation of Roundup Ready Sugar Beets Violated the Plant Protection
        Act and the Administrative Procedure Act. ......................................................................... 18

        A.      Roundup Ready Sugar Beets Are Likely to Increase the Weediness
                Potential of Wild Species With Which They Can Interbreed. ................................. 20

        B.      Roundup Ready Sugar Beets Will Harm Raw and Processed Agricultural
                Commodities. ........................................................................................................... 21

        C.      Roundup Ready Sugar Beets Will Reduce the Ability to Control Weeds. ............... 22

CONCLUSION ................................................................................................................................. 23

25

# TABLE OF AUTHORITIES

## CASES

*Andrus v. Sierra Club*, 442 U.S. 347 (1979)..................................................................................6

*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934 (9th Cir. 2005)....................................11

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................................9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..........................................................................9

*Center for Biological Diversity v. National Highway Traffic Safety Admin.*,
    508 F.3d 508 (9th Cir. 2007).................................................................................................7

*Geertson Seed Farms v. Johanns*, No. C06-01075 CRB,
    2007 WL 518624 (N.D. Cal. Feb. 13, 2007) .............................................................. *passim*

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006)...............................7

*Monsanto Co. v. David*, 516 F.3d 1009 (Fed. Cir. 2008) ..........................................................3

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance*,
    463 U.S. 29 (1983)...............................................................................................19, 20, 22

*Natural Resources Defense Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ........................................................................................15, 19

*Natural Resources Defense Council v. Winter*, 518 F.3d 658 (9th Cir. 2008) .........................7

*Northwest Coalition for Alternatives to Pesticides v. Lyng*, 844 F.2d 588 (9th Cir. 1998)....17

*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) ................8

*Oregon Envt'l Council v. Kunzman*, 714 F.2d 901 (9th Cir. 1983)..........................................18

*Save Our Ecosystems v. Clark*, 747 F.2d 1240 (9th Cir. 1984) ......................................17, 18

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir.2007) ...........................................................6

*The Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ...................................................8

*Washington Toxics Coalition v. Environmental Prot. Agency*,
    413 F.3d 1024 (9th Cir. 2005) .............................................................................................17

## STATUTES

5 U.S.C. § 706...........................................................................................................................1, 8
7 U.S.C. § 7701 *et seq.*...........................................................................................................1, 5
7 U.S.C. § 7702(14)(D)...........................................................................................................5, 18
7 U.S.C. § 7711(a)....................................................................................................................5, 19
42 U.S.C. § 4321 *et seq.*............................................................................................................1
42 U.S.C. § 4331(b)(3)(4)...........................................................................................................12
42 U.S.C. § 4332(2)(C)................................................................................................................6

1
2

**RULES**

Fed. R. Civ. P. 56(c) ...................................................................................................9

3

**REGULATIONS**

4
7 C.F.R. § 340.0(a)..............................................................................................5, 18
5  7 C.F.R. § 340.1 .................................................................................................4, 5
   7 C.F.R. § 340.2(a)............................................................................................4, 18
6  7 C.F.R. §340.6 .....................................................................................4, 5, 18, 19
   40 C.F.R. § 1501.4(b) ........................................................................................6, 7
7  40 C.F.R. § 1502.14(a) ..........................................................................................6
   40 C.F.R. § 1502.16 ..............................................................................................6
8  40 C.F.R. § 1508.7..........................................................................................6, 15
   40 C.F.R. § 1508.8 ................................................................................................6
9  40 C.F.R. § 1508.9 ................................................................................................6
   40 C.F.R. §1508.14 .............................................................................................11
10 40 C.F.R. § 1508.27(b)(3).....................................................................................6

11

**FEDERAL REGISTER NOTICES**

12
64 Fed. Reg. 5628 (Feb. 4, 1999) ......................................................................14
13 65 Fed. Reg. 13534 (Mar. 13, 2000)..................................................................12
   65 Fed. Reg. 52693 (Aug. 30, 2000)..................................................................14
   70 Fed. Reg. 5601 (Feb. 3, 2005) ......................................................................14
14 70 Fed. Reg. 70 (Jan. 3, 2005) ...........................................................................14
   72 Fed. Reg. 42373 (Aug. 2, 2007).....................................................................14

15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

At issue in this case is the Department of Agriculture's decision to deregulate a genetically engineered ("GE") variety of sugar beet that – unlike conventionally bred varieties and most plants – is able to tolerate the chemical glyphosate, the active ingredient in the powerful herbicide Roundup. Deregulation allows these "Roundup Ready" sugar beets to be grown and distributed commercially throughout the United States without permits, labeling, or other restrictions.

It may be decades before the full environmental, agricultural, and health impacts associated with farming and consuming Roundup Ready sugar beets are completely understood.  However, several significant impacts are already well known, and they are well documented in the record. First, wind-blown pollen and carelessly handled seed from Roundup Ready sugar beets will cause non-GE sugar beets and related crops like table beets and chard to become contaminated with GE material.  Such biological contamination will have a significant impact on organic and conventional farmers who market GE-free crops, as well as consumers who choose to consume such crops. Second, the deregulation of Roundup Ready sugar beets will exacerbate the proliferation of weeds that are resistant to glyphosate.  These "super weeds" are increasingly having a significant impact on agriculture, and their control involves additional applications of toxic herbicides.  Third, at least in the near term – before the proliferation of glyphosate-resistant weeds renders glyphosate and Roundup Ready crops largely obsolete – the deregulation of Roundup Ready sugar beets will lead to an increase in the use of glyphosate.  The increased use of this herbicide will have a significant impact on the environment.

Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., the Department of Agriculture had a duty to analyze and disclose the significant adverse impacts associated with deregulating Roundup Ready sugar beets in an environmental impact statement. However, the Department prepared only a cursory environmental assessment that fails to take NEPA's requisite "hard look" at environmental impacts.  Moreover, the Department concluded without any rational basis – and despite overwhelming record evidence to the contrary – that Roundup Ready sugar beets do not present a plant pest risk, in violation of the Plant Protection Act, 7 U.S.C. § 7701 *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 706.

1    Plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club and High Mowing

2    Organic Seeds ask this Court to (1) find and declare that the Department's deregulation of Roundup

3    Ready sugar beets violated NEPA, the Plant Protection Act, and the Administrative Procedure Act,

4    (2) order the Department to prepare a full environmental impact statement as required by NEPA, and

5    (3) initiate proceedings to determine appropriate remedies.

6                                **FACTUAL BACKGROUND**

7    **Sugar Beets (*Beta vulgaris* spp. *vulgaris*)**

8            Sugar beets are leafy green vegetables that are cultivated for their large taproot, which is high

9    in sucrose and can be refined into crystalline sugar.  AR 603.[1]  Grown on approximately 1.3 million

10   acres throughout the northern and western Unites States, sugar beets account for more than half of

11   all refined sugar produced domestically.  *See* Fed. Defs' Answer to Complaint (Doc. 15) ("Answer")

12   at ¶¶ 38-39.  Sugar beet sugar is used in a wide variety of foods and beverages, from confections to

13   soft drinks, making sugar beets one of the country's most important crops.  AR 603.

14           Sugar beets are closely related to table beets and chard, all of which are varieties of a species

15   known as *Beta vulgaris*.  AR 823.  Different varieties of the *Beta vulgaris* species can cross-pollinate

16   (*e.g,* sugar beets can cross-pollinate with chard), and the resulting hybrid plants are fully fertile.  AR

17   823.  In addition, sugar beets can cross-pollinate with wild relatives, including a common weed

18   known as *Beta macrocarpa* that is widespread in California's Imperial Valley.  AR 824.  According

19   to the Department of Agriculture, "hybrids between *Beta macrocarpa* and commercial sugar beets

20   are a weed problem in [sugar beet] production fields" in the Imperial Valley.  AR 823.

21           Sugar beets are normally biennials.  AR 534.  During the first growing season, the plant

22   produces green foliage and a bulbous white taproot.  AR 534.  During the second growing season,

23   the plant produces a tall flowering stalk in a process that is referred to as "bolting."  AR 534.  Sugar

24   beet flowers produce abundant pollen, which is dispersed widely by wind and insects, as well as

25   numerous tiny seeds, which repeat the life cycle when pollinated.  AR 535.

26           Sugar beets are most often planted in the spring, although mild winters allow earlier planting

27

28   ---
     [1] Documents contained in the administrative record lodged with the Court by the federal defendants
     on April 18, 2008 are cited as "AR" followed by the Bates number.

1  in California's Imperial Valley.  AR 603; AR 824.  Sugar beet roots are generally harvested in the

2  same year they were planted, before flowering occurs.  AR 823.  However, certain conditions, such

3  as low temperatures after planting and longer day length, can cause sugar beets to bolt and flower

4  before harvest.  AR 823.  Additionally, volunteer sugar beet plants, known as ground keepers, can

5  grow from residual root material left behind after harvest and flower during the next season.  AR

6  632; AR 813.  As a result of early bolting plants and ground keepers, fields where sugar beets are

7  grown for their roots remain a significant source of pollen and seed.  AR 634.

8          To generate seeds for planting elsewhere, sugar beets are planted in autumn and allowed to

9  flower and set seed immediately after the cold winter months.  AR 534.  Sugar beet seed production

10 takes place primarily in Oregon's Willamette Valley, where approximately 3,000 to 5,000 acres of

11 sugar beet seed are grown annually.  AR 634.  The Willamette Valley is also an important area for

12 seed production for the related crops Swiss chard and table beet.  AR 634.

**Roundup Ready Sugar Beets**

13

14         The sugar beets at issue in this case have been genetically engineered by the U.S. company

15 Monsanto and the German company KWS to resist the chemical glyphosate.  AR 807.  Glyphosate-

16 based herbicides, such as Monsanto's own "Roundup" brand, normally kill plants by inhibiting an

17 enzyme that is necessary for the conversion of sugars into amino acids.  AR 645.  By inserting

18 genetic material from a species of *Agrobacterium* into the sugar beet genome, Monsanto and KWS

19 artificially engineered a new strain of "Roundup Ready" sugar beet (referred to officially as "event

20 H7-1" sugar beets) whose metabolic process is unaffected by glyphosate.  AR 807.

21         In theory, when glyphosate is applied to fields that are planted in Roundup Ready crops, the

22 weeds are killed but the Roundup Ready crop are unaffected.  *See generally Monsanto v. David*, 516

23 F.3d 1009, 1011-12 (Fed. Cir. 2008) (describing Roundup Ready technology).  In reality, the

24 situation is far more complex.  As will be discussed in detail below, the cultivation of Roundup

25 Ready crops results in the unintentional breeding – either indirectly through selective pressure or

26 directly through accidental cross-pollination – of weeds that are themselves able to withstand

27 glyphosate.  Scientists warn that, over time, the proliferation of glyphosate-resistant weeds will

28 render both Roundup Ready technology and glyphosate itself obsolete.  AR 825

1

**The Deregulation of Roundup Ready Sugar Beets**

2       Bacteria of the genus *Agrobacterium* are identified as plant pests in regulations adopted by

3   the Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS") to

4   implement the Plant Protection Act.  7 C.F.R. § 340.2(a).  Because Roundup Ready sugar beets

5   contain genetic material from *Agrobacterium*, they were initially considered "regulated articles"

6   under the Plant Protection Act, 7 C.F.R. § 340.1, and therefore could not be introduced into the

7   environment without a permit from APHIS, 7 C.F.R. §340.6.  *See also* AR 689 (discussing the

8   regulation of Roundup Ready sugar beets under the Plant Protection Act).

9       On November 19, 2003, Monsanto and KWS petitioned APHIS to "deregulate" event H7-1

10  Roundup Ready sugar beets.  AR 360.  A GE crop that is deregulated by APHIS can be grown and

11  distributed commercially without notification, permits, or other restrictions.  AR 809.  For example,

12  APHIS cannot impose isolation distances on growers of deregulated GE crops to ensure that they do

13  not cross-pollinate with non-GE varieties.  Nor can APHIS ensure that food produced from

14  deregulated GE crops is labeled as such.  As far as APHIS is concerned, a GE crop that has been

15  deregulated is no different from any conventionally-bred variety.

16      On October 19, 2004, APHIS published notice of Monsanto and KWS' petition in the

17  Federal Register, AR 688, and made available to the public a cursory draft environmental assessment

18  of deregulation's purported impacts on the environment, AR 690.  APHIS received several public

19  comments, including comments opposing deregulation from plaintiff Center for Food Safety, AR

20  714, and comments opposing deregulation from Imperial Sugar Company, a large U.S. sugar

21  processor, AR 793.  Among other things, these organizations cited evidence that deregulating

22  Roundup Ready sugar beets would result in the contamination of non-GE crops, the proliferation of

23  glyphosate-resistant weeds, and an overall increase in the use of glyphosate.  The Center for Food

24  Safety specifically urged APHIS to analyze these impacts in a thorough environmental impact

25  statement, as is required by NEPA.  AR 714.

26      On March 17, 2005, APHIS announced that event H7-1 Roundup Ready sugar beets do not

27  present a plant pest risk and would no longer be regulated under the Plant Protection Act.  AR 795.

28  APHIS did not disclose the significant impacts associated with deregulation in an environmental

impact statement. Instead, APHIS adopted a short environmental assessment that claims deregulation will not have any environmental impacts of significance. AR 797. Based on this cursory analysis, APHIS concluded:

> H7-1 sugar beet . . . is unlikely to increase the weediness potential of any other cultivated or wild species with which it can interbreed; will not cause damage to raw or processed agricultural commodities; . . . and should not reduce the ability to control pests and weeds in sugar beet or other crops.

AR 796. As detailed below, APHIS' conclusions in this regard are arbitrary and capricious, and they are contradicted directly by overwhelming evidence in the record.

## LEGAL BACKGROUND

**The Plant Protection Act**

The Plant Protection Act of 2000 reflects Congress' judgment that the "the detection, control, eradication, suppression, prevention, or retardation of the spread of plant pests or noxious weeds is necessary for the protection of the agriculture, environment, and economy of the United States." 7 U.S.C. § 7701(1). With certain limited exceptions, the statute provides that "no person shall import, enter, export, or move in interstate commerce any plant pest" without a permit from the Department of Agriculture. 7 U.S.C. § 7711(a). The term "plant pest" is defined to include any living stage of any bacterium that can "directly or indirectly injure, cause damage to, or cause disease in any plant or plant product." 7 U.S.C. § 7702(14)(D).

Pursuant to the Plant Protection Act, the Department of Agriculture, acting through APHIS, has adopted regulations that prohibit the introduction of any "regulated article" into the environment without a permit. 7 C.F.R. § 340.0(a). The term "regulated article" is defined to include "any organism which has been altered or produced through genetic engineering," if the donor organism, recipient organism, or vector has been identified by APHIS as a "plant pest." 7 C.F.R. § 340.1. *See also id.* at § 340.0(a)(2) n.1 ("Part 340 regulates, among other things, the introduction of organisms and products altered or produced through genetic engineering that are plant pests or are believed to be plant pests.").

Any person may petition APHIS to determine that a particular regulated article does not present a plant risk and therefore should not be regulated. 7 C.F.R. § 340.6(a). Upon receiving a

1    deregulation petition, APHIS must publish notice in the Federal Register and invite public comment.

2    7 C.F.R. § 340.6(d)(2).  If APHIS determines that the organism in question is not a plant pest, it is no

3    longer subject to the Plant Protection Act and can be disseminated freely without a permits, labels, or

4    other restrictions.

5    **The National Environmental Policy Act**

6        "NEPA is a procedural statute that does not mandate particular results, but simply provides

7    the necessary process to ensure that federal agencies take a hard look at the environmental

8    consequences of their actions."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007).  At

9    its core, NEPA directs federal agencies to prepare an environmental impact statement ("EIS") for all

10   "major federal actions significantly affecting the quality of the human environment."  42 U.S.C.

11   § 4332(2)(C).  An EIS must "rigorously explore and objectively evaluate all reasonable alternatives"

12   to the proposed federal action.  40 C.F.R. § 1502.14(a).[2]  An EIS must also include a full and fair

13   discussion of the proposed action's effects and their significance.  40 C.F.R. § 1502.16.  Relevant

14   effects may be "ecological . . . aesthetic, historic, cultural, economic, social, or health, whether

15   direct, indirect, or cumulative."  40 C.F.R. § 1508.8.  "Indirect" effects are "caused by the action and

16   are later in time or farther removed in distance, but are still reasonably foreseeable," 40 C.F.R.

17   § 1508.8(b), while "cumulative" effects "result[] from the incremental impact of the action when

18   added to other past, present, and reasonably foreseeable future actions," 40 C.F.R. § 1508.7.

19       Where the preparation of an EIS is neither categorically required nor categorically excluded

20   by regulation, agencies must prepare an environmental assessment ("EA").  40 C.F.R. § 1501.4(b).

21   An EA must provide evidence and analysis sufficient to determine whether the proposed action will

22   have a significant effect on the environment, and therefore whether an EIS is required.  40 C.F.R.

23   § 1508.9.  A number of factors are considered in this analysis, including "proximity to . . . prime

24   farmlands," the "degree to which the effects on the quality of the human environment are likely to be

25   highly controversial," the "degree to which the possible effects on the human environment are highly

26

27   _____

[2] NEPA is accompanied by implementing regulations promulgated by the Council on Environmental Quality, 40 C.F.R. §§ 1501.1-1508.28, which are "entitled to substantial deference."  *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

28

uncertain or involve unique or unknown risks," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(3), (4), (5), (7). An action's impacts may be "significant" if just one of these factors is present. *See Center for Biological Diversity v. National Highway Traffic Safety Admin.*, 508 F.3d 508, 553 (9th Cir. 2007).

If, after preparing an EA, an agency concludes the proposed action will not have a significant effect on the environment, it may prepare a brief finding of no significant impact ("FONSI") in lieu of an EIS. 40 C.F.R. § 1501.4(e). However, it is well established that "[a]n EIS must be prepared if substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Natural Resources Defense Council v. Winter*, 518 F.3d 658, 688 (9th Cir. 2008) (emphasis added) (quoting cases). "Thus, a plaintiff need not show that significant effects on the environment will in fact occur; raising substantial questions whether a project may have a significant effect on the environment is enough." *Id.* As the Ninth Circuit has recognized, "[t]his is a low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) (emphasis added).

Moreover, "an agency may not avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." *Natural Resources Defense Council*, 518 F.3d at 688. "If an agency opts not to prepare an EIS, it must put forth a convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* The Ninth Circuit has held that "[t]he statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Center for Biological Diversity*, 508 F.3d at 553.

**Geertson Seed Farms v. Johanns**

This is not the first case to examine the interplay between the Plant Protection Act and NEPA in the context of deregulating a Roundup Ready crop. In *Geertson Seed Farms v. Johanns*, No. C 06-01075 CRB, 2007 WL 518624 (N.D. Cal. Feb. 13, 2007) (hereinafter, "*Geertson*"), this District Court concluded that APHIS' decision to deregulate Round Ready alfalfa was a major federal action significantly affecting the environment requiring the preparation of an EIS. The court's reasoning in that case is instructive.

First, the court found there was "a realistic potential" for pollen and seeds from Roundup Ready alfalfa to contaminate conventional and organic alfalfa varieties. *Id.* at \*5. The court held that the possibility that contamination might "eliminate[e] a farmer's choice to grow non-genetically engineered alfalfa and a consumer's choice to consume such food" was a significant impact that required the preparation of an EIS. *Id.* at \*9. Second, the court found that "the use of Roundup Ready alfalfa may result in the development of Roundup-tolerant weeds," and held that APHIS' failure to take a hard look at this issue violated NEPA. *Id.* at \*9-10. Third, the court recognized evidence that the deregulation of Roundup Ready alfalfa could result in the increased use of glyphosate. *Id.*

In short, as will be discussed further below, *Geertson* strongly supports plaintiffs' claims in the present case that the deregulation of Roundup Ready sugar beets is a major federal action with significant impacts that requires preparation of an EIS.

## STANDARD OF REVIEW

APHIS' decision to deregulate Roundup Ready sugar beets is subject to judicial review under the Administrative Procedure Act ("APA"). *See Geertson Seed Farms*, 2007 WL 518624, at \*3 (reviewing APHIS' deregulation of Roundup Ready alfalfa under the APA). Under the APA, this Court must set aside APHIS' decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). According to the Ninth Circuit:

> An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.

*The Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). This Court's review should be "searching and careful," and the Court "must not rubber stamp administrative decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 858-59 (9th Cir. 2005).

## ARGUMENT

There can be no genuine dispute as to any of the material facts in this case, all of which are contained in the administrative record prepared by APHIS and lodged with the Court on April 18,

1    2008.  Since the record demonstrates that APHIS' decision to deregulate Roundup Ready sugar beets

2    was arbitrary, capricious, and otherwise not in accordance with law, summary judgment in favor of

3    plaintiffs is appropriate.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

4    (1986) (articulating summary judgment standard).[3]

5  **I.    APHIS Violated NEPA by Failing to Prepare an Environmental Impact Statement in
         Connection With Its Decision to Deregulate Roundup Ready Sugar Beets.**

6
7           As discussed above, APHIS did not prepare an EIS in connection with its decision to

8    deregulate Roundup Ready sugar beets, but rather a cursory EA and finding of no significant impact.

9    AR 797.  The EA is wholly inadequate, and fails to take a hard look at the environmental

10   consequences of deregulation as NEPA requires.  Because the record in this case at a minimum

11   raises substantial questions as to whether the deregulation may have a significant impact on the

12   environment, APHIS violated NEPA by failing to prepare an EIS.

13       **A.    Deregulation Will Result in the Biological Contamination of Non-GE Crops.**

14          **1.    Roundup Ready Sugar Beets Are Likely to Cross-Pollinate with Non-GE
                   Crops and Cause them to Become Contaminated with GE Material.**

15          The term "biological contamination" refers to the unintended comingling of GE crops with

16   non-GE crops.  "Biological contamination can occur through pollination of non-genetically

17   engineered plants by genetically engineered plants or by the mixing of genetically engineered seed

18   with natural, or non-genetically engineered seed."  *Geertson*, 2007 WL 518624, at *4.  As this

19   District Court noted in *Geertson*:  "Once the gene transmission occurs and a farmer's seed crop is

20   contaminated with the Roundup Ready gene, there is no way for the farmer to remove the gene from

21   the crop or control its further spread."  *Id.*  The record in this case demonstrates that pollen and seed

22   from Roundup Ready sugar beets are likely to result in the contamination of non-GE sugar beets and

23   related crops such as table beets and chard.

24          APHIS admits that "it is possible for sugar beets genetically engineered to be resistant to

25   glyphosate to cross-pollinate with chard and table beets."  Answer at ¶ 2.  *See also* AR 823 ("Sugar

26
27   ---
     [3] Plaintiffs have standing to bring this action.  *See Bennett v. Spear*, 520 U.S. 154, 162 (1997)
     (articulating standing requirements) and Declarations of Neil Carmen, Donna Hoffman, Frank
28   Morton, Bernard Macdonald, Erica Martenson, Tom Stearns, Matthew Dillon, Andrew Kimbrell,
     Lori Ann Burd, Mark Des Marets, and Don Tipping, submitted herewith (demonstrating standing).

beet hybridizes freely with all members of the section *Beta* and the resulting progeny are fully

fertile."). If cross-pollination occurs, APHIS concedes that the resulting hybrid seed may become

contaminated with the GE Roundup Ready trait. AR 806 ("Gene introgression from these sugar

beets into . . . cultivated sexually compatible plants is possible."). Nevertheless, the EA prepared by

APHIS does not take a hard look at the potential for Roundup Ready sugar beets to cross-pollinate

with non-GE crops and cause biological contamination.

Sugar beets are pollinated by both wind and insects, and scientists have documented that

sugar beet pollen can disperse across very large distances. *See* AR 4104 ("Pollen dispersal by wind

has been shown to occur up to 800 [meters] at relatively high frequencies, and under certain

atmospheric conditions are likely to be dispersed more widely."). Because sugar beet pollen is so

easily dispersed, there is abundant evidence that the commercialization of Roundup Ready sugar

beets is likely to result in the contamination of conventional and organic crops. *See, e.g.,* AR 4098

("The potential for sugar beet pollen to become airborne seem to be high. . . . When this is combined

with the very high peak pollen release that can occur . . . it would seem that the potential for long

distance distribution under appropriate atmospheric conditions is high."); AR 2977 ("Gene flow is

hard to control in wind-pollinated plants like beet."). The potential for contamination is especially

great here, because almost all sugar beet, table beet, and Swiss chard seed – whether conventional,

organic, or Roundup Ready – is produced in Oregon's Willamette Valley in open-air fields where

plants are encouraged to flower, generate pollen, and set seed. AR 634. *See also Geertson*, 2007

WL 518624, at *5 ("[G]ene transmission is especially likely in this context given the geographic

concentration of alfalfa seed production.").

As this District Court found previously, once a GE crop is deregulated "the government will

not be able to impose isolation distances on the growers of [the GE crop]; in other words, it cannot

ensure that farmers using the genetically engineered seed will be [isolated] from seed farmers who

do not wish to grow [the GE crop]." *Geertson*, 2007 WL 518624, at *5. In this case, the record

shows that one of the country's largest sugar processors, Imperial Sugar Company, specifically

cautioned APHIS that "observers in the scientific community have raised serious doubts as to the

adequacy of current regulations and control regimes intended to prevent cross-pollination and related

1  problems in the field." AR 794. APHIS nevertheless failed to address the potential for biological

2  contamination in its EA. Instead, APHIS concluded without any support or analysis that "non-

3  transgenic sugar beet will likely still be sold and will be available to those who wish to plant it." AR

4  816. In this case as in *Geertson,* "APHIS's reasons for concluding that the potential for the

5  transmission of the genetically engineered gene is not significant are not 'convincing' and do not

6  demonstrate the 'hard look' that NEPA requires." 2007 WL 518624, at *6.

7           **2.**      **Contamination Will Have a Significant Impact on Farmers and**
                     **Consumers of Non-GE Crops.**

8

9       Biological contamination will have potentially devastating socio-economic effects on farmers

10  and processors who do not want to grow or market GE crops. As Imperial Sugar Company noted in

11  its comments to APHIS, "many buyers of industrial and consumer sugars have expressed either

12  extreme reluctance or an emphatic opposition to receiving such GMO sugars [*i.e.,* sugar derived

13  from genetically modified organisms]." AR 793. Imperial Sugar explained that there are several

14  reasons for this:

15      1) A belief that consumers react negatively to products containing or derived from
    GMO material and a lack of willingness to test this acceptance with their branded
    products.

16

17      2) Some countries will not allow GMO products to be imported.

18      3) Labeling requirements for exporting food products to many nations that
    specifically require the labeling of GMO content.

19      4) Concerns that the current marketing, transportation and manufacturing systems are
    generally not able to keep product batches in an identity preserved manner.

20

21  AR 793-94.

22       Contamination will also have an obvious impact on consumers who chose not to eat GE-

23  food. Indeed, consumers determined to avoid GE-food may have little choice but to reject all

24  processed food that could contain sugar beet sugar as well as chard and table beets, since there will

25  be essentially no way of knowing whether such food is contaminated. *See Geertson*, 2007 WL

26  518624, at *9 ([T]he significant impact that requires the preparation of an EIS is the possibility that

27  the deregulation of Roundup Ready alfalfa will degrade the human environment by eliminating a

28  farmer's choice to grow non-[GE] alfalfa and a consumer's choice to consume such food.").

1    APHIS concedes it did not consider the "full socio-economic impacts" associated with

2  deregulating Roundup Ready sugar beets.  AR 801.  It attempted to justify this shortcoming by

3  arguing that "[t]o enter into a discussion of the socio-political and economic impacts of granting

4  nonregulated status goes beyond the intent [of] an EA and the authority of APHIS."  *Id*.  This

5  statement demonstrates a fundamental misunderstanding of NEPA.

6    The rule under NEPA is that socio-economic effects are relevant and must be examined

7  "when they are interrelated with natural or physical environmental effects."  *Ashley Creek Phosphate*

8  *Co. v. Norton*, 420 F.3d 934, 944 (9th Cir. 2005) (quoting 40 C.F.R. §1508.14).  As the court

9  explained in *Geertson*:  "The economic effects on the organic and conventional farmers of the

10  government's deregulation decision are interrelated with, and, indeed, a direct result of, the effect on

11  the physical environment; namely, the alteration of a plant species' DNA through the transmission of

12  the genetically engineered gene to organic and conventional [crops]."  2007 WL 518624, *8.

13  Moreover, "one of Congress's express goals in adopting NEPA was to attain 'the widest range of

14  beneficial uses of the environment without degradation, risk to health and safety, *or other*

15  *undesirable and unintended consequences*.'"  *Id.* (emphasis in original) (quoting 42 U.S.C.

16  § 4331(b)(3)).  "A federal action that eliminates a farmer's choice to grow non-genetically

17  engineered crops, or a consumer's choice to eat non-genetically engineered food, is an undesirable

18  consequence:  another NEPA goal is to 'maintain, wherever possible, an environment which

19  supports diversity and variety of individual choice.'"  *Id.* (quoting 42 U.S.C. § 4331(b)(4)).

20    Equally unpersuasive is APHIS' claim that there will be no impacts on organic farmers

21  because the presence of a detectable GE material "does not necessarily constitute a violation of the

22  National Organic Standards."  AR 816.  During the implementation of the Organic Food Production

23  Act, the Department of Agriculture indicated that the presence of GE contaminants would render a

24  product unmarketable as organic.  The Department explained:

25      [C]onsumers have made clear their opposition to the use of [GE] techniques in
26      organic food production.  This rule is a marketing standard, not a safety standard.
        *Since use of genetic engineering in the production of organic food runs counter to*
        *consumer expectations, [GE foods] will not be permitted to carry the organic label.*

27
28  65 Fed. Reg. 13535 (Mar. 13, 2000) (emphasis added).  Thus, as the *Geertson* court found:

1
2
3
4
5

> [E]ven APHIS is uncertain whether farmers can still label their products organic under the federal government's organic standards.  Second, many farmers and consumers have higher standards than what the federal government currently permits; to these farmers and consumers organic means not genetically engineered, even if the farmer did not intend for his crop to be so engineered. . . . Third, and most importantly, APHIS's comment simply ignores that these farmers do not want to grow . . . genetically engineered alfalfa, regardless of how such alfalfa can be marketed.

6
7

2007 WL 518624, at *7.  Here, as in *Geertson*, "APHIS reasoning that farmers will 'not necessarily' be prohibited from labeling their products as organic is wholly inadequate."  *Id*. at *7.

8
9
10

In short, there is overwhelming evidence that the deregulation of Roundup Ready sugar beets will result in the contamination of non-GE crops and have a significant impact on farmers and consumers.  APHIS' failure to analyze and disclose this impact in an EIS violated NEPA.

11
12

**B.    Deregulation Will Exacerbate the Proliferation of Glyphosate-Resistant Weeds.**

    **1.    The Commercial Production of Roundup Ready Sugar Beets Will Breed Glyphosate-Resistant Weeds.**

13
14
15

The deregulation of Roundup Ready sugar beets will have a significant direct and cumulative impact on the proliferation of glyphosate-resistant weeds.  There are two distinct reasons for this phenomenon.

16
17
18
19
20
21

First, Roundup Ready sugar beets can cross-pollinate with feral weed beets and related weed species like *Beta macrocarpa*.  *See* Answer at ¶ 40 (averring that "sugar beets are grown in California, and a related species (*Beta macrocarpa*) that could potentially cross-pollinate with sugar beets also occurs there.").  Through cross-pollination, it is reasonably foreseeable that these weeds will acquire the Roundup Ready trait and become glyphosate resistant themselves.  Thus, APHIS explains in its EA:

22
23
24
25
26
27

> Sugar beet production continues in [California's] Imperial Valley and is a major center of production.  There are free living sugar beets that have escaped cultivation and have persisted and these plants are a minor weed problem in this area.  <u>Movement of the transgenes from H7-1 to these plants is likely.</u>  In addition, *B. macrocarpa* species grows as a weed beet in sugar beet fields in this location, and even though *B. macrocarpa* usually flowers earlier than sugar beet, it can cross with sugar beet bolters when flowering times overlap.  In the Imperial Valley, sugar beet is grown in winter culture, and vernalization (bolting) of sugar beet is a common phenomenon due to moderately cold winter weather. . . .  <u>Therefore, escape of the engineered trait into weed beet populations is possible.</u>

28

AR 824 (emphasis added).  The record shows that scientists overwhelmingly agreed that cross-

pollination with Roundup Ready sugar beets would cause weed beets to acquire the Roundup Ready gene and become glyphosate-resistant. *See, e.g.,* AR 2949 ("Our conclusion . . . is that there will be an exchange and an introgression of transgenes in the wild beet populations."); AR 4617 ("If transgenic sugar beet are commercialized, outcrossing of the modified traits has to be taken into account if sugar beet are grown close to wild beet habitats."); AR 3225 ("We have shown that the eventual formation of transgenic weed beets is not only possible, but even probable."); AR 3090 ("[T]he risks of transgenic material escaping to adventitious . . . beet are considerable.").

Second, it is well established that the deregulation of Roundup Ready crops has resulted in a significant increase in the use of glyphosate. Indeed, a comprehensive 2004 study concluded that the commercial production of Roundup Ready crops "increased herbicide use by *138 million pounds*" over a nine-year period. AR 3050 (emphasis added). But just as overusing antibiotics inevitably breeds antibiotic-resistant bacteria, increased use of glyphosate has bred glyphosate-resistant weeds. This is due to "the naturally occurring inheritable ability of some weed biotypes within a given weed population to survive a herbicide treatment that should, under normal use conditions, effectively control that weed population." AR 648. *See also* AR 3949 (http://ipm.osu.edu/trans/122_121.htm) ("Researchers say the culprit in glyphosate resistance . . . is continuous use of glyphosate in Roundup Ready cropping systems"); AR 3017 ("Reliance on a single herbicide, glyphosate, as the primary method for managing weeds on millions of acres planted to [Roundup Ready] varieties remains the primary factor that has led to the need to apply more herbicides per acre to achieve the same level of weed control."); *Geertson*, 2007 WL 518624, at *9 ("APHIS acknowledges that the use of Roundup Ready alfalfa may result in the development of Roundup-tolerant weeds. The resistance develops because of the increased use of Roundup on the crops.").

The record in this case indicates that "[w]eed scientists have warned for about a decade that heavy reliance on [herbicide tolerant] crops would trigger changes in weed communities and resistance, in turn forcing farmers to apply additional herbicides and/or increase herbicide rates of application." AR 3016-17. Indeed, scientists have already identified Roundup Ready crops as a primary contributor to the proliferation of glyphosate-resistant weeds. One study explains:

> Until the widespread adoption of [Roundup Ready] crops, weed scientists had confirmed only two cases of glyphosate-resistant weeds – rigid ryegrass in Australia, South Africa, and the U.S., and goosegrass in Malaysia. Six different weeds are now resistan[t] in multiple countries and states, and there is a long list of weeds that have developed a degree of tolerance sufficient to require applications of other herbicides.

AR 3021. *See also* AR 3850-55 (APHIS biotechnologist Bruce MacBryde chronicling 20 separate glyphosate-resistant and/or -tolerant weeds in the United States in February 2004). Nevertheless, APHIS has deregulated numerous Roundup Ready crops already, and additional petitions are pending. *See, e.g.,* 72 Fed. Reg. 42373 (Aug. 2, 2007) (deregulating a variety of Roundup Ready soybean); 70 Fed. Reg. 5601 (Feb. 3, 2005) (announcing a petition to deregulate Roundup Ready alfalfa); 70 Fed. Reg. 70 (Jan. 3, 2005) (deregulating a variety of Roundup Ready cotton); 65 Fed. Reg. 52693 (Aug. 30, 2000) (deregulating a variety of Roundup Ready corn); 64 Fed. Reg. 5628 (Feb. 4, 1999) (deregulating a variety of Roundup Ready canola).

"While the deregulation of one crop in and of itself might not pose a significant risk for the development of glyphosate resistant weeds, when all the crops are considered cumulatively such a risk may become apparent." *Geertson,* 2007 WL 518624, at *10. "NEPA requires an agency to consider the environmental impact that results from the incremental impact of the action when added to other past, present and reasonably foreseeable actions." *Natural Resources Defense Council v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005) (quoting 40 C.F.R. § 1508.7). In this case, APHIS concedes that the deregulation of Roundup Ready sugar beets is likely to lead to an increase in the use of glyphosate. *See* Answer ¶¶ 13, 53. Yet APHIS nowhere considered the cumulative impact of this additional glyphosate. APHIS' failure in this regard is especially significant given that fields in which Roundup Ready sugar beets a grown are likely to be rotated with other Roundup Ready crops, such as Roundup Ready soy. According to Monsanto and KWS:

> Currently, other commercially available Roundup Ready crops are grown in sugar beet production states and Monsanto is petitioning []APHIS for a determination of nonregulated status for additional Roundup Ready crops. *Therefore, some of the rotational crops following Roundup Ready sugar beet production may be another Roundup Ready crop.*

AR 627-28 (emphasis added). When farmers rotate a series of Roundup Ready crops in their fields and douse each one with glyphosate, the likelihood of breeding glyphosate-resistant weeds is greatly increased. *See* AR 3051 ("The number of resistant weeds and their rate of spread is not surprising

given the degree of selection pressure imposed on weed populations by farmers applying glyphosate

herbicides multiple times per year, and sometimes year in and year out on the same field.").

In short, the record shows that the deregulation of Roundup Ready sugar beets will have a

significant direct and cumulative impact on the proliferation of glyphosate-resistant weeds. APHIS'

complete failure to take a hard look at such impacts violated NEPA.

### 2. Glyphosate-Resistant Weeds Have a Significant Impact on Agriculture.

"Due to the severe impact weeds can have on sugar beet production, weed control is

considered by many growers to be their most serious problem." AR 604. The record is replete with

evidence that the proliferation of glyphosate-resistant weeds will make weed control even more

difficult, costly, and harmful to the environment. *See, e.g.,* AR 4104 ("The hybridization between

wild beets and GM [*i.e.,* genetically modified] sugar beet is highly likely to lead to weed beets with

GM characters, which in the case of herbicide resistance or virus resistance may compound the weed

problem."); AR 3051 ("Resistance to glyphosate has emerged as a serious concern across most of the

intensively farmed regions of the U.S."); AR 4298 ("[T]ransfer of a gene conferring herbicide

tolerance to weed beet would bring us back to the current situation where control of weed beet in

beet fields can be difficult and expensive.").

The Center for Food Safety urged APHIS to consider the impact of glyphosate-resistant

weeds in its environmental review, but APHIS declined to do so. Instead, APHIS responded:

1. Glyphosate tolerant weeds exist.

2. None of the verified glyphosate tolerant weeds . . . is considered to be a major
weed in sugar beets.

3. Numerous herbicides are available for use on sugar beets that would provide an
alternative control for glyphosate tolerant weeds that might develop.

4. Cultural management practices in current use of large acreages (hand weeding,
mechanical cultivation, rotary hoeing, etc.) will always be available to growers.

AR 801 (citations omitted). This cursory "analysis" falls far short of what NEPA requires.

APHIS' first point misses the issue entirely. As the *Geertson* court held: "Reasoning that

weed species often develop resistance to herbicides is tantamount to concluding that because this

environmental impact has occurred in other contexts, it cannot be significant. Nothing in NEPA, the

relevant regulations, or the caselaw support such a cavalier response." 2007 WL 518624, at *10.

APHIS' second claim is similarly off target. As discussed above, the relevant "impact" is the likelihood that deregulation will breed a host of *new* glyphosate-resistant weeds that *will* affect sugar beets and other crops. And regardless – contrary to what APHIS claims – the record indicates that at least two *existing* glyphosate-tolerant weeds (pigweed and lambsquarter), AR 3850-51, *are* in fact considered "key weeds" in sugar beet fields, AR 604.

APHIS' third point begs a panoply of questions that go completely unexamined in the EA. Precisely what alternative herbicides are available? What would be the cost to farmers of switching to these purported alternatives? What would be impact to the environment of switching to alternative – likely more toxic – herbicides? APHIS fails entirely to take NEPA's requisite hard look at such issues.

APHIS' final assertion that "good stewardship" may be the only defense against glyphosate-resistant weeds is equally unconvincing. As the *Geertson* court found: "There may be ways to reduce the proliferation of weeds, but if farmers are not engaging (or cannot engage) in those practices, then the availability of those practices does not ameliorate the potential environmental impact." 2007 WL 518624, at *10.

In sum, there is overwhelming evidence that the proliferation of glyphosate-resistant weeds will have a significant impact on agriculture. APHIS' failure to analyze this impact thoroughly in an EIS violated NEPA.

## C.     Deregulation Will Result in an Increase in the Use of Glyphosate.

As discussed above, it is well established that the deregulation of Roundup Ready crops has led to a significant increase in the use of glyphosate. *See* AR 3050; Answer ¶¶ 13, 53. APHIS concedes that herbicides containing glyphosate – including Roundup in certain formulations – can be hazardous. *See* Answer ¶ 3 ("Roundup in certain formulations may contain chemicals that can be harmful if used improperly."). Nevertheless, APHIS declined explicitly to consider the impact of increased glyphosate use in its EA. *See* AR 805 ("This EA specifically addresses the potential for impacts to the human environment through the use in agriculture of [Roundup Ready sugar beets]. It does not address the separate issue of the potential use of the herbicide glyphosate in conjunction

1   with these plants.").  Instead, APHIS relied on the fact that "[t]he United States Environmental

2   Protection Agency (EPA) has authority over the use in the environment of all pesticidal substances

3   under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)."  AR 805.  APHIS'

4   approach violates NEPA.

5          The Ninth Circuit has long held that "[t]he EPA registration process for herbicides under

6   FIFRA is inadequate to address environmental concerns under NEPA."  *Save Our Ecosystems v.*

7   *Clark*, 747 F.2d 1240, 1248 (9th Cir. 1984).  The court has determined that "FIFRA does not require

8   or even contemplate the same examination that [an agency] is required to undertake under NEPA."

9   *Id.  See also Washington Toxics Coalition v. Environmental Prot. Agency*, 413 F.3d 1024, 1032 (9th

10  Cir. 2005) (same).  The Ninth Circuit has therefore made clear "that the registration and labeling of a

11  substance under FIFRA does not exempt an agency from its obligations under [NEPA]."

12  *Washington Toxics Coalition*, 413 F.3d at 1032.  *See also Northwest Coalition for Alternatives to*

13  *Pesticides v. Lyng*, 844 F.2d 588, 596 (9th Cir. 1998) ("EPA's registration of an herbicide under

14  [FIFRA] is inadequate to address NEPA environmental concerns and therefore reliance alone on that

15  registration process is improper."); *Save Our Ecosystems*, 747 F.2d at 1249 ("[An agency] cannot

16  abdicate its [NEPA] responsibilities by relying on another agency.  It must evaluate the impact of its

17  own actions."); *Oregon Envt'l Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir. 1983) ("One agency

18  cannot rely on another's examination of environmental effects under NEPA.").

19         In this case, APHIS' failure to take its own "hard look" at the environmental impact of taking

20  an action that it concedes will result in an increase in the use of glyphosate across thousands of acres

21  of prime farmland violated NEPA.  *See* 40 C.F.R. § 1508.27(b)(3).

22  **II.    The Deregulation of Roundup Ready Sugar Beets Violated the Plant Protection Act and
        the Administrative Procedure Act.**

23

24         APHIS' decision to deregulate Roundup Ready sugar beets violated the Plant Protection Act

25  and the Administrative Procedure Act, because the record does not support – indeed, it contradicts –

26  APHIS' conclusion that Roundup Ready sugar beets do not pose a plant pest risk.  As discussed

27  above, the Plant Protection Act defines the term "plant pest" to include any living stage of any

28  bacterium "that can directly or indirectly injure, cause damage to, or cause disease in any plant or

1    plant product." 7 U.S.C. § 7702(14)(D). APHIS has specifically identified bacteria that belong to

2    the genus *Agrobacterium* as plant pests. 7 C.F.R. § 340.2(a). Because Roundup Ready sugar beets

3    were genetically engineered from a species of *Agrobacterium*, AR 807, they are subject to regulation

4    by APHIS as potential plant pests. *See* 7 C.F.R. § 340.0(a)(2) n.1 ("Part 340 regulates, among other

5    things, the introduction of organisms and products altered or produced through genetic engineering

6    that are plant pests or are believed to be plant pests.").

7           In response to a petition, APHIS may determine that a particular GE organism – although it

8    contains genetic material from an indentified plant pest – does not pose a plant pest risk and should

9    not be subject to regulation under the Plant Protection Act. 7 C.F.R. § 340.6(a). Such a petition

10    must "substantiate that the regulated article [*i.e.*, the GE organism] is unlikely to pose a greater plant

11    pest risk than the unmodified organism from which it was derived [*i.e.,* the conventional crop]." 7

12    C.F.R. § 340.6(c)(4). In particular, the petition must consider the "weediness of the regulated article,

13    impact on the weediness of any other plant with which it can interbreed, agricultural or cultivation

14    practices . . . [and] indirect plant pest effects on other agricultural products." *Id.* APHIS' decision to

15    grant or deny a deregulation petition "shall be based on sound science." 7 U.S.C. § 7711(c)(3).

16           In this case, APHIS based its determination that event H7-1 Roundup Ready sugar beets do

17    not present a plant pest risk on six conclusory findings. Specifically, APHIS stated:

18           H7-1 sugar beet: (1) [e]xhibits no plant pathogenic properties; (2) is nor more likely
            to become weedy than the nontransgenic parental line or other cultivated sugar beet;
19           (3) is unlikely to increase the weediness potential of any other cultivated or wild
            species with which it can interbreed; (4) will not cause damage to raw or processed
20           agricultural commodities; (5) will not harm threatened or endangered species or
            organisms that are beneficial to agriculture; and (6) should not reduce the ability to
21           control pests and weeds in sugar beet or other crops.

22    AR 796. The problem for APHIS is that the record simply does not support APHIS' third, fourth,

23    and sixth findings above. To the contrary, the record demonstrates that Roundup Ready sugar beets

24    are <u>likely</u> to increase the weediness potential of wild species with which they can interbreed, <u>will</u>

25    harm raw and processed agricultural commodities, and <u>will</u> reduce the ability to control pests in

26    sugar beets and other crops. Because APHIS "offered an explanation for its decision that runs

27    counter to the evidence," APHIS' deregulation determination is arbitrary and capricious. *Motor*

28    *Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983). *See also Natural*

1  *Resources Defense Council*, 421 F.3d at 806 ("[A]rbitrary and capricious agency action exists when

2  the agency offers an explanation that runs counter to the evidence before the agency.").

3           **A.    Roundup Ready Sugar Beets Are Likely to Increase the Weediness Potential of**

4                  **Wild Species With Which They Can Interbreed.**

5          The record does not support APHIS' finding that Roundup Ready sugar beets are "not likely

6  to increase the weediness potential of any other cultivated or wild species with which [they] can

7  interbreed." AR 796. Instead, as discussed in section I(B)(1) above, the record is replete with

8  evidence that Roundup Ready sugar beets are indeed likely to interbreed with wild beets and cause

9  these weeds to acquire the "Roundup Ready" trait. *See, e.g.,* AR 2949 ("[T]here will be an exchange

10  and an introgression of transgenes in the wild beet populations."); AR 3225 ("[T]he eventual

11  formation of transgenic weed beets is not only possible, but even probable."); AR 3090 ("[T]he risks

12  of transgenic material escaping to adventitious . . . beet are considerable."). Indeed, APHIS

13  <u>concedes</u> in its EA that, at least in California's Imperial Valley, wild beets such as *Beta macrocarpa*

14  may interbreed with Roundup Ready sugar beets and become glyphosate-resistant. *See* AR 824

15  ("[E]scape of the engineered trait into weed beet populations is possible."). The record therefore

16  compels the conclusion that Roundup Ready sugar beets are likely to "increase the weediness

17  potential" of wild beets. *See, e.g.,* AR 4104 (concluding that hybrids between Roundup Ready sugar

18  beets and wild beets have the "potential for increased invasiveness" and "may compound the weed

19  problem"); AR 3225 (warning that hybrids "would bring us rapidly back to the current situation in

20  which no herbicide is available for weed beet control"); AR 4298 (concluding that hybrids could

21  make weed control "difficult and expensive").

22          Despite the forgoing, APHIS concludes in its EA that the proliferation of the Roundup Ready

23  gene would not increase the weediness of related species because glyphosate resistance "would not

24  confer any competitive advantage to these plants unless challenged by glyphosate." AR 824.

25  However, APHIS, fails to consider the logical – and inescapable – implication of this conclusion.

26  According to Monsanto, glyphosate is "the world's most popular herbicide active ingredient," AR

27  645, and it is the primary herbicide used on Roundup Ready crops (indeed, that is the reason

28  Monsanto developed Roundup Ready crops, and the reason farmers grow them). On farms

throughout the United States, weeds are all but guaranteed to be "challenged by glyphosate" since farmers use the herbicide routinely for weed control. Once weed beets like *Beta macrocarpa* interbreed with Roundup Ready sugar beets and become glyphosate resistant, they will have a competitive advantage and will therefore have increased "weediness potential."

In short, the record makes clear that Roundup Ready sugar beets are likely to interbreed with wild relatives and create hybrid weeds that are immune to glyphosate – the "world's most popular herbicide." AR 645. APHIS' finding that Roundup Ready sugar beets are "not likely to increase the weediness potential" of related wild beets runs counter to the evidence, making its deregulation determination arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

**B.     Roundup Ready Sugar Beets Will Harm Raw and Processed Agricultural Commodities.**

APHIS' conclusion that Roundup Ready sugar beets "will not cause damage to raw or processed agricultural commodities," AR 796, is likewise at odds with the evidence in the record. As discussed in section I(A)(1), it is undisputed that Roundup Ready sugar beets can cross-pollinate with conventional sugar beets, table beets, and chard and cause these crops to become contaminated with GE material. *See* Answer at ¶ 2 (averring that "it is possible for sugar beets genetically engineered to be resistant to glyphosate to cross-pollinate with chard and table beets"); AR 806 (conceding that "[g]ene introgression from these sugar beets into . . . cultivated sexually compatible plants is possible"). Because sugar beet pollen is dispersed by wind over long distances, AR 4104, the record indicates that biological contamination of organic and conventional sugar beets and related crops is likely to occur. *See* AR 2977 ("Gene flow is hard to control in wind-pollinated plants like beet."). The potential for contamination is particularly high, given that almost all sugar beet, table beet, and chard seed is grown in close proximity in Oregon's Willamette Valley. *See Geertson*, 2007 WL 518624, at *5 ("[G]ene transmission is especially likely in this context given the geographic concentration of alfalfa seed production.").

The record also shows that biological contamination, when it occurs, will damage raw and processed agricultural products. APHIS all but concedes that biological contamination could render organic and conventional beets and chard less valuable. AR 816. *See also Geertson*, 2007 WL

518624, at *5 ("Organic farmers will no longer be able to market their seed as non-genetically engineered [once they are contaminated], rendering their crops less valuable; consumers pay a premium for organic and non-genetically engineered food.").  Along the same lines, Imperial Sugar Company objected that contamination would damage processed sugar, citing evidence that, among other things, "consumers react negatively to products containing or derived from [GE] material," and "[s]ome countries will not allow [GE] products to be imported."  AR 793.

"Once the gene transmission occurs and a farmer's seed crop is contaminated with the Roundup Ready gene, there is no way for the farmer to remove the gene from the crop or control its further spread."  *Geertson*, 2007 WL 518624, at *5.  For farmers who choose to grow organic or conventional crops, and consumers who choose to consume such crops, biological contamination will certainly damage their raw and processed agricultural products.  Because APHIS' conclusion to the contrary is directly counter to the only evidence in the record, its decision to deregulate Roundup Ready sugar beets is arbitrary and capricious.

### C.     Roundup Ready Sugar Beets Will Reduce the Ability to Control Weeds.

Finally, the record directly contradicts APHIS' conclusion that Roundup Ready sugar beets "should not reduce the ability to control pests and weeds in sugar beets or other crops."  AR 796.  As discussed in section I(B)(1), the record demonstrates that the increased use of glyphosate associated with the shift to planting Roundup Ready sugar beets will exacerbate the growing problem of glyphosate-resistant weeds.  *See, e.g.,* AR 3021 (correlating increased use of glyphosate in connection with Roundup Ready crops with the proliferation of glyphosate-resistant weeds).  This is no different than was the situation with Roundup Ready alfalfa.  *See Geertson*, 2007 WL 518624, at *9 ("APHIS acknowledges that the use of Roundup Ready alfalfa may result in the development of Roundup-tolerant weeds.  The resistance develops because of the increased use of Roundup on the crops.").

As mentioned previously, glyphosate is "the world's most popular herbicide active ingredient."  AR 645.  Not surprisingly, the record shows that "[r]esistance to glyphosate has emerged as a serious concern across most of the intensively farmed regions of the U.S."  AR 3051.  By accelerating the spread of glyphosate-resistant weeds, Roundup Ready sugar beets and other

Roundup Ready crops are rapidly rendering glyphosate obsolete and thereby reducing farmers' ability to control weeds in sugar beets and other crops. *See* AR 3021 (noting a substantial increase in the number of glyphosate-resistant weeds following the widespread adoption of Roundup Ready crops); AR 3850-55 (chronicling 20 glyphosate-resistant and/or -tolerant weeds in the United States). The record shows that pigweed and lambsquarter – two "key weeds identified as problematic" in sugar beet fields, AR 604, are already showing signs of glyphosate tolerance. AR 3850-51. If farmers shift to growing Roundup Ready sugar beets, they will increase the selective pressure on these weeds and accelerate the breeding of pigweed and lambsquarter that are completely glyphosate-resistant.

In sum, APHIS' conclusion that Roundup Ready sugar beets "*should not* reduce the ability to control pests and weeds" is at odds with the evidence in the record. Its decision to deregulate Roundup Ready sugar beets is therefore arbitrary and capricious, in violation of the Plant Protection Act and the Administrative Procedure Act. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## CONCLUSION

APHIS failed to analyze and disclose the significant environmental, agricultural, and socio-economic impact associated with deregulating Roundup Ready sugar beets in a full environmental impact statement. In addition, APHIS based its decision to deregulate Roundup Ready sugar beets on conclusory findings that are unsupported and even contradicted by the evidence in the record. For these reasons, plaintiffs ask this Court to find and declare that APHIS' decision to deregulate Roundup Ready sugar beets violated NEPA, the Plant Protection Act and the Administrative Procedure Act. Plaintiffs request additionally that the Court order APHIS to prepare an environmental impact statement and initiate further proceedings to determine appropriate remedies.

Respectfully submitted,

Dated: June 2, 2008

  /s/ Gregory C. Loarie
GREGORY C. LOARIE
PAUL H. ACHITOFF
Earthjustice

KEVIN Z. GOLDEN
Center for Food Safety

*Counsel for Plaintiffs*

1 | KEVIN Z. GOLDEN, State Bar No. 233378
Center for Food Safety
2 | 2601 Mission Street, Suite 803
San Francisco, CA 94110
3 | T: (415) 826-2770 / F: (415) 826-0507
Email: kgolden@icta.org
4 |
5 | PAUL H. ACHITOFF (*Pro Hac Vice*)
Earthjustice
223 South King Street, Suite 400
6 | Honolulu, HI 96813
T: (808) 599-2436 / F: (808) 521-6841
7 | Email: achitoff@earthjustice.org

8 | GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
9 | 426 17th Street, 5th Floor
Oakland, CA 94612
10 | T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

11 |
*Counsel for Plaintiffs*
12 |

13 | UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
14 | SAN FRANCISCO DIVISION

15 | CENTER FOR FOOD SAFETY, *et al.*,     ) Case No.:  3:08-cv-00484-JSW
                                         )
16 |          Plaintiffs,                 )
                                         )
17 |                                      ) [PROPOSED] ORDER
     vs.                                 ) GRANTING PLAINTIFFS'
18 |                                      ) MOTION FOR SUMMARY JUDGMENT
                                         )
19 | EDWARD T. SCHAFER, *et al.*,         )
                                         )
20 |                                      )
             Defendants.                 )
21 | _____ )

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**[PROPOSED] ORDER**

The Court, having considered the memoranda and other papers submitted in support of and in opposition to plaintiffs' June 2, 2008 Motion for Summary Judgment, as well as the arguments of counsel at the hearing on this matter, hereby finds and declares that defendants' March 17, 2008 Determination of Nonregulated Status for Sugar Beet Genetically Engineered for Tolerance to the Herbicide Glyphosate, 70 Fed. Reg. 13007, was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706, the Plant Protection Act, 7 U.S.C. § 7701 *et seq.*, and applicable regulations.  In addition, the Court finds and declares that the environmental assessment and Finding of No Significant Impact prepared by defendants in connection with their March 17, 2008 Determination violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and further finds and declares that defendants violated NEPA by failing to prepare a full environmental impact statement.  The Court therefore GRANTS plaintiffs' Motion for Summary Judgment.


Dated:                                    _____
                                          Hon. Jeffrey S. White
                                          United States District Judge