KEVIN GOLDEN, State Bar No. 233378
Center for Food Safety
2601 Mission St., Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Email: kgolden@icta.org

PAUL H. ACHITOFF (*Pro Hac Vice*)
Earthjustice
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: achitoff@earthjustice.org

GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR FOOD SAFETY, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>EDWARD T. SCHAFER, *et al.*,<br><br>Defendants. | Case No.: 3:08-cv-00484-JSW<br><br>DECLARATION OF NEIL CARMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

I, Neil Carman, do hereby declare as follows:

1. I have personal knowledge of the following and could competently testify if called as a witness.

2. My principal place of residence is in Austin, Texas.

3. My Sierra Club membership is currently in good standing. My original Sierra Club membership dates back to the early 1980s.

4. I have a Ph.D. in Botany emphasizing natural products chemistry from the University of Texas at Austin and a B.S. and M.S. in Botany from the University of Iowa at Iowa City with master's research in biochemical systematics and genetics. My science degrees involved courses and labs in genetics: introductory genetics, plant genetics, plant cytogenetics, biochemical genetics, human genetics, and plant evolutionary genetics. Other courses advanced my understanding of the biochemistry and molecular biology of genes, DNA-RNA-protein synthesis, and gene expression--courses such as molecular biology, plant systematics, biochemical systematics, mycology, phycology, and ecology. My master's research in part studied the genetics of *Bidens* taxa by collecting flower buds in meiosis to study the number of chromosomes and to look for evidence of natural hybridization in plant populations. Chromosome number is just one specific trait to test in related, sexually compatible species.

5. I have extensively studied classical and molecular genetics, and based on my training and knowledge, I am concerned about the lack of scientific understanding of the new technology of genetic engineering, in particular the paucity of research into the potential hazards this technology poses to wild species and ecological systems. Genetic engineering or "recombinant DNA technology," because it involves the novel recombining of genes, is a new way of transferring genetic traits of one species into another, which includes artificial gene transfers into unrelated, sexually incompatible species.

6. I have worked for Sierra Club's Lone Star Chapter in Austin, Texas since 1992 as director of the Clean Air Program, focusing on a range of environmental issues. Since 2007, I have served as the Sierra Club's representative in the lawsuit over genetically engineered ("GE")

1  Roundup Ready sugar beets and report back to the Sierra Club's Environmental Law Program in
2  San Francisco and the Sierra Club's national Genetic Engineering Committee on which I am a
3  volunteer.
4      7.    As a Sierra Club member and unpaid volunteer, I serve as an officially appointed
5  member and biologist on the Sierra Club's national Genetic Engineering Committee ("GEC") to
6  help draft national policy papers to address the organization's scientific concerns over crop
7  research in genetic engineering and outdoor releases of GE organisms such as crop species into
8  agricultural fields and the environment. I have held this position on the Sierra Club's GEC for
9  nine years, since 1999, when it was created by the Board of Directors. I am one of several
10 scientists serving on the GEC. The Sierra Club's GEC educates the public and advocates for
11 regulatory reform to protect the natural environment and human health from the threats posed by
12 release of GE organisms.
13     8.    In 1999-2000, I helped the Sierra Club's GEC research a new comprehensive
14 Sierra Club national policy on genetic engineering. This policy, based on the widely accepted
15 precautionary principle, holds that GE crops should not be commercialized until they are shown
16 to be safe for humans and the environment. The Sierra Club's Genetic Engineering Policy of
17 2000 directly opposes the release of all GE organisms into nature based on legitimate biological
18 concerns over obvious weaknesses in the science of genetic engineering. The Sierra Club's
19 Genetic Engineering Policy was approved May 2000 by unanimous vote of the Board of
20 Directors (Attached as Exhibit A is a true and correct copy of Sierra Club's Genetic Engineering
21 Policy of 2000). The Sierra Club Genetic Engineering Policy serves as a basis for members to
22 raise scientific concerns over serous gaps in our knowledge of the nature and consequences of
23 genetic engineering.
24     9.    In addition, I have volunteered for twelve years as a scientific advisor to citizens
25 in Austin, Texas and nonprofit groups concerned with the biological hazards of genetic
26 engineering and GE foods in the U.S. due to the introduction of new GE crops into agriculture.
27 In this regard, I have spoken as a scientist nearly 100 times in Texas, Missouri, Arizona and
28

Florida on the hazards of genetic engineering of crops and foods. For example, I was invited to give a presentation on biological issues in GE foods to a Texas Medical Association Task Force on Genetically Modified Foods in September 2001.

10. The Sierra Club was established to protect endangered species, species habitat, pollution, and human health concerning environmental harms including genetic engineering and industrial agriculture. The Roundup-tolerant sugar beet falls within the scope of diverse concerns (i.e., environment and public health) that Sierra Club's GEC has been raising over novel GE crops since 1999.

11. As a scientist, I am deeply concerned about the lack of predictability in genetic engineering and the artificial lab methods of horizontal gene transfer used to facilitate transfer of genes across species barriers. Biological hazards stem from unintended consequences and unknown effects in using the power of recombinant DNA technology (popularly known as "genetic engineering") to create novel organisms. Recombinant DNA technology is unique among breeding technologies because it permits the transfer of genes between radically different species that could never sexually reproduce in nature or with the use of traditional breeding methods, including the transfer of genes between plants, animals, viruses, bacteria, fungi, insects, fish, and amphibians. Despite the radical nature of this technology, there has been extremely little independent research into its short-term and long-term effects.

12. The biological and ecological hazards presented by GE crops like the Roundup Ready sugar beet (event H7-1) includes the following:

A) Biological contamination via gene flow from transgenic crops to organic and conventional agricultural crops and to wild relatives. Transgenic gene flow can occur by pollen, and by escape of seeds and vegetative material (especially in biennials and perennials); cases of transgenic contamination of wild relatives have already been documented in several species.

B) The potential for the creation of superweeds by hybridization of transgenic species with conventional crops and wild relatives presents a biological risk for agricultural crops and an ecological risk for the environment. For example, hybridization of three herbicide-

tolerant canola varieties in Canada has resulted over time in canola plants that are resistant to three different herbicides, including the herbicide Roundup, posing serious weed control problems for Canadian farmers. GE canola has also hybridized with conventional and organic canola, causing additional agricultural problems for non-GE canola growers. Finally, GE canola has hybridized with wild, weedy relatives of canola, presenting both agronomic and ecological risks.

   C) Biological harm to non-target species such as soil organisms, non-pest insects, birds and other animals, presenting ecological risks extending far beyond the agricultural fields.

   D) Creation of new or more vigorous pests and pathogens, for example, when insect pests evolve new resistance to plant-incorporated insecticides engineered into the crops like cotton and corn.

   E) Disruption of biotic communities (including agroecosystems) indicates ecological risk.

   F) Irreparable loss or changes in species diversity or genetic diversity within species, which represent novel ecological risks.

   G) Unintended consequences due to complexities in the DNA and cell biochemistry, which poses both biological (to organic and conventional crops) and ecological risks to wild relatives and other organisms.

   H) Inadequately studied biological effects of recombinant DNA technology used to cross the species barriers of plants, animals, viruses, bacteria, fungi, insects, fish, amphibians, and other organisms in the different phylogenetic groups in nature.

   The concerns outlined above reveal that more scientific study is needed to comprehensively investigate the biological and ecological risks of transgenic crops on agriculture, humans and nature.

  13.  The Sierra Club and its 1.3 million members and supporters have an interest in the protection of wildlife including endangered species and their habitat. The Sierra Club has urban members who hike and camp out in wild, natural areas, and who are concerned about GE crops

such as Roundup Ready sugar beet. The spread of Roundup Ready sugar beet genes into the environment will impair their enjoyment of natural places. The high glyphosate residue levels permitted by EPA and increased Roundup use anticipated with Roundup Ready sugar beet may harm members' interests in endangered species and other wildlife that live near or feed upon sugar beet fields. The USDA's Deregulation Determination adversely affects me and other Sierra Club members because the action allows genetically engineered sugar beets to be commercially cultivated and placed in the stream of commerce without labeling, adequate environmental review, or any other safeguards.

14. As a member of the Sierra Club, I am adversely affected by the USDA's failure to comply with environmental laws regarding Roundup Ready sugar beet *Beta vulgaris*. My use and aesthetic enjoyment of the parks and hiking areas near Roundup Ready sugar beet fields will be altered if the native species are injured or killed by the introduction of genetically engineered Roundup-tolerant sugar beet and associated glyphosate use with this crop. I have twice visited the Willamette Valley, Oregon to hike in its wild areas in the last ten years. I plan to return to the Valley in the future. As a botanist for more than forty years, I have traveled extensively throughout the United States hiking in wild places in many parks, natural preserves, and scenic areas. I derive aesthetic enjoyment from the wondrous world of natural organisms and not genetically engineered life forms created in biotechnology laboratories that will alter the balance of nature in unpredictable ways.

15. The commercial introduction of GE glyphosate-tolerant sugar beets will lead to increased use of glyphosate herbicide, the use of which has already dramatically increased due to the widespread commercial planting of glyphosate-tolerant soybeans, cotton and corn. However, the USDA has thus far failed to conduct a cumulative environmental impact analysis of glyphosate and other pesticide use associated with Roundup Ready sugar beets in combination with other Roundup Ready crops. There has been no analysis of the impacts of increased pesticide use on the environment, particularly its impacts on wildlife, drinking water supplies for local communities, rural residents, and landowners and their farm animals. I will be harmed by the

increased use of Roundup on sugar beets.

16. I have additional concerns about harmful organic chemical surfactants such as polyoxyethylene alkylamine, typically used in Monsanto's proprietary "Roundup" formulations of glyphosate. These organic chemical surfactants in Roundup have been shown to increase glyphosate toxicity to amphibian species such as frogs. But such harmful ecological impacts have not been evaluated by the USDA, the U.S. Environmental Protection Agency ("EPA") or the U.S. Fish & Wildlife Service ("US FWS"). Moreover, glyphosate formulations may also contain known toxic organic chemical impurities, such as 1,4-dioxane in the surfactant polyoxyethylene alkylamine. 1,4-dioxane is a known carcinogenic agent and listed by EPA as a "hazardous" chemical in Title III of the 1990 Clean Air Act Amendments. According to a report issued by the Food and Agricultural Organization of the United Nations at http://www.fao.org/ag/agp/agpp/pesticid/Specs/docs/Pdf/new/glypho01.pdf, glyphosate produced using the batch manufacturing process contains other hazardous impurities, such as N-nitrosoglyphosate, formaldehyde (carcinogenic), and various insoluble chemicals,. I am concerned about the environmental impacts of all chemical impurities in glyphosate, such as higher wildlife mortality in amphibian species. However, such impacts have not been adequately studied by the USDA, EPA or US FWS. The EPA, for instance, does not evaluate the potential toxicity of surfactants used in pesticide formulations, which are wrongly regarded as "inert ingredients." There is also inadequate study of the potential adverse environmental and health impacts of toxic impurities generated during the manufacture of glyphosate. These potential adverse impacts of glyphosate formulations require more careful review by USDA. I will be harmed because I hike in areas where sugar beets are grown, and I will be aesthetically injured where the mortality of wildlife, such as amphibians, increases due to the increased use of glyphosate formulations such as Roundup in those areas.

17. Based on my knowledge of genetic engineering, I know that the engineering processes used to introduce genetic constructs into plants are random in nature and cause pleiotropic (i.e. unintended) effects. Pleiotropic effects can include generation of novel and potentially

hazardous compounds in the G.E. plant, such as food allergens; increased levels of native plant toxins which are present at levels too low to cause adverse effects in the non-engineered plant; and decreased levels of plant nutrients. Pleiotropic effects depend on the site of insertion of the introduced genetic material in the plant's genome, which is not predictable with currently employed genetic engineering techniques; on the number of the introduced genetic constructs, since multiple insertions are common; and on the molecular structure of the introduced genetic material, which can be altered during the insertion process; among other factors. Therefore, I believe that more precise molecular characterization data should be required for genetically engineered plants, in order to better predict and forestall potential adverse impacts. I desire more detailed information on RR sugar beet's molecular characterization, such as the number and molecular structure of the inserted genetic construct(s), and the precise chromosomal location(s) where the genetic construct is incorporated, including the number of the chromosome(s) where the recombinant DNA segment(s) are integrated.

18. I am concerned about the weak federal regulatory system governing recombinant DNA technology in GE crops, because this radical method of transferring genes from one species to an entirely different species has effects that are not predictable until years of detailed experimental research have been conducted. In this regard, the USDA should require better scientific review through environmental impact statements ("EIS") for all new GE crop releases. USDA did not conduct an EIS prior to its deregulation of Roundup Ready sugar beets. Improved federal regulation, such as a mandatory environmental impacts statements, are needed to better detect potential environmental and human health harms from all new GE crop varieties. Prior to a determination of non-regulated status, the USDA's should conduct more research and more careful reviews to thoroughly study the biological effects of recombinant DNA-genetic engineering technology on other crops and the environment.

19. I am adversely affected by the lack of information available on the environmental effects of Roundup Ready sugar beets such as genetic contamination of related cultivars (table beet and chard). My concern here is that for the past sixteen years I have consumed organically

grown and certified foods bought at Wheatsville Food Co-op, of which I have been a member since 1978. Over 95 percent of Wheatsville Food Co-op's food is certified organic. Now Roundup Ready sugar beets pose a new threat to me and my family's organic-based diet because it creates a new food crop that will contaminate organically grown crops (i.e., table beets and chard). Beets and chard are foods I consume on a regular daily basis as ingredients in nutritional supplements. I regularly eat organic table beets and Swiss chard cooked or added to salad greens, soups, nutritional shakes, protein powders, and super-green nutritional products. Moreover, daily for four years I have consumed NatureRich Greens nutritional powder, which contains 94 organic ingredients, including dried ground red beetroots and Swiss chard leaves. Inadequate information exists on the long-term effects of GE crops like Roundup Ready sugar beets on species that ingest them. With Roundup Ready sugar beets coming into commercial production and entering the U.S. food supply in 2008-09, I am harmed because it will become difficult, if not impossible, to choose to eat foods containing sugar that are not tainted by Roundup Ready sugar beets due to lax USDA regulations and oversight.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May ___, 2008, in Austin, Texas                    _____

                                                                                   Neil J. Carman, Ph.D.

1  grown and certified foods bought at Wheatsville Food Co-op, of which I have been a member
2  since 1978. Over 95 percent of Wheatsville Food Co-op's food is certified organic. Now
3  Roundup Ready sugar beets pose a new threat to me and my family's organic-based diet because
4  it creates a new food crop that will contaminate organically grown crops (i.e., table beets and
5  chard). Beets and chard are foods I consume on a regular daily basis as ingredients in nutritional
6  supplements. I regularly eat organic table beets and Swiss chard cooked or added to salad
7  greens, soups, nutritional shakes, protein powders, and super-green nutritional products.
8  Moreover, daily for four years I have consumed NatureRich Greens nutritional powder, which
9  contains 94 organic ingredients, including dried ground red beetroots and Swiss chard leaves.
10 Inadequate information exists on the long-term effects of GE crops like Roundup Ready sugar
11 beets on species that ingest them. With Roundup Ready sugar beets coming into commercial
12 production and entering the U.S. food supply in 2008-09, I am harmed because it will become
13 difficult, if not impossible, to choose to eat foods containing sugar that are not tainted by
14 Roundup Ready sugar beets due to lax USDA regulations and oversight.

16 I declare under penalty of perjury that the foregoing is true and correct.

18 Executed on May 31st, 2008, in Austin, Texas

*/s/ Neil J. Carman, Ph.D.*
Neil J. Carman, Ph.D.

Decl. of Neil Carman in Supp. of Pls.' Mot. for Summ. J. - 3:08-cv-00484-JSW       9

# EXHIBIT A

Case 3:08-cv-00484-JSW   Document 91   Filed 06/02/2008   Page 11 of 18



http://www.sierraclub.org/policy/conservation/biotech.asp

Sierra Club Policies
Sierra Club Conservation Policies

Biotechnology

The following policies on Biotechnology have been adopted by the Sierra Club Board of Directors:

GENETIC ENGINEERING is a new technology which, unlike traditional breeding methods, allows the transfer of genetic material from one organism into a host organism of an unrelated species, thus bypassing the natural reproductive barriers between species. The genetic manipulation resulting from genes inserted by genetic engineering cannot be recalled; the altered characteristics will be passed on to future generations and continue to be reproduced in the environment.

Genetic engineering became possible with the advent of recombinant DNA technology, which for the first time allowed for the transfer, using laboratory procedures, of DNA from one species into the DNA of an unrelated species. For purposes of this policy, however, we define genetic engineering to include all direct molecular manipulation of the genetic structure of organisms or viruses, including additions of foreign genes (transgenes), gene alterations, duplications, or deletions.

Genetic engineering is not, as many of its supporters claim, merely a more efficient form of traditional plant and animal breeding. There is a clear boundary between traditional breeding methods and the radically new technology of genetic engineering.

A GENETICALLY ENGINEERED ORGANISM (GEO) is a single-celled or multicellular organism, the genetic structure of which has been altered by genetic engineering, resulting in genetic changes that could not be achieved using conventional breeding methods. (The terms "GEO," "genetically modified organism" and "genetically altered organism" all have the same meaning.)

The accidental outflow of transgenes or altered genes from a genetically engineered organism to a natural organism, by pollen transfer or by other means, results in the production of an organism which, although it has not intentionally been genetically engineered, must be classified as a genetically engineered organism.

GENERAL STATEMENTS OF PRINCIPLE (further expanded in the guidelines, to follow)

The Sierra Club urges full public disclosure, discussion and evaluation of the potential hazards, the potential benefits, and policy options for genetic engineering research and the development and use of products from that research. We urge the development of adequate regulatory, legislative, and other controls and that these decisions be based on a reverence for nature and life, as well as socioeconomic equity.

We call for acting in accordance with the Precautionary Principle, meaning that when an activity raises the possibility of serious or irreversible harm to the environment or living creatures, precautionary measures that prevent the possibility of harm shall be taken even if the causal line between the activity and the possible harm has not been proven.

In accordance with this Precautionary Principle, we call for a moratorium on the planting of all genetically engineered crops and the release of all GEOs into the environment, including those now approved. Releases should be delayed until extensive, rigorous research is done which determines the long-term environmental and health impacts of each GEO and there is public debate to ascertain the need for the use of each GEO intended for release into the environment.

We urge that where there are safer alternatives to the use of GEOs, these technologies should be given preference. For example, genetic engineering solutions should never be used to divert attention from the solutions to the problem of hunger that carry less biological risk (e.g., better distribution of food, land reform, sustainable soil conservation strategies, promotion of regional sustainability, reduced consumption of animal products, and stabilization of population).

GUIDELINES

(1) TESTING OF GEOs. There are health and environmental risks inherent in the release of GEOs during field testing and/or commercial planting. Government agencies must develop and enforce policies that require stepwise testing, with strict controls to prevent accidental and premature releases. The stepwise testing must include (as appropriate) contained testing in the laboratory and greenhouse. The results of each step must be made publicly available when tests are subject to approval processes. No field testing should be done until all guidelines in this policy are met.

(2) REGULATION OF GEO RELEASES. Regulation of releases of genetically engineered organisms should ensure that potentially hazardous organisms are not released into the environment without sufficient safeguards and monitoring. Final evaluation should be made on the basis of the effects of genetic modifications, taking into account other factors, particularly the site where the organism will be released. Long-term as well as short-term impacts of GEOs must be evaluated, and a finding of environmental safety made before a release is approved. At a minimum, the evaluation must assess:

(a) the genetically engineered organism's role in the ecosystem (including its food and nutrients, its predators, parasites, and competitors, organisms with which it can exchange genetic material, and environmental limits to its growth);

(b) the impact of its release and potential use on ecosystems and genetic diversity;

(c) the effects of its potential use on sustainable agriculture, resource use, and cultural systems;

(d) the impacts of the organism and its products on human health; and

(e) the impacts of marker genes as well as genes of interest to producers. (Antibiotic resistance marker genes should not be used in GEOs released into the environment.)

All impacts from production to disposal should be assessed, as well as all paths of potential migration, and the scale of the release. Deleterious impacts on workers or on

those living near production or release sites should also be considered. An emergency response plan must be in place in case of unforeseen outcomes.

If any government, organization or individual wishes to release, for any purpose, genetically engineered organisms into the environment of a foreign country, they should abide by the standards of the releasing party's home country as well as those of the host country. In the case of conflicting national standards, the standard more protective of the environment and human health should prevail.

Public agencies providing biosafety oversight must notify the public of proposed releases and provide a reasonable and timely opportunity for the public to comment on proposed releases. Notification should include, but not be limited to, the location of release sites. Public comment should be encouraged and receive response. Agencies should ensure public access to all information necessary to evaluate potential hazards even when such needed information otherwise qualifies as confidential business information. In addition, companies and institutions should not be permitted to withhold scientific testing data as trade secrets.

The Sierra Club supports the establishment of a repository for information on GEOs that have been approved for release. Such information must be available to the public.

(3) MONITORING OF GEOs. Both deliberate and unintentional releases of genetically engineered organisms should be monitored through coordinated efforts of agencies, companies, and academic institutions in order to test predictions about the organisms' behavior, numbers, dispersal and environmental impact. The public should be involved in the design of these monitoring programs. Data from such programs must be made available to the public and widely distributed and publicized.

(4) LABELING AND SUBSTANTIAL EQUIVALENCE. Foods produced from or containing GEOs may contain new substances or have purposeful or inadvertent compositional changes. All foods containing or produced with genetically engineered material must be labeled as such. The federal government should carefully regulate food produced from or containing genetically engineered organisms to ensure safety. The use of the concept of "substantial equivalence" in order to waive the need for both pre- and post-marketing testing and surveillance should be prohibited.

(5) LIABILITY. Liability issues must be addressed and resolved prior to the release of every GEO. Manufacturers of GEOs should be fully liable for any environmental damage caused by the organisms they genetically engineer. The burden of proof of safety must be on the manufacturing company. At a minimum, these companies must be fully insured and able to reimburse:

(a) farmers whose crops are less saleable because of genetic contamination from GEOs;

(b) farmers using nonviable genetically engineered seeds; and

(c) for any human or animal suffering health dysfunction resulting from consumption of products that contain GEOs, where the conventional counterpart did not cause such health dysfunction.

(6) CONFLICT OF INTEREST. Regulations should require that there be full public disclosure when there is potential conflict of interest with individuals: (1) serving on biosafety committees; (2) working for or advising government regulatory or research agencies involved in genetic engineering research or regulatory oversight.

(7) REGULATION OF GEOs/TRADE RULES WITHIN THE USA. We support the right of states and localities to adopt regulations for genetically engineered organisms more stringent than federal regulations. We support efforts to ensure communication and, where appropriate, to coordinate oversight among federal, state, and local agencies. Federal and international trade policies and rules must not interfere with the right of states and localities to adopt more stringent measures.

(8) REGULATION OF GEOs / INTERNATIONAL TRADE RULES. All nations should develop and enforce regulations governing experimental release and commercialization of genetically engineered organisms. We oppose any release or agricultural/industrial commercialization of GEOs until appropriate procedures are in place to protect human health, biodiversity, and cultural systems. Trade rules must not be used to override the right of each country to establish regulations based on its own level of risk and based on precautionary action in the absence of scientific certainty.

GEOs may have transboundary impacts. They also may move in international trade. To address these international aspects, governments must complete and ratify the Convention on Biological Diversity negotiations and complete a biosafety protocol establishing adequate minimum standards for regulation of the risk of GEOs, in particular introductions through trade and possible transboundary effects. At a minimum, a biosafety protocol must:

(a) provide for assistance to developing countries to help them build regulatory capacity;

(b) support the implementation of the Precautionary Principle; and

(c) not be subordinated to trade rules.

Members of multilateral trade institutions such as the WTO must work to ensure that trade rules recognize and do not interfere with the implementation of the Precautionary Principle.

(9) INAPPROPRIATE USE OF GEOs. We oppose any development or use of biological weapons and agents used for agricultural bioterrorism, including any use of genetic engineering for these purposes.

We oppose the introduction of any GEOs onto public lands or other open spaces that are protected chiefly for their natural characteristics.

We oppose activities that have the potential to adversely affect the viability of biodiversity and food security. Genetically engineered seed meant to enhance monocropping is an example of such an activity. Others include:

(a) Systems which combine the development of herbicide-tolerant crops with reliance on the manufacturer's proprietary herbicides to control competing plant species should not be instituted;

(b) Technologies that encourage corporate control over seeds should not be employed. Genetic restrictive use technology (commonly known as "terminator technology") is an example of such corporate control; and

(c) Policies that encourage further consolidation or monopolistic control of the food production system should be avoided.

(10) PATENTING of GEOs. All humans, animals, plants, and microorganisms are products of nature.

No individual, institution or corporation should have the ability to claim ownership over species or varieties of living organisms. We oppose the granting of patent claims over organs, cells, genes, proteins, and other living matter whether naturally occurring, genetically engineered, or otherwise modified. The genetic code of humans, animals, plants and microorganisms has evolved over hundreds of millions of years and represents not only our natural world of today but also its past and future. We hold that respect for this natural treasure demands that no government should have power to grant patents or property rights over it. Just as civilized societies have decided that there can be no ownership of human beings (slaves), we believe that there should be no ownership of genetic code, which should continue to be the shared common heritage of all.

Indigenous peoples, their knowledge and resources are the primary target for the commodification of genetic resources. We recognize these peoples' sovereign rights to self-determination and territorial rights, and support their efforts to protect themselves, their lands and genetic resources from commodification and manipulation.

Patents over life forms are not necessary to conduct scientific and technological research, and, in fact, retard and limit access to benefits which may result from new information, treatments or products.

(11) BIOPROSPECTING. Our national park system was established to conserve its scenery, natural and historic objects, and wildlife in such a manner that will leave them unimpaired for the enjoyment of future generations. This mandate protects all genetic resources within our national park system from commodification and manipulation. Accordingly, we oppose any individual, institution or corporation's ability to claim control and ownership over this diversity through the act of bioprospecting and/or through contractual agreements allowing access to such diversity for the purpose of commercial gain. We respect the rights of all peoples and governments to similarly designate and restrict exploitation of their own genetic resources.

Adopted by the Sierra Club Board of Directors, May 21, 2000, replaced the policy adopted September 18-19, 1993.

Special Guidelines Concerning Fish and Other Aquatic Life

Sierra Club's Biotechnology Policy, which, among other things, defines genetic engineering and genetically engineered organisms (GEOs), calls for the development of adequate regulatory, legislative and other controls, calls for a reverence for nature, and invokes the Precautionary Principle, is applicable in its entirety to genetically engineered (GE'd) fish, shellfish, and all other GE'd aquatic organisms, in freshwater or salt.

The Guidelines relating to agricultural crops are also broadly applicable. The major issue is very similar: the uncontrolled release of GEOs. Thus, the points in the Guidelines about testing and regulation, monitoring, labeling, liability, application of the Precautionary Principle and other topics mentioned in the Guidelines are equally as important for GE'd fish and aquatic organisms, except where the language specifically refers to "farmers," "crops," or "seeds." We embrace the extension of those Guidelines to all aquatic life, whether the GEOs are intended for food, feed, sport, environmental management, artistic statement or pet store trade.

(1) We believe that GE'd fish and aquatic organisms are an even greater hazard to natural stocks and are even more difficult to properly evaluate and to monitor than GE'd crops, and therefore our primary position is to oppose releases of transgenic aquatic organisms out of doors, or where there is any chance of the organisms or their genetic code escaping into the general environment.

(2) Genetically engineered fish intended for fish farming, whether intended as human food or for other uses such as mosquito control, feed for other fish, or pet store trade, can't be adequately contained. Fish in inland ponds are often swept into steams by storms and can be transported by birds. Fish constrained by nets (such as nearshore netpens for salmon and offshore pens for tuna) have a high rate of escape into the wild. The same is true of other aquatic organisms. Eggs, sperm, larval and planktonic forms of GEOs present additional problems making containment impracticable in out-of-doors environments. The possibility that new or altered genes could wreak havoc with natural ecosystems is therefore great, and this type of genetic adulteration of nature may be irreversible once it occurs. It may lead to extinction of species or to the creation of new bioinvasive varieties. Therefore, we oppose the cultivation of any genetically engineered fish or other aquatic organisms outside of laboratory confinement (or equivalent complete confinement during industrial processes).

(3) We are opposed to genetically engineered sport fish, and to "genetic enhancement" of natural populations.

(4) We are opposed to the production of aquatic GEOs for export, even though the laws or regulations of the importing country may not prohibit it, excepting small and rigorously contained shipments intended solely for research. All exports must be made known to the customs authorities of the importing country in advance of shipment.

(5) Notwithstanding our strong belief that all releases should be prohibited at the present time, it is important that good regulatory mechanisms be established which give government the authority to study and to regulate production or release of transgenic fish. The Sierra Club's existing Guidelines apply here.

(6) We are opposed to release of sterile GE'd fish or other aquatic organisms, much as we are opposed to "Terminator" technology in plant crops, because (a) it would deprive small fish farmers of the opportunity to breed their own fish, (b) escaping sterile fish would reduce the breeding efficiency of wild populations, and (c) it would tend to turn the traditional property of the poor and disadvantaged into the intellectual property of the rich and advantaged. We also do not believe that sterility and reproduction are adequately understood in fish. Prediction is further impaired by the ability of some fish to change sex during their life cycle.

(7) The concepts in the paragraphs above, where written with regard to fish, are embraced and extended to include all uses of any transgenic organisms in aquaculture. Unicellular organisms and plants are included.

(8) Definitions and application. For the purposes of these Guidelines covering fish and aquatic life, amphibians and other life forms that are aquatic during part of their life cycle will be considered aquatic. We recognize that there may be difficulties in deciding whether some organisms such as brewer's yeast, a Pseudomonas bacterium, or a mosquito is to be considered aquatic. In such instances, the general principles of precaution, scientific evaluation of ecological and health risks, and ongoing surveillance will apply regardless of whether the GEO is aquatic or not. On a case-by-case basis, some exceptions to our broad policy may become acceptable (such as, possibly, the release of GE'd sterile mosquitoes as a means of malaria control), but that will not mean

that these Guidelines are any less relevant to decisionmaking regarding any and all future releases.

Adopted by the Sustainable Planet Strategy Team, February 20, 2001.