Pages 1 - 28

United States District Court

Northern District of California

Before The Honorable Jeffrey S. White

Center for Food Safety,      )
                             )
            Plaintiff,       )
                             )
  vs.                        )          No. C08-0484 JSW
                             )
Charles Conner, et al.,      )
                             )
            Defendant.       )
_____)

San Francisco, California
Friday, June 6, 2008

**Reporter's Transcript Of Proceedings**

**Appearances**:


For Plaintiff:          Earthjustice
                        223 South King Street, Suite 400
                        Honolulu, Hawaii  96813
                **By:  Paul Henry Achitoff, Esquire**

                        Earthjustice
                        426 Seventeenth Street, 5th Floor
                        Oakland, California  94612
                **By:  Gregory Loarie, Esquire**

                        The Center for Food Safety
                        2601 Mission Street, Suite 803
                        San Francisco, California  94110
                **By:  Kevin Scott Golden, Esquire**

(Appearances continued on next page.)

*Reported By:*        *Sahar McVickar, RPR, CSR No. 12963*
                      *Official Reporter, U.S. District Court*
                      *For the Northern District of California*

(Computerized Transcription By Eclipse)

1    **Appearances, continued:**

2    For Defendant:              U.S. Department of Justice
                                 1961 Stout Street, 8th Floor
3                                Denver, Colorado  80294
                        **By:  Lori Caramanian, Esquire**

4
     For Intervenor
5    Defendant:                 Latham & Watkins
                                 555 11th Street, N.W., Suite 1000
6                                Washington, DC  20004
                        **By:  Philip Jonathan Perry, Esquire**

7
                                 Howrey LLP
8                                1299 Pennsylvania Avenue N.W.
                                 Washington, DC  20004
9                       **By:  Gilbert S. Keteltas, Esquire**

10                               The Bryson Group PLLC
                                 575 7th Street, N.W.
11                               Washington, DC
                        **By:  Nancy Southard Bryson, Esquire**

12
                                 Debevoise & Plimpton LLP
13                               919 Third Avenue
                                 New York, NY  10022
14                      **By:  Daniel M. Abuhoff, Esquire**

15

16

17                            **---oOo---**

18

19

20

21

22

23

24

25

```
 1   Friday, June 6, 2008                              9:00 a.m.
 2                       P R O C E E D I N G S
 3            THE CLERK:  Calling case number C-08-0484,
 4   Center for Food Safety versus Charles Conner, et al.
 5            Counsel, please state your appearances for the
 6   record.
 7            To the podium, Counsel.
 8            MR. ACHITOFF:  Good morning, Your Honor.
 9            Paul Achitoff appearing on behalf of the plaintiffs.
10            THE COURT:  Good morning.
11            MR. ACHITOFF:  And at counsel table with me,
12   Greg Loarie, Kevin Golden.
13            THE COURT:  Welcome, Counsel.
14            MS. CARAMANIAN:  Good morning, Your Honor.
15            Lori Caramanian representing the United States.
16            THE COURT:  Good morning.
17            MR. KETELTAS:  Good morning, Your Honor.
18            Gill Keteltas representing the growers and
19   processors of sugar beets.
20            THE COURT:  Good morning.
21            MR. PERRY:  Good morning, Your Honor.
22            Phil Perry representing Monsanto, proposed
23   intervenor.
24            THE COURT:  All right.
25            MR. ABUHOFF:  Good morning, Your Honor.
```

1          Dan Abuhoff representing Betaseed, potential

2     intervenors.

3               **THE COURT:**  Good morning.

4               **MS. BRYSON:**  Good morning, Your Honor.

5          Nancy Bryson representing proposed intervenors,

6     Syngenta Seeds.

7               **THE COURT:**  Good morning and welcome.

8          All right, I assume that all counsel has seen the

9     Court's questions; is that correct?

10              **MR. ACHITOFF:**  Yes.

11              **THE COURT:**  All right.

12         For those of you, which probably will cover just

13    about all of you who haven't been in this Court before, the way

14    the Court operates is that, as you know, I have issued

15    questions; sometimes I issue a tentative ruling, sometimes I

16    don't.  It really doesn't matter because it's only tentative,

17    anyway, but what is important is that, as we all know, at least

18    in the district there is no absolute right to have oral

19    argument.  And I have oral argument where I have questions

20    remaining after reviewing all of the papers, the authorities

21    and all the supporting declarations.

22         And so sometimes it's frustrating to parties if they

23    feel, especially when there's a tentative ruling against their

24    position on a particular point that they feel they need to

25    argue against the tentative ruling.  But I don't allow that.  I

1    have not given you a tentative, so you don't know what you

2    would be arguing against.

3           The most important point, in terms of the best use

4    of, you know, this Court's time and your resources, these are

5    the questions that I have in order to -- left after reviewing

6    your papers, which given -- given the girth of the papers

7    versus the number of questions tells you that your papers

8    served the purpose of at least helping the Court to resolve

9    many questions that it has.

10           So and given the fact that we have a number of

11   intervenors, plus the defendant, the federal defendants, there

12   will be a tendency for everybody to want to get their air time

13   here.  And you all have a right, at least in this argument, to

14   speak to the Court, but I don't want to hear repetition or

15   extraneous arguments.

16           If anybody wants to be heard on -- for anything, any

17   of the parties here today, they can be heard, but I'm just sort

18   of exhorting all of you to, especially on the intervenor's

19   side, to not repeat what other counsel said.  Obviously, the

20   legal questions that the Court has would apply -- the standards

21   that it's referring to would apply to all of the intervenors.

22           So with that said, I'm going to start -- and the way

23   I typically do it is I'll start with one side or the other.

24   For example, the first question, obviously, is addressed to the

25   plaintiffs in the first instance.  So I'll hear from the

1  plaintiffs, and then I will hear from whichever of the proposed

2  intervenors and the Government defendants, if they have a

3  response as well.

4     So, Counsel?

5     **MR. ACHITOFF:**  Thank you, Your Honor.

6     Okay, I would like to emphasize in my argument the

7  fact that the issue on these motions --

8     **THE COURT:**  Wait, wait, wait.  No, no.  Stop.

9     **MR. ACHITOFF:**  What?

10     **THE COURT:**  First of all, the question, the first

11  question is essentially a yes-or-no question, so you can say

12  whatever you want in support, but I like to get a teaser for

13  the news at 11:00.  You could say yes and let me tell you why,

14  or no, but it really helps me to first get an answer.  And I'm

15  not going to cut you off at yes or no.

16     **MR. ACHITOFF:**  I appreciate that, Your Honor.

17     Plaintiffs do not concede that applicants meet the

18  test for permissive intervention.  And plaintiffs agree with

19  all of the intervenors who argued in their briefs that the test

20  for determining independent grounds for jurisdiction is

21  essentially the standing test.

22     **THE COURT:**  All right, now you can go on.

23     **MR. ACHITOFF:**  Thank you.

24     I want to emphasize that -- the fact that is obvious

25  in our papers; nevertheless, that plaintiffs don't object to

```
 1   intervention in the remedy phase, and that the distinction in
 2   this particular case between the liability and the remedy is
 3   the key to the proper disposition of these motions, and that
 4   the proper disposition is to allow participation only in the
 5   remedy phase.  And I would like to explain why that is both
 6   legally compelled and will address all of the legitimate
 7   concerns that the parties and the proposed intervenors have.
 8         THE COURT:  But -- I appreciate that but, again, I
 9   think that perhaps I didn't make the ground rules clear or
10   perhaps I'm not understanding your answer.
11         I asked for a specific question -- I asked a
12   specific question, you don't concede, and your answer is and
13   what's more, the other side agrees with our position; now, what
14   you are about to say, is that an answer to Question No. 1?
15         MR. ACHITOFF:  Yes, it is.
16         THE COURT:  All right, fine.
17         MR. ACHITOFF:  The issue -- the critical inquiry
18   here under the test that the Court has discussed in its
19   questions, whether we speak of claims or defenses with common
20   questions or standing or independent grounds for jurisdiction,
21   or significantly protectable interests, for that matter, in the
22   intervention as of right test, it all boils down to one thing,
23   and having looked at all of the cases, it all reduces to this
24   question:  Has the applicant met the burden of proving that it
25   has an interest that will necessarily be harmed if it
```

1    participates in the remedy phase but not the liability phase of

2    this case?  And the answer in this case is no.

3            Obviously, the applicants want to participate in the

4    liability phase, but as a matter of law they have nothing

5    relevant to offer in the liability phase.  And as a practical

6    matter, they have no need to do so to protect any legitimate

7    interest that they have.

8            Okay, now, in the context of permissive

9    intervention --

10           **THE COURT:**  Can you tell me this, then --

11           **MR. ACHITOFF:**  Yes.

12           **THE COURT:**  I cited a couple of cases, the District

13   of Arizona and the Washington case -- I didn't cite them, but I

14   referred to them as being cited by the intervenors.

15           **MR. ACHITOFF:**  Yes.

16           **THE COURT:**  And the question -- I assume you are

17   also kind of moving into Question No. 2?

18           **MR. ACHITOFF:**  I see them as related.

19           **THE COURT:**  Yeah, and that's fine.

20           And you have now stated your position of what the

21   test is, you know, if the test for determining whether the

22   proposed intervenors have an independent basis, what is the --

23   what is the test the Court should apply?  And do you have any

24   authority to support that position about what the proper test

25   is?  Because that's, to the Court, you know, the quintessential

1    question here.

2        **MR. ACHITOFF:**  Well, the Court has put out there the

3    ***Protect Lake Pleasant*** case and the ***Stevens County*** case, and

4    frankly, we see no reason to disagree with the way in which the

5    test is presented in those cases and the way in which the

6    proposed intervenors have adopted that test, which is the way

7    in which the standing test has been laid out in ***Friends of the***

8    ***Earth versus Laidlaw***.

9        **THE COURT:**  So are you saying and explicitly or

10   implicitly that there is not a separate -- a test that's

11   separate from standing, that the test is standing?

12       **MR. ACHITOFF:**  In the context of this type of case,

13   yes, it reduces to standing, yes.  That is as useful a test as

14   any that I have seen in any of the cases.

15       **THE COURT:**  All right.

16       **MR. ACHITOFF:**  So I have no reason to debate it.

17       **THE COURT:**  All right.

18       **MR. ACHITOFF:**  Okay, so in ***Protect Lake Pleasant***,

19   the Court says, "In order to satisfy Article 3 standing

20   requirements, the party must show it suffered an injury in fact

21   that is concrete, particularized and actual and imminent and

22   not conjectural or hypothetical and fairly" --

23       **THE COURT:**  Slow down.

24        When you read you -- we tend to speed up.  So even

25   as good as this court reporter is, she is not a superwoman.

1    Maybe she is, but I don't have super ears.

2              So would you act as if you are dictating to her?

3              **MR. ACHITOFF:**  I apologize.

4              "In order to satisfy Article 3 standing

5    requirements, a party must show that it has suffered an injury

6    in fact, that it is a concrete and particularized and actual

7    and imminent and not conjectural or hypothetical and that the

8    injury is fairly traceable to the challenged action of the

9    defendant."

10             Now, in the context of this case, that test needs to

11   be viewed in the context of the liability phase versus the

12   remedy phase because, as is clear, remedy intervention is not

13   being challenged in this situation.

14             Now, first of all, in **_Protect Lake Pleasant_**, we

15   had -- the proposed intervenor was Marina Partners, and it was

16   a contractor to develop a marina; no applicant in this case has

17   any interest that's comparable to the interest of Marina

18   Partners.

19             Now, I'm not just trying to distinguish that

20   particular case, but what I'm trying to emphasize here is that

21   none of these proposed intervenors has a Government permit.

22   None of these intervenors holds a contract with any of the

23   parties to the case.  And none of the interests that these

24   intervenors claim will, in fact, be threatened by the liability

25   phase of this case.

1          Now, these applicants are among an enormous number

2     of entities that the applicants themselves argue may be

3     affected by the outcome of this case, including beet growers,

4     beet processors, seed growers, seed sellers, seed patent

5     holders, sugar refineries, and presumably could also include

6     every farmer who buys genetically engineered seed, every

7     distributor who sells the seed to every farmer, every company

8     that buys or sells the sugar beets, buys or sells the sugar

9     made from the sugar beets, buys or sells the products made from

10    the sugar that comes from the sugar beets.  And it goes on and

11    on into the thousands.  All can claim to have an interest and a

12    unique perspective, including, how they'll be harmed if the

13    plaintiffs prevail in this case.

14         Now, when we get down to the -- regardless of the

15    nature of these interests, no applicant has any interest that

16    is threatened by the liability phase, but only by the remedies

17    phase.

18         Now, regarding the requirement of a claim or defense

19    with common questions of law or fact, now, applicants have no

20    claims whatsoever, nor do they have any defenses that as a

21    legal matter are relevant to the liability phase.  Only the

22    Government can be liable under either the Plant Protection Act

23    or NEPA, that is clear and uncontested.

24         Now, the applicants all clamor to be heard on the

25    defense of laches.  They all claim that because of a purported

1  delay in bringing this case they have been injured.  Okay.

2  Now, this is an attempt by the applicants to force their way

3  into the liability phase through the back door of arguing an

4  affirmative defense.  But what's critical here is that laches

5  is a personal defense.

6           Now, this is why last night, after receiving the

7  court's order, we filed a supplement that cited one case, the

8  ***Sweetheart Plastics versus Detroit Forming Inc.***, a Fourth

9  Circuit decision, but there are many other cases which cite the

10 identical principle, which is that laches is a personal defense

11 which merely results in a loss of rights as against one

12 defendant.  Simple principle.  That's the nature of that

13 affirmative defense.

14          Now, the point here is that even assuming for the

15 sake of discussion that one of these applicants or all of these

16 applicants can allege -- can show that they have somehow been

17 prejudiced by this purported delay and that they have -- they

18 can -- they can show something akin to laches, that is of

19 absolutely no relevance in the liability phase of this case.

20 It cannot be transferred to the Government, which is the only

21 party that can possibly be liable in either of these claims.

22          No matter what the applicants say about how they've

23 been harmed, we can assume it for the sake of discussion, it

24 does the Government absolutely no good, and it in no way

25 impairs the plaintiff's ability to get judgment against the

1    Government.

2            Now, if the Government wants to allege a laches

3    defense, fine, that's a different story entirely.  But it has

4    absolutely nothing to do with anything that has happened with

5    respect to the applicants.  And unless the Government itself

6    has been harmed by this purported delay, there is no relevance

7    of laches in this case.  So in order for this affirmative

8    defense of laches to be established, the Government has to rely

9    on the interaction between it and the plaintiffs and not a

10   third party.  And that's very clear in the basic law of laches.

11           Now, that doesn't mean that if, in fact, these

12   applicants have -- have in some way been harmed by the delay

13   that they say occurred that there is nothing that can be done,

14   not at all.  That is -- that can, in fact, be dealt with in the

15   remedy phase of this case.

16           Now, in terms -- the distinction between the

17   liability and the remedies phase, in **_Protect Lake Pleasant_**, for

18   example, there was already a preliminary injunction motion on

19   file in that case at the time these intervention motions came

20   up, so the distinction between the merits and the remedy phase

21   wasn't addressed, and it wasn't relevant.  But if you look

22   closely at the case, it was very plain that the issue was the

23   impact of the injunctive relief on this proposed intervenor.

24           The Court said on page 5, "Marina Partners seeks to

25   squarely address the relief sought by plaintiffs in the request

1  for preliminary injunction."  And then the Court says, "It's

2  beyond dispute that the economic injury to Marina Partners

3  contemplated by plaintiff's requested injunctive relief is

4  concrete and imminent and traceable," and so forth.  And

5  therefore, it met the Court's test for intervention.  That is

6  the same situation here.

7         Now, this distinction is highlighted by several

8  cases that we cited in our opposition papers.  For example, the

9  *Oregon Natural Desert Association versus Schuford*, 2006, from

10 the District of Oregon, the Court said on page 5, "Regarding

11 the requirement that there be a common question of law or fact,

12 the only issue in the liability phase of this litigation is

13 whether the Bureau of Land Management has complied with NEPA,

14 FLPMA, and the other federal statutes.  There is no dispute

15 that only the BLM can be held liable under the federal laws."

16        So the Court denied intervention in the liability

17 phase and allowed intervention in the remedy phase.  Exact same

18 situation in *Center for Tribal Water Advocacy versus Gutierrez*,

19 District of Oregon, last year:  "No common issue of law or

20 fact" --

21        THE COURT:  Counsel, what you are doing now is you

22 are reviewing cases that are in your brief, all of which I have

23 read.

24        MR. ACHITOFF:  Okay.

25        THE COURT:  So obviously, it sounds to me like you

1    completed your answer to the question, and you are going beyond

2    it and reviewing the briefs and the cases I've read.

3              **MR. ACHITOFF:**  I'm sorry, Your Honor, I won't pursue

4    that.  But I would like to focus on the fact that the

5    applicants themselves have made it clear in their briefs that

6    it's the remedy that they are concerned about.

7              Monsanto, for example, arguing on this issue of

8    standing, says, "The relief plaintiffs seek itself would cause

9    Monsanto's injuries."  The grower/processors state, quote, "If

10   the deregulation is vacated by the Court and they are unable to

11   plant," et cetera, "they will be harmed."

12             Syngenta, same thing.  It says that its rights will

13   be affected, quote, "should plaintiffs obtain the relief they

14   seek," et cetera.

15             Now, so then the question becomes how can the Court

16   address this issue?  And whether we are talking about

17   injunctive relief or we're talking about vacating the

18   deregulation decision under the Plant Protection Act, both of

19   them can be and should be properly handled in the remedy phase.

20             And, in fact, this is exactly what Judge Breyer did

21   in the **Geertson Seed** case, which is closely analogous to this

22   case, the case that the Court is now familiar with, having read

23   the briefs.

24             Vacatur is a remedy.  The Court could, but need not

25   necessarily, vacate the Government's deregulation decision.

1   The Court could, but need not necessarily, issue an injunction

2   under NEPA.  That is a question of remedy.  And in ***Giertson***

3   ***Seed***, in which Monsanto did intervene but only in the remedy

4   phase and made the same types of arguments about prejudice, and

5   so forth, that they are arguing here in the form of a laches

6   defense, what Judge Breyer did was in the remedy phase he

7   vacated the Government's deregulation decision and -- but

8   nonetheless, he did allow some of the farmers to plant and to

9   continue to grow the genetically engineered crops after they

10  had established that they had acted in reliance on the

11  deregulation decision, which is the basis for all of these

12  applicants' claims of laches.  So applicants claiming the exact

13  same interests with the exact same issues and defenses were

14  fully protected in the ***Giertson Seed*** case by participating in

15  the remedy phase alone.

16          And so to conclude, our position is that they do not

17  meet the standard for permissive intervention or intervention

18  as of right or standing in the liability phase.  And we have no

19  issue whatsoever with them participating in the remedy phase.

20          ***THE COURT:***  Thank you.

21          Before I hear from -- thank you very much -- the

22  intervenors, I guess I would like to hear from Government

23  counsel.  And I don't know whether the Government feels it has

24  a dog in this race about the Government's position, if you want

25  to state it in response to the Court's questions.  I've read

```
 1    your position.  I know you have an argument with one of the

 2    assertions in the plaintiff's reply brief.

 3              MS. BRYSON:  Your Honor, I agree with you, the

 4    Government doesn't really have a dog in this fight.  We think

 5    that the intervenors do have a role to play here.

 6              THE COURT:  I use race and you use fight, so there

 7    is a difference.

 8              MS. BRYSON:  Dog fighting probably should be off the

 9    table.

10              THE COURT:  That's right.

11                      (Laughter.)

12              MS. BRYSON:  Race is a better way to go.

13              THE COURT:  Yes.

14              MS. BRYSON:  We support their intervention,

15    particularly permissive.  With regard to the question of

16    laches, there are arguments that the intervenors have that the

17    Government doesn't share those interests.

18              THE COURT:  Well, I guess I should ask you this

19    since you are up there and I asked for your position, but do

20    you have a different view than the plaintiffs with respect to

21    the test for determining whether intervenors have an

22    independent basis -- whether the tests are separate, or is it

23    coterminous with standing?

24              MS. BRYSON:  I don't know that it's coterminous with

25    standing, Your Honor.  I think it's laid out correctly in
```

1   intervenors' briefs.

2            The -- it's clear to me that if the Court grants the

3   plaintiff's motion, intervenors will suffer an injury.  The

4   plaintiffs are essentially asking the Court to direct AFIS to

5   reregulate sugar beets.  So I think the plaintiffs, regardless

6   of whether you reach that issue or not, the plaintiffs have an

7   injury here.  And they share common issues, but not the exact

8   same issues with the Government.

9            The *Stevens County* case that the Court raised in its

10  brief -- or in its order -- actually involved an environmental

11  intervenor defendant.  And in that case, arguably, the

12  Government would, and, in fact, did make the same arguments as

13  intervenors -- yes, as intervenors made.  Excuse me.  And here

14  we have less of a commonality of interests than we did in that

15  case.

16           *THE COURT:*  All right.  Thank you very much.

17           Now I'll hear from whichever of the intervenors wish

18  to address the Court.

19           And again, as I admonished plaintiff's counsel, I

20  would like you to stick to the question that I asked.  The

21  questions, if you want to bring them together, I have no

22  problem with that.

23           *MR. KETELTAS:*  Thank you, Your Honor.

24           Gill Keteltas on behalf of the growers and

25  processors.  I'm going to address the independent jurisdiction

```
 1   question first and then touch on the laches question.
 2               THE COURT:   All right.
 3               MR. KETELTAS:   In their briefs, the proposed
 4   intervenors, following the lead of the Ninth Circuit case, talk
 5   about this independent jurisdiction question in different ways.
 6   They are complementary, but said another way, I think the way
 7   we have fully answered the question, we have probably gone a
 8   little further than we need to.  And let me break down the
 9   standard.
10               We would qualify for intervention under the standing
11   test that has been embraced by the plaintiffs and that some of
12   us cite in our papers.  In fact, we go through that test pretty
13   specifically in our papers and how we meet the requirements.
14   But whereas here standing is not an issue, which the Court
15   implicitly points out in its ruling, and the proposed
16   intervenors seek to intervene on defenses against the claim
17   brought under federal statutes, the federal question provides
18   an independent basis for subject matter jurisdiction.  And let
19   me tell you how we get there.
20               If you scrutinize the _Kootenai_ case, here is what it
21   says:  First, it says the Court has discretion to grant
22   permissive intervention where there is a common question of law
23   or fact.  And here we've got at least the laches issue in
24   common.
25               Second, it says that the unique intervention of
```

1   right requirements, the none but the Federal Rule, at a NEPA

2   merits case do not apply to permissive intervention.  Very

3   clearly lays that out.

4           Third, **Kootenai** doesn't analyze the independent

5   grounds for jurisdiction as a requirement for intervenors at

6   the District Court level.  It didn't have to.  The District

7   Court let these plaintiffs -- I mean, let these intervenors

8   come into the case.  It never found that there was a lack of

9   subject matter jurisdiction.  It only went to these unique

10  Article 3 requirements when the Government left the case.

11          So the point I'm making is we don't have to meet

12  Article 3 requirements at this time.  We have a federal

13  question that conveys jurisdiction on the Court.  If the

14  Government were to exit the case, which we have no indication

15  they would, we have made the point that we meet the Article 3

16  requirements.  And that is laid out pretty exhaustively in our

17  briefs.  We go through the various requirements and explain how

18  we meet them.

19          Let me briefly touch on the laches question, Your

20  Honor.  Laches is a merits defense.  It's not simply something

21  considered at the relief stage.  It is a defense on the merits.

22  Indeed, one of the cases the growers and processors cite says

23  it's a defense that should even be considered before you get to

24  the merits.

25          And the plaintiffs cite a Fourth Circuit trademark

1    case on unique facts in a unique world.  It's different than

2    the world we are in.  But what they tell you about that case --

3            **THE COURT:**  By "world," you mean Ninth Circuit

4    versus Fourth Circuit?

5                        **(Laughter.)**

6            **MR. KETELTAS:**  They're two different worlds,

7    Your Honor, that world and the trademark versus the NEPA world.

8            **THE COURT:**  Right.

9            **MR. KETELTAS:**  What they tell you is laches is a

10   personal defense based on personal facts.  And I think that

11   emphasizes the need for us to participate in this case.

12           As the Government says, it also has a laches

13   defense, but it cannot fully represent the facts that we bring

14   to you, the growers and processors.  We are here not just

15   because the decision will affect us, we are here because the

16   choice to wait three years to file this case has dramatically

17   exacerbated those effects, as we explain in our brief.

18           The other point that was made is that there is no

19   permit here.  In fact, the deregulation decision that allows us

20   to plant, sell, pick, process our sugar beets is the kind of

21   permit that is at issue here.

22           And I think my colleagues from Monsanto and Beta and

23   Syngenta will have a very specific view of the permit issue

24   because they sought the permission to, you know, create the

25   seed and use this technology.

1          **THE COURT:**  Thank you.

2          **MR. KETELTAS:**  Thank you.

3          **THE COURT:**  I'll hear from the next person who would

4    like to address the Court.

5          **MR. PERRY:**  Phil Perry for Monsanto.

6          I'll just pick up on what Mr. Keteltas --

7          **THE COURT:**  Again, I -- as has been the case with

8    the other counsel, I want you to concentrate your argument on

9    the question of meeting the minimum threshold because the

10   question of exercise of discretion is something I don't have

11   any questions for you all about.  I have to obviously decide

12   whether I want to do that, but it really is -- because if you

13   don't meet the minimum threshold, then you are not coming in.

14         **MR. PERRY:**  Certainly, Your Honor.

15         Mr. Keteltas and Mr. Achitoff both mentioned the

16   permit issue, and I thought I would just give you a little more

17   detail on that.

18         Of course, what we have here is a deregulation order

19   which we, after ten years obtaining at great expense, and so

20   forth, that is essentially a permit to operate outside the

21   regular format.  So my limited point for you now is that is, in

22   all significant respects, the same as the permit that you saw

23   in other contexts where permissive intervention was granted.

24         **THE COURT:**  All right.  Thank you.

25         **MR. ABUHOFF:**  Dan Abuhoff for Betaseed, Your Honor.

1          I just thought I would mention in basically one

2     minute so the record is clear:  I agree with everything that

3     was said by counsel in support of the intervenors, particularly

4     with respect to the **_Kootenai_** case in talking about our meeting

5     requirements with respect to standing.

6          I'm sure you noticed in our brief, our position was

7     not that standing is the test, our brief was, in fact, that

8     standing really has nothing to do with it.  That it is, as

9     Mr. Keteltas said, very clearly a situation which when you have

10    a federal question and federal statutes involved, that is the

11    independent basis for jurisdiction.

12         And, in fact, if you look at Moore's Section 24:11,

13    it says right there in Moore's, when it sets out the very

14    requirements, the first requirement being a common question of

15    law or fact; the second requirement being independent

16    jurisdiction if jurisdiction in the original action was based

17    on diversity of citizenship, or the federal question case.

18         Thank you, Your Honor.

19         **THE COURT:**  All right.  Thank you.

20         Ms. Bryson, do you wish to be last but not least?

21         **MS. BRYSON:**  I'll be very quick, Your Honor.

22         On behalf of Syngenta Seeds, we agree with the

23    arguments that have been presented by the other three

24    intervenors.  There is case law in this circuit recognizing the

25    right by parties who are regulated by the Plant Protection Act,

1  the challenged decisions that are made by USDA under the Plant

2  Protection Act and to intervene on behalf of USDA in those same

3  decisions.   The case we cited in our brief is *Cactus Corner*.

4           Thank you, Your Honor.

5           **THE COURT:**  Thank you very much.

6           I will -- I think we have covered all of you here.

7  I'll give the plaintiffs a chance to reply, if you wish.  I'm

8  not requiring it, but if you wish, tailored to exactly what was

9  argued by the intervenors' counsel.

10           **MR. ACHITOFF:**  Yes.

11           **THE COURT:**  And the Government as well.

12           **MR. ACHITOFF:**  Very briefly, Your Honor, with

13  respect to laches being a personal defense and that -- the cite

14  I provided, I could easily provide the Court with any number of

15  similar statements of the law from any number of jurisdictions,

16  including courts within the Ninth Circuit as far as the

17  personal nature of --

18           **THE COURT:**  What is -- you know, I have this theory

19  that I espouse every week which is, for those of you who have

20  any science background, it's the vacuum theory.  The vacuum

21  theory is that nature hates a vacuum; lawyers hate a vacuum,

22  and if given an opportunity to file briefs and make arguments,

23  they will fill that vacuum.

24           I say that because it always amazes me, I've been

25  doing this now for almost six years, the same procedure, and

1    people come up with -- you gave me an out-of-circuit decision

2    from 1984.  It was quite clear from the substantial briefing

3    from the proposed intervenors that this issue of laches and the

4    reliance on latches was an issue.  And it amazes me, I'm sort

5    of pontificating now about why, if that were true, A, it wasn't

6    in your brief, and B, you didn't find this other authority

7    between the time you got the -- I know you are coming from far

8    away, but I'm just curious as to why you didn't cite that

9    authority in your brief and you didn't find it last night or

10   whenever you found, the Ninth Circuit authority?

11           *MR. ACHITOFF:*  The answer to why I did not cite it

12   in my brief, Your Honor, was because I didn't think of it.

13           *THE COURT:*  All right.

14           *MR. ACHITOFF:*  The answer as to why I did not cite

15   any other authorities last night is because I didn't see the

16   purpose of doing a long list of cites.  But I have about six of

17   them in front of me right now, if the Court is interested.

18           *THE COURT:*  Do you have any in the Ninth Circuit?

19           *MR. ACHITOFF:*  I have district courts within the

20   Ninth Circuit, I do not have a Ninth Circuit Court of Appeals

21   cite.

22           *THE COURT:*  Do you have any reported cases from this

23   district?

24           *MR. ACHITOFF:*  Not from this district.  I have a

25   reported case from the District of Hawaii; I have a Federal

1  Circuit case on appeal from a California District Court case

2  from 1992; I have a District of Ohio case; I have --

3          **THE COURT:**  That's not in this circuit.

4          **MR. ACHITOFF:**  In this circuit?  Okay, here is an

5  unreported District of Oregon 2006 case; ***Adidas America versus***

6  ***K-Mart Corporation***, 2006, West Law 204 4857, District of

7  Oregon, 2006, which cites the Fourth Circuit case that I

8  provided --

9          **THE COURT:**  If those cases could be obtained through

10 Lexisising the Fourth Circuit case, then we can do that just as

11 well.

12         **MR. ACHITOFF:**  I believe most of them can.

13         **THE COURT:**  Anything further?

14         **MR. ACHITOFF:**  One other point, Your Honor.

15         **THE COURT:**  Yes.

16         **MR. ACHITOFF:**  With the distinction between a

17 permit --

18         **THE COURT:**  I didn't mean Lexisising, I meant

19 shepardizing.  I apologize.  Give credit where credit is due

20 here.

21         **MR. ACHITOFF:**  With respect to this issue of the

22 permit, I would like to respond with this analogy of the

23 deregulation being a permit.  The deregulation decision

24 deregulates this crop as to the world.  Anyone in the United

25 States, anyone in the world can grow this crop now.  So for

1   Monsanto to say, well, we have the equivalent of a permit when

2   you are talking about cases in which the proposed intervenor

3   was uniquely situated by having a, for example, a Clean Water

4   Act permit in, you know, *Sierra Club versus EPA*, or what have

5   you, where you are talking about a very small and very specific

6   kind of right that the proposed intervenor has by virtue of an

7   actual permit, comparing that to the fact that a crop has now

8   been simply declared free of regulation as to everybody in the

9   world, no -- now Monsanto has no greater rights than I do to

10  grow this crop, I think it's a stretch to say they have a

11  permit.

12          **THE COURT:**  Thank you.

13          **MR. ACHITOFF:**  Thank you.

14          **THE COURT:**  In response to the last point, anybody

15  on intervenor's side wish to be heard further?

16                  **(Shaking heads in the negative.)**

17          **THE COURT:**  All right.

18          Thank you very much, Counsel.  The matter is

19  submitted.

20                  **(Proceedings adjourned.)**

21

22

23                  **---o0o---**

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

**Sahar McVickar, RPR, CSR No. 12963**

**June 11, 2008**