IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR FOOD SAFETY, et al.

    Plaintiffs,

v.

THOMAS J. VILSACK, et al.

    Defendants.

No. C 08-00484 JSW

**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court are the cross-motions for summary judgment filed by plaintiffs Center for Food Safety, Organic Seed Alliance, Sierra Club, and High Mowing Organic Seeds (collectively, "Plaintiffs") and defendants Thomas J. Vilsack, in his official capacity as Secretary of the United States Department of Agriculture and Cindy Smith, in her official capacity as Administrator of the Animal and Plant Health Inspection Service (collectively, "Defendants"). Amici curiae American Sugarbeet Growers Association, Ervin Schlemmer, Mark Wettstein, John Synder, and Duane Grant ("Growers"), American Crystal Sugar Company, the Amalgamated Sugar Company, Western Sugar Cooperative, Wyoming Sugar Company, LLC, United States Beet Sugar Association ("Processors"), Betaseed, Inc. ("Betaseed"), Monsanto Company ("Monsanto"), and Syngenta Seeds, Inc. ("Syngenta") (collectively, "Amici") have also filed a brief in opposition to Plaintiff's motion for summary judgment and in support of Defendants' cross-motion for summary judgment. Having considered the parties' and Amici's arguments and relevant legal authority, the Court hereby

grants Plaintiffs' motion for summary judgment and denies Defendants' cross-motion for summary judgment.[1]

**BACKGROUND**

Plaintiffs filed this action challenging the decision by the United States Department of Agriculture ("USDA") and its Animal and Plant Health Inspection Service ("APHIS") to deregulate a variety of genetically engineered sugar beets. Plaintiffs contend that Defendants failed to comply with the environmental and agricultural review requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321-4335 ("NEPA") and the Plant Protection Act ("PPA") in making that decision. Plaintiffs bring claims against Defendants under NEPA, the PPA, and the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq.* ("APA").

The PPA gives the Secretary of the USDA the authority to adopt regulations preventing the introduction and dissemination of plant pests. 7 U.S.C. § 7711(a). Pursuant to this authority, APHIS, a division of the USDA, regulates "the introduction of organisms and products altered or produced through genetically engineering that are plant pests or are believed to be plant pests," or "regulated articles." *See* 7 C.F.R. § 340.0(a)(2) & n.1. APHIS initially classified genetically engineered Roundup Ready sugar beet designated as event H7-1 as a regulated article.

Montsano and Betaseed's parent company, KWS SAAT AG ("KWS") filed a petition seeking to have APHIS deregulate their genetically engineered Roundup Ready sugar beets. (AR 0805.) Montsano and KWS sought a determination from APHIS that event H7-1 and its progeny do not present a plant pest risk and therefore, would no longer be regulated pursuant to 7 C.F.R. § 340. (*Id.*) "Event H7-1 was engineered to be glyphosate tolerant by inserting a gene

---

[1] The Court DENIES Amici's motion for leave to file a reply brief.
Both Plaintiffs and Amici submit declarations. However, the Court cannot examine extra record evidence unless an exception has been demonstrated. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Courts may admit extra-record evidence: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Id.* (internal quotation marks and citation omitted). As the court in *Lands Council* explained, "these exceptions are narrowly construed and applied." *Id.* The Court finds that no exception is applicable here. Therefore, the Court will not consider the submitted declarations.

2

for the enzyme 5-enolpyruvylshikimate-3-phosphate synthase ("EPSPS") into the sugar beet genome. The gene is from the common soil bacterium *Agrobacterium* sp. strain CP4 and was introduced into these sugar beets via an *Agrobacterium*-mediated transformation protocol." (*Id.*) Event H7-1 had been regulated under the PPA because it contains genetically engineered material that is derived from plant pathogens and the vector agent used to deliver the transforming DNA is a plant pathogen. (AR 0807.)

APHIS had three options to respond to the petition: (1) it could have taken no action, and thus, Roundup Ready sugar beets would continue to be a regulated article; (2) it could have unconditionally deregulated Roundup Ready sugar beets; or (3) it could have partially deregulated Roundup Ready sugar beets, by approving the petition but imposing geographic limitations. *See Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1134 (9th Cir. 2009).

APHIS and the Department of Agrigulture prepared an environmental assessment ("EA") in response to Montsano's and KWS's petition. APHIS reached a finding of no significant impact ("FONSI") "on the environment from the unconfined cultivation and agricultural use of event H7-1 and its progeny." (AR 0797.) It therefore concluded that it did not need to prepare an environmental impact statement ("EIS"), and it unconditionally deregulated Roundup Ready sugar beets. (AR 0797, 0819.)

Worldwide, approximately 30% of refined sugar is produced from sugar beet. (AR 0603.) In 2001 and 2002, 1.3 and 1.4 million acres of sugar beet, respectively, were planted in the United States. (*Id.*) Sugar beets are largely wind pollinated and are normally a biennial crop that develops a large succulent root in the first year and a seed stalk in the second. (AR 0603, 0823. Pollen from sugar beets may also be dispersed by insects -AR 535. Because sugar beets are normally harvested in the first year, while still in the vegetative state, flowers rarely develop. "However, certain conditions such as low temperatures after planting and longer day length can cause the sugar beet to 'bolt' or produce a seed stalk during the first growing season." (AR 0823.)

Occasionally, volunteer plants, known as ground keepers or weed beets, grow up from residual root material in the soil after harvest. (AR 0632.) According to Monsanto, these plants

3

1  are cold sensitive and do not easily survive the winter conditions found in most sugar beet

2  production states. (*Id.*) If an event H7-1 ground keeper or volunteer plant were to survive the

3  winter, such plants could be controlled by mechanical means or by several other registered

4  herbicides besides glyphosate. (AR 0632, 0813.) APHIS and the Department of Agriculture

5  note that sugar beets possess few of the characteristics of plants that are notable of successful

6  weed plants. (AR 0813.)

7       Montsano contends that sugar beet pollen remains viable for a maximum of 24 hours,

8  depending on environmental conditions. (AR 0535.) However, other sources provide that

9  sugar beet pollen may remain viable for much longer. (AR 4100 ("[S]ugar beet pollen can

10 remain viable for 50 days when stored cold and dry, but does not survive wetting by dew or

11 usually remain viable for more than a day.").)

12      Sugar beets are in the *Beta vulgaris* species and are closely related to red table beets and

13 Swiss chard, which are also in the *Beta vulgaris* species. (AR 0823.) All varieties of Section

14 Beta species, including *Beta vulgaris* and *Beta macrocarpa*, can cross-pollinate with each other,

15 including with wild relatives, and the resulting hybrid plants are fully fertile. (AR 0823.)

16 Hybrids between cultivated sugar beet and resident species have occurred in commercial

17 operations. APHIS noted that "hybrids between *Beta macrocarpa* and commercial sugar beets

18 are a weed problem in production fields." (AR 0823 (*citing* Hultén and Fries, 1986).) In

19 Europe, natural hybrids have occurred between cultivated sugar beets and wild beets, which has

20 resulted in a hybrid form of "weed beet" that can bolt in a single season, while growing among

21 biennial sugar beet varieties. (AR 0823.)

22      Wild *Beta vargaris* exists in the Imperial Valley of California, where there is a major

23 center of production of sugar beets. (AR 0824.) There are free living sugar beets that have

24 escaped cultivation and have persisted. These plants are a minor weed problem in the Imperial

25 Valley and movement of the transgenes from H7-1 to these plants is likely. (*Id.*) In the

26 Imperial Valley, the *Beta macrocarpa* species grows as a weed beet in sugar beet fields and

27 even though *Beta macrocarpa* usually flowers earlier than sugar beet, it can cross with sugar

28 beet bolters when flowering times overlap. (*Id.*) Sugar beets are grown in winter in the

1  Imperial Valley and bolting is a common phenomenon there due to moderately cold winter
2  weather. One study has documented an introgression rate of 2% from *Beta vulgaris* to *Beta*
3  *macrocarpa*, indicating past gene flow between these two species. Therefore, APHIS
4  concluded that escape of the engineered trait into the weed beet population is possible. (AR
5  0824.)

6  Nevertheless, APHIS believes that if and when the glyphosate tolerance trait moves
7  from H7-1 to other sexually compatible *Beta* species, such gene flow will not have a significant
8  impact in the United States. (AR 0824.) APHIS reasoned that because the wild beet is regarded
9  as a weed, there will be no impact on the genetic resources of this species and that if glyphosate
10 tolerant individuals did arise through hybridization, the tolerance would not confer any
11 competitive advantage to these plants unless challenged by glyphosate. "This would only occur
12 in managed ecosystems where glyphosate is applied for broad spectrum weed control, on in
13 plant varieties developed to exhibit glyphosate tolerance and in which glyphosate is used to
14 control weeds." (AR 0824-825.) In that circumstance, glyphosate would be a lost tool to
15 control these species and other sound crop management practices, such as other chemical and/or
16 mechanical means, would have to be used. (AR 0825.)

17 Sugar beet seed production takes place primarily in the Willamette Valley of Oregon,
18 where approximately 3,000 to 5,000 acres of sugar beet seed are grown annually. (AR 0634.)
19 However, there are no known wild beet species currently in the Willamette Valley. The wild
20 relatives of cultivated sugar beet are located exclusively in California. (AR 0634.) Seed
21 production for the related crops Swiss chard and table beet also occurs in the Willamette Valley.
22 (*Id.*) Oregon Seed Certification Standards require a minimum isolation distance of 3,200 feet
23 (~975 meters) between sugar beet varieties and at least 8,000 feet (~2438 meters) from other
24 *Beta* species, such as red table beet and Swiss chard. (*Id.*)

**ANALYSIS**

**A.  Legal Standards Applicable to Motions for Summary Judgment.**

27 Summary judgment is proper when the "pleadings, depositions, answers to
28 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5

1  genuine issue as to any material fact and that the moving party is entitled to judgment as a
2  matter of law." Fed. R. Civ. P. 56(c). A principal purpose of the summary judgment procedure
3  is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S.
4  317, 323-24 (1986). "In considering a motion for summary judgment, the court may not weigh
5  the evidence or make credibility determinations, and is required to draw all inferences in a light
6  most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.
7  1997).

8  The party moving for summary judgment bears the initial burden of identifying those
9  portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine
10 issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this initial
11 burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth
12 specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The
13 non-moving party must "identify with reasonable particularity the evidence that precludes
14 summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v.
15 Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task
16 to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails
17 to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477
18 U.S. at 323. The Court must evaluate each party's motion on its own merits. *See, e.g., Fair
19 Housing Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

20 **B.     NEPA Requirements.**[2]

21 NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony
22 between man and his environment,' and was intended to reduce or eliminate environmental
23 damage and to promote 'the understanding of the ecological systems and natural resources
24 important to' the United States." *Department of Transportation v. Public Citizen*, 541 U.S. 752,
25 756 (2004) (quoting 42 U.S.C. § 4321) (hereinafter "*Public Citizen*"). NEPA does not mandate
26 particular results. Rather "it imposes only procedural requirements on federal agencies with a

---

[2] NEPA does not contain a separate provision for judicial review and, thus, an agency's compliance with NEPA is reviewed under the APA. *Ka Makani 'O Kohala Ohana, Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) (hereinafter "*Ka Makani*").

6

particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-51 (1989)).

NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211-12 (9th Cir. 1998) (hereinafter "*Blue Mountains*") (quoting 42 U.S.C. § 4332(2)(C)). "NEPA ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Id*. at 1212 (internal quotation marks and citation omitted).

Accordingly, "a threshold question in a NEPA case is whether a proposed project will 'significantly affect' the environment, thereby triggering the requirement for an EIS." *Id*. (quoting 42 U.S.C. § 4332(2)(C)). "Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS." *Ocean Advocates v. United States Army Corps of Engineers*, 402 F.3d 846, 864 (9th Cir. 2005). "An EA is a concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." *Blue Mountains*, 161 F.3d at 1212.

"An EIS must be prepared if substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Id*. (internal quotation marks and citation omitted). The regulations, promulgated by the Council on Environmental Quality ("CEQ"), guide the court's review of an agency's determination of "significance." *Id*. (citing 40 C.F.R. § 1508.27). The regulations provide two components to the determination of whether environmental impacts may be significant: context and intensity. *Ocean Advocates*, 402 F.3d at 865 (citing 40 C.F.R. § 1508.27). "Context refers to the setting in which the proposed action takes place .... Intensity means "the severity of the impact." *Id*. (citing C.F.R. §§ 1508.27(a), (b)).

7

The regulations provide the following factors for courts to consider in evaluating the severity of the impact:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
> (2) The degree to which the proposed action affects public health or safety.
> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
> (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
> (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
> (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
> (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

In general, an agency's decision not to prepare an EA or EIS can be set aside "only upon a showing that [the decision] was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Public Citizen*, 541 U.S. at 763 (quoting 5 U.S.C. § 706(2)(A)); *see also Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 961-62 (9th Cir. 2006) (hereinafter "*Great Basin*").

When a court applies the "arbitrary and capricious" standard, it must "'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' ... [Courts] must also ensure that the agency 'took a hard look at the environmental consequences of its action.'" *Great Basin*, 456 F.3d at 962 (citations omitted). A court may reverse an agency decision under the arbitrary and capricious standard "only if the

1 agency has relied on factors Congress has not intended it to consider, entirely failed to consider
2 an important aspect of the problem, offered 'an explanation [for its decision] that runs counter
3 to the evidence before the agency, or is so implausible that it could not be ascribed to a
4 difference in view or the product of agency expertise.'" *Id.* (quoting *Sierra Club v. EPA*, 346
5 F.3d 955, 961 (9th Cir. 2003) (noting standard), *amended by* 352 F.3d 1186 (9th Cir. 2003)
6 (brackets in original)).

"The standard for determining whether the implementation of a proposal would significantly affect the human environment," and thereby trigger the need to prepare an EIS, "is whether 'the plaintiff has alleged facts which, if true, show that the proposed project may significantly degrade some human environmental factor.'" *Foundation for North American Wild Sheep v. USDA*, 681 F.2d 1172, 1177-78 (9th Cir. 1982) (hereinafter "*Wild Sheep*") (quoting *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 597 (9th Cir. 1981)). The plaintiff need not show that significant effects will in fact occur, but if the plaintiff raises substantial questions about whether a project may have a significant effect, an EIS must be prepared. *Blue Mountains*, 161 F.3d at 1212 (citing *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1150 (9th Cir. 1998)); *Wild Sheep*, 671 F.2d at 1178. "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant. *Blue Mountains*, 161 F.3d at 1211 (internal quotation marks and citations omitted).

**C. Issues Regarding Consumer Choice Have Not Been Waived.**

Defendants and Amici argue that Plaintiffs waived the ability to argue whether the deregulation of event H7-1 will negatively impact consumers who choose not to eat genetically engineered food and whether deregulation will lead to gene transmission to the related Swiss chard and table beets because they did not assert these issues during the administrative proceedings. However, as the court made clear in *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006), when the agency has independent knowledge of the issues that concerns the plaintiffs, "there is no need for a commentator to point them out specifically to preserve its ability to challenge a proposed action." *Id*. at 1092-93 (*quoting Public Citizen*, 541

9

U.S. at 765). This is so because "the primary responsibility for NEPA compliance is with the agency." *Id*. at 1092. In *'Ilio'ulaokalani* the court held that the plaintiffs did not waive their opportunity to assert an issue because the record was replete with evidence that the agency recognized the specific shortfall raised by the plaintiffs. *Id*. Here, these issues were raised before APHIS (*see* AR 0726-727, 0794), and even if they had not, as Amici concede, APHIS commented on these issues in the EA. Therefore, these issues have not been waived and may be considered.

**D. Specific Issues and Whether They May Have a Significant Impact on the Environment.**

    **1. Cross Pollinate With and Contaminate Non-Genetically Engineered Sugar Beets and Related Swiss Chard and Table Beets.**

Plaintiffs contend that one significant environmental impact resulting from the deregulation of Roundup Ready sugar beets is that genetically-engineered sugar beet seeds may cross-pollinate with and thus genetically modify non-genetically engineered sugar beets and *Beta* related Swiss chard and table beet seed, all of which are grown in the same valley in Oregon. Imperial Sugar, a company that processes sugar beets in California and produces and markets sugar beet seed, raised the following concerns in response to the petition for deregulation:

> When questioned about their willingness to accept sugar produced from [genetically modifed] sugar beets, many buyers of industrial and consumer sugars have expressed extreme reluctance or an emphatic opposition to receiving such [genetically modified] sugars. We believe this arises from several considerations:
> 1) A belief that consumers react negatively to products containing or derived from [genetically modified] material and a lack of willingness to test this acceptance with their branded products.
> 2) Some countries will not allow [genetically modified] products to be imported.
> 3) Labeling requirements for exporting food products to many nations that specifically require the labeling of [genetically modified] content.
> 4) Concerns that the current marketing, transportation and manufacturing systems are generally not able to keep product batches in an identity preserved manner. There are numerous significant concerns even where dedicated equipment/facilities might be utilized for transportation and manufacturing involving the [genetically modified] product, *i.e.* what assurances can be made that the equipment is cleaned thoroughly when switching usage between [genetically modified] and non-[genetically modified] product.

10

1
2
> ... We are aware that some observers in the scientific community have raised serious doubts as to the adequacy of current regulations and control regimes intended to prevent cross-pollination and related problems in the field.

3 (AR 0793-794.)

4  Event H7-1 may cross-pollinate with non-genetically engineered sugar beets and with
5 the related Swiss chard and table beets. (AR 0823 ("Sugar beet hybridizes freely with all
6 members of the section *Beta* and the resulting progeny are fully fertile.").) Even APHIS
7 acknowledged that "[g]ene introgression from [event H7-1] into wild or cultivated sexually
8 compatible plants is possible." (AR 0806.)

9  Sugar beets are pollinated by both wind and insects and scientist have documented that
10 sugar beet pollen can disperse up to 800 meters. (AR 4065 (Sugar beet "pollen can be spread
11 extensively on the airflow (significant quantities have been recorded at distances up to 800m)
12 and by insects."); AR 4104 ("Pollen dispersal by wind has been shown to occur up to 800
13 [meters] at relatively high frequencies, and under certain atmospheric conditions are likely to be
14 dispersed more widely."); AR 2977 ("Gene flow is hard to control in wind-pollinated plants like
15 beet.").) One report found that isolation distances of 1000 meters and 3200 meters may not be
16 sufficient for genetically modified ("GM")-free organic operations with adjacent fields of GM
17 sugar beet. (AR 4098; *see also* AR 4042 (suggesting that isolation distances of up to 3200 to
18 4800 meters (3.2 to 4.8 kilometers) may be desirable).) Another study found that wind-born
19 pollen can be distributed at least 4,500 meters. (AR 3992; *see also* 4098-99 (noting that "no
20 research has been carried out specifically on the movement of sugar beet pollen in atmospheric
21 conditions such as convection currents, turbulent conditions and weather fronts" and that within
22 twenty-four hours it is possible to estimate that pollen could be dispersed up to 864,000 meters
23 (864 kilometers) in turbulent conditions).)

24  Sugar beet seed production takes place primarily in the Willamette Valley of Oregon,
25 where approximately 3,000 to 5,000 acres of sugar beet seed are grown annually. (AR 0634.)
26 Seed production for the related crops Swiss chard and table beet also occurs in the Willamette
27 Valley. (*Id*.) Oregon Seed Certification Standards require a minimum isolation distance of
28 3,280 feet (1,000 meters) between sugar beet varieties and at least 8,000 feet from other *Beta*

11

1 species. (*Id*.) Defendants concede that these isolation distances are voluntary. (Defendants'
2 Reply at 2.)

3 In the EA, APHIS states in a conclusory manner:

> It is not likely that organic farmers, or other farmers who chose not to plant transgenic varieties or sell transgenic sugar beets, will be significantly impacted by the expected commercial use of this product since: (a) non-trangenic sugar beet will likely still be sold and will be available to those who wish to plant it; (b) farmers purchasing seed will know this product is transgenic because it will be marked and labeled as glyphosate tolerant.

8 (AR 0816.) APHIS further comments that "[w]ith the exception of seed production fields, sugar
9 beets do not typically flower in their one year production cycle, therefore, the likelihood of
10 cross pollination to organic fields is unlikely. Current seed certification standards ... are
11 sufficient to address this issue." (*Id*.)

12 In response to the comments on the EA, APHIS acknowledges the commentator's
13 critique that the agency failed to analyze the socio-economic impacts of deregulating event H7-
14 1 on farmers and processors seeking to avoid genetically engineered sugar beets and derived
15 products, but merely responds that it is not required to analyze the full socio-economic impacts
16 of an action. (AR 0801.) And then, because APHIS found that there was no data or other
17 evidence indicating that there was an organic sugar beet industry, concluded that it was unlikely
18 that any major economic impact would occur on the organic sugar beet industry. (*Id*.)

19 Economic effects are relevant and must be addressed in the environmental review "when
20 they are '*interrelated*' with 'natural or physical environmental effects.'" *Ashley Creek*
21 *Phosphate Co. v. Norton*, 420 F.3d 934, 944 (9th Cir. 2005) (emphasis in original) (quoting 40
22 C.F.R. 1508.14); *see also Geertson Seed Farms v. Johanns*, 2007 WL 518624, *7 (N.D. Cal.
23 Feb. 13, 2007). In *Geertson Seed Farms*, the court found that "the economic effects on the
24 organic and conventional farmers of the government's deregulation decision are interrelated
25 with, and, indeed, *a direct result of*, the effect on the physical environment; namely, the
26 alteration of a plant specie's DNA through the transmission of the genetically engineered gene
27 to the organic and conventional [crop]." *Id*., 2007 WL 518624, *8 (emphasis added).
28 Therefore, the court held that APHIS was required to consider these effects in assessing whether

12

the impact of its proposed action of deregulation was significant. *Id*. The court further found that "[a] federal action that eliminates a farmer's choice to grow non-genetically engineered crops, or a consumer's choice to eat non-genetically engineered food, is an undesirable consequence," and that "[a]n action which potentially eliminates or .. greatly reduces the availability of a particular plant ... has a significant effect on the human environment." *Id*., *8, 9.[3]

In light of the large distances pollen can travel by wind and the context that seed for sugar beets, Swiss chard, and table beets are primarily grown in one valley in Oregon, Plaintiffs have demonstrated that deregulation may significantly effect the environment. As the court concluded in *Geertson Seed Farms v. Johanns*, this Court finds that the potential elimination of farmer's choice to grow non-genetically engineered crops, or a consumer's choice to eat non-genetically engineered food, and an action that potentially eliminates or reduces the availability of a particular plant has a significant effect on the human environment. "APHIS's reasons for concluding that the potential for the transmission of the genetically engineered gene is not significant are not 'convincing' and do not demonstrate the 'hard look' that NEPA requires." *Id*., 2007 WL 518624, *6 (N.D. Cal. Feb. 13, 2007). Because APHIS concluded that it was not required to consider the effects of gene transmission and observed the lack of evidence

---

[3] To the extent Defendants rely on *Public Citizen* for the proposition that APHIS could not have addressed the socio-economic impacts of deregulation, their reliance is misplaced. In *Public Citizen*, the Supreme Court held that the Federal Motor Carrier Safety Administration ("FMCSA") did not need to consider the environmental effects of increased cross-border operations of Mexican motor carriers in the EA because the FMCSA had no ability to prevent those operations. *Id.*, 541 U.S. at 770. A "critical feature" of that case was that the "FMCSA [had] no ability to countermand the President's lifting of the moratorium or otherwise categorically exclude Mexican motor carriers from operating within the United States." *Id*. at 766. The agency had "only limited discretion regarding motor vehicle carrier registration: It must grant registration to all domestic or foreign motor carriers that are willing and able to comply with the applicable safety, fitness, and financial-responsibility requirements... . FMCSA [had] no statutory authority to impose or enforce emissions controls or to establish environmental requirements unrelated to motor carrier safety." *Id*. at 758-59 (internal quotation marks and citation omitted). In contrast here, APHIS has authority to examine the environmental impacts of deregulation, and in response to the petition for deregulation, APHIS had three options: (1) it could have taken no action, and thus, Roundup Ready sugar beets would continue to be a regulated article; (2) it could have unconditionally deregulated Roundup Ready sugar beets; or (3) it could have partially deregulated Roundup Ready sugar beets, by approving the petition but imposing geographic limitations. *See Geertson Seed Farms*, 570 F.3d at 1134.

13

regarding an organic beet seed market, it did not consider the effects of gene transmission on conventional farmers and consumers of sugar beet seed or of gene transmission to the related crops of to red table beets and Swiss chard. To the limited extent APHIS did examine this issue, it did so only on a cursory level. It did not consider the fact that the isolation distances are only voluntary. It did not examine whether the isolation distances were actually followed and likely to be followed in the future. Nor did APHIS analyze, in light of the evidence that pollen may travel significant distances, whether the isolation distances set by the Oregon Seed Certification Standards are sufficient to protect the non-genetically engineered crops. Moreover, there is no support in the record for APHIS conclusion that non-trangenic sugar beet will likely still be sold and will be available to those who wish to plant it and that farmers purchasing seed will know whether it is transgenic because it will be marked and labeled as glyphosate tolerant. Therefore, the Court finds that APHIS's finding of no significant impact was not supported by a convincing statement of reasons and thus was unreasonable. APHIS is required to prepare an EIS.[4]

///
///
///
///
///
///

---

[4] Because the Court finds that Defendants violated NEPA by failing to take a hard look at the likelihood and effects of gene transmission on conventional farmers and consumers of sugar beet seed or of gene transmission to the related crops of red table beets and Swiss chard, the Court need not determine whether Defendants further violated NEPA by failing to sufficiently address whether deregulation would cause the proliferation of glyphosate resistant weeds or whether APHIS had an obligation to address the cumulative effects of increased use of glyphosate. Moreover, because the Court has concluded that APHIS must prepare and EIS before approving the petition to deregulate Roundup Ready sugar beets, the Court need to address whether APHIS also violated the PPA.

Amici attempt to assert a laches defense, but laches is a defense that is "personal to the particular party." *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992); *see also Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1046 (4th Cir. 1984) (laches is a "personal defense"). Amici are not a party to the merits portion of this action. Therefore, they may not raise a laches defense during the merits phase.

14

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for summary judgment and DENIES Defendants' cross-motion. The Court HEREBY SCHEDULES a further case management to address the remedies phase on October 30, 2009.

**IT IS SO ORDERED.**

Dated: September 21, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE