1  LATHAM & WATKINS LLP
       Holly J. Tate (Bar No. 237561)
2        holly.tate@lw.com
   505 Montgomery Street, Suite 2000
3  San Francisco, California  94111-2562
   Telephone:  (415) 391-0600
4  Facsimile:  (415) 395-8095

5  LATHAM & WATKINS LLP
       Philip J. Perry (Bar No. 148696)
6        philip.perry@lw.com
       Janice M. Schneider (DC Bar No. 472037) (*pro
7  hac vice* granted)
       janice.schneider@lw.com
8  555 11th Street, N.W., Suite 1000
   Washington, D.C.  20004
9  Telephone:  (202) 637-2200
   Facsimile:  (202) 637-2201

10

11 HOWREY LLP
       Gilbert S. Keltas (DC Bar No. 421236) (*pro hac
   vice* granted)
12     keltasg@howrey.com
       John F. Bruce (DC Bar No. 1578) (*pro hac vice*
13 granted)
       brucej@howrey.com
14     Christopher H. Marraro (DC Bar No. 395152) (*pro
   hac vice* granted)
15 1299 Pennsylvania Avenue, N.W.
   Washington, D.C. 20004-2402
16 Telephone: (202) 783-0800
   Facsimile: (202) 383-6610

17

18 Intervenor-Defendants American Sugarbeet Growers
   Association, et al.

19 [Complete list of Parties on signature page]

20            **UNITED STATES DISTRICT COURT FOR THE**
                **NORTHERN DISTRICT OF CALIFORNIA**
21                    **SAN FRANCISCO DIVISION**

22 Center for Food Safety, *et al.*,            |  CASE NO. C-08-0484 JSW
23            Plaintiffs,                        |  **DEFENDANT INTERVENORS'**
                                                 **OPPOSITION TO PLAINTIFFS'**
24        v.                                     **MOTION FOR PRELIMINARY**
                                                 **INJUNCTION**
25 Thomas J. Vilsack, *et al.*,
                                                 **(Honorable Jeffrey S. White)**
26            Defendants.
                                                  Date:  March 5, 2010
27                                                Time:  9:00 a.m.
28                                                Place:  Courtroom 11

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

SUMMARY OF ARGUMENT ................................................................................................... v

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 4

    A.  Sugarbeet and Chard Seed Crops ................................................................................. 4

    B.  Sugarbeet Root Crop ..................................................................................................... 8

LEGAL STANDARDS ................................................................................................................ 9

ARGUMENT .............................................................................................................................. 10

  I.   PLAINTIFFS HAVE NOT ESTABLISHED LIKELIHOOD OF SUCCESS ON
       THE MERITS AS TO ANY ISSUE EXCEPT "GENE FLOW" AS TO THE
       WILLAMETTE VALLEY SEED CROP ................................................................ 11

  II.  PLAINTIFFS HAVE NOT ESTABLISHED IMMEDIATE IRREPARABLE
       HARM TO PLAINTIFFS ARISING OUT OF THE NEPA VIOLATION ................... 11

    A.  Plaintiffs have not shown that any immediate irreparable harm to them from
        gene flow in the Willamette Valley crop is likely ...................................................... 12

       1.  Plaintiffs' assertions about gene flow rest on flawed analysis and run
          contrary to the record ................................................................................ 12

       2.  Plaintiffs' allegations concerning gene flow from sources other than cross-
          pollination are exaggerated .......................................................................... 13

       3.  Gene flow is not an irreparable harm ........................................................... 14

    B.  Plaintiffs have not shown that any immediate irreparable harm associated with
        the root crop is possible, much less likely .................................................................. 16

  III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FACTORS
       SHARPLY TILT AGAINST THE BROAD INJUNCTION REQUESTED .................. 17

    A.  Plaintiffs' delay in seeking injunctive relief is inexcusable and belies any
        contention of immediate irreparable harm ................................................................. 18

    B.  A ban on sugarbeet crop and seed production would impose staggering harms
        on seed growers, beet farmers, and the U.S. public .................................................. 19

    C.  By comparison, the alleged *status quo* harms to plaintiffs are minimal .................... 20

  IV. THE COURT MAY NOT GRANT PLAINTIFFS' REQUESTED RELIEF
       WITHOUT AN EVIDENTIARY HEARING ......................................................... 21

CONCLUSION ........................................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) .................................................................................................... 17, 18

*American Trucking Associations v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) ............................................................................................ 3, 9

*Amoco Production Co. v. Village of Gambell,*
    480 U.S. 531 (1987) ............................................................................................................ 20

*California Pharmacists Association v. Maxwell-Jolly,*
    563 F.3d 847 (9th Cir. 2009) ............................................................................................. 21

*Center for Food Safety v. Vilsack,*
    No. 08-00484, 2009 WL 3047227 (N.D. Cal. Sept. 21, 2009) ............................................ 11

*Charlton v. Estate of Charlton,*
    841 F.2d 988 (9th Cir. 1988) ............................................................................................. 22

*Costello v. United States,*
    365 U.S. 265 (1961) ............................................................................................................ 18

*Geertson Farms, Inc. v. Johanns,*
    No. 06-1075, 2007 WL 1302981 (N.D. Cal. May 3, 2007) ............................................ 3, 15

*Geertson Seed Farms v. Johanns,*
    570 F.3d 1130, 1142 (9th Cir. 2009) ................................................................................. 22

*Lathan v. Brinegar,*
    506 F.2d 677 (9th Cir. 1974) ............................................................................................. 18

*Lewis v. Casey,*
    518 U.S. 343 ....................................................................................................................... 10

*Metropolitan Edison Co. v. People Against Nuclear Energy,*
    460 U.S. 766 (1983) ............................................................................................................ 21

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,*
    460 U.S. 1 (1983) ................................................................................................................. 7

*Munaf v. Geren,*
    128 S. Ct. 2207 (2008) ......................................................................................................... 9

*Oakland Tribune, Inc. v. Chronicle Publishing Co.,*
    762 F.2d 1374 (9th Cir. 1985) ........................................................................................... 18

*Perez-Gonzalez v. Gonzales,*
    403 F.3d 1116 (9th Cir. 2005) ........................................................................................... 19

*Price v. City of Stockton,*
    390 F.3d 1105 (9th Cir. 2004) ................................................................................... 9, 10, 11

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009) ........................................................................................... 3

*Stanley v. University of Southern California*,
  13 F.3d 1313 (9th Cir. 1994) ............................................................................................ 9

*United States v. Microsoft*,
  253 F.3d 34, 101 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001) ......................................... 22

*Winter v. NRDC, Inc.*,
  129 S. Ct. 365 (2008) ............................................................................... v, 2, 9, 10, 11, 12, 17

**STATUTES AND REGULATIONS**

9 U.S.C. § 2 .............................................................................................................................. 7

64 Fed. Reg. 18360 (Apr. 14, 1999) ............................................................................................ 8

1

**SUMMARY OF ARGUMENT**

2          More than 1750 days since the U.S. Department of Agriculture's ("USDA") Animal and

3  Plant Health Inspection Service ("APHIS") granted Roundup Ready sugarbeets ("RRSB") non-

4  regulated status, and more than 730 days since plaintiffs brought this suit challenging that

5  determination, plaintiffs now seek *preliminary* injunctive relief to halt planting of 95% of the

6  2010 sugarbeet root crops nationwide and to compel sugarbeet seed growers to rip thousands of

7  acres of sugarbeet seed crops from the ground in the Willamette Valley in Oregon.  The Supreme

8  Court's recent decision in *Winter v. NRDC, Inc.*, 129 S. Ct. 365 (2008), requires that they

9  demonstrate a *likelihood* of *immediate irreparable* harm to plaintiffs to justify each element of

10  the preliminary relief they seek, along with each of the other traditional equitable factors, and

11  that the Court must *narrowly tailor* any such relief to avoid imposing unnecessary hardships.

12  The astonishingly broad relief plaintiffs seek cannot be justified:

13   •   The relief requested improperly extends far beyond the narrow NEPA violation the Court
14        found based on an alleged risk of cross-pollination from RRSB seed crops in Oregon.

15   •   None of the harms plaintiffs allege are immediate or irreparable.  RRSB crops have been
          grown on a large scale for multiple years without causing any harm at all to plaintiffs.
16        Indeed, sugarbeet seed crops were already 60% RRSB in 2006 and 95% RRSB in 2007
          before this suit was even brought, and plaintiffs admit they have suffered no harm to date.
17

18   •   Isolation distances and reproductive techniques now utilized in the Willamette Valley
          make the alleged risk of cross-pollination extremely remote.   Indeed, plaintiffs have
19        neglected to inform this Court that their own genetic testing over several years *has
          repeatedly shown zero cross-pollination*, and that their principal declarant explicitly
20        consented in 2007 to the isolation distances they vehemently oppose today.  And even in
          the unlikely event that cross pollination did occur, it would not be "irreparable."
21        Plaintiffs could simply sell their crops to different customers, and any cross-pollination of
          seed stocks would be fully reparable through common breeding practices.
22

23   •   There is *zero* chance of irreparable harm from the RRSB root crop.  In depositions to
          date, plaintiffs could not articulate any concrete harm from those crops or establish
24        standing to seek a remedy halting planting.

25   •   The inequity of plaintiffs' proposed relief would be staggering: at most, tens of thousands
          of dollars of highly speculative harm to plaintiffs on one hand, versus more than a *billion*
26        dollars in certain and permanent harm to thousands of sugarbeet farmers and other
          interests, thousands of layoffs, and a severe domestic sugar shortage on the other.
27

28  Plaintiffs' motion for a preliminary injunction should be denied.

Case Number:  C 06-2893 CW
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

1    Defendant Intervenors ("Intervenors") represent the thousands of family sugarbeet farms,

2    the grower-owned processors who produce refined sugar from sugarbeets, and the companies

3    who developed and produce Roundup Ready sugarbeet ("RRSB") seed, all of whom face

4    devastating harm from the relief plaintiffs seek.

5                                    **INTRODUCTION**

6        At the December 4 Case Management Conference, this Court instructed that it would not

7    conduct "rocket justice in a case of this complexity and importance," and entered an order

8    allowing targeted discovery and setting a June hearing on plaintiffs' request for a permanent

9    injunction.  Transcript of Proceedings, Initial Case Management Conference ("Case Mgmt. Tr.")

10   (Dkt. #179), at 6:11-7:11, 14:1-2.  But "rocket justice"—without genuine scrutiny of plaintiffs'

11   allegations or witnesses—is exactly what plaintiffs now seek.

12       Although the parties are in the midst of the discovery the Court ordered, plaintiffs now

13   seek a "preliminary" injunction with profound and unambiguously permanent effects across the

14   nation.  Already, in depositions conducted to date, plaintiffs' proffered support for this

15   "preliminary" relief is unraveling.  For example, although plaintiffs insist that unwanted cross-

16   pollination between RRSB and their chard or beet seed crops in the Willamette Valley in Oregon

17   is "inevitable" and poses "immediate irreparable harm," discovery has revealed that plaintiffs'

18   repeated genetic testing over several years has shown *zero cross-pollination* while RRSB have

19   been grown widely in the Valley subject to the agreed seed crop isolation distances now in

20   effect: "[W]e tested 80,000 seed embryos . . . 80,000 pollination events and no GMOs detected.

21   You have very pure seed, it seems."  Morton Dep., Ex. A to Turner Decl., at 161:8-10.  And

22   plaintiffs' principal declarant, Frank Morton—a Board member of plaintiff Organic Seed

23   Alliance, a member of plaintiff Center for Food Safety, and the admitted origin and driving force

24   of this litigation—consented, in writing on multiple occasions, to the exact "isolation distances"

25   for Willamette Valley seed crops that plaintiffs now ask this Court to set aside.  The only RRSB

26   field anywhere near Mr. Morton this year is a hybrid field cultivated with the Roundup Ready

27   "gene on the female" non-pollinator plants, a cultivation method that Mr. Morton himself has

28   admitted *would pose no risk to him*.  And yet the alleged risk of cross-pollination to Frank

Morton's fields is the only supposed "irreparable harm" plaintiffs have identified to any grower in the Willamette Valley.  As plaintiffs have admitted, all commercial growers of chard and beet seed in the Willamette Valley consented to and abide by the existing isolation distances.  These isolation distances have and will continue to serve their purpose.  And in the highly unlikely event that cross-pollination does occur, it is fully reparable.  *See infra* Section II.A.

But plaintiffs' proposed preliminary relief is not limited only to the Willamette Valley.  They also seek to halt the entire RRSB root crop grown by 10,000 farms in 10 states.  As a matter of law, seeking this broad relief is improper because the Court's summary judgment decision did not extend to—and plaintiffs have no standing to challenge—the alleged root crop weed resistance risks plaintiffs' proposed injunction purports to address.  As a matter of procedure, this request flouts the Court's clear instructions that any motion for a "preliminary" injunction seek "a quick remedy targeted to a specific set of events."  Case Mgmt. Tr. at 13:12-13.  And as a matter of fact, plaintiffs show no concrete harm to plaintiffs, much less the required "likelihood" of immediate irreparable harm, caused by the RRSB root crop.  Plaintiffs do not even attempt to suggest that the root crop would cause harm by cross-pollinating chard or beet seed crops.  They cannot.  Nor can plaintiffs show any immediate irreparable harm arising out of alleged weed resistance to glyphosate (Roundup) caused by RRSB.  In fact, the relief plaintiffs seek absurdly would compel sugarbeet farmers who could return to conventional farming to use more environmentally damaging herbicides instead of Roundup and, without any justification, cause severe financial hardship to thousands of family farms.  *See infra* Section II.B.

Unable to identify any actual irreparable harm, plaintiffs argue that the Supreme Court decision in *Winter v. NRDC, Inc.*, 129 S. Ct. 365, did not change Ninth Circuit law, and that NEPA "process" injury alone – *i.e.* a failure to properly perform an EIS – is "harm" sufficient to warrant the relief they seek.[1]  Pls.' Br. at 10-13.  This Court explicitly rejected that contention at the Case Management Conference, acknowledging that after *Winter*, "[t]he Ninth Circuit rule no longer exists."  Case Mgmt. Tr. at 18:2-3; *see also id.* at 13:19-20 (*Winter* "sets a new standard

---

[1]  In so arguing, plaintiffs effectively urge this Court to embrace the views of the dissenting Justices in *Winter*, rather than the majority.

1   for the issuance of these preliminary remedies."). Plaintiffs themselves admitted this significant

2   change in the law in their recent brief opposing certiorari in *Monsanto Co. v. Geertson Seed*

3   *Farms*, No. 09-475, explaining that the Ninth Circuit has "squarely acknowledged that *Winter*

4   significantly changes the standard applicable to injunctive relief in the Ninth Circuit." Opp'n to

5   Pet. for Cert. at 24 (citing *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th

6   Cir. 2009)). Consequently plaintiffs conceded that the Ninth Circuit "did not view the grant of

7   injunctive relief in a meritorious NEPA case as automatic." *Id.* at 25 (citing *Sierra Forest*

8   *Legacy v. Rey*, 577 F.3d 1015, 1022-24 (9th Cir. 2009)). Plaintiffs cannot now successfully

9   assert a contrary position here.[2] In short, it is beyond dispute that plaintiffs seeking an injunction

10  must demonstrate an actual *likelihood of irreparable harm to plaintiffs*, not just insufficient

11  NEPA process, and must meet all the other factors for relief. And any such relief must be

12  *narrowly tailored* to avoid imposing unnecessary hardships.

13  Plaintiffs also rely extensively on *Geertson Farms, Inc. v. Johanns*, No. 06-1075, 2007

14  WL 1302981 (N.D. Cal. May 3, 2007).[3] *See, e.g.*, Pls.' Br. at 5, 7, 16. But plaintiffs fail to

15  mention to this Court that the United States Supreme Court has granted Monsanto's petition for

16  *certiorari* in *Geertson* and expedited the case to address the very issues for which plaintiffs cite

17  that case. *See* Notice of Supplemental Authority (Dkt. #204). Argument will be scheduled for

18  April, with a decision likely before the end of the Supreme Court's term this June. *Id.* Perhaps

19  this explains plaintiffs' rush to seek relief now, before the Supreme Court rules.

20  Finally, plaintiffs here seek a harsh, inequitable and unwarranted remedy. Since learning

21  about the planting of RRSB seed in the Willamette Valley in December 2006, plaintiffs stood on

22

23  [2] The few cases plaintiffs cite in support of recognizing "procedural harm" or bureaucratic inertia

24  as a basis for injunctive relief predate *Winter*. Pls.' Br. at 10-12. Insofar as these decisions recognized a lesser "harm" as a basis for injunctive relief, they are overruled by *Winter*.

25  [3] Though superficially similar, as both involve Roundup Ready crops, *Geertson* and this case

26  differ in key respects. *First*, the Roundup Ready alfalfa crop in *Geertson* constituted slightly less than 1% of alfalfa acreage nationwide, whereas roughly 95% of all sugarbeet crops are now

27  Roundup Ready. *Second*, unlike Roundup Ready alfalfa in *Geertson*, RRSB production and commercial root production are completely geographically separate. And, *third*, the isolation distances preventing cross-pollination by RRSB seed crops in the Willamette Valley do not

28  govern alfalfa farming

Case Number: C 06-2893 CW
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

the sidelines while 95% of sugarbeet seed fields and sugarbeet root farmers across the nation switched to RRSB. This is the *status quo*, and plaintiffs' attempt over a few weeks to reverse a multi-year transition would cause over $1.4 billion in largely permanent damage across the United States to those who relied in good faith on a government decision. Plaintiffs cavalierly seek an injunction that could mean financial ruin for many of the nation's 10,000 family farmers of sugarbeets (while choosing not to disclose key evidence that cuts against the relief they seek). This Court should not improvidently grant plaintiffs the broad permanent relief they seek in the guise of a preliminary injunction. Instead, the Court should deny plaintiffs' Motion and proceed in accordance with the Court's existing schedule for a June remedies hearing.

## BACKGROUND

An accurate understanding of the nature of sugarbeet cultivation is important to address the issues presented by plaintiffs' Motion.

### A.  Sugarbeet and Chard Seed Crops

Ninety-nine percent of sugarbeet acreage in the U.S. is grown for sugarbeet roots, which are processed into more than half of the nation's domestic sugar supply. Pierson Decl. ¶ 13. These crops are grown by roughly 10,000 family farms in eleven states across the U.S.: California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming. Sexton Decl. ¶ 8. Roundup Ready sugarbeets are grown in all of these states but California. *Id.* ¶ 15. Ninety-five percent of all sugarbeet root crops are RRSB. Miller Decl. ¶ 11. One percent of U.S. sugarbeet acreage is grown for sugarbeet seed crops. Pierson Decl. ¶ 13. The vast majority of this acreage is in the Willamette Valley in Oregon. *Id.* ¶ 30. Sugarbeet seed crops have been grown in the Valley since World War II. Meier Decl. ¶ 32. Root and seed crops are not grown in the same area. Pierson Decl. ¶ 13.

Seed for chard and table beet crops is grown in several locations, but predominantly in Washington state. Pierson Decl. ¶¶ 40, 43 (citing estimates that 95% of chard and table beet seed is grown in Washington). Chard and table beet seed crops grown in the Willamette Valley in Oregon have historically been grown apart from the sugarbeet crop. Morton Dep. at 142:1-8 (agreeing that "table beets have been grown in the north end of the valley ... sugar beets in the

central and south valley and chard around the margins"). Organic chard and table beet seed crops are available from many sources outside the Willamette Valley where no sugarbeet crops are grown. Plaintiff High Mowing Seeds, for example, purchases only 10-20% of its organic chard and table beet seed crops from the Valley; most of its chard and table beet seed is sourced in Washington and California fields. Stearns Dep., Ex. B to Turner Decl., at 69:16-70:18.[4]

A significant lead time—roughly 2 years—is required to grow and process sugarbeet seeds for a sugarbeet root crop. Meier Decl. ¶ 20.[5] Thus, the 2008 sugarbeet root crop was grown from a seed crop planted in 2006, the 2009 sugarbeet root crop was grown from seeds planted in 2007, and so on. *Id.* ¶ 25. By 2007, roughly 95% of the Willamette Valley seed crop was already RRSB, and the sugarbeet industry had irretrievably committed to RRSB. Miller Decl. ¶¶ 17-19. Very little conventional non-RRSB sugarbeet seed is available for 2010 or 2011 root crops. *Id.* ¶¶ 15-22; Manning Decl. ¶¶ 16-17.

### *Willamette Valley Seed Crops and Frank Morton*

In the Willamette Valley, where sugarbeet seed crops are grown, seed growers cooperate through what plaintiffs acknowledge is a "world class" organization for organizing seed production efforts – the Willamette Valley Specialty Seed Association (WVSSA). Morton Dep. at 56:17-21 (conceding that "the Willamette Valley is considered a world-class place to grow seed is because it has an effective industry-wide system for establishing pollen isolation"). Members of the WVSSA cooperate to ensure that seed field "isolation distances" are set and observed to reduce any possibility for cross-pollination. Lehner Decl. ¶ 12. Seed fields are "pinned" on a map in Oregon State University Extension offices, so that growers in the Valley with potentially cross-pollinating crops can identify where other like fields are planted. *Id.* ¶ 11. The isolation distances for particular crops are set by agreement among WVSSA members with extensive experience in the Valley growing those crops, and the WVSSA rules give priority to

---

[4] Plaintiffs' declarants allege without citation that a larger percentage originates in the Willamette Valley (*see* Navazio Decl. ¶ 20), but they are mistaken. Pierson Decl. ¶¶ 41-45.

[5] Plaintiff High Mowing Seed's 30(b)(6) representative Tom Stearns testified that two years of lead time was also required to grow seeds for organic plants. Stearns Dep. at 91:16-25.

1   growers who have planted in certain locations in prior years.   Loberg Decl. ¶ 11.

2          The "pinning committee" in the Valley convened in late 2006 and 2007 to discuss the

3   appropriate pinning isolation distances for *Beta vulgaris* crops, such as sugarbeets, table beets

4   and chard.  Most chard and table beet seed fields are "open-pollinated," meaning that each plant

5   sheds pollen to the wind and each plant can pollinate each other.  Stander Decl. ¶ 7.  By contrast,

6   sugarbeet seed crops are hybrids, with male pollinators and female non-pollinators planted in

7   different rows.   *Id.* (typically two rows of pollinators for six rows of female non-pollinating

8   plants).  There are several factors that affect the likelihood of cross-pollination from one field to

9   another, including distances between fields, prevailing wind direction, viability of the pollen,

10  natural or artificial obstructions between fields, and perhaps most important, the amount of local

11  pollen competition at the downwind field.  Westgate Decl. ¶¶ 12-21; *see also* Morton Dep. at

12  244:20-21.   Because open-pollinated crops produce much more pollen than do hybrid crops,

13  sugarbeet seed fields are more susceptible to cross-pollination from chard or table beet fields

14  than vice versa.   Stander Decl. ¶ 7; Westgate Decl. ¶¶ 14-15, 21.  WVSSA isolation distances

15  account for these factors, distinguishing open-pollinated and hybrid fields.  Loberg Decl. ¶ 10.

16         In early 2007, the WVSSA pinning committee agreed on a series of isolation distances

17  for *Beta* groups.   Plaintiffs' member Frank Morton expressly agreed to these distances and

18  confirmed his agreement in emails sent at the time to other participants in the WVSSA pinning

19  committee.   Morton Dep. at 162:8-165:4 (noting that three-mile isolation distance "works for

20  me").  All of the other chard and beet seed growers also agreed.  *Id*.  The fact that sugarbeet seed

21  crops were intended to be largely RRSB was known and expressly discussed at the time.  *Id.* at

22  71:2-72:3.  In 2007, after delivering a presentation in Portland, Mr. Morton received a phone call

23  from the Center for Food Safety discussing prior litigation regarding Roundup Ready alfalfa and

24  the possibility of litigation involving RRSB.   *Id.* at 10:18-11:11.   Around that time and

25  thereafter, Mr. Morton changed his position and opposed the WVSSA isolation distances, and

26  alleged that he faced a risk of irreparable harm with those distances.  Mr. Morton has tested his

27  chard and beet seed crops on four occasions since 2007, in 2008, 2009 and two times in the last

28  three months.  *Id.* at 27:15-20 (tested "at least three times"), 91:23-92:13 (tests in December

Case Number:  C 06-2893 CW
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

2009 and January 2010).  Each of those tests has confirmed that Mr. Morton's crops do not contain any genetic material from RRSB crops.  *See, e.g.*, *id.* at 92:8-10.  Intervenors have also ordered and tested certain of Mr. Morton's chard seed crops.  Such tests also reveal no sign of genetic material from RRSB.  Harris Decl. ¶ 19.  Finally, root crop growers have grown nearly 10 million RRSB plants in variety trials between 2007 and 2009, and have found virtually no instances of cross-pollination.  Berg Decl. ¶ 15; Grant Decl. ¶ 18; Hofer Decl. ¶ 14.

Mr. Morton's new litigation position is that 10-mile isolation distances are appropriate.[6] Morton Decl. ¶ 18.  But he has publicly acknowledged that if RRSB growers "put their Roundup Ready genes in the female, those female lines do not produce any pollen, so they would not be a source of genetic contamination and ... then there would be no danger to people like me." Interview with Frank Morton, Ex. C to Turner Decl., Vol. III, at 9:13-19.[7]  The only RRSB fields within 10 miles of Mr. Morton have the Roundup Ready genes exclusively on the female non-pollinating plants.  Ex. D to Turner Decl. (map of Morton field and surroundings); Lehner Decl. ¶¶ 15-16.  Thus, even under his own extreme standards, Mr. Morton is at no risk.  Mr. Morton has now asked the WVSSA to conduct an arbitration proceeding under its pinning rules regarding the location of that field.  Morton Dep. at 51:20-25.[8]

## *Don Tipping*

Plaintiffs' declarant Don Tipping also grows chard seed crops, but not in the Willamette Valley.  Tipping Decl. ¶¶ 4-5.  His farm is in Southern Oregon in a mountainous area near the California border.  *Id.* ¶ 5.  Mr. Tipping alleges that small RRSB seed fields are approximately 6

---

[6] A ten mile isolation distance would create a 314 square mile exclusion zone around Mr. Morton's fields and is not justified by any scientific finding or data.

[7] In his deposition, Mr. Morton recanted and contended that "gene on the female" would only "reduce[] the risk" of gene flow.  Morton Dep. at 118:8-11.  With proper stewardship, this methodology can effectively "reduce the risk" of gene flow to zero.  Lehner Decl. ¶¶ 15-16.

[8] Mr. Morton pinned his field allegedly one mile from a Betaseed RRSB field despite Betaseed's seniority and existing pin for the location.  Lehner Decl. ¶¶ 32-38.  The arbitral process Mr. Morton has selected is "an adequate remedy at law," precluding any injunctive relief as to that field.  And, pursuant to the Federal Arbitration Act, the arbitral forum—and not this Court—is the proper forum for resolution of Mr. Morton's dispute regarding the WVSSA isolation distances.  *See* 9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

1   and 9 miles from his chard seed fields.  *Id.* ¶ 8.  Expert analysis demonstrates that Mr. Tipping

2   faces no realistic threat of cross-pollination from such fields.  Westgate Decl. ¶¶ 30-31.  Notably,

3   Mr. Tipping is not a plaintiff in this case.

4   **B.   Sugarbeet Root Crop**

5          Sugarbeet root crops are raised as an annual crop, with planting occurring in the spring

6   and harvest in the fall.  Sexton Decl. ¶ 8.  The sugarbeet harvest is processed into sugar through

7   organizations owned and controlled by the sugarbeet growers.  *Id.* ¶¶ 9-10.  Growers have

8   rapidly adopted RRSB seed.  *Id.* ¶ 15.  But plaintiffs have not proffered any evidence that RRSB

9   root crops could cross-pollinate any of their chard or table beet seed crops.  First, they are grown

10  in different regions.  Ex. E to Turner Decl. (map of RRSB root crops); Pierson Decl. ¶¶ 30-31,

11  65.  Second, sugarbeet root crops are harvested before they would bolt, flower and produce

12  viable pollen or seed in any event.  *Id.* ¶ 34.  Third, premature bolting is now rare, and even if

13  bolting did occur, the plants would be rogued or topped.  *Id.* ¶¶ 64-66; Miller Decl. ¶ 26

14  ("Bolting sugarbeets must be rogued or topped" in RRSB fields); *see also, e.g.*, Petersen Decl. ¶

15  11 (destroyed only bolter in root crop); Schlemmer Decl. ¶ 10 (rogued rare bolter).

16         Weeds in sugarbeet root crops can dramatically reduce root crop yields, interfere with

17  harvesting efficiency, and diminish harvest quality, making the use of herbicides on all sugarbeet

18  crops a necessity.  Pierson Decl. ¶¶ 14-16; Kniss Decl. ¶ 17 (such "technology resulted in a net

19  economic gain of $226 per acre compared to conventional sugarbeet.").  RRSB have been

20  engineered to be tolerant to glyphosate, the active ingredient in Roundup, making it safe to apply

21  Roundup agricultural herbicides directly on the crop to eliminate surrounding weeds.  Pierson

22  Decl. ¶ 24.  The possibility that glyphosate use on RRSB will contribute to weed resistance to

23  glyphosate has been dramatically exaggerated.  Kniss Decl. ¶ 9 ("highly unlikely" RRSB will

24  lead to glyphosate resistant weeds), 10, 13; Cole Decl. ¶ 8; Wilson Decl. ¶ 32.  RRSB represent

25  less than 0.7% of the nation's total glyphosate use.  Cole Decl. ¶ 49.  The EPA has designated

26  Roundup a "reduced risk" herbicide.  Schneider Decl. (Dkt. #33) ¶ 14 & Ex. D.[9]  In fact, if

27

28  [9] In 1999, the EPA approved the use of glyphosate over-the-top of RRSB and established a
    tolerance for glyphosate on sugarbeets.  64 Fed. Reg. 18360 (Apr. 14, 1999).  In 2004, the FDA

RRSB were not available, farmers able to plant conventional sugarbeet seed in 2010 or 2011 would need to return to the "high risk" six-herbicide cocktail formerly used on sugarbeet crops and tillage practices that have negative environmental consequences.  Kniss Decl. ¶ 14; Wilson Decl. ¶¶ 20-21.  For the many growers unable to secure conventional seed in 2010 or 2011, a ban on RRSB seed and root crops would leave them no alternative, resulting in $1.4 billion in economic harm, loss of thousands of jobs, and dramatic harms to the rural communities dependent on sugarbeet farming and manufacturing.  Sexton Decl. ¶¶ 7, 16-17, 22, 26-50, 53.

## LEGAL STANDARDS

Plaintiffs seek broad preliminary mandatory injunctive relief, a form of relief courts are extremely reluctant to award, especially in the wake of *Winter*.  In *Winter*, the Supreme Court raised the bar for preliminary relief, requiring plaintiffs to show that irreparable harm is not merely possible, but "likely."  *Winter*, 129 S. Ct. at 374.  As the Ninth Circuit has noted, any lesser standard is "no longer controlling, or even viable."  *Am. Trucking Ass'ns*, 559 F.3d at 1052.  Plaintiffs mechanically recite the controlling standard in *Winter* but then ignore not only *Winter*'s stringent requirements for preliminary relief but also four other characteristics of the requested injunction that militate against its entry here.

*First*, as a threshold matter, an injunction is an "extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008).  It is not, as plaintiffs would have the Court believe, the necessary consequence of a finding on the merits.

*Second*, mandatory injunctions—injunctions that go "beyond simply maintaining the status quo"—are "particularly disfavored."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quotations omitted); *see also Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (per curiam) ("A preliminary injunction should be used only to maintain the status quo.").  When a mandatory preliminary injunction is requested, the court should "deny such relief 'unless the facts and law clearly favor the moving party.'"  *Stanley*, 13 F.3d at 1320 (citation omitted).

---

found RRSB to be as safe as other types of sugarbeet and to present no food safety or nutritional concerns under federal law.  *See* Biotechnology Consultation Agency Response Letter BNF No. 000090, *available at* www.fda.gov/Food/Biotechnology/Submissions/ucm155747.htm.  Plaintiffs have never challenged either agency's determination.

1   *Third*, the alleged irreparable harm must be imminent.  *Winter*, 129 S. Ct. at 374.  As this

2   Court noted, under *Winter*, a preliminary injunction requires "a different evidentiary showing"

3   establishing a need for "immediate" relief.  Case Mgmt. Tr. at 13:9-10.  Here plaintiffs must

4   show that irreparable harm is likely to occur before this Court can adjudicate their request for

5   permanent relief, currently scheduled for a hearing on June 11, 2010.  *Id.* at 14:7-9 ("[Plaintiffs]

6   will have to make the showing of irreparable harm if the Court doesn't rule by the date you want

7   to.").  And they make no showing that any alleged form of irreparable harm is remotely likely to

8   occur during this short timeframe and to require "immediate" relief.

9   *Fourth*, the alleged irreparable harms must be to plaintiffs specifically, not to the public

10  at large.  Plaintiffs are not a class, and basic principles of constitutional standing and equity do

11  not permit plaintiffs to seek relief for non-parties or the environment in the abstract.  *See, e.g.*,

12  *Winter*, 129 S. Ct. at 374 ("A plaintiff seeking a preliminary injunction must establish that ... *he*

13  is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added));

14  *Lewis v. Casey*, 518 U.S. 343, 355-58 (invalidating system-wide injunction based upon "only

15  two instances of actual injury" and holding that violations not "found to have harmed any

16  plaintiff in this lawsuit ... were not the proper object of ... remediation").  Consequently, an

17  "injunction must be narrowly tailored ... to remedy only the specific harms shown by the

18  plaintiffs, *rather than to enjoin all possible breaches of the law*."  *Price*, 390 F.3d at 1117

19  (emphasis added) (quotations omitted).  Moreover, rushing to a decision is particularly

20  inappropriate here because plaintiffs seek effectively *permanent* relief in the guise of a

21  *preliminary* injunction.  As the Court predicted, plaintiffs have requested "remedies which are

22  really more in the nature of permanent injunction."  Case Mgmt. Tr. at 13:11-12.  The broad

23  relief sought—a complete bar on "planting, cultivation, processing, or other use" of RRSB—

24  would have permanent and devastating effects on farmers, processors, manufacturers, and the

25  consuming public.  *See* Section III.B *infra*.  Plaintiffs' invocation of a provisional remedy does

26  not diminish the implications of its request.

27  ## **ARGUMENT**

28  As plaintiffs and the Court acknowledge, in order to obtain preliminary relief, the

plaintiffs must show "that [they] are likely to succeed on the merits, that [they] are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374.

## I.   PLAINTIFFS HAVE NOT ESTABLISHED LIKELIHOOD OF SUCCESS ON THE MERITS AS TO ANY ISSUE EXCEPT "GENE FLOW" AS TO THE WILLAMETTE VALLEY SEED CROP.

Plaintiffs' motion is based on the mistaken premise that their victory on one narrow NEPA issue (cross-pollination from seed crops in the Willamette Valley) entitles them to relief on all conceivable NEPA violations, which have never been adjudicated.   The controlling precedents are clear, however, that injunctive relief can only issue to remedy the actual harms found by the district court, and not "all possible breaches of the law." *Price*, 390 F.3d at 1117.

Plaintiffs assert that they have "achieved success on the merits of this case" (Pls.' Br. at 2:24), but the holding below was limited to gene transmission among seed crops in the Willamette Valley. *Ctr. for Food Safety v. Vilsack*, No. 08-00484, 2009 WL 3047227, at *9 (N.D. Cal. Sept. 21, 2009).   The court has not determined that there were any violations concerning weed resistance. *Id.* at *9 n.4.   Nonetheless, plaintiffs now seek a bar extending beyond RRSB seed crops in the Willamette Valley to all RRSB seed and root crops nationwide. The proposed injunction is not pegged to the NEPA violation found by the district court, but instead to alleged violations and harms not found by the court—specifically, concerns relating to gene flow outside the Willamette Valley and weed resistance to glyphosate.   The broad injunctive relief plaintiffs seek must be, but is not, "narrowly tailored ... to remedy *only the specific harms shown by the plaintiffs.*" *Price*, 390 F.3d at 1117 (emphasis added).   Thus, the court may not grant it.[10]

## II.   PLAINTIFFS HAVE NOT ESTABLISHED IMMEDIATE IRREPARABLE HARM TO PLAINTIFFS ARISING OUT OF THE NEPA VIOLATION.

In order to prevail, plaintiffs must demonstrate that one of them is likely to suffer

---

[10] Moreover, insofar as plaintiffs are seeking injunctive relief on these other claims raised to, but not ruled on by, the district court, they must, but cannot, show that success on the merits of these claims is likely. *See infra* Section II.B; *see also* Intervenors' Amicus Br. (Dkt. #121) at 19-26.

Case Number: C 06-2893 CW
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

imminent irreparable harm. *Winter*, 129 S. Ct. at 374. They identify no specific harms to any individual plaintiffs and instead rely on vague assertions about gene flow, weed resistance, and the general effect of each on organic farming and the environment. They deal in abstractions because they must. Specific facts regarding sugarbeet farming in the Willamette Valley—the layout of seed farms in the Valley, measures taken by manufacturers and farmers, and advances in technology safeguarding against gene flow to plaintiffs' farms—reveal that plaintiffs face no likelihood of harm, much less *immediate irreparable* harm, from gene flow from RRSB crops.

### A.      Plaintiffs have not shown that any immediate irreparable harm to them from gene flow in the Willamette Valley crop is likely.

RRSB seeds have been grown in the Willamette Valley for several years. Plaintiffs have tested for Roundup Ready gene flow each of the last three years, and all of these tests have come back negative. Morton Dep. at 27:15-20, 91:23-92:13; Stearns Dep. at 40:4-15 (acknowledging testing and no finding of gene flow). Plaintiffs would have the Court believe that irreparable harm from cross-pollination is inevitable under current conditions (Pls.' Br. at 3-5), but three years of testing belie this contention. The past is strong precedent, and recent advances only make the risk of any harm from gene flow in the Valley even more remote.

### 1.      Plaintiffs' assertions about gene flow rest on flawed analysis and run contrary to the record.

Plaintiffs summarily conclude that an "isolation distance of 3 miles is inadequate" (Navazio Decl. ¶ 15), and that "risk of GE contamination . . . is very high." Fagan Decl. ¶ 11. But plaintiffs' inexpert[11] declarants ignore the following critical facts:

- Repeated genetic testing has shown *zero gene flow* to date (Morton Dep. at 27:15-20, 91:23-92:13; Harris Decl. ¶ 19);

- The relevant isolation distance from any chard or table beet field is *four* miles, not three miles, and these distances have worked for multiple years (Meier Decl. ¶ 32);

- Two of the three seed companies in the Willamette Valley, which are together responsible for a majority of the RRSB fields in the Valley, now grow the RRSB seed

---

[11] Neither John Fagan nor John Navazio is an agronomist or has developed any expertise in the pollination and outcrossing issues on which he opines.

crop with the Roundup Ready gene on the female non-pollinator (Lehner Decl. ¶¶ 15-16, Hovland Decl. ¶ 13), which plaintiffs' declarants concede "only receive pollen from another parental source and do not produce pollen" (Navazio Decl. ¶ 5);[12]

- Plaintiffs' only representative in the Valley, Frank Morton, has never had any RRSB pollination of his crops with the isolation distances in place (Morton Dep. at 161:9-10); and

- Plaintiffs' declarant Don Tipping in Southern Oregon has no evidence of past cross-pollination from RRSB and can only now identify RRSB crops more than 6 or 9 miles from his field that pose effectively no risk of gene flow (Westgate Decl. ¶ 30).

Both Navazio's and Fagan's conclusions are unsupported in several other ways as well.  Each takes an "unduly simplistic and misleading" approach, emphasizing the distance between fields and largely ignoring the myriad other factors that could slow pollen travel, including wind speed and direction, topography, humidity, and natural or artificial barriers.  Westgate Decl. ¶¶ 12-19, 22.  Moreover, the conclusion that minimal pollen travel necessarily results in significant cross-pollination ignores the largest factor hindering cross-pollination—competition from the local pollen cloud in the non-RRSB field.  *Id.* ¶¶ 20-22.  Only when considering these additional factors can one properly analyze the potential for gene transfer through cross-pollination.  *Id.* ¶¶ 13, 22.  With four-mile isolation distances in place between open-pollinated and hybrid fields, the possibility of pollination of open-pollinated table beet or chard fields by hybrid sugar beet pollen would be "infinitesimally small" even from a hybrid field with RRSB pollinators.  *Id.* ¶ 22.  As plaintiffs face no material risk of Roundup Ready gene flow through cross-pollination, they cannot show any injury, much less any irreparable harm, arising out of the NEPA violation.

## 2.  Plaintiffs' allegations concerning gene flow from sources other than cross-pollination are exaggerated.

Unable to point to any instance of RRSB gene flow by cross-pollination, plaintiffs rest their concerns of irreparable harm from gene flow on an isolated discovery of RRSB stecklings in potting soil at Pro Bark, an Oregon gardening store.  Again, they provide the Court only half

---

[12] Though plaintiffs and their declarants appear willing to ignore this important development, this Court wisely has not.  In the Order Granting SESVanderHave's Motion to Intervene, the Court noted that seed producers' use of a "'female side' production practice . . . will be relevant to whether any injunction issued will be narrowly tailored."  Order at 4.

the story.  First, plaintiffs apparently did not realize that over 95% of the RRSB stecklings in the soil could not produce RRSB pollen—they were either female plants, bred specifically to shed no pollen at all, or pollinators not carrying the Roundup Ready gene.  Lehner Decl. ¶ 21.  Second, plaintiffs omit any mention of what intervenor Betaseed did to address the concerns.

By early June 2009, Betaseed learned that Pro Bark was selling a mixture of its peat moss with potting soil and the mixture contained RRSB stecklings.  *Id.* ¶ 22.  Betaseed responded by:

- Contacting Pro Bark and repossessing all of the unsold mix;

- Meeting with Pro Bark's owner and obtaining contact information for the customers who had purchased the potting soil;

- Personally visiting the 20 customers for whom Betaseed had been provided contact information and inspecting the soil they had purchased;

- Locating and destroying any sugarbeet stecklings in the mix;

- Asking customers whether they had seen (and disposed of) stecklings in the soil; and

- Having Pro Bark confirm with 7 other customers that no sugarbeet stecklings had been contained in the potting soil they purchased.

*Id.* ¶¶ 22-26.  Inspection of the locations where potting soil had been delivered revealed that very few live sugarbeet plants were in the soil, and that no plants had produced any pollen.  *Id.* ¶ 27.  Now all of the plants involved in this isolated incident are dead, so there is no chance that they will pollinate any other plants in the future.  *Id.*  Thus, these allegations are irrelevant.[13]

### 3.    Gene flow is not an irreparable harm.

Even if plaintiffs could show that gene flow could occur within the Willamette Valley, they cannot show that gene flow would cause "irreparable" harm. They rely on the misguided premise that the spread of an engineered gene to even a single organic plant rings a death knell

---

[13]   In the declarations in support of their Motion, plaintiffs raise other isolated instances of gene flow in other crops, including rice (Howington Decl. ¶¶ 6-9) and corn (Gurian-Sherman Decl. ¶¶ 22-26) in a strained effort to assert risk of gene flow from mechanical mixing or human error. Concerns arising out of mechanical mixing are irrelevant to sugarbeets, which have a single processing stream and for which there is no organic market.  Pierson Decl. ¶¶ 71-80.  And none of the rice or corn incidents has any relationship to any issue in this case.

1   for the seed field containing that plant.[14]  This is not the case.

2       *First*, gene flow itself is not "irreparable."  Cross-pollination in seed stock fields may be

3   undone at modest expense using conventional breeding practices.  Stander Decl. ¶ 8 ("[R]emoval

4   of unwanted genetic traits from a line is routine in plant breeding programs.");  Pierson Decl. ¶¶

5   54-61.  *Second*, even if a chard or table beet crop did have low level cross-pollination from

6   RRSB, it could still be sold by the seed grower, just not to one of their customers who have GE

7   "zero tolerance" policies rooted in a philosophic aversion to genetically engineered plants.  *See,*

8   *e.g.*, Clarkson Decl. ¶ 14 (plaintiffs' declarant indicating that GE cross-pollination would simply

9   cause the organic seller to "sell them [the crops] into conventional markets").  *Third*, a grower

10  with unintended low level cross-pollination from a GE crop will not lose its organic certification.

11  Kershen Decl. ¶ 17 (outlining the National Organic Program's process standard).  As plaintiffs

12  concede, "[t]he way that organic rules read, it's all process-based certification, and that means

13  that if the organic grower did everything in their power to prevent" gene flow, then even if

14  genetically engineered plants "are detected in his [crop], it's still organic."  Morton Interview,

15  Vol. I, at 15:13-23.

16      Plaintiffs contend that the mere perception of the possibility of gene flow in the Valley

17  will irreparably damage the organic table beet and chard seed markets, but after three years of

18  RRSB seed production in the Valley—and plaintiffs' many efforts to publicize this lawsuit—the

19  market for organic seed from the Valley admittedly remains vibrant.  Stearns Dep. at 19:7-18

20  (noting increased demand for organic seed and food); Morton Dep. at 64:5-7 (noting 25%

21  increase in business in last two years).  There is no reason to believe that maintaining *status quo*

22  RRSB production will cause irreparable damage to the markets for organic table beet and chard.

23      Moreover, only small fractions of Messrs. Morton and Tipping's farms are devoted to

24  organic table beet and chard.  Morton Dep. at 43:10-15, 64:5-7 (less than 10%); Tipping Decl. ¶¶

25  12-13 (less than 20%).  Both grow many other organic crops.  Indeed, Mr. Morton admitted that

26

27  [14] Plaintiffs attempt to assign this flawed premise legal significance by citing the district court's
    decision in *Geertson*, 2007 WL 1302981.  Pls.' Br. at 5:21-24.  But *Geertson* involves markedly
28  different facts, and its reasoning is being reviewed by the Supreme Court.  *See supra* at 3 & n.3.

1   he has multiple fields and could choose to grow chard crops in more isolated locations. Morton

2   Dep. at 68:15-70:8.   And, of course, many other farms in Washington and California grow

3   organic chard and table beet seed.  Stearns Dep. at 69:16-70:18.

4          **B.    Plaintiffs have not shown that any immediate irreparable harm**
              **associated with the root crop is possible, much less likely.**
5

6          The Court's summary judgment order was limited to gene flow in the sugarbeet seed crop

7   in the Willamette Valley and did not reach any conclusion that APHIS violated NEPA on any

8   other ground.  Thus, it would constitute an abuse of discretion to grant injunctive relief for other

9   alleged violations—*e.g.*, the RRSB root crop—on which no merits finding was made.  *See supra*

10  Section I.  Even so, there is no risk of immediate, irreparable harm arising out of the RRSB root

11  crop, and barring "planting, cultivation, processing, or use" of this crop cannot be justified.

12         Plaintiffs do not even discuss gene flow from the commercial sugarbeet root crop, and

13  there is no possibility of harm to plaintiffs from cross-pollination by the root crop.  Morton Dep.

14  at 182:15-183:25; Stearns Dep. at 54:13-58:1.  Nor do plaintiffs face any risk of irreparable

15  harm, much less any immediate risk, from any weed resistance to glyphosate associated with

16  RRSB crops.  Sugarbeet crops are only a small part of the glyphosate footprint.  Cole Decl. ¶ 49

17  (RRSB account for only 0.7% U.S. glyphosate use).  And "[i]t is highly unlikely that the use of

18  glyphosate in connection with GR [glyphosate-resistant] sugarbeet will result in the same

19  conditions that have led to GR weeds in other GR crops, particularly over the relatively short

20  time frame of the next 3 to 5 years."  Kniss Decl. ¶ 9; *see also* Cole Decl. ¶ 8; Wilson Decl. ¶ 32.

21  Indeed, plaintiffs do not—because they cannot—show any need for *immediate* relief.  Cole Decl.

22  ¶ 8 ("no potential" for weed resistance to develop between now and June).  RRSB have been

23  widely grown for three years, and plaintiffs' marginal weed resistance concerns, which have not

24  been actualized during this time, do not *now* require preliminary relief.

25         Plaintiffs and their inexpert declarants[15] address Roundup Ready crops only generally

26

27  ───────────────

28  [15] Neither of plaintiffs' declarants on the issue of weed resistance is a weed scientist.  Dr.
    Benbrook is an agricultural economist, and Dr. Gurian-Sherman is a plant pathologist.  Benbrook
    Decl. ¶¶ 1-2; Gurian-Sherman Decl. ¶ 3.  By contrast, Drs. Wilson, Kniss, and Cole, each of

and ignore key specific facts about sugarbeet farming that minimize any risk of weed resistance. Dr. Benbrook's report never mentions sugarbeets and focuses exclusively on other crops—corn, cotton, and soybean—because these crops account for the vast majority of the nation's glyphosate usage. Pl.'s Ex. 1; *see* Kniss Decl ¶ 21. And these crops, unlike sugarbeets, are continuously produced year after year on the same fields. Sugarbeets are typically subject to a three or four-year crop rotation, as such rotation is often necessary to manage pests on a sugarbeet crop. Kniss Decl. ¶ 12; *see also, e.g.*, Petersen Decl. ¶ 11 (RRSB in five-year rotation); Schlemmer Decl. ¶ 11 (RRSB in 3½-year rotation). These sugarbeet crop rotations reduce the potential for herbicide resistant weed development. Kniss Decl. ¶ 10; Wilson Decl. ¶¶ 28-31. As glyphosate use on RRSB is both comparatively slight and is subject to rotation and Monsanto's stewardship guidelines (Cole Decl. ¶¶ 26-36), it does not cause any irreparable risk of glyphosate resistance.

Moreover, glyphosate is considered a "low risk" herbicide for the development of herbicide-resistant weeds. Kniss Decl. ¶ 14; Cole Decl. ¶ 22. Before RRSB were introduced, conventional sugarbeets were typically sprayed with a six-herbicide cocktail that included inhibitors that are considered "high risk" for herbicide resistance development. Kniss Decl. ¶ 14; Wilson Decl. ¶ 20. If use of RRSB were enjoined, sugarbeet farmers would be forced to return to this higher-risk and far less effective herbicide cocktail, and to tillage practices with negative environmental consequences. Kniss Decl. ¶ 14; Wilson Decl. ¶¶ 16, 20-21. Concerns about environmental consequences thus counsel *against* the injunctive relief plaintiffs seek.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FACTORS SHARPLY TILT AGAINST THE BROAD INJUNCTION REQUESTED.

In order to obtain preliminary relief, plaintiffs must show not only a likelihood of success on the merits and irreparable harm to plaintiffs but also "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374. In addition, laches can bar plaintiffs from relief entirely. *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967).

---

whom find no immediate risk of glyphosate resistance from RRSB, specialize in weed science and weed resistance. Kniss Decl. ¶¶ 1-6; Wilson Decl. ¶¶ 2-8; Cole Decl. ¶¶ 1-5.

Here, the equities and the public interest tilt overwhelmingly against injunctive relief.

> **A.**     **Plaintiffs' delay in seeking injunctive relief is inexcusable and belies any contention of immediate irreparable harm.**

As a threshold matter, plaintiffs' long delay in seeking preliminary relief counsels against providing them *equitable* relief.  The defense of laches lies where there is "'lack of diligence by the party against whom the defense is asserted'" and "'prejudice,'" *Lathan v. Brinegar*, 506 F.2d 677, 692 (9th Cir. 1974) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)), and is a complete bar to equitable relief, including "injunctive remedies." *Abbott Labs.*, 387 U.S. at 155.

Here, inexcusable delay is plain from the numbers alone.  This lawsuit was brought nearly three years after the March 17, 2005 deregulation of RRSB.  AR 795.  Plaintiffs' preliminary injunction motion comes another two years after the filing of their complaint, 122 days after the court's summary judgment ruling, and a month-and-a-half after the December 4 scheduling conference at which plaintiffs raised the possibility of an injunctive relief filing.

But these numbers tell only part of the story.  This motion, which cites no new basis for emergency relief, could have been brought years ago.[16]  Plaintiffs' January 2008 complaint alleged "imminent and significant potential for GE sugar beet seed to contaminate non-GE sugar beet seed and seed of other related crops" (11:19-20) and prayed for "appropriate preliminary and permanent injunctive relief" (16:6).  *See Morton Dep.* at 103:8-104:13 (ceding that "new" allegations of "grave harm" were actually "cut and pasted" from his June 2, 2008 declaration).

Plaintiffs' litigation-inspired statement that they did not have reason to act until "late 2007" is not credible.  Pls.' Br. at 1:14-16.  In his recent deposition, Mr. Morton testified that he learned the seed industry would be growing RRSB seed in the Valley on December 8, 2006 (Morton Dep. at 10:15-17), and that "it would have dawned on me at that moment that my life had just changed." (*Id.* at 34:20-21).  Plaintiffs knew that RRSB seed crops flowered in the past three years (the *status quo*), yet never sought emergency relief to prevent these plantings.

---

[16] At the very least, their "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

1      Rather than explain why they took so long to attempt to stop the planting of RRSB,

2   plaintiffs attempt to shift blame, claiming that Intervenors were not entitled to rely on the

3   deregulation of RRSB and, by relying on that deregulation, accepted the risk of economic

4   catastrophe if and when plaintiffs won summary judgment and got around to seeking injunctive

5   relief.  But Intervenors were entitled to rely on the government's deregulation decision which is

6   presumed valid until determined otherwise.  *See, e.g., Perez-Gonzalez v. Gonzales*, 403 F.3d

7   1116, 1119 (9th Cir. 2005) (agency regulations are presumed valid).  If accepted, plaintiffs'

8   argument would effectively preclude anyone from relying on a regulatory decision until the six-

9   year statute of limitations for challenging deregulation expired.[17]

10
          **B.    A ban on sugarbeet crop and seed production would impose**
11             **staggering harms on seed growers, beet farmers, and the U.S. public.**

12      The immediate effects of the proposed ban would be catastrophic.  Over 95% of the

13   nation's sugarbeet seed and root crops are RRSB.  Without RRSB seed, growers would face

14   severe shortfalls of sugarbeet seed.[18]  Manning Decl. ¶¶ 12-17; Sexton Decl. ¶¶ 16-17.  In sum:

15        •   At least 14 of 21 sugarbeet processing plants in the U.S. will close in 2010 and 2011
              due to lack of supply (Sexton Decl. ¶¶ 7, 22);
16
          •   About 5,800 full-time and seasonal jobs would be lost in the rural communities in
17             which sugarbeet processing facilities are located and those lost jobs generally will not
              be replaced (*id.* ¶¶ 26, 50, Table 3);
18
          •   The family farmers who grow sugarbeets will collectively lose more than $283
19             million in gross profits (*id.* ¶¶ 7, 42-49, Tables 11-12);

20        •   The ban on planting, cultivation, or use of RRSB seeds and root crops would cost
              Intervenor seed growers and technology companies nearly $300 million.  Sexton
21             Decl. ¶¶ 7, 53; Meier Decl. ¶¶ 4, 35-37; Enright Decl. ¶ 4; Fritz Decl. ¶¶ 8-11; Nixon

22

23   [17] To put what plaintiffs are asking in perspective, consider that here, plaintiffs waited years after
     the deregulation of RRSB to file suit, and in the interim challenged and litigated to completion
24   the alfalfa case, which involved a deregulation decision post-dating the deregulation of RRSB.

25   [18] Indeed, the consequences of plaintiffs' proposed *interim* relief would extend beyond 2010 and
     well into the next decade.  Supplies of conventional sugarbeet seed are very limited, and it is too
26   late for any of the major seed producers to alter production plans to shift to conventional seed for
     sale in 2011.  Miller Decl. ¶¶ 20-24 (Betaseed "would not be able to supply farmers with the
27   normal seed volume of seed until 2014 at the earliest"); Meier Decl. ¶¶ 6-7, 10.  Contrary to Mr.
     Morton's rank hearsay (Morton Dep. at 232:12-237:11), there is no indication that there are
28   enough conventional stecklings to plant this spring.  Miller Decl. ¶¶ 30-32; Meier Decl. ¶ 22.

1   Decl. (Dkt. #29) ¶¶ 14-15; and

2   • Total economic losses for the 2010 crop year would exceed $1.4 billion (with even more severe losses in 2011), and those losses would directly impact the local communities in which sugarbeets are grown and processed (Sexton Decl. ¶ 53).

3

4   Beyond the summary statistics, there are the plights of individual farmers and processors.  *See,*

5   *e.g.*, Wettstein Decl. ¶¶ 9-11 (farmer faces individual loss of $250,000+ investment and 25% of

6   income); Grant Decl. ¶ 21 (processor's factory closure would require layoff of 1950 workers).[19]

7   Moreover, sugarbeets account for over half of the U.S.'s domestic sugar production, so a ban on

8   nearly all domestic sugarbeet crops and seeds would wreak havoc on the price and supply of

9   domestic sugar and the U.S. sugar program.[20]  Gregory Decl. ¶ 5.  Even a short-lived injunction

10  on RRSB seeds would affect seed availability and sugarbeet production for years after the ban

11  expires.  The "preliminary" relief would have devastating, irreversible effects on sugarbeet

12  farmers, seed growers, the sugar industry, and others.

13  **C.   By comparison, the alleged *status quo* harms to plaintiffs are minimal.**

14      Plaintiffs brazenly do not deny that the injunction would cause catastrophic economic

15  harms.  Instead, they insist that any environmental damage, no matter how small, trumps any

16  economic damages, no matter how great.  But that is not the law.

17      Plaintiffs' lead case on this point, *Amoco Production Co. v. Village of Gambell*, 480 U.S.

18  531, 545 (1987), is instructive.  There, the Supreme Court reversed a broad injunction, holding

19  that remote risk of environmental harm did not overcome the prospect of economic harm.  *Id.* at

20  544-46 ($70 million petitioners "would have lost without chance of recovery" outweighed "not

21  at all probable" risk of environmental harm).  This is particularly true when the economic harms

22

23  [19] *See also, e.g.*, Berg Decl. ¶ 19 (closing factory based on lower supply); Hofer Decl. ¶¶ 2, 21 (closing of refineries resulting in loss of more than 1,000 full-time and seasonal jobs); Mauch Decl. ¶¶ 13-15 (North Dakota grower's shares in beet cooperative would be worthless and cooperative "would likely cease to operate"); Schlemmer Decl. ¶¶ 6-9 (Montana farmer faces hundreds of thousands of dollars in losses, penalties and increased feed costs).

24

25

26  [20] Indeed, read broadly, plaintiffs' request to bar "use" of RRSB could extend to the sugar processed from RRSB and thereby prevent purchase, sale, or any other use of over 50% of the nation's present domestic sugar supply.  This result would be absurd—as is plaintiffs' argument about consumer choice (Pls.' Br. at  7-8)—as sugar processed from RRSB does not carry the Roundup Ready gene.  Baker Decl. ¶¶ 7-8.

27

28

Case Number:  C 06-2893 CW
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

cannot be remedied by monetary damages. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) (finding economic harm "irreparable" where compensatory relief was not available at law). The crop farmers, seed growers, and sugar refiners whose livelihoods depend on RRSB would have no recourse against plaintiffs or anyone else for the damages caused by the injunctive relief plaintiffs seek. Added protection against purely theoretical gene flow from cross-pollination is cold comfort to RRSB farmers, for many of whom the requested injunction would mean financial and occupational ruin.

The harms alleged by plaintiffs, in any event, are economic, not environmental. The only alleged injuries specific to plaintiffs are several months of marginally increased skepticism of crop purity for two organic growers. *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776 (1983) (non-environmental risks are not "cognizable under NEPA"). These harms are purely economic and are dwarfed by the damages caused by the injunction.

The current seed farming practices and policies in the Willamette Valley are designed to—and do—protect the interests of all of the Valley's growers. And the current schedule of a June hearing for the remedies phase of this action is designed to—and does—protect the interests of all of the parties to this action. Plaintiffs seek to upset both in one fell swoop by demanding, at this late stage, broad preliminary injunctive relief. As they cannot show any irreparable harm requiring such immediate relief, and the equities and public interest tilt sharply against the requested injunction, *Winter* requires that their request for preliminary relief be denied.

## IV.   THE COURT MAY NOT GRANT PLAINTIFFS' REQUESTED RELIEF WITHOUT AN EVIDENTIARY HEARING.[21]

As this Court has noted, the "preliminary" relief plaintiffs seek is "really more in the nature of permanent injunction." Case Mgmt. Tr. at 13:11-12. "Only when the facts are not in dispute, or when the adverse party has waived its right to a hearing," may the Court grant

---

[21] At the December 4, 2009 case management conference, the Court instructed Intervenors to explain in their briefs opposing injunctive relief the basis for their request for an evidentiary hearing. Case Mgmt. Tr. at 7:12-25. Intervenors hereby renew their request for an evidentiary hearing of two to three days, with three to five defense witnesses, before plaintiff's proposed relief may be granted. *See* Joint Case Management Statement at 12:7-13:2.

effectively permanent relief without the benefit of an evidentiary hearing. *Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). This is consistent with the law of nearly every other Circuit. *United States v. Microsoft*, 253 F.3d 34, 101 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001). Intervenors dispute the facts alleged for nearly every point raised in plaintiffs' Motion:

- Whether plaintiffs have established a likelihood that the RRSB seed crops will cross-pollinate plaintiffs' chard or table beet seed crops with the current isolation distances and cultivation practices in place (*see supra* pp. 12-14);

- Whether cross-pollination of organic chard or table beet seed would cause "irreparable harm" to any plaintiff in any event (*see supra* pp. 14-16);

- Whether plaintiffs have established any likelihood of irreparable harm, or even have standing to seek any remedy, with respect to the RRSB root crop (*see supra* pp. 16-17); and

- Whether the extensive damage that would be caused by plaintiffs' proposed relief can be justified in this case, and whether laches, unclean hands or other equitable remedies bar any relief altogether (*see supra* pp. 18-21).

Plaintiffs oppose an evidentiary hearing based principally on *Geertson*, but fail to mention that the Supreme Court will review this term whether Intervenors' request an evidentiary hearing was properly denied in that case. *See* Notice of Supplemental Authority (Dkt. #204)); *Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1142 (9th Cir. 2009) (Smith, J., dissenting) ("The district court could have used the evidentiary hearing to better ascertain the nature of the alleged injury and to further understand the balance of the hardships associated with the parties' varying proposals for injunctive relief."). Here, the Court may deny plaintiffs' requested far-reaching relief and proceed according to the schedule for determining remedies set in the December 4, 2009, Case Management Conference, without conducting an evidentiary hearing. But granting the effectively permanent injunction without the benefit of an evidentiary hearing would constitute an abuse of discretion.

## CONCLUSION

For the reasons set forth above, Intervenors respectfully request that this Court deny Plaintiffs' Motion for Preliminary Injunction and proceed in accordance with the schedule for the remedies phase of this action that the Court outlined in the Case Management Conference.

*[signature page follows]*

Dated: February 10, 2010                     Respectfully Submitted,

                                             /s/ Holly J. Tate
PHILIP J. PERRY (CA Bar No. 148696)          HOLLY J. TATE (Ca. Bar No. 237561)
JANICE M. SCHNEIDER (DC Bar No.              LATHAM & WATKINS LLP
472037) (*pro hac vice* granted)             505 Montgomery Street, Suite 1900
LATHAM & WATKINS LLP                         San Francisco, California 94111-2562
555 11th Street, N.W., Suite 1000            Telephone: (415) 391-0600
Washington, D.C. 20004                       Facsimile: (415) 395-8095
Telephone: (202) 637-2200                    Email: holly.tate@lw.com
Facsimile: (202) 637-2201
Email: phil.perry@lw.com
Email: janice.schneider@lw.com


STANLEY H. ABRAMSON (DC Bar No. 217281)
(*pro hac vice* granted)
RACHEL G. LATTIMORE (DC Bar No.450975)
(*pro hac vice* granted)
ARENT FOX LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
Email: abramson.stanley@arentfox.com
Email: lattimore.rachel@arentfox.com

              Attorneys for Intervenor-Defendant Monsanto Company

                                             /s/ Gilbert S. Keteltas
JOANNE LICHTMAN (Ca. Bar No. 137300)         GILBERT S. KETELTAS (DC Bar No.
HOWREY LLP                                   421236)
550 South Hope Street, Suite 1100            (*pro hac vice* granted)
Los Angeles, California 90071-2627           JOHN F. BRUCE (DC Bar No. 1578) (*pro hac*
Telephone: (213) 892-1800                    *vice* granted)
Facsimile: (213) 892-2300                    CHRISTOPHER H. MARRARO (DC Bar No.
Email: lichtmanj@howrey.com                  395152) (*pro hac vice* granted)
                                             HOWREY LLP
                                             1299 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20004-2402
                                             Telephone: (202) 783-0800
                                             Facsimile: (202) 383-6610
                                             Email: keteltasg@howrey.com
                                             Email: brucej@howrey.com
                                             Email: marraroc@howrey.com

         Attorneys for Intervenor-Defendants American Sugarbeet Growers Association, Ervin
        Schlemmer, Mark Wettstein, Duane Grant, John Snyder, Jr., United States Beet Sugar
      Association, American Crystal Sugar Company, The Amalgamated Sugar Company LLC,
                                    Western Sugar Cooperative
                              and Wyoming Sugar Company LLC

1

2 DAVID J. LAZERWITZ (Cal. Bar. No. 221349 – admitted)

      /s/ Nancy Bryson_____
NANCY BRYSON (DC Bar No. 913673) (*pro hac vice* granted)

3 FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor

HOLLAND & HART LLP
975 F Street, N.W., Suite 900

4 San Francisco, CA 94104
Telephone: (415) 954-4400

Washington, D.C. 20004
Telephone: (202) 654-6921

5 Facsimile: (415) 954-4480
Email: dlazerwitz@fbm.com

Facsimile: (202) 747-6567
Email: nbryson@hollandhart.com

6

              Attorneys for Intervenor-Defendant Syngenta Seeds, Inc.

7

8 DANIEL M. ABUHOFF (NY Bar No. 1227057) (*pro hac vice* granted)

      /s/ Daniel Murphy_____
DANIEL MURPHY (Ca. Bar No. 141006)
W. ALLAN EDMISTON (Ca. Bar No. 228246)

9 HARRY ZIRLIN (NY Bar No. 2315737) (*pro hac vice* granted)

LOEB & LOEB LLP

10 DEBEVOISE & PLIMPTON LLP
919 Third Avenue

10100 Santa Monica Blvd., 22nd Floor
Los Angeles, California 90067

11 New York, NY 10022
Telephone: (212) 909-6000

Telephone: (310) 282-2000
Facsimile: (310) 282-2200

12 Facsimile: (212) 909-6836
Email: dmabuhof@debevoise.com

Email: dmurphy@loeb.com
Email: aedmiston@loeb.com

13 Email: hzirlin@debevoise.com

14

              Attorneys for Intervenor-Defendant Betaseed, Inc.

15

16 SARAH G. FLANAGAN (CA Bar No. 70845 – admitted)

      /s/ Daniel Bukovac_____
DANIEL BUKOVAC (Mo. Bar No. 33456) (*pro hac vice* granted)

17 PILLSBURY WINTHROP SHAW PITTMAN LLP

STINSON MORRISON HECKER LLP
1201 Walnut Street, Suite 2900

18 50 Fremont Street
P.O. Box 7880

Kansas City, Missouri 64106
Telephone: (816) 842-8600

19 San Francisco, CA 94120-7880
Telephone: (415) 983-1000

Facsimile: (816) 412-1051
Email: dbukovac@stinson.com

20 Facsimile: (415) 983-1200
Email: sarah.flanagan@pillsburylaw.com

21

            Attorneys for Intervenor-Defendant SESVanderHave USA, Inc.

22

23

24

25

26

27

28