IGNACIA S. MORENO
Assistant Attorney General
BEVERLY F. LI
LUTHER L. HAJEK
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel.: (202) 353-9213 (Li)/ (202) 305-0492 (Hajek)
Facsimile: (202) 305-0506
Beverly.Li@usdoj.gov
Luke.Hajek@usdoj.gov

TONY WEST
Assistant Attorney General
JOHN R. GRIFFITHS
Assistant Director, Federal Programs Branch
JOHN R. COLEMAN (Va. Bar # 70908)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CENTER FOR FOOD SAFETY., et al. | ) | Case No. C-08-00484 JSW |
| | ) | |
| Plaintiffs, | ) | **DEFENDANTS' OPPOSITION TO** |
| | ) | **PLAINTIFFS' MOTION FOR** |
| v. | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| THOMAS J. VILSACK, et al., | ) | Date:   March 5, 2010 |
| | ) | Time:  9:00 a.m. |
| Defendants. | ) | Judge: Hon. Jeffrey S. White |
| | ) | Place: Courtroom 11 |
| | ) | |
| | ) | |

1

## TABLE OF CONTENTS

2   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6       A.    Plaintiffs Have Not Shown a Likelihood of Immediate, Irreparable Injury . . . . 2

7            1.    Plaintiffs' Delay in Seeking Injunctive Relief Undermines Any Claim of

8                Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

9            2.    Procedural NEPA Violations Do Not Constitute Irreparable Harm that
                Requires Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10           3.    Plaintiffs' Assertions Concerning Bureaucratic Inertia Are Unwarranted

11                and in No Way Support Plaintiffs' Claims of Irreparable Harm . . . . . . . 5

12           4.    Plaintiffs Fail to Show a Likelihood of Immediate, Irreparable Harm
                Based on Alleged Gene Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

13                a.    Gene Flow Is Unlikely to Occur . . . . . . . . . . . . . . . . . . . . . . . . 7

14                b.    Plaintiffs Have Not Shown that They Will Lose Their Organic

15                    Certification or Lose Sales Due to the Planting of RRSB . . . . . . 10

16                c.    Processing of Already-Harvested RRSB Will Not Cause Harm . 13

17           5.    Plaintiffs Cannot Rely on Allegations of Increased Glyphosate Resistance
                as a Basis for Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18       B.    The Balance of the Equities and the Public Interest Weigh Against Granting the

19            Injunction Plaintiffs Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20            1.    Even Though the Court Has Issued a Ruling on the Merits, It Must
                Balance the Equities Before Issuing an Injunction . . . . . . . . . . . . . . . . . 14

21           2.    In Balancing the Public Interest, the Court Should Consider the Potential

22                for Significant Economic Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23           3.    Serious Harm to the U.S. Sugar Market Would Result if the Court Issues
                the Injunction Requested by Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

24                a.    The Current Status of the U.S. Sugar Market and Sugar Beet

25                    Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

26                b.    Potential Harm to the U.S. Sugar Market if the Court Enjoins the
                    Processing of Sugar Beets Harvested in 2009 . . . . . . . . . . . . . 18

27                c.    Potential Harms to the U.S. Sugar Market if the Court Enjoins the

28                    Planting of Sugar Beets in 2010 for Processing in 2011 . . . . . . 19

C.    Even if the Court Finds that a Preliminary Injunction Is Warranted, the Court
Should Adopt APHIS's Proposed Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

**TABLE OF AUTHORITIES**

2

<u>**CASES**</u>

3

<u>Abbott Labs. v. Gardner,</u>
387 U.S. 136, 155 (1967), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4

<u>Am. Trucking Ass'ns v. City of Los Angeles,</u>
559 F.3d 1046 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

6

<u>Amoco Prod. Co. v. Vill. of Gambell,</u>
480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15, 16

7

<u>Balt. Gas Co. v. Natural Res. Def. Council,</u>
462 U.S. 87, 101(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8

9

<u>Califano v. Yamasaki,</u>
442 U.S. 682 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10

<u>Caribbean Marine Serv. Co. v. Baldrige,</u>
844 F.2d 668 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11

12

<u>Conservation Law Found. of New England, Inc. v. Reilly,</u>
950 F.2d 38 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

13

<u>Friends of the Earth v. Laidlaw Envt'l Servs.,</u>
528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22

14

15

<u>Fund for Animals v. Frizzell,</u>
530 F.2d 982 (D.C. Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16

<u>Fund for Animals, Inc. v. Lujan,</u>
962 F.2d 1391 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

17

18

<u>Geertson Seed Farms v. Johanns,</u>
2007 WL 1302981, aff'd 570 F.3d 1130 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 9, 17, 18

19

<u>Headwaters, Inc. v. BLM,</u>
665 F. Supp. 873 (D. Or. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20

21

<u>Horne v. Flores, — U.S. —,</u>
129 S. Ct. 2579 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22

<u>Idaho Watersheds Proj. v. Hahn,</u>
307 F.3d 815 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

23

24

<u>Kentuckians for Commonwealth Inc. v. Rivenburgh,</u>
317 F.3d 425 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

25

<u>Lamb-Weston, Inc. v. McCain Foods, Ltd.,</u>
941 F.2d 970 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26

27

<u>Lands Council v. McNair,</u>
537 F.3d 981 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15, 16

28

<u>Lathan v. Brinegar</u>,
506 F.2d 677, 692 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>League to Save Lake Tahoe</u>,
2009 WL 3048739  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21

<u>Leatherback Sea Turtle v. Nat'l Marine Fisheries Serv.</u>,
No. 99-00152 DAE, 1999 WL 33594329 (D. Haw. Oct. 18, 1999) . . . . . . . . . . . . . . . . . . . . . . 16

<u>Lydo Enters., Inc. v. City of Las Vegas</u>,
745 F.2d 1211 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Marsh v. Or. Natural Res. Council</u>,
490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Massachusetts v. Watt</u>,
716 F.2d 946 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Meinhold v. U.S. Dep't of Def.</u>,
34 F.3d 1469, 1480 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

<u>Monsanto Co. v. Geertson Seed Farms</u>,
No. 09-475, 2010 WL 144075 (Jan. 15, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Natural Res. Def. Council v. Winter</u>,
508 F.3d 885 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>,
235 F. Supp.2d 1143 (W.D. Wash. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>N. Cheyenne Tribe v. Hodel</u>,
851 F.2d 1152 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>N. Cheyenne Tribe v. Norton</u>,
503 F.3d 837 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Oakland Tribune, Inc. v. Chronicle Publ'g Co.</u>,
762 F.2d 1374 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Or. Natural Res. Council Fund v. Goodman</u>,
505 F.3d 884 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

<u>Orantes-Hernandez v. Thornburgh</u>,
919 F.2d 549 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13

<u>Price v. City of Stockton</u>,
390 F.3d 1105 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Quince Orchard Valley Citizens Assoc., Inc. v. Hodel</u>,
872 F.2d 75 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Save the Yaak Committee v. Block</u>,
840 F.2d 714 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Sierra Club Forest Legacy v. Rey,
577 F.3d 1015 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 20

Sierra Club v. Bosworth,
510 F.3d 1016 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sierra Club v. Penfold,
857 F.2d 1307 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Strahan v. Coxe,
127 F.3d 155 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Summers v. Earth Island Inst., ___ U.S. ___,
129 S. Ct. 1149 (2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

Town of Huntington v. Marsh,
884 F.2d 648 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Chem. Found.,
272 U.S. 1 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Mendoza,
464 U.S. 154 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n,
263 F.3d 379 (4th Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Walters v. Reno,
145 F.3d 1032 (9th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Water Keeper Alliance v. Dep't of Def.,
271 F.3d 21 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Weinberger v. Romero-Barcelo,
456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Wildwest Inst. v. Bull,
472 F.3d 587 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___,
129 S. Ct. 365, 375 (2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 15

**STATUTES**

7 U.S.C. § 6501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 U.S.C. § 6504-11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 U.S.C. § 6513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 U.S.C. § 6514-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**REGULATIONS**

65 Fed. Reg. 80548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 C.F.R. § 205.100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 C.F.R. § 205.202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 C.F.R. § 205.401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 C.F.R. § 205.662(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 C.F.R. § 205.662(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 C.F.R. §§ 205.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 C.F.R. §§ 205.404-205.406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 C.F.R. §§ 205.405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7 C.F.R. §§ 205.406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1

**INTRODUCTION**

2       Almost five years after Roundup Ready sugar beets ("RRSB") were deregulated and two

3   years after the initiation of this action, Plaintiffs now seek the drastic remedy of an emergency

4   injunction halting "further planting, cultivation, processing, or other use of Roundup Ready sugar

5   beets or sugar beet seeds, including the flowering of any sugar beet seed crop."  Pls. Prelim. Inj. Br.

6   at 1 ("Pls. PI Br.").  Plaintiffs do not seek to maintain the status quo.  Rather, they seek to require

7   RRSB farmers to rip out already-planted seed crop.  Moreover, the overbroad relief that Plaintiffs

8   seek would preclude the processing of already-harvested sugar beets and prevent the sale and

9   consumption of sugar from already-processed sugar beets, thereby decimating the entire sugar beet

10  industry and almost half of the nation's domestic sugar supply for multiple years.  Plaintiffs cannot

11  show immediate irreparable injury, or that the balance of harms and public interest weigh in favor

12  of an extraordinary emergency injunction.  Therefore, the Court should deny Plaintiffs' motion (Dkt.

13  No. 194).

14

**BACKGROUND**

15      After preparing an Environmental Assessment, on March 17, 2005, the U.S. Department of

16  Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") issued a

17  determination that RRSB do not pose a plant pest risk pursuant to the Plant Protection Act and

18  therefore must be given nonregulated status.  The deregulation determination allowed RRSB to be

19  planted and sold commercially.   In 2008, three years after deregulation, Plaintiffs – who

20  fundamentally oppose genetic engineering of any crops – filed this lawsuit and alleged violations

21  of the Plant Protection Act, the Administrative Procedure Act, and the National Environmental

22  Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, in connection with the deregulation determination.

23      On September 21, 2009, this Court granted Plaintiffs' motion for summary judgment and

24  denied Defendants' cross-motion for summary judgment.  See Order Regarding Cross-Motions for

25  Summary Judgment ("MSJ Order") (Dkt. No. 139).  The Court found that the agency violated NEPA

26  because APHIS did "not demonstrate the 'hard look' that NEPA requires" specifically with respect

27  to the analysis of the pollination distances of sugar beets, the effectiveness of isolation distances

28

used by seed growers to prevent cross-pollination of genetically modified sugar beets with other sexually-compatible crops, and the socio-economic effects of gene transmission on farming and consumption of conventional sugar beets and related crops. MSJ Order at 13. The Court did not reach Plaintiffs' Plant Protection Act, Administrative Procedure Act, or other NEPA claims. This case is now in the remedies phase. Based on the Court's Order, the only potential harm to be addressed in the remedies phase is harm related to gene flow.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must at a minimum demonstrate four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in his favor, and (4) that the injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., __ U.S. __, 129 S. Ct. 365, 375 (2008). An environmental plaintiff may not obtain an injunction based on a mere *possibility* that the government's action will result in irreparable harm. Rather, a plaintiff must demonstrate that such harm is *likely* to occur. See id. ("We agree with the Navy that the Ninth Circuit's 'possibility' standard is too lenient."). Thus, even if a NEPA violation has been found, a court may not issue an injunction based on only a possibility of harm to the environment.[1]

## ARGUMENT

**A.    Plaintiffs Have Not Shown a Likelihood of Immediate, Irreparable Injury[2]**

Plaintiffs cannot show a likelihood of irreparable injury for several reasons. At the outset, Plaintiffs delayed several years in bringing this lawsuit and their motion for a preliminary injunction.

---

[1]    The Ninth Circuit has recognized that, based on Winter's requirement of a likelihood of harm, its prior precedent is called into doubt. See Sierra Club Forest Legacy v. Rey, 577 F.3d 1015, 1019 (9th Cir. 2009) ("[The Winter opinion] requires us to revisit our holding with respect to the factors governing preliminary relief other than likelihood of success on the merits – irreparable harm, balancing of equities, and the public interest."); Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) ("To the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable").

[2]    Because the Court granted summary judgment to Plaintiffs, Dkt. No. 139, Defendants do not dispute that Plaintiffs have satisfied the criteria of establishing a likelihood of success on the merits with respect to their NEPA claim related to cross-pollination.

1   Given that the Court already set a schedule for remedies briefing with a hearing date in June 2010,

2   Plaintiffs bear the burden of showing that irreparable harm warrants an injunction during the

3   intervening months.  This they cannot do.  A procedural NEPA violation does not by itself constitute

4   irreparable injury.  Plaintiffs' speculative assertions regarding gene flow do not suffice to show that

5   irreparable harm is likely.  Finally, Plaintiffs' assertions regarding glyphosate resistance cannot

6   appropriately form the basis of a narrowly-tailored injunction when the Court did not rule on the

7   merits of those issues.  Even if the Court were to consider Plaintiffs' glyphosate arguments, they

8   cannot show irreparable harm.

9          1.     Plaintiffs' Delay in Seeking Injunctive Relief Undermines Any Claim of Irreparable
              Harm
10

11          Plaintiffs' claim of irreparable harm is undermined by the timing of their motion for

12   preliminary injunction.  After delaying the filing of their lawsuit for nearly three years, Plaintiffs did

13   not seek a preliminary injunction until almost five years since APHIS deregulated RRSB.  In

14   assessing Plaintiffs' motion, the Court must consider the timing of their motion because their delay

15   implies that they have not in fact suffered and are not threatened with irreparable harm.  Quince

16   Orchard Valley Citizens Assoc., Inc. v. Hodel, 872 F.2d 75, 79-80 (4th Cir. 1989) (rejecting

17   preliminary injunction where significant investment in highway construction project could have been

18   obviated if plaintiffs had not delayed bringing suit for six months and stating that "[w]hatever

19   irreparable harm Plaintiffs face . . . is very much the result of their own procrastination "); Oakland

20   Tribune, Inc. v. Chronicle Publ'g Co., 762 F.2d 1374, 1377 (9th Cir. 1985); Lydo Enters., Inc. v.

21   City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary

22   injunction is a factor to be considered in weighing the propriety of relief . . . .  By sleeping on its

23   rights a plaintiff demonstrates the lack of need for speedy action."); Headwaters, Inc. v. BLM, 665

24   F. Supp. 873, 876 (D. Or. 1987) (denying plaintiff's request for an injunction, in part, because the

25   harms to the timber purchaser were caused by plaintiff's delay).

26          Here, the deregulation determination that Plaintiffs challenge occurred in March 2005, yet

27   Plaintiffs waited nearly three years until January 2008 to file a lawsuit and waited another two years

28   to file a motion for emergency relief.  During this period of delay, Roundup Ready sugar beets were

1  commercially planted, such that RRSB are currently grown on about 1.4 million acres, and 95% of

2  all sugar beet production is now from RRSB.  Hoffman Decl. ¶ 14; Stankiewicz Gabel Decl. ¶ 24;

3  Colacicco Decl. ¶ 8.  If Plaintiffs truly believed that they would suffer imminent irreparable harm

4  from the March 2005 deregulation determination and the subsequent commercial planting of RRSB,

5  they could have filed suit and sought a preliminary injunction much earlier.  Instead, Plaintiffs

6  waited several years before seeking such relief, thereby allowing planting of RRSB and reliance on

7  the technology to occur for several growing seasons.  Plaintiffs' substantial delay undercuts their

8  claim of irreparable injury and justifies the denial of injunctive relief.[3/]  Also, laches should apply

9  to bar Plaintiffs from relief. Abbott Labs. v. Gardner, 387 U.S. 136, 155 (1967); Lathan v. Brinegar,

10  506 F.2d 677, 692 (9th Cir. 1974).

11       Moreover, the timing of Plaintiffs' motion seeks to circumvent the schedule the Court

12  already established for addressing remedies issues.  See Dkt. No. 176.  The Court set this schedule

13  even though it was aware of Plaintiffs' concerns about activities that were likely to occur in the

14  spring of 2010 and their request for a more expedited schedule that would provide them with relief

15  "before the end of April."  Tr. of Dec. 4, 2009, at 9:1-11:16, 12:1-14.  The Court further stated that

16  it did not "believe in rocket justice in a case of this complexity and this importance."  Id. at 13:25-

17  14:2.  By compressing the schedule, Plaintiffs seek to engage in the very "rocket justice" the Court

18  appropriately declined earlier.

19       In sum, the Court should deny emergency relief here.  By waiting years to bring their motion,

20  Plaintiffs have conceded that they can wait until the parties have the opportunity to complete

21  discovery and to submit their remedies briefs in the spring of 2010 on the carefully-planned schedule

22

23  _____

[3/]     Plaintiffs' current assertion that a decision is needed by April 1 is a false deadline.  In
24  December 2009, Plaintiffs told the Court it would be sufficient if the Court decided any motion for
preliminary injunction before the end of April.  Tr. of Dec. 4, 2009 (Dkt. No. 179), at 9:1-9:15, 10:5-
25  10:7.  While Plaintiffs claim harm from the flowering in the spring of 2010 of the RRSB seed crop,
such flowering has already occurred for several seasons.  Tr. of Dec. 4, 2009 at 17:11-17:22.  The
26  planting of RRSB root crop in the spring of 2010 will not cause Plaintiffs any immediate, irreparable
harm because the root crop is harvested before flowering and any bolting would not occur for
27  several months.  Hoffman Decl. ¶¶ 43-45.  Though Plaintiffs seek to enjoin further processing of
28  RRSB root crop, processing of the current RRSB root crop has been occurring since the fall of 2009.

1    ordered by the Court (see Dkt. No. 176).  As a result of Plaintiffs' own actions and delay in this case,

2    the Court should neither find an immediate threat of irreparable harm nor award injunctive relief.

3         2.        Procedural NEPA Violations Do Not Constitute Irreparable Harm that Requires
                    Injunctive Relief

4

5         Plaintiffs' argument that a NEPA violation constitutes irreparable injury fails as a matter of

6    well-established law.  Pls. PI Br. at 10-11.  It is well settled that there is no presumption of

     irreparable injury in environmental cases.  Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545-
7
     46 (1987); Lands Council v. McNair, 537 F.3d 981, 1005 (9th Cir. 2008) ("irreparable harm" should
8
     not be presumed in environmental cases and that alleged environmental injuries may be outweighed
9
     by other considerations); Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992)
10
     ("Merely establishing a procedural violation of NEPA does not compel the issuance of a preliminary
11
     injunction."); Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th Cir. 1988); Save the Yaak
12
     Committee v. Block, 840 F.2d 714, 722 (9th Cir. 1988).  Rather, moving parties must show some
13
     tangible irreparable injury.  See Amoco Prod., 480 U.S. at 542; Weinberger v. Romero-Barcelo, 456
14
     U.S. 305, 312 (1982); Town of Huntington v. Marsh, 884 F.2d 648, 653 (2d Cir. 1989) (showing of
15
     irreparable injury required in addition to violation of NEPA for injunction).  Plaintiffs have the
16
     burden to prove a substantial and immediate irreparable injury by a preponderance of the evidence.
17
     Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 558 (9th Cir. 1990); see also Walters v. Reno, 145
18
     F.3d 1032, 1048 (9th Cir. 1998).  Unsupported or speculative assertions of injury do not suffice.
19
     Caribbean Marine Serv. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).  Plaintiffs have not met
20
     their burden here.
21
          3.        Plaintiffs' Assertions Concerning Bureaucratic Inertia Are Unwarranted and in No
22                  Way Support Plaintiffs' Claims of Irreparable Harm

23        Plaintiffs argue that they will suffer additional irreparable harm because, if the Court does

24   not issue an injunction, bureaucratic inertia will make APHIS less likely to change its decision to

25   deregulate RRSB after additional NEPA analysis.  See Pls. PI Br. at 12 (citing Massachusetts v.

26   Watt, 716 F.2d 946 (1st Cir. 1983)).  In Watt, the court enjoined an oil lease sale because, even

27   though the lease sale itself would cause minimal environmental harm, the bureaucratic inertia

28

generated by the lease sale could inevitably lead to oil development, which would involve significant environmental harms. <u>Watt</u>, 716 F.2d at 952-53. The situation here is unlike <u>Watt</u> because APHIS has already decided to deregulate RRSB and did so years earlier in 2005. Despite the changes to the sugar beet market that have taken place since deregulation, the Court must presume that APHIS will comply with the law in completing its new NEPA and decision making process. <u>See Sierra Club v. Penfold</u>, 857 F.2d 1307, 1319 (9th Cir. 1988) ("It would be a mistake for us to assume that because an EA was inadequate in the past, BLM will not comply with NEPA in the future."); <u>N. Cheyenne Tribe v. Hodel</u>, 851 F.2d 1152, 1157 (9th Cir. 1988) (rejecting plaintiffs' argument that oil and gas leases should be voided rather than suspended pending the completion of a new NEPA process because the risk of bureaucratic inertia would be the same in either case); <u>League to Save Lake Tahoe</u>, 2009 WL 3048739, at *7 (distinguishing <u>Watt</u> on the basis that the relevant agency decision had already been made); <u>see also United States v. Chem. Found.</u>, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Accordingly, Plaintiffs' assertions regarding bureaucratic inertia cannot support their claims of irreparable harm.

4. <u>Plaintiffs Fail to Show a Likelihood of Immediate, Irreparable Harm Based on Alleged Gene Flow</u>

Plaintiffs' arguments that they will be irreparably harmed because of alleged gene flow are unfounded for several reasons. Pls. PI Br. at 3-8. First, Plaintiffs' assertions regarding the chance that gene flow will occur are speculative, particularly with respect to the RRSB root crop that is harvested before it flowers. With respect to the RRSB seed crop that is grown in Oregon, all commercial RRSB seed growers in the Willamette Valley follow the Willamette Valley Specialty Seed Association ("WVSSA") guidelines for isolation distances, which virtually eliminate the possibility of gene flow. Even if there were hybrids produced from cross-pollination between RRSB and swiss chard or table beets, the resulting seed would grow into an offtype that is readily identified and culled. Genetically engineered ("GE") traits would be unlikely to be passed on to subsequent generations. Second, Plaintiffs have failed to show irreparable injury from gene flow, and, in fact,

1  sales of organic products have increased since the deregulation decision.  Even if inadvertent gene

2  flow occurred, organic farmers would not have their USDA certified organic status revoked due to

3  inadvertent gene flow.  Finally, Plaintiffs can make no showing of irreparable harm based on gene

4  flow from the processing of already-harvested RRSB and the sale or use of sugar from sugar beets.

5          It cannot be the case that any occurrence of gene flow from a RRSB to a conventional or

6  organic *Beta*[4]/ species plant would constitute irreparable harm to Plaintiffs, and there is no record

7  evidence to support Plaintiffs' contentions that RRSB will "destroy" conventional or organic Beta

8  crops merely because there is an extremely speculative possibility of gene flow.  Pls. PI Br. at 5.

9  By comparison, courts have held that with respect to animal species, the "loss of only one [animal]

10  is [not a] sufficient injury to warrant a preliminary injunction"; a plaintiff "must demonstrate 'a

11  substantial likelihood of . . . irreparable harm'" to his own interests resulting from some form of

12  irretrievabl[e] damage [to] the species."  Fund for Animals v. Frizzell, 530 F.2d 982, 986-987 (D.C.

13  Cir. 1975); accord Water Keeper Alliance v. Dep't of Def., 271 F.3d 21, 34 (1st Cir. 2001) (death

14  of a "single member of an endangered species" does not qualify as irreparable harm absent showing

15  of how "probable death . . . may impact the species"); Strahan v. Coxe, 127 F.3d 155, 171 (1st Cir.

16  1997) (upholding denial of preliminary injunction to halt activity causing take and holding such an

17  injunction was mandatory only where activity would have caused eradication of entire species).

18  There is no reason the analysis should be different for plant species.

19              a.      *Gene Flow Is Unlikely to Occur*

20          Although the deregulation decision occurred in 2005 and RRSB has been commercially

21  planted in increasing amounts for several years, Plaintiffs have not provided any evidence that gene

22  flow has occurred or that it is likely to occur.  Plaintiffs hypothesize that gene flow is likely because

23  pollen containing the GE trait could theoretically cross-pollinate with non-GE crops.  Pls. PI Br. at

24  3-5.  But the mere possibility of harm is insufficient to establish a likelihood of irreparable harm that

25  warrants a preliminary injunction.  Winter, 129 S. Ct. at 375.

26          Contrary to Plaintiffs' speculative statements, the possibility of cross-pollination from RRSB

27

28  _____
    [4]/     *Beta* species include swiss chard, sugar beets, table beets, and fodder beets.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIM. INJ.                                    7

1    is remote.  According to APHIS's own scientific expert, Dr. Neil Hoffman, 99.9% of all fertilization

2    events are a result of pollen emitted from a source 500 m (0.3 miles) away.  Hoffman Decl. ¶ 32.

3    As pollen moves away from a pollen source, it becomes increasingly diluted and/or inactive.  Id. ¶¶

4    28-35.  Indeed, at a distance of 0.3 miles away from the pollen source, the concentration of pollen

5    has decreased by more than a factor of 1,000.  Id. ¶ 33.  Increased pollen competition also occurs

6    as one moves away from a pollen source and toward another one, and this competition can reduce

7    the likelihood of cross-pollination by at least an order of magnitude to under 1 in 10,000 seeds.  Id.

8    ¶¶ 30-31, 34-35, 55.  These two factors, distance and competition, work in tandem to dilute the

9    pollen concentration such that the risk of cross-pollination is extremely unlikely at the recommended

10   isolation distances in the Willamette Valley.  Id. ¶¶ 34-35, 55.

11          Any cross-pollination that might occur would be extremely unlikely to come from the RRSB

12   root crop because the RRSB root crop is harvested before it flowers.  Hoffman Decl. ¶ 43.  The

13   RRBS root crop "bolts" (i.e., produces a flower) in only rare instances–usually less than 0.01% of

14   the time.  Id. ¶ 43.  Any bolters are easily identified and can be managed over a 4-6 week window

15   before they produce pollen.  Id. ¶¶ 44.  Finally, even if RRSB pollen reached a receptive swiss chard

16   or table beet, no genetic material would be transferred to a vegetable crop grown for its root or

17   leaves.  Id. ¶ 45.

18          As for the risk of cross-pollination from RRSB seed crops, the only area where there is any

19   small possibility of gene flow from RRSB seed crops to other *Beta* crops is in the Willamette Valley

20   in Oregon.  Hoffman Decl. ¶ 54; Stankiewicz Gabel Decl. ¶¶ 22-23.  The existing isolation distance

21   guidelines that commercial sugar beet growers in the Willamette Valley follow further minimize the

22   potential for any gene flow from RRSB to non-GE *Beta* crops.  Hoffman Decl. ¶¶ 26, 51, 55, 59.

23   The WVSSA established an isolation distance of 4 miles between RRSB and conventional beets or

24   chard.  First Morton Decl. ¶ 16 (Docket No. 98).  In light of the limited ability of sugar beet pollen

25   to cross-pollinate with compatible plants after only 500 meters, Hoffman Decl. ¶¶ 33-34, the

26   likelihood of cross-pollination at the WVSSA isolation distances of 4 miles is minute.  Id. ¶ 55.  A

27   4-mile isolation distance is twelve times the distance at which cross-pollination occurs in only 1 seed

28

out of 1,000 seeds. Id. ¶ 55. At this greater distance and taking into account the impact of pollen competition, the level of gene flow is estimated to be reduced by at least an order of magnitude to under 1 in 10,000 seeds. Id. Increasing the isolation distance would not significantly reduce the risk of gene flow, but would limit the ability of GE and non-GE farmers to coexist in the Willamette Valley. Id. ¶¶ 31, 53, 60-61.[5]/ The risk of cross-pollination is further minimized by the fact that certain RRSB seed growers use conventional pollinator plants and place the GE trait on the male sterile plant which releases a miniscule fraction of the total pollen in a field. Id. ¶ 41; Second Hovland Decl. ¶ 12 (Dkt. No. 170).

Plaintiffs simply cannot show that irreparable injury related to gene flow has occurred to date, or is likely to occur in the next few months in the absence of injunctive relief.[6]/ Plaintiffs' declarant Frank Morton has asserted the same "grave harm" of genetic contamination in his June

---

[5]/ Plaintiffs' declarants have acknowledged that isolation distances can be used to prevent cross-pollination. Morton Depo. (Ex. A to Li Decl.) at 73:21-23; First Morton Decl. ¶ 18 (Dkt. No. 98); Tipping Decl. ¶ 7 (Dkt. No. 7). Although Mr. Morton supported a 10-mile isolation distance between GE and non-GE *Beta* species in his first declaration from June 2008, when he discussed isolation distances in e-mails sent in January and February 2007, he stated that he had "no argument" with a proposed three-mile isolation distance and that three miles "should be enough" if considerations are taken. Morton Depo. at 172:8-173:11, 176:7-176:23, Ex. 22-23. It is noteworthy that when the WVSSA was debating a 6-mile or 3-mile isolation distance, Mr. Morton abstained from a vote on the issue in part because a 6-mile distance would hurt his ability to grow crops in the Willamette Valley. Third Morton Decl. ¶ 8 (Dkt. No. 220); Morton Depo. at 113:11-114:19.

Further, gene flow to Mr. Morton's farm is unlikely for the further reason that he is upwind of his closest sugarbeet growing neighbor. Morton Depo. at 64:14-64:21, 64:24-65:3, 66:18-66:21.

[6]/ Though Plaintiffs cite Geertson Seed Farms v. Johanns, 2007 WL 1302981, aff'd 570 F.3d 1130 (9th Cir. 2009), for the proposition that harm from genetic "contamination" cannot be undone and constitutes irreparable harm, their reliance on Geertson is misplaced. The Supreme Court has granted certiorari on the remedy ruling in Geertson. See Monsanto Co. v. Geertson Seed Farms, No. 09-475, 2010 WL 144075 (Jan. 15, 2010). Moreover, there are important factual differences between the alfalfa crop at issue in Geertson and the sugar beet seed industry with respect to geography, plant biology, agronomic practices, as well as the existence of an organic alfalfa industry when there is no organic sugar beet industry. Unlike the situation with Roundup Ready alfalfa, RRSB seed production and commercial root production are geographically separate because sugarbeet seed production is concentrated in 3,000 to 5,000 acres in the Willamette Valley, AR 634, where isolation distances are used, and the root crop is grown elsewhere in ten states and is not grown to seed. As a result, there is very unlikely to be any potential for cross-pollination between conventional or organic Beta species and RRSB crops. Thus, this Court should not rely on Geertson in assessing whether injunctive relief is appropriate.

2, 2008 declaration as in his January 22, 2010 declaration. First Morton Decl. ¶ 11 (Dkt. No. 98); Third Morton Decl. ¶ 4 (Dkt. No. 220); Morton Depo. at 111:12-111:17. Yet, the results of genetic testing for his organic swiss chard and table beet seed crops on four occasions since January 2008 have been negative each time. Morton Depo. at 34:12-34:16, 36:16-36:17, 43:21-44:1, 44:7-44:12, 57:24-58:2, 99:6-99:18. Indeed, in his first test from January 2008, there were no GE traits detected in over 80,000 pollination events. Morton Depo. at 169:8-169:22, Ex. 12. In short, although RRSB has been deregulated since 2005, there is no evidence that gene flow has occurred or is imminent or likely in the absence of preliminary injunctive relief.

                *b.*      *Plaintiffs Have Not Shown that They Will Lose Their Organic Certification or Lose Sales Due to the Planting of RRSB*

      Plaintiffs argue that they will suffer significant economic harm without an injunction because, if their crops become "contaminated" by GE crops, they will not be able to sell them as organic. See Pls. PI Br. at 5-7. As demonstrated above, gene flow to organic *Beta* species plants is exceedingly unlikely to occur. But even if some genetic drift were to occur, that would not cause organic growers to lose their USDA organic certifications or make their organic products unsaleable. The USDA National Organic Program ("NOP") requires compliance with a certification process and does not automatically exclude growers whose crops test positive for the inadvertent presence of genetically modified organisms ("GMOs"). Moreover, despite the fact that RRSB have been on the market for several years, Plaintiffs point to no actual lost sales due to genetic drift.

      The NOP was established in 1990 to create uniform standards governing the marketing of organic crops. See Organic Foods Production Act of 1990, 7 U.S.C. § 6501 *et seq*. To be certified as organic by USDA, farms abide by certain standards. See 7 U.S.C. § 6504-11; 7 C.F.R. § 205.100. USDA relies on independent certifying agents to issue the organic certifications. 7 U.S.C. § 6514-15; 7 C.F.R. § 205.401. A farmer seeking to market products as organic must submit an organic plan to the applicable independent certifying agent who will set the specific standards for organic certification, establish mechanisms to ensure compliance with those standards, and have the authority to grant or deny or revoke or suspend certification. See 7 U.S.C. § 6513; 7 C.F.R. §§ 205.404-205.406. The NOP regulations do not specifically require testing.

1   The process-based NOP "requires organic production operations to have distinct, defined

2   boundaries and buffer zones to prevent unintended contact with prohibited substances from

3   adjoining land that is not under organic management."  AR816; 7 C.F.R. § 205.202.  The Organic

4   Foods Production Act itself has no provisions governing GE crops, but NOP regulations provide that

5   growing GE crops is an excluded method of production.  See National Organic Program Final Rule,

6   65 Fed. Reg. 80548, 80549 (Dec. 21, 2000); 7 C.F.R. §§ 205.2, 205.105(e), 205.301(f).  However,

7   the NOP regulations do not prohibit the sale of crops as organic merely because they have been

8   affected by genetic drift from other GE crops.  65 Fed. Reg. at 80556 ("The presence of a detectable

9   residue of a product of excluded methods alone does not necessarily constitute a violation of this

10  regulation.").  Indeed, the issue of genetic drift was raised during the rulemaking process for the

11  NOP, and USDA rejected suggestions that restrictions should be placed on the growers of GE crops

12  to protect against genetic drift.  See id.  Instead, USDA explained that, "[a]s long as an organic

13  operation has not used excluded methods and takes reasonable steps to avoid contact with the

14  products of excluded methods as detailed in their approved organic system plan, the unintentional

15  presence of the products of excluded methods should not affect the status of an organic product or

16  operation."  Id.  Thus, if an organic grower follows buffer requirements in its organic plan, the

17  grower will not necessarily lose its organic certification due to the inadvertent presence of GMOs.

18  See id. ("[I]t is particularly important to remember that organic standards are process based.").[2]

19   Because organic growers who comply with the NOP certification process will not lose their

20  organic certification merely because inadvertent GMOs are detected, the alleged economic losses

21  of Plaintiffs' declarants are questionable and appear to be overstated.  See, e.g., Third Morton Decl.

22  ¶ 13 (Dkt. No. 220) ("Contamination from GE sugar beets into my *Beta* crops will render them

23

24  [2]   If the inadvertent presence of GMOs were detected in organic crops, a certifying agent may
    require that the organic plan be revised, and would communicate with the organic farmer about any
25  needed changes. 7 C.F.R. §§ 205.406, 205.662.  The certifying agent would issue a notice of
    noncompliance only if revisions to the organic plan were insufficient.  7 C.F.R. § 205.662(a).  If
26  noncompliance was not corrected, the certifying agent could issue a notification of proposed
    suspension or revocation. 7 C.F.R. § 205.662(c). After the issuance of a notice of denial, the organic
27  farmer could reapply for certification, request mediation, or file an appeal pursuant to 7 C.F.R. §§
    205.405, 205.663, 205.681.
28

1    valueless in the marketplace.").  For example, Mr. Morton would not necessarily be excluded from

2    selling his seed as USDA certified organic even if inadvertent genetic drift occurred, thus preventing

3    the potential for lost profits on those organically grown seeds.  And he would also be free to sell his

4    seeds on the conventional market.  Indeed, none of the producers of organic seeds or crops who have

5    filed declarations on behalf of  Plaintiffs have alleged that they have lost their USDA certification

6    or that any of the certifying agents have initiated inquiries which could lead to a suspension or loss

7    of their organic certification.[8]/

8            Further, the co-existence of RRSB and organic *Beta* crops over the past four years

9    contradicts the assertions of Mr. Morton and others that the sale of organic seeds and organic

10   produce will not be possible.  Plaintiffs claim that the potential for cross-pollination from RRSB will

11   harm their sales and cause them to lose contracts, but the evidence does not bear out those claims.

12   Mr. Morton, for example, alleges that due to the presence of RRSB in nearby fields, "we will not

13   be able to fulfill seed contracts with organic seed companies like High Mowing Seeds, Seeds of

14   Change, and Fedco Seeds because they have zero tolerance for the presence of GE contamination."

15   Third Morton Decl. ¶ 14.  However, Tom Stearns, President of High Mowing Seeds, testified at his

16   deposition that he has contracted with Mr. Morton to buy organic seeds over the past four years

17   despite the minimal  potential for cross-pollination from GE crops.  See Stearns Depo. (Ex. B to Li

18   Decl.) at 31:24-32:6.  At his own deposition, Mr. Morton could not identify any specific instances

19   in which he suffered economic losses due to potential cross-pollination from RRSB.  See Morton

20   Depo. at 67:5-67:15, 112:15-112:20.  In fact, Mr. Morton testified that his sales of chard and table

21   beet seeds have increased since the deregulation of RRSB.  Morton Depo. at 68:15-68:18, 69:5-

22   69:17.[9]/ Plaintiffs' other declarants similarly fail to point to any specific instances of economic harm

23

24   [8]/     In addition, as Intervenors have argued, Intv's PI Opp'n at 15 (Dkt. No. 237), even if gene
      flow were to occur it can be undone, and is thus not irreparable.  Further, there may be other
25   adequate remedies at law that could make Plaintiffs whole if any economic injury did occur.

26   [9]/     As for any asserted harm arising from the costs of conducting genetic testing, contrary to Mr.
27   Morton's statement in his third declaration (Dkt. No. 220) ¶ 15, his cost of genetic testing is no
      longer $300 per seed lot but $142 per seed lot, and he has spent only $900 on genetic testing over
28   the past three years.  Morton Depo. at 70:3-70:10, 96:24-97:7, 98:3-98:8.  These costs of genetic

1  resulting from the 2005 deregulation of RRSB, despite the fact that RRSB have been cultivated since

2  their deregulation.

3         In short, even though RRSB have been cultivated over the past four years, Plaintiffs cannot

4  show immediate, irreparable harm from loss of organic certification or a decrease in organic sales

5  from the planting of RRSB.  If anything, the sale of organic *Beta* crops appears to be on the rise.

6                    *c.    Processing of Already-Harvested RRSB Will Not Cause Harm*

7         The overbroad injunction Plaintiffs seek would prevent the processing or use of already-

8  harvested RRSB.  Yet Plaintiffs make no showing of harm from such activities.  The sugar that is

9  produced from RRSB is chemically identical to the sugar produced from conventional or organic

10  sugar beets.  Hoffman Decl. ¶¶ 38, 64; AR 602, 806, 819.  The sugar extracted from RRSB does not

11  contain any genetic material or protein.  Id.  Because the refining process destroys the RRSB root,

12  it eliminates any potential for flowering and cross-pollination.  Hoffman Decl. ¶ 62.  Thus,

13  Plaintiffs' request to enjoin processing of RRSB and use of sugar from RRSB should be rejected.

14         5.    Plaintiffs Cannot Rely on Allegations of Increased Glyphosate Resistance as a
                Basis for Injunctive Relief
15

16         Although Plaintiffs argue that glyphosate resistance is inevitable and will cause them

17  irreparable harm, Pls. PI Br. at 8-10, the Court should not grant a preliminary injunction on the basis

18  of any glyphosate issues.  "[A]n injunction must be narrowly tailored to give only the relief to which

19  plaintiffs are entitled."  Orantes-Hernandez, 919 F.2d at 558; see Natural Res. Def. Council v.

20  Winter, 508 F.3d 885, 886 (9th Cir. 2007) ("Injunctive relief must be tailored to remedy the specific

21  harm alleged, and an overbroad preliminary injunction is an abuse of discretion.").  The Court's

22  summary judgment decision reached only NEPA issues related to cross-pollination, isolation

23  distances, and the socio-economic effects of gene transmission.  MSJ Order at 13.  The Court

24  reached no other NEPA issues.  Thus, the issuance of injunctive relief designed to redress alleged

25  harm from glyphosate is neither warranted nor appropriate in this case.  See Friends of the Earth v.

26  Laidlaw Envt'l Servs., 528 U.S. 167, 193 (2000) (courts should ensure "the framing of relief no

27

28  testing are not required by any contracts that he has with seed companies or his organic certifier.
    Morton Depo. at 33:11-18, 90:9-90:19, 218:1-218:6; Stearns Depo. at 41:22-41:25.

1  broader than required by the precise facts"); see also Price v. City of Stockton, 390 F.3d 1105, 1117

2  (9th Cir. 2004); Meinhold v. U.S. Dep't of Def., 34 F.3d 1469, 1480 (9th Cir.1994).

3       In the event the Court considers Plaintiffs' alleged harms based on glyphosate resistance, the

4  declarations they have submitted do not show a likelihood of immediate, irreparable harm arising

5  from increased use of glyphosate.  Importantly, none of Plaintiffs' declarations asserts any

6  immediate harms from glyphosate use that would occur before the time the issue of remedies can

7  be briefed and heard according to the Court's case management schedule.  See, e.g., Gurian-

8  Sherman Decl. ¶ 8 (discussing development of glyphosate-resistant weeds over "several years").

9  And as Plaintiffs' own declarants acknowledge, glyphosate will still be used on other crops such as

10  corn, soybeans, and cotton even if it is not used on RRSB.  Benbrook Decl. ¶¶ 6, 8, 9 (Dkt. No. 205);

11  Feldman Decl. ¶ 10 (Dkt. No. 212) ; Gurian-Sherman Decl. ¶ 11 (Dkt. No. 213).  The effect of

12  glyphosate use on the approximately 1.4 million acres where RRSB are grown would be a minimal

13  contribution to cumulative glyphosate use across all crops.  See Alfalfa Draft EIS at 173 (Dec. 18,

14  2009),available at http://www.aphis.usda.gov/biotechnology/downloads/alfalfa/gealfalfa_deis.pdf.

15  By comparison, in 2009, there were more than 59 million acres planted with Roundup Ready corn,

16  about 70.5 million acres planted with Roundup Ready soybeans, and about 6.3 million acres planted

17  with Roundup Ready cotton.  See NASS Acreage Report at 24-27 (June 30, 2009), available at

18  http://usda.mannlib.cornell.edu/usda/current/Acre/Acre-06-30-200.pdf.     Furthermore, using

19  glyphosate–which Plaintiffs' declarants have admitted is less toxic than other herbicides–may result

20  in decreased use of other more toxic herbicides.  AR 815; Gurian-Sherman Decl. ¶ 16 (Dkt. No.

21  213); Morton Depo. at 195:22-196:1; see also Alfalfa Draft EIS at 175.  Thus, Plaintiffs cannot show

22  immediate, irreparable harm from glyphosate use on RRSB crops, and the Court should not rely on

23  purported harms related to glyphosate use as a basis for granting any injunctive relief.

24  **B.   The Balance of the Equities and the Public Interest Weigh Against Granting the
           Injunction Plaintiffs Request**

25

26       The balance of the equities and the public interest do not weigh in favor of the broad

27  injunction Plaintiffs seek.  If the Court were to grant Plaintiffs' requested relief, the U.S. sugar

28  market would suffer significant disruption, likely resulting in significantly higher sugar prices for

consumers.  It is also likely that some sugar beet processing facilities would be forced to close, resulting in substantial job losses.  Accordingly, the Court should deny the relief sought by Plaintiffs and, at most, issue a narrowly tailored injunction.

      1.    Even Though the Court Has Issued a Ruling on the Merits, It Must Balance the Equities Before Issuing an Injunction

The Court's summary judgment ruling on certain NEPA claims does not alter the balancing of the equities that the Court must perform before issuing injunctive relief.  The Supreme Court has established that violations of environmental laws such as NEPA do not displace the Court's balancing of equitable factors in determining whether an injunction is an appropriate remedy. Winter, 129 S. Ct. at 381 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.") (quoting Weinberger, 456 U.S. at 313) (internal quotation marks omitted).  Rather, a court must balance the potential harms to the parties in determining whether injunctive relief is appropriate.  Amoco Prod., 480 U.S. at 542; see Lands Council, 537 F.3d at 1004; Fund for Animals, 962 F.2d at 1400.  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." See Winter, 129 S. Ct. at 376-77 (quoting Weinberger, 456 U.S. at 312).  Further, the public interest to be examined is the "overall public interest," not just the public interest in the environment.  Id. at 378.  Even if a court determines that some preliminary relief is warranted, an injunction should be narrowly tailored to minimize the harm to the parties and the public.  See N. Cheyenne Tribe v. Norton, 503 F.3d 837, 842-44 (9th Cir. 2007) (rejecting argument that all development of coal bed methane must cease pending the completion of an environmental impact statement and upholding a partial injunction allowing some development to continue); Idaho Watersheds Proj. v. Hahn, 307 F.3d 815, 833-34 (9th Cir. 2002) (upholding district court's rejection of a complete injunction of grazing activities pending completion of new environmental impact statement and adoption of interim measures proposed by agency); see also Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991) (stating that an injunction must be narrowly tailored to address alleged harm and that an overbroad injunction is an abuse of discretion).

2.    In Balancing the Public Interest, the Court Should Consider the Potential for Significant Economic Harm

While the Court should consider the potential harm to the environment in determining whether to issue an injunction, see, e.g., Or. Natural Res. Council Fund v. Goodman, 505 F.3d 884, 898 (9th Cir. 2007), harm to the environment does not necessarily outweigh other considerations, including the potential for significant economic harm. See Lands Council, 537 F.3d at 1005 ("[W]e decline to adopt a rule that *any* potential environmental injury *automatically* merits an injunction."). Thus, the potential for significant economic or other harm can warrant the denial of an injunction, even when environmental interests are at stake. See id. at 1004-05 (citing Amoco, 480 U.S. at 545).

The balancing of environmental, economic, and other factors affecting the public interest depend on the particular facts and circumstances of each case. Among the factors that should be considered are the nature and severity of the economic harm. See Lands Council, 537 F.3d at 1005 (denying request to enjoin a logging project because, among other reasons, the project would "further the public's interest in aiding the struggling local economy and preventing job loss"); Wildwest Inst. v. Bull, 472 F.3d 587, 592 (9th Cir. 2006) (denying request to enjoin a timber sale based, in part, on the revenue that would be lost to the Forest Service); see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 235 F. Supp.2d 1143, 1162 (W.D. Wash. 2002) ("Although economic injuries are often characterized as not irreparable, a company's lost profits often results in a lost job. The profound consequences of such losses on individuals, families and communities are well known."); Leatherback Sea Turtle v. Nat'l Marine Fisheries Serv., No. 99-00152 DAE, 1999 WL 33594329, *18 (D. Haw. Oct. 18, 1999) ("Defendants have demonstrated that an injunction of all fishing activities is not in the public interest.").

The overriding purpose of a preliminary injunction is to preserve the status quo pending a resolution of the merits, or in this case, resolution of a permanent remedy. See Sierra Forest Legacy, 577 F.2d at 1023. Thus, in considering the potential for economic harm that would result from an injunction, a court should consider the status of activities that have already been approved and the effect of an injunction on such activities. See Sierra Club v. Bosworth, 510 F.3d 1016, 1034 (9th Cir. 2007) (recognizing that "many individual projects already have been approved and are in the

1   operational stages" and remanding to the district court to determine the appropriate scope of an

2   injunction); see also Or. Natural Res. Council, 505 F.3d at 898 (enjoining a proposed ski area

3   expansion but noting that "this is not a case where an injunction would halt ongoing economic

4   activity but would simply delay the expansion of an existing facility").

5     The status quo is that 95 percent of the current sugar beet crop is comprised of GE Roundup

6   Ready sugar beets. Colacicco Decl. ¶ 8. The existing widespread use of RRSB distinguishes this

7   case from the Roundup Ready alfalfa case. In Geertson, the court found that "the balance of the

8   equities weighs in favor of maintenance of the status quo and against allowing the continued

9   expansion of the Roundup Ready alfalfa market pending the completion of the EIS." Geertson, 2007

10  WL 1302981, at *6. The court reasoned that "Roundup Ready alfalfa is only 15 percent of Forage

11  Genetics' total revenue and much, much less of Monsanto's." Id. Because the use of Roundup

12  Ready alfalfa was not as widespread as the use of RRSB, the potential for market disruption was not

13  nearly as serious as it is in this case. Further, the plaintiffs in the alfalfa case did "not seek to enjoin

14  [already planted Roundup Ready] alfalfa from being grown, harvested and sold, and the Court agrees

15  that such a remedy would be too drastic." Id. at *8. Here, Plaintiffs are seeking to enjoin any

16  planting, cultivation, or processing of RRSB, which is a far more drastic remedy and, as described

17  below, will have far more drastic consequences.

18
19    **3.**  <u>Serious Harm to the U.S. Sugar Market Would Result if the Court Issues the Injunction Requested by Plaintiffs</u>

20    Granting Plaintiffs' requested relief is not in the public interest because it would seriously

21  harm the U.S. sugar market and have serious ramifications for sugar processors, sellers, and

22  consumers. Half of the U.S. sugar supply comes from sugar beets, and roughly 95% of the sugar

23  beets currently being grown in the United States are RRSB. Therefore, a blanket injunction on any

24  RRSB planting or processing would lead to widespread disruption of the U.S. sugar markets.

25    *a.*  *The Current Status of the U.S. Sugar Market and Sugar Beet Production*

26    The domestic sugar market relies heavily on the production of sugar beets, which are used

27  to produce roughly 44 percent of the domestic sugar supply. Colacicco Decl. ¶ 5. The rest of the

28  U.S. sugar supply comes from the refining of domestic and foreign sugarcane and the importation

1   of refined sugar.  Id. ¶ 4.  The growing of sugar beets and ultimate production of sugar from sugar

2   beets is a lengthy process conducted on a four-year cycle.  Id. ¶ 5.  In the fall of the first year,

3   growers plant the sugar beet seed crop.  Id.  A year later in the fall of the second year, growers

4   harvest the seed produced by the seed crop and store that seed through the winter.  Id.  In the third

5   year, the harvested sugar beet seeds are planted in the spring to produce the root crop, which is

6   harvested in the fall of the same year and delivered to sugar beet processors.  Id.  In the fall of the

7   third year and throughout the fourth year, the sugar beets are processed into sugar.  Id.

8       Consistent with the four-year cycle for the production of sugar from sugar beets, the sugar

9   beet root crop that was planted in the spring of 2009 and harvested in the fall of 2009 is currently

10  being processed into sugar, and will constitute 42% of the domestic supply of sugar in fiscal year

11  2010.  Id. ¶ 8.  Ninety-five percent of the 2009 sugar beet crop was comprised of RRSB.  Id.

12  Further, the RRSB are commingled with conventional sugar beets following harvesting.  Id.  As

13  noted above, there is no organic sugar beet production.

14      In the U.S., sugar beet processors are usually structured as cooperatives of sugar beet

15  growers who share in the profits from the sale of sugar.  Id. ¶ 6.  The sugar beet processors sell the

16  sugar on a rolling basis throughout the year to manufacturers of goods that require sugar or to

17  wholesalers or retailers of sugar.  Id.  Buyers usually contract to buy sugar six months to a year in

18  advance, and thus the pricing of sugar usually begins roughly a year before it is available.  Id.

19      USDA carefully regulates the pricing of sugar and imposes a tariff on imported refined sugar.

20  Id. ¶ 10.  USDA manages the market to establish a price floor during times of oversupply and to

21  maintain an adequate supply during shortages.  Id.  But USDA's price control mechanisms are

22  ineffective against significant supply shortages.  Id. ¶¶ 11-13.

23          b.    *Potential Harm to the U.S. Sugar Market if the Court Enjoins the Processing*
                  *of Sugar Beets Harvested in 2009*
24

25      Serious harm to the U.S. sugar market would result if the Court were to enjoin the processing

26  of RRSB harvested in 2009 into sugar and the sale of that sugar.  By the end of February 2010,

27  roughly 40 percent of the 2009 sugar beet crop will already have been processed into sugar.

28  Colacicco Decl. ¶ 15.  And roughly 90 to 95 percent of the sugar that will be extracted from the 2009

1   sugar beet crop has already been contracted for sale.  Id.  If the Court were to enjoin the production

2   of sugar from the 2009 sugar beet crop, about 2.6 million tons of refined sugar from sugar beets

3   would have to be removed from the market.  Id.  That sugar is expected to supply 42 percent of

4   domestic sugar consumed in 2010.  Id.

5        An injunction against processing the 2009 sugar beet harvest would cause sugar beet growers

6   substantial financial hardship.  Id. ¶ 16.  They have incurred all of the costs to this point of planting

7   and harvesting their sugar beets and would lose all of that investment.  Id.  They would also

8   experience roughly $1.9 billion in lost sales.  Id. ¶ 17.  Further, it would cost roughly $423 million

9   to dispose of sugar and sugar beet crops if further processing and distribution were banned.  Id. ¶

10  16.  Sugar beet processing plants and related businesses also would be hard hit, resulting in

11  thousands of lost jobs and harming local economies.  Id. ¶ 18.[10]/

12       Substantial costs would be passed onto consumers because the price of sugar would rise

13  precipitously.  Id. ¶¶ 19-20.  USDA estimates that the price of sugar in the U.S. would double.  Id.

14  ¶ 20.  Total costs to consumers from such an increase in the price of sugar are estimated at $4 billion

15  for fiscal year 2010.  Id.  Inadequate sugar supply would cause shortages on grocery market shelves

16  and also limit the production ability of food manufacturers.  Id.[11]/

17              c.    *Potential Harms to the U.S. Sugar Market if the Court Enjoins the Planting*
18                   *of Sugar Beets in 2010 for Processing in 2011*

19       An injunction against the planting of the RRSB root crop in 2010, which would be otherwise

20  be processed into sugar in 2011, would further harm the U.S. sugar market because the lost crop

21  could be only partially replaced.  Due to the two-year lag time in producing sugar beet seed for root

22  crop planting and the fact that nearly all of the sugar beets planted in recent years are RRSB, there

23  _____
    [10]/   Intervenors have provided more detail regarding specific economic harms to RRSB growers,
24  as well as the potential for lost jobs and damage to local economies.  Intv's PI Opp'n at 19-20.

25  [11]/   Other sources of refined sugar cannot make up for the shortfall.  U.S. sugarcane refineries
    are already running at near capacity, so domestic sugar users would have to rely on foreign supplies
26  of refined sugar to make up the deficit.  Colacicco Decl. ¶ 21.  But foreign supplies are limited due
27  to poor crop conditions.  Id. ¶ 14.  In addition, a significant portion of foreign supplies are already
    under contract for 2010 and thus unavailable.  Id.  Further, even if foreign supplies were available,
28  the quality of foreign sugar is often inadequate to meet the needs of U.S. sugar users.  Id. ¶ 22.

1   is a shortage of conventional sugar beet seed.  Id. ¶ 24.  Furthermore, sugar beet seed is not uniform

2   but is tailored to particular geographic areas to protect against diseases among other factors.  Id.

3   Thus, even if conventional sugar beet seed were available for certain areas, such seed may not be

4   suitable for planting in other areas because of different growing conditions and disease threats.

5   Foreign beet seed is generally not suitable for planting in the U.S. because it has not been developed

6   for U.S. local conditions or undergone field testing to ensure high yields.  Id. ¶ 25.

7          Based on the difficulties in procuring conventional beet seed, the amount of sugar beets that

8   could be planted in 2010 would be substantially reduced from the previous year.  Intervenors

9   estimate that, due to seed shortages, the acreage of sugar beets planted would be reduced by 60.2

10  % in 2010.  Id. ¶ 26; Manning Decl., Exs. H & I (filed under seal).  The seed shortage would cause

11  a 2.6 million ton reduction in sugar from beet sugars in 2011.  Id.  Due to the shortage in U.S.

12  production, USDA estimates that the price of sugar would continue to increase in 2011 and thus

13  impose additional costs on food manufacturers and sugar consumers of roughly $5.6 billion.  Id. ¶

14  27.  An injunction against planting the 2010 sugar beet crop would also have cumulative detrimental

15  effects on sugar beet growers and processors who would lose an estimated $1 billion in sales, of

16  which roughly $261 million may be offset by alternative crops.  Id. ¶ 28.[12]/

17  **C.   Even if the Court Finds that a Preliminary Injunction Is Warranted, the Court Should
        Adopt APHIS's Proposed Remedy**

18

19         Even if the Court concludes that Plaintiffs have met the Winter requirements for obtaining

20

_____

21  [12]/     The harm to the U.S. sugar market from an injunction would continue to be felt two years
    from now.  If the 2010 sugar beet seed crop could not be planted and harvested in 2010, there would

22  be a seed shortage for the sugar beet root crop planted in 2011.  Id. ¶ 30.  Intervenors estimate that,
    due to lack of conventional seed, the sugar beet acreage would decrease by 65.2 % from current

23  levels in 2011.  Id.; Manning Decl. Exs. H & I (filed under seal).  That would result in a loss of 2.8
    million tons of sugar from sugar beets.  Id.  The price of sugar would be expected to continue to be

24  high, and food manufacturers and consumers would pay an additional $4.6 billion for sugar in 2012
    compared to the scenario without an injunction.  Id. ¶ 31.  Sugar beet growers and processors would

25  lose an estimated $1.3 billion in lost sugar sales, of which $283 million may be offset through the
    sale of alternative crops.  Id. ¶ 32.  In sum, the economic costs of an injunction on the planting,

26  growing, and processing of RRSB would be enormous.  Sugar beet growers would lose roughly
    $4.16 billion.  Id. ¶ 33.  The price of refined sugar would immediately double and remain high for

27  the next two years, resulting in a cost to consumers of roughly $14.09 billion.  Id.

28

1   a preliminary injunction, it should not grant the overbroad relief that Plaintiffs seek.  The Ninth

2   Circuit has interpreted Winter as rejecting an "all-or-nothing" approach in determining whether an

3   injunction is warranted.  Sierra Forest Legacy, 577 F.3d at 1022.  Instead, courts must weigh the

4   potential harms to the parties and the public in light of the "options on the table."  Id.; see also

5   League to Save Lake Tahoe v. Tahoe Regional Planning Agency, Nov. Civ. S-08-2828 LKK/GGH,

6   2009 WL 3048739, at *8 (E.D. Cal. Sept. 18, 2009) (rejecting the plaintiff's proposed injunction and

7   holding that a narrower injunction proposed by the agency was in the public interest).  The Court

8   should adopt APHIS's proposed remedy, which is founded on its scientific expertise, consistent with

9   USDA's policy goals, and narrowly tailored to address specific NEPA violations this Court found.

10          A fundamental principle in equity is the rule that "injunctive relief should be no more

11  burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Califano

12  v. Yamasaki, 442 U.S. 682, 702 (1979).  A court should issue an injunction only to the extent

13  necessary to redress the injuries of the plaintiffs before the court.  See Va. Soc'y for Human Life,

14  Inc. v. Fed. Election Comm'n, 263 F.3d 379, 381, 393 (4th Cir. 2001) (vacating nationwide

15  injunction); Kentuckians for Commonwealth Inc. v. Rivenburgh, 317 F.3d 425, 436 (4th Cir. 2003)

16  (vacating district-wide injunction); Meinhold, 34 F.3d at 1480 (vacating nationwide injunction); cf.

17  Horne v. Flores, — U.S. —, 129 S. Ct. 2579, 2606-07 (2009) (finding statewide injunction improper

18  for violation involving one school district).[13]/ Here, though Plaintiffs seek a nationwide injunction,

19  they have brought forth only one individual organic chard and table beet seed grower who is near

20  RRSB seed crop fields–Frank Morton.  As discussed above, Mr. Morton has had no positive genetic

21  tests of his Beta seeds.  Plaintiffs have not established standing regarding any area outside of the

22

23  _____

    [13]/     This principle serves several purposes.  First, it reflects the Article III limitation that restricts
24  judicial power to particular "cases" and "controversies," i.e., where a plaintiff suffers "concrete and
    particularized" harm.  Summers v. Earth Island Inst., __ U.S. __, 129 S. Ct. 1149 (2009).  Plaintiffs
25  who do not suffer nationwide injuries have no standing to seek nationwide relief.  Conservation Law
    Found. of New England, Inc. v. Reilly, 950 F.2d 38 (1st Cir. 1991).  Second, it promotes comity
26  interests among the federal circuits.  When a court grants a nationwide injunction unnecessarily, the
    deciding court improperly "impose[s] [its] view of the law on all of the other circuits."  See Va.
27  Soc'y for Human Life, 263 F.3d at 394.  Third, it minimizes non-reciprocal impacts on non-litigants.
    See generally United States v. Mendoza, 464 U.S. 154, 160 (1984).
28

1   Willamette Valley that could form the basis of broad injunctive relief.  See Summers, 129 S. Ct. at

2   1151; Friends of the Earth, 528 U.S. at 181-84 (2000).

3       Because of APHIS's regulatory history involving sugar beets, APHIS is uniquely situated

4   to offer a proposed remedy for implementation until the Court resolves the remedy issue it will hear

5   in June 2010.[14]/  APHIS's proposal reflects the reasoned input of its experts regarding cross-

6   pollination risks, and deserves the deference of the Court.  See, e.g., Idaho Watersheds Proj. 307

7   F.3d at 831 (upholding district court's decision to reject "drastic" remedy argued by plaintiffs and

8   defer to agency expertise in adopting interim remedy crafted by the agency); see also Marsh v. Or.

9   Natural Res. Council, 490 U.S. 360, 378 (1989); Balt. Gas Co. v. Natural Res. Def. Council, 462

10  U.S. 87, 101, 103 (1983).  APHIS's proposal would avoid the drastic results of Plaintiffs' proposal

11  to disrupt the planting and processing of RRSB and the attendant adverse supply and price impacts.

12  Additionally, APHIS's proposed remedy would further USDA and Secretary Vilsack's desire that

13  production of GE crops should coexist with production of non-GE crops.  See Smith Decl. ¶ 9.

14      Accordingly, if the Court is inclined to issue preliminary injunctive relief, the Court should

15  give deference to and adopt the remedy the APHIS Administrator, Cindy Smith, has proposed in her

16  declaration, which would make mandatory the 4-mile WVSSA isolation distance that applies to

17  RRSB and related Beta species.  See Smith Decl. ¶ 25.  If the Court is inclined to adopt the remedy

18  APHIS proposes, APHIS respectfully requests an opportunity to submit a proposed order that will

19  outline details regarding how this proposed remedy could be enforced.

20                                    **CONCLUSION**

21      For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary

22  Injunction.  In the alternative, if the Court concludes that preliminary injunctive relief is warranted,

23  it should adopt APHIS's proposed remedy.

24

25      Respectfully submitted this 12th day of February, 2010.

26

27  _____

28  [14]/   After further discovery, APHIS may modify its proposal for any remedy that would be in
    effect until APHIS cures the NEPA defects this Court found.

FED. DEFS.' OPP'N TO PLS.' MOT. FOR PRELIM. INJ.                                    22

IGNACIA S. MORENO
Assistant Attorney General

/s/   Beverly F. Li
BEVERLY F. LI
LUTHER L. HAJEK
Trial Attorneys
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel.: (202) 353-9213 (Li)/ (202) 305-0492 (Hajek)
Facsimile: (202) 305-0506
Beverly.Li@usdoj.gov
Luke.Hajek@usdoj.gov

TONY WEST
Assistant Attorney General
JOHN R. GRIFFITHS
Assistant Director, Federal Programs Branch
JOHN R. COLEMAN (Va. Bar # 70908)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2010, I electronically filed the foregoing (1) FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, with the Clerk of Court using the CM/ECF system, which will automatically send email notification to the following attorneys of record:

Kevin Z. Golden
Paul H. Achitoff
Gregory C. Loarie

Attorneys for Plaintiffs

Philip J. Perry
Christopher H. Marraro
Gilbert S. Keteltas
Holly J. Tate
Janice M. Schneider
John F. Bruce
Rachel G. Lattimore
David J. Lazerwitz
Nancy Bryson
Harry Zirlin
Walter Edmiston
Joanne Lichtman
Daniel Bukovac

Attorneys for Intervenor-Defendants

**Served by First Class Mail:**

Paige Michele Tomaselli
Center for Food Safety
2601 Mission St., Suite 803
San Francisco, CA 94110

Attorney for Plaintiffs

J. Thomas Carrato
Monsanto Company
Mail Zone EINH
800 N. Lindbergh Blvd.
St. Louis, MO 63167-0001

Stanley H. Abramson
1050 Connecticut Avenue NW
Washington, DC 20036

Attorneys for Intervenor-Defendants

/s/   _Beverly F. Li_
Beverly F. Li
Counsel for Federal Defendants