UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| CENTER FOR FOOD SAFETY, *et al.*,  )<br>)<br>)<br>)<br>    Plaintiffs,  )<br>)<br>        v.  )<br>)<br>THOMAS J. VILSACK,  *et al.*,  )<br>)<br>    Defendants.  )<br>) | Civ. No. 08-CV-00484 (JSW) |

### **DECLARATION OF DANIEL COLACICCO**

I, Daniel Colacicco, declare and state the following:

1. I make the following representations based upon my personal knowledge and upon facts made known to me in my capacity as an official of the Farm Service Agency (FSA) of the United States Department of Agriculture (USDA).

2. I serve as the Director of the Dairy and Sweetener Analysis Group (DSA). DSA is the FSA's primary analytical resource for formulating, developing, analyzing, and evaluating national program policies for dairy, livestock, and sweeteners (sucrose from sugarcane and sugar beets, and honey). DSA produces a broad range of analysis assessing USDA commodity program and policy effectiveness, and it provides detailed summaries of impacts on commodity supply, demand, price, income, and Commodity Credit Corporation (CCC), USDA, outlays. To keep the agricultural sector informed and to support USDA administrators and policymakers throughout the Government, DSA collects primary data from the sugar and honey producers and publishes periodic summaries; develops and maintains a comprehensive data base and efficient

retrieval system for assigned commodities to improve the analytical support and streamline the decision making process for policy planning; and monitors, analyzes, projects, and reports developments related to sweeteners such as stocks, production, utilization, prices, income and other aspects of potential interest to policy officials.

    3. I have been in this position for approximately 10 years. I received a B. A. in Economics at the University of Maryland in 1973 and I received a Ph.D. in Agricultural Economics at the University of Maryland in 1980. I have been employed as a professional agricultural economist at USDA for over 31 years. Prior to my current position I was an agricultural economist in the Dairy and Sweetener Analysis Group for 6 years. I oversaw the collection and publication of monthly data on sugar, forecast federal costs and revenues from dairy price support and sugar loan programs, and conducted the economic analyses to establish purchase prices for dairy products under the milk price support program and establish statutory sugar loan rates and minimum grower payments. I drafted the sugar price support program regulations and prepared Decision Memorandums, Federal Register Notices, Benefit-Cost Analyses, and Environmental Assessments required to modify dairy and sugar policy and regulations. I was an agricultural economist in the Natural Resources Analysis Division, FSA, for 3 years developing and analyzing FSA's conservation programs. I was an agricultural economist with the Economic Research Service, USDA, for 12 years, where I analyzed the economic and environmental impacts of waste management technologies, acreage reduction programs, and conservation programs. I wrote over 30 articles for journals, books, periodicals, and research reports from 1976 to 1988. I make about 8 presentations a year to various sugar industry groups on the U.S. sugar program and the state of the U.S. sugar market. I have attached a copy of my curriculum vitae as Attachment 1.

## Description of the Domestic Sugar Market

4. The United States meets domestic refined sugar demand by 1) producing refined sugar from domestic sugar beets, 2) refining raw cane sugar produced by domestic and foreign sugarcane processors, and 3) importing refined cane sugar from other countries. Sugar beets are processed directly into refined sugar, but sugarcane is processed into raw cane sugar, which must be further refined by cane refineries.

5. Roughly 44 % of the domestic refined sugar supply comes from sugar beets. Refined sugar from sugar beets is the product of a four-year cycle and involves beet seed suppliers, sugar beet growers, sugar beet processors, sugar users and consumers. Beet seed suppliers plant the commercial sugar beet seed crop in the Fall of Year 1, which produces the commercial seeds harvested in the Fall of Year 2. The commercial seed is processed over winter and sold to sugar beet growers who plant it in the Spring. Sugar beet growers harvest the beets (roots) in the Fall of Year 3 and deliver to beet processing facilities owned by the beet processors. Beet sugar is extracted by beet processors beginning in the Fall of Year 3 and throughout Year 4. The sugar produced from these beets is purchased by food manufacturers and consumers throughout Year 4. For example, the commercial seed crop planted in the fall of 2009 will be harvested for commercial seed in the fall of 2010. It will be processed over the 2010-2011 winter and planted in the spring of 2011 for sugar beet (root) production. The 2011 beet crop is harvested in the fall of 2011, processed, and becomes the refined sugar supply for fiscal year (FY) 2012, which runs from October 1, 2011 through September 30, 2012

6. In the United States, all beet processors are structured as cooperatives, owned by growers who share in the net returns of the processing and sale of sugar produced from their

sugar beets. These cooperatives process the beets into refined sugar and deliver it incrementally throughout the year to a variety of users such as food manufacturers (bakeries, dairy products, beverages, confectionery) and middlemen (hotels, restaurants, wholesale, retail, supermarkets). Generally, beet processors enter into contracts with sugar users for their expected beet sugar supply roughly 6 months to a year before the sugar is physically available.

7. Most refined sugar (76%) is packaged in bulk for sale to food manufacturers. The remaining 24% is packaged for sale to individual consumers.

8. Of the 2009 sugar beet (root) crop planted in the Spring, 95 percent was reported to be planted from Roundup Ready Sugar Beet seed (RRSB). RRSB were most likely comingled in beet piles with conventional beets upon harvest. Therefore, virtually all of the 4.4 million tons of sugar expected to be derived from sugar beets in FY 2010 will include sugar processed from RRSB. This 4.4 million tons represents approximately 42% of the U.S. domestic sugar supply for FY 2010.

9. USDA is already projecting a tight FY 2010 world and domestic sugar market. World and domestic sugar prices are currently at 30-years highs. The world refined price is currently at 33 cents per pound, which is twice the past 5-year average of 17 cents per pound. The U.S. refined sugar price is currently at 53 cents per pound, compared to the past 5-year average of 32 cents per pound. U.S. domestic cane sugar refiners are expected to provide 5.6 million tons of refined sugar from raw cane sugar in FY 2010. This represents about half the total domestic refined sugar supply. U.S. cane refiners could not fill the void in FY 2010 if sugar beet processors were enjoined from selling sugar because cane sugar refiners are currently expected to run near full capacity in FY 2010 to meet demand. Refined sugar from world markets would

have to make up the shortfall.

10. The domestic sugar market is closely managed by USDA's sugar program and therefore not governed solely by supply and demand. USDA controls domestically produced sugar through the Flexible Sugar Marketing Allotment Program and foreign imports through the raw and refined sugar tariff-rate quotas (TRQs). Unlimited amounts of refined sugar can be imported under the high duty, 16.3 cents per pound. USDA is required by section 156 of the Federal Agriculture Improvement and Reform Act of 1996, as amended by the Food Conservation, and Energy Act of 2008 (the Farm Bill) and the Harmonized Tariff Schedule of the United States (HTS) to establish a range of acceptable market conditions – maintain a price floor in potentially oversupplied situations by removing surplus supply and maintain "adequate supply" in potentially undersupplied market situations. The minimum raw and refined sugar prices that the sugar program must support are the levels which would cause sugar beet and sugarcane processors to forfeit their sugar put up as collateral under the USDA sugar nonrecourse loan program. Sugar nonrecourse loans support raw cane sugar prices at 21 cents per pound and 24 cents per pound for refined beet sugar. The nonrecourse loans support price because forfeiting the sugar collateral completely extinguishes the borrower's debt, thus sugar beet and sugarcane processors are assured of getting at least the USDA loan proceeds for their sugar. Loan collateral forfeiture also removes surplus sugar out of the market because the government is limited by the Farm Bill in its sugar disposal options. At the other end of the range, the objective of maintaining "adequate supply" (Farm Bill) or "adequate supply at reasonable prices" (HTS) requires USDA to increase supply under tight markets, which will make domestic prices lower than they would otherwise be. However, there is no maximum

sugar price concept stipulated in federal law as there is a minimum sugar price. Under the Flexible Sugar Marketing Allotments Program, the sugar beet processors are guaranteed a market share of 46 percent of the domestic market. If the sector cannot fulfill its quota, USDA is required to increase imports to maintain adequate supply.

11. Because the federal government has a major effect on sugar supply, and hence sugar price, the market reaction to a reduction in refined beet sugar is somewhat determined by USDA's supply management response. USDA has recently reacted to two similar, albeit smaller, events that can be compared to the supply reduction that would occur if a preliminary injunction were granted against RRSB.

12. Example 1: In August 2005, the refined market was disrupted by the failure of the early sugar beet crop in the Red River Valley, on the border of North Dakota and Minnesota, and the closing of two cane refineries in New Orleans due to Hurricane Katrina. The loss of refined sugar supply was estimated at 110,000 tons of beet sugar and 50-100,000 tons of refined cane sugar, for a total refined sugar loss of 160,000 – 210,000 tons (Cornell and Colacicco, 2006). However, USDA took immediate action and increased the domestic marketable supply of refined sugar by 300,000 tons and increased the raw sugar supply for the remaining refineries by 84,500 tons. In spite of increasing the domestic sugar supply by more than the lost sugar, refined sugar prices averaged 57 percent higher in the quarter following the disaster than the quarter before the disaster, increasing from 25 to 39 cents per pound. Prices stayed elevated throughout FY 2006 until USDA increased the sugar TRQs and the sugar beet forecast increased substantially in late Summer 2006.

13. Example 2: In February 2008, an explosion at Imperial Sugar's Port Wentworth

(Savannah, Georgia) plant reduced U.S. raw sugar refining capacity by 566,000 tons or 9 percent of annual domestic refined sugar demand. The factory remained down until June 2009 and has only been operating sporadically and at a fraction of its capacity since. Refined sugar prices increased by 46 percent to 38 cents per pound and have remained relatively high since. USDA did not anticipate a shortage at the time of the explosion as refined sugar stocks peak in February. However, in August 2008, when refined sugar stocks were at their minimum, USDA increased refined sugar supply with a sugar import increase of 225,000 tons.

      14. With world market prices currently at 30-year highs, price impacts from shortages would likely be more dramatic than in the past. World sugar production is currently projected to fall short of expected use by 8 million tons in FY 2010 due to poor crop conditions in other countries. While Brazil is the most promising supplier, it is estimated that 85 percent of its crop is already contracted, leaving limited stocks available to flow northward for FY 2010. World stocks were also reduced in FY 2009 as sugar consumption exceeded production, which is also expected to be the case in FY 2011.

### The Harm if Already Harvested Sugar Beets Cannot be Refined or Sold
### (Root crop harvested in 2009 (FY 2010 sugar sales))

      15. Of the sugar beet (root) crop planted in the Spring of 2009 and harvested in the Fall of 2009, it is anticipated that by end February 2010, 40 percent will already have been processed into refined sugar and delivered to sugar users. Around 90 to 95 percent of this crop's sugar has already been contracted for sale. If enjoined, all the remaining sugar beets that have not been processed by the commencement of the injunction could not be processed into refined sugar. Likewise, all the beet sugar in inventory at the time of the injunction could not be sold. Assuming an injunction commences March 1, 2010, an estimated 2.6 million tons of beet sugar

would be removed from the market. This sugar is expected to supply about 42 percent of U.S. sugar consumption during the remainder of FY 2010, which ends on September 30, 2010. Because sugar is mainly used in small quantities as an ingredient in the manufacture of many food products, the demand in the short run is relatively insensitive to price and assumed not be affected in FY 2010 (GAO reports).

16. Sugar beet growers will experience a tremendous hardship because growers have already incurred all the costs of planting and harvesting the 2009 crop, and the bulk of the cost of processing the sugar beets into refined beet sugar. Furthermore, the sugar beets not yet processed and beet sugar that is currently held in storage would have to be safely disposed. We estimate it would cost $423 million to dispose in a landfill the banned sugar and beets produced from the 2009 crop. This estimate does not include the disposal costs of seed or seed producing sugar beet plants.

17. Prohibiting the sale of 2.6 millions tons of beet sugar for the remaining 7 months of FY 2010 would cause sugar beet growers great harm, with lost revenue estimated at $1.9 billion (2.6 million tons X .359 $/lb X 2000).

18. Sugar beet processing factories, and the local economies organized around them, would also experience significant hardship. If beet processing factories were enjoined from purchasing, processing, or selling sugar from RRSB beets harvested in the fall of 2009, the sugar beet processing factories would be idled. If factories were idled, thousands of jobs would be lost and the livelihoods of many rural communities would be at stake.

19. An injunction would also cause greater disruption and greater harm to the U.S. sugar market than the situation caused by the FY 2005 or FY 2008 disruptions described previously.

The reduction, 2.6 million tons, is 10 times larger than the loss of supply in FY 2005 and 5 times larger than the loss in FY 2008. Prices increased substantially in those years, but were never high enough to cause sugar to be imported off the world market at the high tariff rate of 16.3 cents per pound. Under this enjoined scenario, it is anticipated that world sugar would enter under a high tariff, and set the refined price in the U.S. market. With the sudden shortage of sugar in the U.S. market, the world refined sugar price would likely jump by 250 percent to an estimated 85 cents per pound in order to divert sugar to the U.S from already contracted destinations.

20. If sugar from RRSB beets grown and harvested in 2009 was not marketable, beet processors could not deliver on their contracts and would likely declare force majeure, as happened in the 2005 and 2008 disruptions. Sugar users and consumers would lose an estimated $4 billion from having to pay an extra 76 cents per pound on the 2.6 million tons. Sugar users and consumers would not have access to the lower priced beet sugar contracted months earlier and would have to write new contracts, in a much tighter sugar market, with new suppliers. Sugar users could be expected to pay around $1.12 per pound, which is the expected world refined price plus the cost of transportation and the cost of product modification necessary to be suitable for American users. A 5-pound bag of sugar at the grocery store that normally costs a consumer $2 to $2.50, at the usual refined sugar wholesale cost of 25 cents/lb., would be expected to cost the consumer between $7 and $8, at a sugar wholesale cost of $1.12 per pound. The stocks on the grocery shelves would likely be empty due to the lack of supply and the higher price of carrying sugar inventory. It is unlikely that the U.S. could immediately replace the beet sugar prohibited from sale, so some sugar-containing product factories would have to close

temporarily, shorting the market for sugar containing products and consumer packaged products. Food manufacturers rely disproportionately on beet sugar, as opposed to cane sugar, and therefore the supply of sugar products would be affected immediately.

21. Because U.S. sugar cane refiners are expected to run at near full capacity in FY 2010, they will not have the capacity to refine imported raw cane sugar to replace the 2.6 million tons of beet sugar lost. Normally, USDA would increase the raw sugar TRQ to alleviate domestic sugar shortages. However, in FY 2010, domestic needs for sugar would have to be filled by increasing refined sugar imports. But this would be extremely challenging due to the limited world sugar processing capacity and the uncertain capability of foreign producers to supply refined sugar of the quality and packaging needed by American sugar users. In order to meet the 2.6 million ton shortfall, refined sugar imports would have to increase 4 fold from of an average of 690,000 tons over the past 3 years. This increase in refined sugar imports may tax the current refined sugar distribution system. For example, the 2.6 million tons would require over 150,000 containers on at least 200 ships by the end of September 2010.

22. Even if sugar could be attained from the world market, USDA learned from the temporary loss of cane refineries in 2005 and 2008 that many U.S. food manufacturers have difficulty using imported refined sugar due to the difference in product quality or packaging. After the 2005 and 2008 events, a new business developed -- liquefying and clarifying imported refined sugar for domestic use. This was required because domestic food companies would not use the crystallized imported sugar in their original packaging. This effort expanded domestic refined supplies at a cost, but only for users that could use liquid sugar. Most sugar users, i.e. food manufacturers, need crystallized sugar. Many domestic food manufacturing companies

10

perform sugar processing plant inspections to ensure that the quality of sugar meets their specific requirements. With the tight supply in the world market, it would be difficult to secure the quality of sugar that U.S. manufacturers require in the amounts that would be needed if an injunction is imposed on beet sugar processed from RRSB.

**The Harm if the 2010 Planting of Round Up Ready Sugar Beets Root Crop Were Enjoined (planting of seeds harvested in 2009 for the 2010 root crop (FY 2011 sugar sales))**

23. Prohibiting the planting of RRSB seed in 2010 in addition to prohibiting the processing and sale of sugar processed from the Roundup Ready sugar beets would cause substantial harm to domestic sugar beet producers, processors, sugar users and consumers.

24. Domestically-produced conventional (non-Roundup Ready) beet seed is in short supply because domestic seed companies have greatly reduced production of conventional beet seed in recent years. In addition, beet seed is tailored to specific geographic regions of the United States for disease-resistance and other reasons.

25. Foreign beet seed is generally not suitable for commercial production in the United States. There has not been extensive multi-year trial testing in the U.S of the beet seed produced in the European Union (EU) or elsewhere to determine if that seed meets the standards of beet processors. Further, U.S. producers have resisted using European beet seed due to the risk of weed beet contamination

26. If an injunction is placed on the use of RRSB seed, limits on the availability of conventional seed would severely restrict the planting of sugar beets in 2010. Based on estimates provided by Intervenors, who have access to information from sugar beet seed producers and buyers, we estimate that prohibiting the use of RRSB seed would reduce projected sugar beet area by 60.2 percent in 2010. Based on that estimate, the drop in area planted for

sugar beet production would lower beet sugar production by an estimated 2.6 million tons in FY 2011 (lost acreage with unchanged yields and unchanged sugar recovery).

    27. An injunction preventing the planting of GE seed in Spring of 2010 would raise the price of refined sugar in the United States market and the consumer expenditures on sugar-containing products. The United States refined sugar price would be expected to rise to 64 cents per pound in FY 2011, which includes transportation and product modification costs necessary to be suitable for American users, from 36 cents per pound expected under the base (unenjoined) scenario. The price impact is not as strong as in FY 2010 because FY 2011 world and domestic sugar demand would be expected to decline much more in FY 2011 than in FY 2010. Unlike FY 2010, sugar users have some time to reformulate their products to reduce sugar content and costs. The price effect is also smaller in FY 2011 than FY 2010 because in FY 2010, many sugar users and consumers will not have to pay the much higher price, since many food processors have fixed price contracts that are not affected by the U.S. decline in beet sugar supply in FY 2010. However, as contracts are written for FY 2011, all sugar users will face the tighter supply and higher prices. Thus there is greater opportunity and need to use less sugar than in FY 2010. U.S. sugar use is expected to decline by 4 percent from the expected 10.7 million tons (USDA baseline), or a reduction of 400,000 tons since U.S. some users are expected to switch to cheaper, alternative sweeteners. However, the switch to other sweeteners is expected to be slowed by consumer preferences. Recently, some major sweetener users have either switched or are in the process of switching from high fructose corn syrup (HFCS) to sugar as the sweetening agent in their production processes, despite a large and almost 2-year increase in refined sugar prices. Assuming refined sugar imports could supplement the beet sugar shortfall, estimated at

2.6 million tons, food manufacturers and consumers would be expected to pay an additional $5.6 billion for their refined sugar in FY 2011. The FY 2011 cost to sugar users is larger in FY 2011 than in FY 2010 because in FY 2011 all refined sugar (even refined cane sugar) is subject to the higher price, whereas in FY 2010, only sugar users with FY 2010 beet sugar contracts have to pay the higher price. Shortages of sugar and sugar-containing products would be expected to occur in FY 2011 until the supply chain and sugar users could adjust to the larger refined sugar imports required.

28. For FY 2011, beet growers/cooperatives would lose $1.0 billion in sales if 2.6 million tons of sugar were lost to the marketplace due to the prohibition on RRSB seed. This would be less than the loss suffered in FY 2010 because in FY 2011 growers would receive the elevated price on the sugar they can produce. The billion dollars in grower income losses would be partly offset by an estimated $261 million in sales from planting alternative crops.

29. An injunction on planting the 2010 root crop would significantly affect rural communities. A 2004 study by the University of Idaho found that if sugar beet production and processing ceased in Idaho and alternative crops were planted instead, Idaho would lose over 3,000 jobs and farm incomes would decline (given returns to corn, wheat, and other production options based on 2004 projections). Sugar beet growers generally produce other crops, and their land would not remain idle; they have the equipment and expertise to produce other crops. The longer-term concern, however, is in terms of the impact on infrastructure, as some companies may not survive closing down for one season.

**The Harm if the 2010 Harvesting of Round Up Ready Sugar Beet Seed Crop Were Enjoined (harvesting seeds planted in 2009 for the 2011 beet crop (FY 2012 sugar sales))**

30. If an injunction is placed on the RRSB commercial sugar beet seed harvest in 2010, then the limited availability of conventional seed will severely restrict plantings of sugar beets in 2011 and sugar production in FY 2012. Based on estimates provided by Intervenors, who have access to information from sugar beet seed producers and buyers, we estimate that prohibiting the harvest of RRSB seed in 2010 would reduce projected sugar beet area by 65.2 percent in 2011. Based on that estimate, the drop in area planted for sugar beet production would lower beet sugar production by an estimated 2.8 million tons in FY 2012 (lost acreage with unchanged yields and unchanged sugar recovery). The economic impact of a reduction in beet sugar supply on consumer costs and grower incomes in FY 2012 would be severe. However, the severity would be mitigated depending to the degree that sugar users respond by switching to non-sugar sweeteners. Since this impact will occur 2 years from now, manufacturers will have time to adjust their formulas to reduce their sugar use and reduce manufacturing costs. FSA estimates that U.S. demand will fall 7 percent due to the higher sugar costs because of shifting consumer preference for non-HFCS products.

31. If RRSB seed could not be planted in 2011, the FY 2012 U.S. refined sugar price would be expected to rise from 36 cents per pound to 61 cents per pound, which includes transportation and product modification costs necessary to be suitable for American users. The price rise is less than expected in FY 2010 and FY 2011 because the world price increase would result in a greater decline in world sugar demand over 2 years, as sugar users and consumers switch to alternative sweeteners or use less sweetener. With total FY 2012 deliveries forecast at

10.1 million tons under the enjoined scenario, users and consumers would pay an additional total of $4.6 billion for sugar in FY 2012.

32. In FY 2012, sugar beet growers and their cooperatives would lose an estimated $1.3 billion in sales offset by an estimated $283 million in revenues of alternative crops. The sales loss is greater in FY 2012 than FY 2011 because the growers plant less acreage because of reduced seed availability and sugar prices are expected to be slightly lower.

33. A summary of the projected costs from an injunction on the planting, processing and use of GE sugar beets on sugar beet growers and sugar consumers over the next three years is set forth in the chart below.

|  | Total Revenue loss to Beet Growers | Additional User Costs | Cost of Disposal of FY10 Crop | Market Value of Other Crops Harvested - Gain to Beet Growers | Cumulative Net Harms |
|---|---|---|---|---|---|
|  | ($ billions) | | | | |
| FY 2010 | 1.87 | 3.96 | 0.42 | - |  |
| FY 2011 | 0.96 | 5.56 | - | 0.26 |  |
| FY 2012 | 1.33 | 4.57 | - | 0.28 |  |
| Loss Totals | 4.16 | 14.09 | 0.42 | 0.54 | 18.14 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of February, 2010, in Washington, D.C.

_____
Daniel Colacicco

15