KEVIN Z. GOLDEN, State Bar No. 233378
Center for Food Safety
2610 Mission Street, Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Email: kgolden@icta.org

PAUL H. ACHITOFF (Admitted Pro Hac Vice)
Earthjustice
223 South King Street, Suite 400
Honolulu, HI 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: pachitoff@earthjustice.org

GREGORY C. LOARIE, State Bar no. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR FOOD SAFETY, *et al.*, | ) Case No.: 3:08-cv-0484-JSW |
| Plaintiffs, | ) PLAINTIFFS' REPLY IN SUPPORT OF ) MOTION FOR PRELIMINARY ) INJUNCTION |
| vs. | ) |
| TOM VILSACK, *et al.*, | ) |
| Defendants, | ) |
| and | ) |
| MONSANTO COMPANY; SYNGENTA SEEDS, INC.; AMERICAN SUGARBEET GROWERS ASS'N, *et al.*; BETASEED, INC.; and SESVANDERHAVE USA, INC. | ) ) ) ) |
| Defendant-Intervenors. | ) |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    INTERVENORS PURSUED A CALCULATED STRATEGY TO EXPAND
       ROUNDUP READY PRODUCTION FOLLOWING SUIT ...............................3

       A.     Plaintiffs Did Not Unreasonably Delay Filing Suit. .............................3

       B.     Industry Did Not Adopt Roundup Ready Sugarbeets Until Late 2007 ..................4

III.   INTERVENORS' SUPPOSED LACK OF 2010 OPTIONS IS A RUSE ..........................8

IV.    DEFENDANTS ASSUMED THE RISKS OF THEIR ACTIONS AND HAVE
       NO LACHES OR ESTOPPEL DEFENSE TO PROSPECTIVE RELIEF .....................10

V.     PLAINTIFFS ARE ENTITLED TO AN INJUNCTION ENJOINING ALL
       LIKELY, IRREPARABLE, IMMEDIATE HARM RESULTING FROM THE
       DEREGULATION ...............................................................................................14

       A.     The Scope Of Relief Is Not Limited To Willamette Valley Contamination .........14

       B.     Plaintiffs Have Standing To Obtain Broad Relief ...................................15

       C.     The Court Owes No Deference To APHIS ...............................................17

       D.     Loss Of Consumer Choice Is An Immediate Irreparable Injury. ...........................18

       E.     Contamination Has Already Occurred And Is Irreparable Harm ..........................20

       F.     Weed Resistance Is Irreparable and Immediate Injury ...........................................22

       G.     Cross-Pollination Is Immediate And Irreparable Harm ........................................22

VI.    CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

Amoco Production Co. v. Village of Gambell,
480 U.S. 531 (1987)..................................................................................1, 23

Andrus v. Sierra Club,
442 U.S. 347 (1979)..........................................................................................1

Califano v. Yamasaki,
442 U.S. 682 (1979)........................................................................................16

Cantrell v. City of Long Beach,
241 F.3d 674 (9th Cir. 2001) ..........................................................................14

Center For Food Safety v. Johanns,
451 F. Supp. 2d 1165 (D. Haw. 2006) ............................................................17

Diamontiney v. Borg,
918 F.2d 793 (9th Cir. 1990) ..........................................................................22

Golden Gate Restaurant Ass'n v. City and County of San Francisco,
512 F.3d 1112 (9th 2008)................................................................................13

Grand Canyon Trust v. Tucson Elec. Power Co.,
391 F.3d 979 (9th Cir. 2004) ..........................................................................11

Ilio'ulaokalani Coalition v. Rumsfeld,
464 F.3d 1083 (9th Cir. 2006) ........................................................................15

Int'l Center for Tech. Assessment v. Johanns,
473 F. Supp. 2d 9 (D.D.C. 2007)....................................................................17

Jensen v. Western Irr. and Mfg., Inc.,
650 F.2d 165 (9th Cir. 1980) ..........................................................................13

Johnson v. Couturier,
572 F.3d 1067 (9th Cir. 2009) ........................................................................14

LGS Architects, Inc. v. Concordia Homes of Nevada,
434 F.3d 1150 (9th Cir. 2006) ........................................................................14

Lujan v. National Wildlife Federation,
497 U.S. 871 (1990)..................................................................................16, 17

Page

**FEDERAL CASES (Cont.)**

Menendez v. Holt,
128 U.S. 514 (1888)........................................................................................13

National Min. Ass'n v. U.S. Army Corps of Engineers,
145 F.3d 1399 (D.C. Cir. 1998)...................................................................17

National Parks & Conservation Ass'n v. Babbitt,
241 F.3d 722 (9th Cir. 2001) ...............................................................1, 7, 13

National Wildlife Federation v. National Marine Fisheries Service,
422 F.3d 782 (9th Cir. 2005) ........................................................................18

Neighbors of Cuddy Mountain v. U.S. Forest Service,
137 F.3d 1372 (9th Cir. 1998) ......................................................................12

Ocean Advocates v. United States Army Corps of Engineers,
402 F.3d 846 (9th Cir. 2005) ..................................................................11, 15

Portland Audubon Soc'y v. Lujan,
884 F.2d 1233 (9th Cir. 1989) ......................................................................11

Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA,
415 F.3d 1078 (9th Cir. 2005) ......................................................................18

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989).........................................................................................1

Seattle Audubon Soc'y v. Evans,
771 F. Supp. 1081 (W.D. Wash. 1991)........................................................18

South Fork Band Council Of Western Shoshone Of Nevada v. U.S. Dept. of Interior,
588 F.3d 718 (9th Cir. 2009) ..................................................................24, 25

Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix,
283 F.3d 877 (7th Cir. 2002) ........................................................................12

U.S. v. Oakland Cannabis Buyers' Co-op.,
532 U.S. 483 (2001).........................................................................................1

**UNPUBLISHED FEDERAL CASES**

Geertson Seed Farms v. Johanns,
2007 WL 1302981 (N.D. Cal. May 03, 2007)........................................17, 23

1

**UNPUBLISHED FEDERAL CASES (Cont.)**

2

Geertson Seed Farms v. Johanns, No. C 06-01075,
   2007 WL 518624 (N.D. Cal. Feb. 13, 2007) ........................................17, 21, 23

3

In re Genetically Modified Rice Litigation,
   Case No. 406MD1811, 2009 WL 3281928 (E.D.Mo., Oct. 9, 2009)................24

4

5

Northwest Environmental Advocates v. U.S. E.P.A.,
   2006 WL 2669042 (N.D. Cal. Sept. 18, 2006) ........................................16, 23

6

7

**CODE OF FEDERAL REGULATIONS**

8

7 C.F.R. § 205.105(e)........................................................................................24

9

10

**FEDERAL RULES OF CIVIL PROCEDURE**

11

F.R.C.P. 34.........................................................................................................22

12

**FEDERAL REGISTER**

13

APHIS, Draft Environmental Impact Statement; Determination of Regulated Status
   of Alfalfa Genetically Engineered for Tolerance to the Herbicide Glyphosate,
   75 Fed. Reg. 1585-86 (January 12, 2010).........................................................15

14

15

16

**FEDERAL PRACTICE AND PROCEDURE**

17

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure
   § 2948.1 (2d ed.1995).........................................................................................20

18

19

20

21

22

23

24

25

26

27

28

I.      INTRODUCTION

The Court in addressing plaintiffs' motion for injunctive relief must "focus[] … on the underlying substantive policy the process was designed to effect." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 544 (1987). "[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *U.S. v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (citation omitted). "'Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is ... for the courts to enforce them when enforcement is sought.'" *Id.* (citations omitted). "Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all." *Id.* at 497-498 (footnote omitted).

The National Environmental Policy Act "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Preparation of an Environmental Impact Statement also "gives the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,' and, perhaps more significantly, provides a springboard for public comment." *Id.* (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983)). "Where an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001). "An environmental impact statement is more than a disclosure document.  It <u>shall</u> be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." *Andrus v. Sierra Club*, 442 U.S. 347, 351 n.3 (1979) (quoting 40 C.F.R. § 1502.1) (emphasis added).  It should

"not be used to rationalize or justify decisions already made." *Id.* (quoting 40 CFR § 1502.5) (emphasis added).

Defendants would gut the law and toss the public a bone—an after-the-fact EIS describing the environmental and related socioeconomic impacts that could have been prevented had federal defendants complied with the law and made an informed decision as to whether, or how, to deregulate Roundup Ready sugarbeets.  As if to underscore plaintiffs' point, federal defendants make a stunning assertion: "The situation here is unlike [*Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983)] because APHIS has already decided to deregulate [Roundup Ready sugar beets] and did so years earlier in 2005."  F.Defs' Opp. at 6.  Defendants thus announce that as far as they are concerned, the EIS will be a mere formality, making a mockery not only of NEPA but of this Court's order that "APHIS must prepare an EIS before approving the petition to deregulate Roundup Ready Sugar beets."  9/21/2009 MSJ Order at 14 n.4.

Defendants argue that because intervenors made a strategic business decision to persist in planting a crop being challenged in court, this Court now should disregard NEPA's basic purpose.  To make less offensive their argument that the public must be burdened so intervenors may profit from an unlawfully deregulated, unexamined crop, defendants portray the sugar industry as a victim, as though plaintiffs had forced intervenors to grow Roundup Ready sugarbeets, or as though defendants had just now been surprised to discover plaintiffs objected to the deregulation from the outset and filed this lawsuit over two years ago, asking for an injunction.

As will be shown, notwithstanding their representations to the contrary, intervenors have enough conventional seed to plant the 2010 sugarbeet crop.  To whatever extent this would be inconvenient for them, they strategically manufactured their current circumstances, and now try to deflect attention from their role in this charade by pointing the finger at plaintiffs in high

dudgeon, emphasizing the size of the problem they themselves created.  Plaintiffs had no reason to file suit any earlier than they did, nor anything to gain from delay.  The pre-litigation evidence, in intervenors' own words, shows intervenors took a calculated gamble that when this moment arrived—as they have known for over two years it would—the Court would give them a pass.  They then hid from the Court their options to produce a conventional crop.

## II.   INTERVENORS PURSUED A CALCULATED STRATEGY TO EXPAND ROUNDUP READY PRODUCTION FOLLOWING SUIT

### A.   Plaintiffs Did Not Unreasonably Delay Filing Suit.

Intervenors suggest that because plaintiffs did not run into court when the Event H7-1 sugarbeet was deregulated in 2005, the "equities" somehow preclude plaintiffs from obtaining effective relief.  This is legally and factually inaccurate.

Roundup Ready sugar beets were available in the late 1990s, but "[n]one of the processors, at that time, agreed to allow their growers to plant genetically-modified, herbicide-tolerant sugar beets."[1]  A competing herbicide tolerant sugarbeet ("Liberty Link") was subsequently deregulated, never commercialized, and shelved, due in part to widespread adverse publicity from the discovery that StarLink genetically engineered corn, which was not approved for human consumption, had found its way into a wide variety of supermarket products.[2]  Sugar processors "were nervous, their customers were nervous, and everyone was backing away from the engineered sugar beet."[3]  *See also* AR 2099 (deregulating Line 77 GE sugar beets); AR 2548 (deregulating Event T120-7 GE sugar beets).

[1] Exh. 20 to Achitoff decl. at 4 (quoting intervenor Duane Grant, Chairman of the Board of Snake River Sugar Co., parent of intervenor Amalgamated Sugar Co.).
[2] *Id.* at 4-5 (quoting Luther Markwart, Executive Vice President of intervenor American Sugar Beet Growers Association).
[3] *Id.* at 5 (quoting Markwart).

Reply in Support of  Motion for Preliminary Injunction
No. 3:08-cv-0484-JSW                                                                     3

The evidence discussed below demonstrates that until well into 2007, intervenors rejected Roundup Ready sugarbeets. Thus, not until intervenors shifted this position in later 2007 did plaintiffs have reason to believe that challenging the 2005 deregulation was necessary. Once industry sentiment shifted and the public became aware of it in late 2007, a few months before plaintiffs filed suit, the seed companies pushed farmers to buy Roundup Ready seed. After plaintiffs filed suit, intervenors sought to convert as quickly as possible, both for business reasons and to set up their estoppel arguments. The evidence shows these estoppel arguments are not only legally misguided, but disingenuous: defendants conceal from the Court their ability to greatly reduce, if not eliminate, their purported losses by planting a conventional 2010 crop.

B.    Industry Did Not Adopt Roundup Ready Sugarbeets Until Late 2007.

Much of intervenors' argument rests on their assertion that "[b]y 2007, roughly 95% of the Willamette Valley seed crop was already [Roundup Ready], and the sugarbeet industry had irretrievably committed to [Roundup Ready]." *Int. Opp.* at 5. Both statements are demonstrably false. The following timeline, in intervenors' own words, reveals where the equities lie.

In November 2006, the nation's largest beet sugar producer, intervenor American Crystal, publically sent a clear message: No Roundup Ready sugar beets. In a letter to its growers (also posted on its website) disclosing the results of its 2006 variety performance trials, it declared:

> Herbicide resistant varieties developed using biotechnology (GMO) will not be allowed to be sold, given away, distributed, or planted in year 2007. Data for biotech entries are not included since they are not approved for sale. [4]

Betaseed's and SESVanderHave's seed production records show that the large majority of their 2007 seed production was conventional, and that most of their seed fields were not planted with Roundup Ready crops until after suit was filed, in 2008.[5] Consequently, in

---

[4] Exh. 21 to Achitoff decl. at 1-2 (emphasis added).
[5] Exhs. 50 and 51 to Confidential Achitoff decl.

February 2007, intervenor Duane Grant commented, "there won't be <u>any</u> [Roundup Ready] seed available until 2008—and even then it won't be available in any significant quantities." Exh. 20 to Achitoff decl. at 5-6 (emphasis added).  Mr. Grant, a farmer, intended to move cautiously before deciding whether to invest in the new crop. *Id*. at 6.

On <u>June 27, 2007</u>, American Crystal's board of directors authorized its growers to plant Roundup Ready sugarbeets commercially for the first time, in 2008. Exh. 22 to Achitoff decl. at 11 (American Crystal Sugar Co. Form 10-K, filed Nov. 26, 2008).  Even by <u>August 2007</u>, American Crystal's support for Roundup Ready sugarbeets was far from enthusiastic.  Its bulletin, <u>Roundup Ready—Be Careful What You Wish For</u>, cautioned against deciding to convert to this new crop:

> "<u>[A]doption of this technology raises many more questions and concerns than just high cost at least for a few years until variety development progresses</u>.
>
> Variety selection decisions are going to be based on limited research trial information.  In 2006 only one "biotech" coded variety trial was harvested.  Up to 9 biotech trials will be harvested in 2007.  <u>Wise growers will make decisions on more information than just 2006 data.</u>

Exh. 23 to Achitoff decl. at 1 (emphasis added)

On <u>October 30, 2007</u>, American Crystal observed that the question whether to convert to Roundup Ready sugarbeets "will confront each grower in the <u>next 60 days</u>."  Exh. 24 to Achitoff decl. at 1 (emphasis added  It cautioned its growers against ordering "blindly" for 2008 to "avoid unnecessary problems." *Id* .  Thus, only three months before plaintiffs filed suit, growers for the nation's largest beet sugar producer had yet to commit to converting to Roundup Ready sugarbeets—a decision they did not need to make until the end of the calendar year.

On <u>November 26, 2007</u>, the New York Times reported that some sugarbeet growers would plant Roundup Ready sugarbeets for the first time in spring of 2008.[6]  The article noted:

> Seven years ago, beet breeders were on the verge of introducing Roundup-resistant seeds.  But they had to pull back after sugar-using food companies like Mars and Hershey, fearing consumer resistance, balked at the idea of biotech beets.  Now, though, sensing that those concerns have subsided, many processors have cleared their growers to plant the Roundup-resistant beets next spring.
> …
> But so far it is sounding like the <u>quietest of revolutions</u>.
> …
> If … big food companies are now open to genetically modified sugar … they are <u>not talking about it</u>.  Both Hershey and Mars declined to comment.  "There's just nothing we have to say on the topic," a Mars spokeswoman said.  Many sugar refiners and seed developers also <u>refused to comment,</u> hewing to an <u>industrywide plan to coordinate the rollout of the genetically engineered beets and carefully control what is said about them</u>.
>
> When it comes to genetically modified crops, there is a reason to keep one's corporate head low—to avoid protests.  Some opponents of biotechnology are <u>only now getting wind that the sugar beets have been resurrected</u>, and they have issued a call to arms.[7]

Plaintiffs filed this lawsuit less than two months later, on January 23, 2008, seeking injunctive relief.  On <u>February 15, 2008</u>—before both the 2008 root crop and much of the 2008 seed crop was to be planted[8]—intervenor American Sugarbeet Growers Association responded to news of the suit by urging: "Growers just need to continue to proceed as planned."[9]  Not until <u>April 30, 2008</u>—three months after suit was filed—did American Crystal announce: "Roundup

---

[6] Prior to 2008, Roundup Ready sugarbeets were grown on  limited acreage in Wyoming as a "test ground… before commercialization."  Exh. 25 to Achitoff decl. at 1.  *See also* Exhs. 26 and 27 to Achitoff decl.

[7] Exh. 28 to Achitoff decl. at 1-2 (emphasis added).  *See also* Exh. 29 to Achitoff decl. at 1 ("After seven years of keeping sugar from genetically modified sugar beets out of their food, Kellogg, Hershey's and the Wyoming based American Crystal Sugar will use sugar made from genetically modified (GM) beets.  <u>The decision marks a turnaround for Crystal Sugar, the nation's largest sugar producer, which declared in May of this year that it had no plans to use GM sugar beets</u>….") (emphasis added).

[8] Exhs. 50 and 51 to Confidential Achitoff decl.

[9] Exh. 30 to Achitoff decl.

Ready Era Begins."[10]  At this time, nearly two years ago, arguing that injunctive relief could harm their interests, industry moved to intervene.

Plaintiffs moved promptly for summary judgment.  The hearing, scheduled for September 2008, was continued numerous times, such that plaintiffs continually believed a hearing was only a few months away.  Intervenors had the same belief.  In their 2008 Form 10-K, American Crystal warned: "[I]if the Court restricts planting in 2009, <u>conventional varieties would need to be utilized</u> which would have a negative impact on our crop yields."[11] ██████████████

██████████████████████████████████████████

███████ ███████████████████████████████

██████████████████████████████████████

█████████████████████████ American Crystal hinted it was taking such "precautionary measures,"[15] but it has not shared them with the Court.

Nine months after suit commenced, on <u>September 25, 2008</u>, American Crystal revealed that "high pressure seed sales tactics" in 2007 caused a "rush to secure Roundup Ready seed for 2008." Intervenor "strongly encouraged" growers to "postpone 2009 seed orders until 2008 variety field performance can be verified and coded trial data is available.  <u>If ordering early keep your options open to change your selection as more data becomes available</u>."[16] Not until <u>July 2009</u> did intervenor SESVanderHave announce the first availability of its Roundup Ready seed.

---

[10] Exh. 31 to Achitoff decl.
[11] Exh. 22 to Achitoff decl. (emphasis added)
[12] Exh. 53 to Confidential Achitoff decl.
[13] *Id.*
[14] Exh. 52 to Confidential Achitoff decl.
[15] Exh. 22 to Achitoff decl.
[16] Exh. 32 to Achitoff decl. at 1.

It noted that "the selling season for 2010 planting" did not even begin until "October 2009."[17] Although this lawsuit was widely publicized in the industry, intervenors might have added that ordering seed for a crop being challenged in court is a risky business. *See National Parks & Conservation Ass'n,* 241 F.3d at 738 (cruise ship passengers who were not warned by the carrier of a lawsuit "were not well served by that company").

III.    INTERVENORS' SUPPOSED LACK OF 2010 OPTIONS IS A RUSE

On September 21, 2009, this Court ruled that Roundup Ready sugarbeets had been unlawfully deregulated, and plaintiffs announced they would soon be seeking an injunction in the remedy phase. Days later, intervenors acknowledged an injunction might affect the 2010 root crop, which would not be planted for another six or seven months. [18]

At this point the "selling season" for seed for the 2010 crop had not even begun. Growers still could "keep [their] options open" for several months before ordering sugarbeet seed for the 2010 planting season—including conventional seed.

On November 13, 2009—only three months ago—the headline in the agricultural trade weekly Capital Press, covering this lawsuit, declared:

**Non-GMO beet seed available**[19]

North Dakota State University Extension agronomist Jeff Stachler, who "specializes in sugar beets," was quoted:

> As I understand it, there is likely to be enough seed to plant all or nearly all of the sugar beet acres in the U.S. next year.[20]

---

[17] Exh. 33 to Achitoff decl. at 1 (emphasis added).
[18] Exh. 34 to Achitoff decl. at 1-2. *See also* Exh. 35 to Achitoff decl.
[19] Exh. 36 to Achitoff decl.
[20] *Id.* at 1.

Three weeks later, Capital Press reported: "Some in the industry have estimated that there may

be enough conventional beet seed in storage to cover most of the U.S. acreage next year if

Roundup Ready varieties are banned."[21]

This was not idle speculation. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

███████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████

█████████████████████████████████████

█████████████████████████████████████

██████████

*Id.* at 17, 25 (emphasis added).  Consequently, American Crystal's President/CEO assured its

growers:

> If the ruling does impact commercial beet production for the 2010 growing
> season, **we believe that sufficient supplies of conventional non-Roundup
> Ready seed should be available for 2010** for ACSC needs.   However these
> varieties may not be the most current or profitable seed available.  The Company
> has also been in communication with producers of herbicides for conventional

---

[21] Exh. 37 to Achitoff decl.

beets and <u>supplies of these chemicals should be adequate for next year's needs in case Roundup Ready plantings are not allowed</u>.

Exh. 38 to Achitoff decl. (emphasis added).   Intervenors are playing hide the ball.

At the <u>December 4, 2009</u> conference, plaintiffs reemphasized[22] their need for a prompt hearing and announced their intention to seek a preliminary injunction.  Intervenors responded by celebrating their decision to plant Roundup Ready sugarbeets in 2010.[23]  The day plaintiffs filed their motion for a preliminary injunction, intervenor American Crystal announced: "<u>Our legal team has been anticipating and preparing for this motion for months.</u>"[24]  Indeed, twenty-four months.  And American Crystal neglected to tell the Court that this preparation included a contingency plan allowing full conventional production.

Thus, the sugarbeet growers (encouraged by "high pressure seed sales tactics") chose repeatedly to order and plant Roundup Ready sugar beets during the litigation, while stockpiling conventional seed and herbicide it now denies exists.  As intervenor Grant noted, Roundup Ready seed was not even available in "significant quantities" in early 2008, when suit was filed.  If the seed companies actually did lack sufficient seed to plant the optimum acreage of conventional sugarbeets, it would only be because they chose, after suit was filed and even after summary judgment, not to hedge their bets.  But <u>they have the seed and can produce more</u>.

Playing out their charade, the seed companies argue they could not have been expected to prepare by producing conventional seed.  Syngenta sophistically posits the necessity of "produc[ing] two complete seed crops and doubl[ing] its processing capacity when one of those

---

[22] The Court continued the October 30, 2009 case management conference until December 4, 2009 to accommodate SESVanderHave's belated intervention motion.  Plaintiffs on October 22, 2009 sought leave to move to reconsider this delay, citing prejudicial events to occur in spring 2010.

[23] "Clearly, if you don't have a remedies hearing until June, it's pretty difficult to affect this (2010) year's crop."  Exh. 39 to Achitoff decl. at 1.

[24] Exh. 40 to Achitoff decl. (emphasis added).

crops would certainly be unusable." Meier decl., para. 38. *See also* Miller decl., para. 18 (similar

Betaseed argument). These transparent excuses are shown by American Crystal's contingency

plan to be smokescreens. Even intervenors admit viable seed may be stored for three years or

more. Miller decl., para. 42. More important, intervenors do have enough seed for 2010; they

simply do not want to reduce their profits by using it.

IV.   DEFENDANTS ASSUMED THE RISKS OF THEIR ACTIONS AND HAVE NO
      LACHES OR ESTOPPEL DEFENSE TO PROSPECTIVE RELIEF

        Plaintiffs seek only prospective relief. Yet intervenors ask not only that their conduct

(and resulting profits) for over two years be overlooked, but that it be allowed to continue

unabated, regardless of the legal violation and their available options. It is hardly inequitable to

enjoin intervenors from planting an unlawful crop to enforce Congress' intent.

        Analysis of the equitable defense of laches are applicable generally to the appropriate

equitable balancing in this proceeding. "Laches is strongly disfavored in environmental cases."

*Ocean Advocates v. United States Army Corps of Engineers*, 402 F.3d 846, 862 (9th Cir. 2005).

*See also Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989) ("We have

repeatedly cautioned against application of the equitable doctrine of laches to public interest

environmental litigation…. This approach has found unanimous support in the other circuits.").

*Portland Audubon Soc' y v. Lujan*, 884 F.2d at 1241 ("Laches must be invoked sparingly in

environmental cases because ordinarily the plaintiff will not be the only victim of alleged

environmental damage.").

        To establish laches, defendants must establish "(1) lack of diligence by the plaintiff, and

(2) prejudice to the defendant." *Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979,

987 (9th Cir. 2004). "A lengthy delay, even if unexcused, that does not result in prejudice does

not support a laches defense." *Id.* at 988. The evidence does not support defendants' indignant

rhetoric decrying unwarranted "delay" in filing suit. There was none. Plaintiffs filed suit a few

months after the industry's "turnaround."  Exh. 29 to Achitoff decl.  Although intervenors

suggest that once suit was filed, they were entitled to plant and grow Roundup Ready sugarbeets

and seed with impunity unless plaintiffs forced them to stop, the law is just the opposite.

Intervenors assumed the risks of their choices, and cannot now use them as a basis to avoid

prospective injunctive relief.  To estop plaintiffs from obtaining such relief, defendants must at

least prove they reasonably relied to their detriment on plaintiffs' purported conduct.  They did

not, as there was nothing on which intervenors could reasonably have relied.

Moreover, their self-inflicted economic concerns are not legally cognizable prejudice.

*Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1382 (9th Cir. 1998)

("[T]his is not the type of harm that is properly considered in a laches analysis.  Prejudice in

environmental actions is measured by "what Congress defines as prejudice. The primary concern

is whether the harm that Congress sought to prevent ... is now irreversible…. [B]ecause

[plaintiff] seeks only to halt further logging, it cannot be said that the harm it fears, the removal

of more trees, has become irreversible, or that the relief it seeks, an injunction, is

impracticable.")  "[T]his is not a case where a dam or nuclear power plant has already been

built."  *Id*. (citation omitted).

Intervenors have been engaged for two years in a calculated cat-and-mouse game, a

gamble.  Judge Posner points out, in the context of laches:

> An unsuccessful gamble is not a form of reasonable reliance.
> …
> [A] person who thought that because a store had failed to bill him for an item that
> he had bought he could go on buying there and never again have to pay a bill …
> would be a textbook case of unreasonable reliance.

*Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877,

884-885 (7th Cir. 2002).

Thus, even if there had been an "unreasonable delay," that still would not avail intervenors now, where plaintiffs seek prospective injunctive relief after defendants have long been on notice:

> A showing of laches alone is insufficient to bar a [plaintiff's] request for prospective injunctive relief or damages arising after the filing of the suit. The defendant must also prove estoppel by demonstrating representations or conduct by the [plaintiff] which justify a belief by the alleged infringer that the patent will not be enforced against him. The defendant must show that he actually relied on the misleading conduct to his detriment.

*Jensen v. Western Irr. and Mfg., Inc.*, 650 F.2d 165, 169 (9th Cir. 1980) (emphasis added).

Intervenors do not "have cause to claim surprise as a result of any injunction," *National Parks & Conservation Ass'n,* 241 F.3d at 738. They knew very well an injunction might be issued at any time; as noted, American Crystal disclosed the risks publicly back in 2008 and made contingency plans. Plaintiffs gave them no reason to assume they were home free. Intervenors throughout this litigation tried to see how fast they could seem to paint themselves into a corner to avoid an effective remedy. *See also Menendez v. Holt,* 128 U.S. 514, 523 (1888) ("Persistence, then, in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked.")   Intervenors' attempt to create a new "status quo" does not insulate them from injunctive relief. *Golden Gate Restaurant Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1116 (9th 2008) ("Maintaining the status quo is not a talisman…. 'If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury....  The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.'") (citation omitted).

Intervenors simultaneously complain plaintiffs' request for injunctive relief comes both too soon and too late—too late to stop them from the first part of their push to irrevocably monopolize the industry, and too soon because they would prefer to complete their strategy.

Intervenors continue to have choices they would prefer not to make.  Their litigation-inspired rush to transplant conventional pollinators into the seed production acreage neighboring Mr. Morton's farm in February 2010, Lehner decl., para. 18, to reduce his contamination risk; Betaseed's assurances that "when our commercial [seed] plantings in Oregon are completed by the middle of March, 2010, none of the pollinators will be carrying the Roundup Ready gene," Lehner decl., para. 15; and their contingency plan, all demonstrate that intervenors for years had seed production choices they exercised at least as late as "the middle of March," and that in 2010, they still have such choices—when it suits their litigation strategy.[25]

These last-minute shifts of seed production also demonstrate that what intervenors choose to do prior to this injunction hearing—which will occur before "the middle of March"—they may choose not to do, or may undo, afterwards.  Isolation distances are voluntary.  MSJ Order at 12.  The threat of contamination has not evaporated merely because intervenors are putting their best foot forward. *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1153-54 (9th Cir. 2006) (request for injunction not moot unless "absolutely clear" no future repetition); *see also Cantrell v. City of Long Beach*, 241 F.3d 674 678 (9th Cir. 2001) (NEPA defendants face "a particularly heavy burden in establishing mootness.").  Plaintiffs ask the Court to enjoin the planting of <u>any</u> Roundup Ready sugarbeet seed, because it perpetuates the unlawful cycle and all of its attendant risks, and further undermines the NEPA process.

---

[25]  Exh. 54 to Confidential Achitoff decl.  *See also* Exh. 41 at 2 to Achitoff decl. ("Transplanting [pollinators] is an option that also may occur in the early spring (Jan to March). Roots may be harvested from other commercial fields or special nurseries planted intentionally for transplanting."); Morton decl. filed 1/19/2010, paras. 19-20; Morton 2/3/2010 dep. at 240:14-247: 2 and 126:17-25, Exh. 42 to Achitoff decl. (Counsel's hearsay objection is without merit. The Court may consider hearsay in deciding a motion for preliminary injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)).

1  V.      PLAINTIFFS ARE ENTITLED TO AN INJUNCTION ENJOINING ALL LIKELY,
2          IRREPARABLE, IMMEDIATE HARM RESULTING FROM THE DEREGULATION

3          Defendants attempt to convert plaintiffs' burden to establish a likelihood of

4  environmental harm into imaginary obstacles.  They argue only the specific EIS-triggering

5  impacts the Court identified in its summary judgment order may be enjoined, and that only the

6  demonstrated harms to specific, identified plaintiffs may be enjoined.  Neither has merit.

7          A.      The Scope Of Relief Is Not Limited To Willamette Valley Contamination.

8          Defendants' attempt to restrict injunctive relief to cross-pollination in the Willamette

9  Valley applies a nonexistent legal principle to a misrepresentation of the Court's summary

10 judgment.  The Court's ruling was not, as defendants claim, "limited to gene transmission among

11 seed crops in the Willamette Valley." Int. Opp. at 11; see also Fed. Opp. at 13.  The Court noted

12 the potential for cross-pollination triggered the need for an EIS, but also expressly held: "[T]his

13 Court finds that the potential elimination of a farmer's choice to grow non-genetically

14 engineered crops, or a consumer's choice to eat non-genetically engineered food, and an action

15 that potentially eliminates or reduces the availability of a particular plant has a significant effect

16 on the human environment." MSJ Order at 13.  It found defendants' inadequate analysis of this

17 issue violated NEPA and triggered the need for an EIS.  Id at 13-14.  Notably, the Court did not

18 find APHIS's EA adequate in any respect.

19         The argument also is wrong legally.  NEPA is not comprised of a multitude of separate

20 claims or issues.  It is a procedural statute, and as this Court concluded, APHIS violated it by

21 failing to prepare a required EIS before deregulating.  It now must prepare an EIS analyzing all

22 potential environmental impacts of the deregulation, not merely the harms the Court happened to

describe.[26]   The Court found no need to determine every possible violation of NEPA, since one

EIS trigger or twelve would compel the same result.  MSJ Order at 14 n.4; *see Ocean Advocates*

*v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005) (one EIS trigger sufficient).

Moreover, because NEPA is a procedural statute, violations may be purely procedural, without

any specific environmental consequences.  *E.g.*, *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d

1083, 1097-98 (9th Cir. 2006) (failure to examine alternatives).

B.    <u>Plaintiffs Have Standing To Obtain Broad Relief</u>.

Defendants also suggest they are free to ignore NEPA, and the Court is precluded from

enjoining them, unless plaintiffs identify specific plaintiff members who will be harmed by every

environmental impact to be enjoined, in every place it may occur.  For example, defendants

suggest it makes no difference what happens as long as Mr. Morton's farm is not contaminated.

Defendants misconstrue the nature of public interest environmental litigation, and conflate

standing to sue with injunctive relief.  This lawsuit enforces Congress' intent to safeguard the

public interest in the environment through NEPA's procedures.  Plaintiffs established standing to

sue by showing a personal stake in preventing all of the various types of harms NEPA was

intended to prevent in this particular case, in declarations accompanying their motions for

summary judgment[27] and injunctive relief.  Their standing to sue is unchallenged.  The Court

may enjoin any harm to the environment the action likely will cause in which plaintiffs have

shown an interest.  *See Northwest Environmental Advocates v. U.S. E.P.A.*,  2006 WL 2669042,

---

[26] APHIS is well aware of this.  Although Judge Breyer did not try to identify every
NEPA violation either, APHIS's November 2009 draft EIS for Roundup Ready alfalfa purports
to assess all potential impacts, in 192 pages with over 1,200 pages of appendices.  *See* APHIS,
Draft Environmental Impact Statement; Determination of Regulated Status of Alfalfa Genetically
Engineered for Tolerance to the Herbicide Glyphosate, 75 Fed. Reg. 1585-86 (January 12, 2010)
*available at* http://www.aphis.usda.gov/biotechnology/downloads/alfalfa/gealfalfa_deis.pdf (last
viewed 2/18/2010).
[27] *See, e.g.*, Carman, Hoffman, Morton, Macdonald, Martenson, Stearns, Dillon,
Kimbrell, Burd, Des Marets, and Tipping decls.

Reply in Support of  Motion for Preliminary Injunction
No. 3:08-cv-0484-JSW                                                                                      16

*8-9 (N.D. Cal. Sept. 18, 2006) (citing *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Contrary to defendants' rhetoric, plaintiffs do not seek an "automatic" or "blanket" injunction, but one that addresses the likely[28] irreparable harm to the environment from defendants' future actions.  The injunction should be as broad as necessary to address it.  *See Califano v. Yamasaki*, 442 U.S. 682, 701, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class"; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 n.2 (1990) (Blackmun, J., dissenting)[29] ("The Administrative Procedure Act permits suit to be brought by any person 'adversely affected or aggrieved by agency action.'  [I]f the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual.  Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court.").  *See also National Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (quotation, alteration, and citation omitted).

C.    The Court Owes No Deference To APHIS.

Defendants predictably describe the risks of all potential environmental impacts as negligible, despite having failed to go through the NEPA process designed to reveal the facts, and ask the Court to forego that process and decide on the basis of their assurances that the EIS

---

[28] Likely" means "having a better chance of existing or occurring than not." *Jackson v. Kirkland*, 2008 WL 4298217, *4 (N.D. Cal. Sept. 19, 2008) (citation omitted).
[29] This aspect of Justice Blackmun's dissent apparently expresses the sentiments of all nine justices. *See* majority opinion, *id.* at 890 n.2.

Reply in Support of  Motion for Preliminary Injunction
No. 3:08-cv-0484-JSW                                                          17

will reveal nothing of consequence.  The inadvisability, if not absurdity, of deferring to the <u>post</u>

<u>hoc</u> litigation arguments of an agency that, for the fourth time in as many years has been found to

have violated NEPA in connection with genetically engineered crops, is patent. [30]  Certainly,

such deference is not legally compelled during this remedy phase.  The Court is no longer

reviewing an agency decision; the Court already determined APHIS abused its discretion by

deciding not to prepare an EIS.  *See Geertson Seed Farms v. Johanns*, 2007 WL 1302981, *4

(N.D. Cal. May 03, 2007) (rejecting APHIS's request that "this Court [] accept its truncated EIS

without the benefit of the development of all the relevant data and, importantly, without the

opportunity for and consideration of public comment").  Deference due to an agency with a

"sound basis" in an administrative record, *see, e.g., Ranchers Cattlemen Action Legal Fund

United  Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1093-94 (9th Cir. 2005), should not be

confused with review of the agency's litigation proposal here.  The appropriate remedy is not a

matter within APHIS's discretion, and no deference is owed to its opinions about how to remedy

its own unlawful action.  *See National Wildlife Federation v. National Marine Fisheries Service*,

422 F.3d 782, 799 (9th Cir. 2005) (in injunction proceedings following determination agency

violated Endangered Species Act, "there was no formal agency finding to which deference might

arguably be owed.  Rather, the government chose to present its case through expert affidavit.").

"This is not the usual situation in which the court reviews an administrative decision and, in

doing so, gives deference to agency expertise.  The [agency] here has not taken the necessary

steps to make the decision the first place—yet it seeks to take action with major environmental

impact." *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd* 952

F.2d 297 (9th Cir. 1991) (citation omitted).

---

[30] *Center For Food Safety v. Johanns*, 451 F. Supp. 2d 1165 (D. Haw. 2006); *Int'l Center for Tech. Assessment v. Johanns*, 473 F. Supp. 2d 9 (D.D.C. 2007); *Geertson Seed Farms v. Johanns*, No. C 06-01075, 2007 WL 518624 (N.D. Cal. Feb. 13, 2007).

D.   Loss Of Consumer Choice Is An Immediate Irreparable Injury.

Deference aside, given the Court's finding that loss of consumer choice is a cognizable injury, it is indisputable that not only is such injury made likely by production and marketing of sugar from unlawfully deregulated genetically engineered sugarbeets, but it is ongoing.[31] Accepting defendants' claims about the prevalence of sugar on the market today derived from Roundup Ready sugarbeets, and the fact that it is commingled with conventional sugar, *F.Defs' Opp.* at 18, it is impossible for a consumer to avoid the loss of choice other than to avoid all food—from markets, restaurants, and all other sources—that might contain sugar.  Defendants ask the Court to simply ignore this, because restoring that choice would cost intervenors money they chose to invest after this lawsuit was filed.

In the same way, intervenors' bogus argument that they will not be able to plant all of the sugarbeets they would like if they are restricted to their conventional sugarbeet seed, and their intention to further reduce their capacity to ever plant conventional sugarbeets again, regardless of what the EIS may show, by planting only Roundup Ready seed crops this spring and into the indefinite future, merely proves plaintiffs' point.  The Court found "an action that potentially eliminates or reduces the availability of a particular plant has a significant effect on the human environment."  MSJ Order at 13.  If defendants are to be believed, they have not merely "potentially reduced" the availability of conventional sugarbeets, they have practically eliminated the plant.  Defendants' suggestion that this somehow justifies allowing them to finish the job, before the EIS is prepared, is absurd.

---

[31] Plaintiffs submitted numerous declarations with their summary judgment motion establishing that plaintiffs' members are among the many people who have this concern.  Burd Standing Decl. para. 3; Carman Standing Decl. para.19; Hoffman Standing Decl. para. 6; MacDonald Standing Decl. para. 8; Des Marets Standing Decl. para. 11-12.

E.    <u>Contamination Has Already Occurred And Is Irreparable Harm</u>.

Defendants' inability to prevent contamination pending preparation of the EIS has already been established.  The more intervenors try to persuade the Court that their after-the-fact mop-up efforts somehow negate their accidental release last year of thousands of Roundup Ready sugarbeet stecklings, sold blindly on the open market in huge piles of compost, the more evident it becomes, yet again, that genetically engineered plants cannot effectively be contained. It is not enough to rely on such panicky, litigation-driven efforts, or declare that each contamination was a "one-time event," until the next one.  Experience has proven there are far too many routes of potential contamination, and far too many uncontrollable variables, from human error to weather to biological unpredictability.  *E.g.,* 1/22/10 Gurian-Sherman decl., paras. 22-30; Exh. 7 to Gurian-Sherman decl. at 101-103 ("Transgene movement beyond their intended destination is, for all practical purposes, a foregone conclusion.").  When it happens it can be extraordinarily costly.  Howington decl., paras. 2-10 (over $1 billion lost by rice farmers from one contamination event).  Intervenors were clueless this contamination event occurred until they were notified by the public; it was a remarkable stroke of luck the release was discovered; it was fortunate the person who discovered it promptly notified them; and despite intervenors' mitigation efforts, they still could not shoehorn the genie entirely back in the bottle.[32]  This incident concerned entire sugarbeet roots; the difficulty of controlling seed and pollen is far greater.  The standard for an injunction is likely harm, not certainty that harm that has already occurred will be repeated in precisely the same way.  *See* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, at 155-156  (2d ed.1995) ("the injury need

---

[32] While pretending to have the matter under control, *see* Lehner decl., intervenors admit they do not know the identity, number, or locations of cash customers who purchased compost laden with Roundup Ready roots.

Reply in Support of  Motion for Preliminary Injunction
No. 3:08-cv-0484-JSW                                                              20

not have been inflicted when application is made or be certain to occur….") (footnote omitted). The standard has been met.

       F.    <u>Weed Resistance Is Irreparable and Immediate Injury</u>.

       There is abundant evidence that use of Roundup Ready crops leads to weed resistance, notwithstanding "best management practices" designed to minimize it. Intervenor American Crystal tells its growers:

> <u>Weed resistance cannot be prevented</u> but it can be delayed. Every beet grower MUST make every effort to delay glyphosate resistant weed development as long as possible.

Exh. 43 to Achitoff decl. at 2 (emphasis added). To "slow" weed resistance, intervenor urges a multitude of practices (including using "high glyphosate rates"), *Id.* at 1. not one of which is legally required or enforceable, and which collectively have not prevented resistance from developing on millions of acres of Roundup Ready farmland. AR 3021. *See also* 1/22/2010 Benbrook decl., paras.11-20; 1/22/2010 Feldman decl., para. 10.

       The argument that weed resistance is not an "immediate" problem because it occurs over time, F.Defs' Opp. at 14, is unavailing. That an environmental impact does not happen overnight does not make it inappropriate for preliminary injunctive relief. As defendants well know, what <u>will</u> occur quickly, in March and April, 2/10/2010 Miller decl., para. 40—prior to any other opportunity for relief—is the planting of the 2010 sugarbeet crop on 1.4 million acres, in which weed resistance will continue to develop.

       That such weed resistance and increased glyphosate use has already occurred and will continue on other Roundup Ready acreage, F.Defs' Opp. at 14, is no reason not to enjoin it; defendants offer no authority that courts should ignore harm that adds to proven injury. The opposite is true. *See, e.g., Geertson Seed Farms, 2007 WL 518624*, \*10 (cumulative impact of weed resistance from multiple crops may be greater than impact of single crop, and rejecting as

"cavalier" APHIS's argument that "because this environmental impact has occurred in other contexts it cannot be significant."). Weed resistance is exacerbated when different Roundup Ready crops are grown in rotation. Not only are such rotations not prohibited, intervenor American Crystal actually advises growers that soybeans—of which over 90 percent of U.S. acreage is Roundup Ready[33]—are the "ideal crop choice" to follow sugarbeets, for reasons unrelated to weed resistance.[34] See also 1/22/2010 Gurian-Sherman decl, para. 13. And as Judge Breyer noted, "There may be ways to reduce the proliferation of weeds, but if farmers are not engaging (or cannot engage) in those practices, then the availability of those practices does not ameliorate the potential environmental impact." Geertson Seed Farms, 2007 WL 518624, *10. Intervenors admit their sugarbeet growers do not often engage in such practices:

> Idaho/Oregon [sugarbeet] growers do plant Roundup Ready corn. "We do not expect them to move away from this chemistry; but they will use other crops in the rotation," [intervenor Amalgamated Sugar's John] Schorr says. Many American Crystal growers presently do not place much emphasis on managing weed resistance, according to [American Crystal's Allan] Cattanach. "Some will choose other modes of action for herbicides in other crops; but this will not be a widespread practice," he suggests. "Some tank mixing will occur in crops to control more-tolerant weed species." Having wheat and/or barley in the rotation will be very beneficial, he adds, since other mode-of-action herbicides are used for the grain crops. Even so, Crystal expects the weed seed bank of tolerant/resistant populations to slowly build up over time…."At this point, growers will continue to plant Roundup Ready corn because it performs well and has other traits they desire," Guza says.[35]

F.      Cross-Pollination Is Immediate And Irreparable Harm.

While intervenors devote much energy to downplaying the risk of contaminating one particular organic seed grower in the Willamette Valley, Frank Morton, their predictions whether his fields will be contaminated are guesses unsupported by any field studies. The published studies show beet pollen may travel great distances, depending upon the influence of many

---

[33] Exh. 44 to Achitoff decl.
[34] Exh. 45 to Achitoff decl. at 1.
[35] Exh. 46 to Achitoff decl. at 2 (emphasis added).

1  unpredictable factors.  MSJ Order at 11.  That no contamination of Mr. Morton's seed has yet

2  been detected is of little significance.[36]  *See Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir.

3  1990) ("Requiring a showing of actual injury would defeat the purpose of the preliminary

4  injunction, which is to prevent an injury from occurring.")  The requirement that defendants

5  prepare an EIS is designed to answers such questions.  But whether Mr. Morton's fields alone

6  will be contaminated is not the issue.  While intervenors have—at least until after the hearing—

7  moved away from him, other growers of *beta* seed crops are still close to many sugarbeet seed

8  fields.  2/19/2010 Morton decl., paras. 3-12.  If any Valley grower is contaminated, the

9  reputation of all Valley growers will suffer, *id.*, para. 13, and contaminated seed may travel

10  throughout the distribution chain.  Then there is the likelihood that Monsanto will sue the

11  contaminated farmers for patent infringement.[37]  Ironically, when the shoe was on the other foot,

12  Monsanto complained bitterly that its small, conventional canola fields in the Willamette Valley

13  might be contaminated by other fields—including GMO fields.  Exh. 49 to Achitoff decl.

14      "Environmental injury, by its nature, can seldom be adequately remedied by money

15  damages and is often permanent or at least of long duration, *i.e.*, irreparable."  *Amoco Production*

16  *Co*, 480 U.S. at 545.  Judge Breyer found "contamination is irreparable environmental harm. The

17  contamination cannot be undone; it will destroy the crops of those farmers who do not sell

18  genetically engineered" crops.  *Geertson Farms*, 2007 WL 1302981, *6 (N.D. Cal., May 3,

19  2007).  The science supports this.  *See* Exh. 7 to Gurian-Sherman decl. at 103 ("[I]t would be

20  extremely difficult to perform a recall once a transgenic organism becomes widespread."); Exh.

21  6 to Gurian-Sherman decl. at 27 (" Unlike synthetic pesticides such as DDT or parathion, which

---

[36] Mr. Morton openly acknowledged his tests of his seed to date have not shown contamination.  Intervenors' attorneys did not need to stoop to unethically having third party investigators contact Mr. Morton covertly to order his seed for testing, but could have requested seed samples through F.R.C.P. 34.  *See* Exh. 47 to Achitoff decl. (Cal. Ethics Op. 315).

[37] Exh. 48 to Achitoff decl. at 23-36.

are ultimately degraded in the environment, genes (including transgenes) are replicating molecules."); *Northwest Environmental Advocates v. U.S. E.P.A.*, 2006 WL 2669042, *11 (N.D. Cal., Sept. 18, 2006) ("Environmental injury ordinarily constitutes irreparable injury, but the environmental injury in this case-introduction of invasive species-is more certainly irreparable than most…. The broad and significant effects that invasive species have on their new environment, combined with the generally impossible task of removal once those species become established, easily satisfies the threshold requirement of irreparable injury.")

Judge Breyer rightly rejected APHIS's argument, F.Defs' Opp. at 10-11, that genetic contamination will not "necessarily" cost plaintiff organic seed growers and sellers their organic certification, export markets, and goodwill. *Geertson Seed Farms*, 2007 WL 518624, *7. The argument is legally and practically incorrect. Fed. Opp at 10. As a legal matter, the National Organic Program regulations provide that "[t]o be sold or labeled as '100 percent organic,' 'organic,' or 'made with organic (specified ingredients or food group(s)),' the product must be produced and handled without the use of … (e) excluded methods." 7 C.F.R. § 205.105(e). The term "excluded methods" is defined to mean "methods used to genetically modify organisms or influence their growth and development by means that are not possible under natural conditions or processes…." *Id.* § 205.2. Thus, seed that has been fertilized by genetically engineered pollen, such that the resulting fruit will be genetically engineered, is by definition "excluded" from organic certification.[38] As a practical matter, consumers purchase organic seed and produce because they expect that it is free of genetically engineered material, and would reject the notion that a genetically engineered vegetable is "organic" regardless of how it was grown.

---

[38] The Kershen decl. purporting to interpret the law is inappropriate and should be stricken. *In re Genetically Modified Rice Litigation*, Case No. 406MD1811, 2009 WL 3281928, *6-8 (E.D.Mo., Oct. 9, 2009)(" The meaning of the regulation is a matter of law for the court to decide; expert testimony is neither helpful nor proper.")

1   If consumers learn that a seed source has been contaminated by genetically engineered material,

2   they will reject that seed, regardless of whether it is nominally certified as "organic" by USDA.

3   *E.g.*, Clarkson decl., paras. 10-18.

4   IV.     CONCLUSION

5           All of defendants' claimed potential losses—which are both far less than they pretend

6   and self-inflicted—are strictly economic.  They are not analogous to the threat of enemy

7   submarines, but are no different in kind, or extent, from the economic impacts courts have found

8   repeatedly do not outweigh potential environmental injuries.  *E.g.*, *South Fork Band Council Of*

9   *Western Shoshone Of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).  The

10  price of a fungible, internationally-traded commodity like sugar is subject to complex factors,

11  including trade agreements, tariffs, price supports, availability and price of other sweeteners,

12  ethanol policies, energy prices, and weather.  Exh. 22 to Achitoff decl. at 5-10.  If there is some

13  disruption in the market, this is not uncommon, due to accidents or crop failures, and the federal

14  government has substantial ability to stabilize prices.  Colocicco decl., paras. 10-13.  Defendants'

15  elaborate scenarios, however, all depend on the assumption that adequate conventional seed is

16  not available, which has been shown to be false.  Their actual cost of complying with the law are

17  far more modest, and are the natural result of their business decisions.  (Indeed, American

18  Crystal assured the public its insurance will cover its losses.  Exh. 22 at 14.)  There is no reason

19  why plaintiffs, the public, and the clearly expressed public policy embodied in NEPA should

20  suffer so that intervenors can maximize their profits without facing the consequences of their

21  business-driven gambles.

22          DATED: Honolulu, Hawai'i, February 19, 2010.

23

24                                          /s/ Paul H. Achitoff
                                            PAUL H. ACHITOFF (Pro Hac Vice)
25                                          Earthjustice
                                            223 South King Street, Suite 400

26

27

28

Reply in Support of  Motion for Preliminary Injunction
No. 3:08-cv-0484-JSW                                                                    25

1   Honolulu, Hawai'i 96813

2   GREGORY C. LOARIE, State Bar No. 215859
    Earthjustice
3   426 17th Street, 5th Floor
4   Oakland, CA 94612

5   KEVIN GOLDEN, State Bar No. 233378
    Center for Food Safety
6   2601 Mission St., Suite 803
7   San Francisco, CA 94110

8   *Counsel for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28