Pages 1 - 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

Center for Food Safety,   )
et al.,                    )
                           )
          Plaintiffs,      )
                           )
  VS.                      )   NO. C 08-0484 JSW
                           )
Charles Connor, et al.,    )
                           )
          Defendants.      )
_____)

San Francisco, California
Friday, March 5, 2010

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

           EARTHJUSTICE
           223 South King Street - Suite 400
           Honolulu, Hawaii 96813
    BY:  **PAUL H. ACHITOFF**
        **ATTORNEY AT LAW**

           EARTHJUSTICE
           426 17th Street - 5th Floor
           Oakland, California 94612
    BY:  **GREGORY C. LOARIE**
        **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:          Kelly L. Bryce, CSR No. 13476, RPR
                      Court Reporter Pro Tem

Computerized Transcription By Eclipse

1   **APPEARANCES**:  (CONTINUED)

2   For Plaintiffs:

3
```
                            THE CENTER FOR FOOD SAFETY
                            2601 Mission Street - Suite 803
                            San Francisco, California 94110
```
4
```
                    BY:  PAIGE MICHELE TOMASELLI
                         ATTORNEY AT LAW
```
5

6   For Intervenor Defendants American Sugarbeet Growers
Association, Ervin Schlemner, Mark Wettstein, Duane Grant, John
Snyder, U.S. Beet Sugar Association, American Crystal Sugar

7   Company, Amalgamated Sugar Company, Western Sugar Cooperative,
and Wyoming Sugar:

8
```
                            HOWREY LLP
                            1299 Pennsylvania Avenue, NW
```
9
```
                            Washington, DC 20004
                    BY:  GILBERT S. KETELTAS
```
10
```
                         CHRISTOPHER MARRARO
                         ATTORNEYS AT LAW
```
11

12   For Intervenor Defendant Monsanto Company:
```
                            LATHAM & WATKINS
                            555 Eleventh Street, NW - Suite 1000
```
13
```
                            Washington, D.C.  20004
                    BY:  PHILIP J. PERRY
```
14
```
                         ATTORNEY AT LAW
```
15   For Federal Defendants:
```
                            U.S. DEPARTMENT OF JUSTICE
```
16
```
                            Environment & Natural
                            Resources Division
```
17
```
                            PO BOX 663
                            WASHINGTON, DC 20044
```
18
```
                    BY:  BEVERLY LI
                         TRIAL ATTORNEY
```
19

20   For Intervenor Defendant Betaseed, Inc.:
```
                            DEBEVOISE & PLIMPTON LLP
                            919 Third Avenue
```
21
```
                            New York, New York 10022
                    BY:  HARRY ZIRLIN
```
22
```
                         ATTORNEY AT LAW
```
23

24

25

1    **APPEARANCES**:   (CONTINUED)

2    For Intervenor Defendant Syngenta Seeds, Inc.:
                            HOLLAND & HART LLP
3                          975 F Street, NW - Suite 900
                            Washington, DC 20004
4                  BY:  **NANCY S. BRYSON**
                        **ATTORNEY AT LAW**
5
     For Intervenor Defendant SESVanderHave USA, Inc.:
6                          STINSON, MORRISON, HECKER LLP
                            1201 Walnut Street - Suite 2900
7                          Kansas City, Missouri 64106
                   BY:  **DANIEL BUKOVAC**
8                        **ATTORNEY AT LAW**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>Friday - March 5, 2010</u>                                    <u>9:37 a.m.</u> |
| 2 | |
| 3 | **THE CLERK:**  Calling Case Number C-08-484, Center for |
| 4 | Food Safety, et al. versus Charles Connor, et al. |
| 5 | Counsel, please approach the podiums and state your |
| 6 | appearances. |
| 7 | **MR. ACHITOFF:**  Good morning, Your Honor.  Paul |
| 8 | Achitoff, Greg Loarie, and Paige Tomaselli appearing for the |
| 9 | plaintiffs. |
| 10 | **THE COURT:**  Good morning. |
| 11 | **MR. KETELTAS:**  Good morning, Your Honor.  Gil |
| 12 | Keteltas from Howrey for American Sugarbeet Growers |
| 13 | Association, Ervin Schlemner, Mark Wettstein, Duane Grant, John |
| 14 | Snyder, U.S. Beet Sugar Association, American Crystal Sugar |
| 15 | Company, Amalgamated Sugar Company, Western Sugar Cooperative, |
| 16 | and Wyoming Sugar. |
| 17 | **THE COURT:**  Welcome. |
| 18 | **MR. PERRY:**  Good morning, Your Honor.  Phil Perry |
| 19 | for Monsanto. |
| 20 | **THE COURT:**  Good morning. |
| 21 | **MS. LI:**  Good morning.  Beverly Li for the Federal |
| 22 | Defendants. |
| 23 | **MR. ZIRLIN:**  Good morning, Your Honor.  Harry Zirlin |
| 24 | for Betaseed, Inc. |
| 25 | **THE COURT:**  Good morning. |

1          **MS. BRYSON:**  Good morning, Your Honor.  Nancy Bryson

2    for Syngenta Seeds.

3          **THE COURT:**  Good morning.

4          **MR. MARRARO:**  Your Honor, good morning.  Chris

5    Marraro with the Growers and Processors.

6          **THE COURT:**  Good Morning.

7          **MR. BUKOVAC:**  Your Honor, Daniel Bukovac for

8    defendant intervenor SESVanderHave USA, Inc.

9          **THE COURT:**  Welcome.

10         All right.  I assume everybody received a copy of

11   the Court's notice of questions?

12         **MR. ACHITOFF:**  Yes.

13         **MR. KETELTAS:**  We did, Your Honor.

14         **THE COURT:**  Very well.  And, as we go forward, if --

15   I don't want to -- I want to give everybody an opportunity to

16   respond to these questions, so if there's anybody who has

17   additional information and I don't -- you know, and I move on

18   to the next question, just, you know, come on up and raise your

19   hand or if you'll wave your arm, or whatever you need to do.  I

20   want to hear from anybody who has input on these questions.

21         And, as you all know from having participated in the

22   summary judgment motion hearing, the Court is receiving answers

23   to questions and not general argument.  We have plenty of paper

24   here.  I've read -- I've read all the paper.  I've read the

25   cases and the attachments.

1          This is a little bit unusual.  These questions were

2     a little unusual because they are 99 percent factual in what

3     they seek.  And in some instances it may be that the answers

4     are found somewhere in this massive paper that was filed in

5     connection with this motion for preliminary injunction.  In

6     some instances, I suspect, unless I missed it, I haven't seen

7     anything in response.

8          So to the extent that there may be factual disputes

9     or disputes about the answers, obviously the Court reserves the

10    right to require some proof on with respect to those facts that

11    it deems to be material.

12         And, so, what I wanted to say was, sometimes

13    counsel, and I did the same thing when I was on your side of

14    the bench, try to glean some, you know, hidden meaning or theme

15    that the Court is getting at, but it's not really that.  It's

16    just a mass of very complicated information that you've

17    presented to the Court and these are questions that I really

18    need answered.

19         And, so, I'm not going to cut you off unless you're

20    not being responsive, unless you're going off in making your

21    arguments and saying, "Well, because the answer to this

22    question is 'X,' therefore, we win on this issue."  That's not

23    what I want.  I really just want answers.

24         And then at the end, if there's something that the

25    Court missed that you think that was raised by what we disused,

1    I will be more than happy to hear from you.

2              Now, it's pretty clear from the question who, in the

3    first instance, the Court is seeking the answers from; and then

4    I will, obviously, give other parties, particularly the

5    plaintiffs, an opportunity to respond as well.

6              And, again, if there are more than one -- if there's

7    more than one intervenor, because I didn't want my questions to

8    be, you know, lumped all together without regard to your

9    separate interests, then certainly -- and you have an answer, I

10   would certainly want to hear from you.

11             So, let's start with question number one, and the

12   first part of that having to do with how the genetically

13   engineered stecklings got into the potting soil.

14        **MR. PERRY:**  Your Honor, we've organized ourselves in

15   the way you predicted to respond individually based on our

16   knowledge of the specific instances.  So Mr. Zirlin who

17   represents Betaseed, will begin our response on that.

18        **THE COURT:**  Very well.  And, sir, to the extent that

19   what you are saying is -- obviously I mentioned it in the

20   substantive answer, if what -- if the answer is supported by

21   something in the record or something that could be made to

22   supplement the record, then I would like to know that as well,

23   especially if there's going to be a dispute about the accuracy

24   of the response.  All right?

25        **MR. PERRY:**  Yes, Your Honor.

1          **MR. ZIRLIN:**  Thank you, Your Honor.

2          As I said, I'm Harry Zirlin.  I'm with the law firm

3   Debevoise & Plimpton representing Betaseed, Inc.

4          The first part of your question, as I understand,

5   is:  How did this happen?  And the second part of your question

6   is:  What steps has Betaseed taken to ensure that it never

7   happens again?

8          How it happened is that Betaseed, like other seed

9   companies, uses a combination in processing its seed product of

10  both direct seeding, where it gives seed to its growers and the

11  growers plant the seed directly in the ground, and

12  transplanting or what are called stecklings.  Stecklings is

13  just another name for a young plant.  The young plants, the

14  stecklings, are grown in rows at a time after the directly

15  seeded plants have already started to come up.

16         Those stecklings are delivered to their growers in

17  peat moss.  The peat moss is just a packing material that's

18  used to keep the plants at the right temperature, at the right

19  moisture, and as a protective packaging material.

20         That peat moss, after the stecklings are delivered

21  to the growers and the stecklings are taken out of the peat

22  moss and delivered over to the growers for the growing process,

23  the peat moss is waste.  The farmers don't want the peat moss.

24  Betaseed takes the peat moss back to its facility.

25         In this particular case, the peat moss contained

1    what were discarded stecklings; that is, as they were unpacking

2    them, either the farmer or the Betaseed employee said, "That

3    one's not going to grow.  That one's a runt.  That one's kind

4    of crummy looking."  And there were a number of those

5    stecklings that were thrown back into the packing material,

6    taken back to Betaseed's facilities all in the Willamette

7    Valley for proper disposal, but they weren't properly disposed

8    of.

9            What happened is some gentleman driving by in a

10   truck, working, who worked for an entity called Pro Bark, which

11   is a greenhouse gardening kind of commercial enterprise in the

12   Valley, saw a nice big pile of peat moss and he said to a

13   Betaseed employee, who didn't realize there were discarded

14   stecklings in the peat moss, "Can I have that?  I'll take that

15   off your hands.  That looks like something I can use for

16   mulch."

17           The Betaseed employee, not knowing any better and

18   not having at that time the proper standard operating procedure

19   in effect that they do know, which says you treat the peat moss

20   the same as you treat the stecklings, said, "Sure.  Take it off

21   our hands.  Go."  Okay.  That's how it happened.

22           What has Betaseed done to make sure --

23           **THE COURT:**  Well, let me just ask you a question.

24   Who is the person most knowledgeable at this particular --

25           **MR. ZIRLIN:**  I apologize, Your Honor.  I just

1    thought about it.

2           All of this that I'm telling you now is in the

3    declaration of Casper Lehner, Betaseed's seed production

4    manager in Tangent, Oregon, and it is covered in his

5    declaration at paragraphs 19 through 31.  Everything I've said

6    so far is in his declaration --

7           **THE COURT:**  All right.

8           **MR. ZIRLIN:**  -- including the next part that I'm

9    going to tell you, which is what Betaseed has done to make sure

10   that this will never happen again, and I've already alluded to

11   that.

12          Betaseed always had a standard operating procedure

13   that said the stecklings after -- if you have discarded

14   stecklings rejected or extras, they're to be disposed of in a

15   proper way on Betaseed property or property where Betaseed has

16   custody control over it so that in case they were to volunteer

17   or grow where they weren't supposed to, you know, where they

18   wouldn't expect a plant to grow because they were discarded,

19   they would be able to see them and kill them, row them, spray

20   them, whatever they needed to do.

21          But prior to this incident, the standard operating

22   procedure did not cover the peat moss that they were packing.

23   Now it's clear.  They revived, Betaseed revived their standard

24   operating procedure so that both the stecklings and the peat

25   moss that the stecklings are packed in must be disposed of

1    properly in a Betaseed-controlled site; and each person at

2    Betaseed seed who has any participation in the seed production

3    process, all of their employees at Tangent, Oregon, were made

4    to read this new standard operation procedure and were made to

5    sign an acknowledgment that they understand that procedure,

6    which, I can tell you, Your Honor, is not something they don't

7    always make their people sign something.  It's basically

8    telling them that if you don't do this and we fire you because

9    you don't do this, don't tell us that we didn't tell you.

10              So that's what I can tell you that Betaseed has

11   done, and all that is in Mr. Lehner's declaration, the

12   paragraphs that I mentioned.

13              **THE COURT:**  All right.  There aren't any other --

14   yes.

15              Now I'll give the plaintiff a chance to respond to

16   all of the intervenors.

17              **MS. BRYSON:**  Your Honor, the other seed --

18              **THE REPORTER:**  I'm sorry, Counsel.

19              **THE COURT:**  Would you mind reidentifying yourself,

20   please?

21              **MS. BRYSON:**  I'm sorry.

22              **THE COURT:**  Thank you.

23              **MS. BRYSON:**  Yes.  Nancy Bryson for Syngenta Seeds.

24              Your Honor, we have a small board on this, if you

25   can see the screen, we can put up that shows you where the

1    evidence I'm going to talk about is in the record.

2              **THE COURT:**  All right.

3              **MS. BRYSON:**  If we can have 1A.  Yes.

4              The other seed companies -- Syngenta, SESVanderHave,

5    and American Crystal -- have their seed produced for them by a

6    company called West Coast Beet Seed.

7              There is a declaration in the record from Greg

8    Loberg, who is the manager of West Coast Beet Seed, and

9    Exhibit C to that declaration describes the process that

10   West Coast uses to ensure that it maintains control of the

11   stecklings.

12             Some of the elements of that, which you'll see in

13   there, are that there is an orange color-coded material tagging

14   system.  There's a strict chain of custody.  The stecklings are

15   delivered to growers by West Coast Beet Seed employees, and any

16   extras that are not used are taken back and they are properly

17   disposed of, either through incineration of landfill or

18   returned to the nursery where they're just using standard

19   packing-them-out procedures.

20             **THE COURT:**  All right.  Thank you.

21             Any other who wish to respond?

22                       (No response.)

23             **THE COURT:**  Okay.  All right.

24             So, Mr. Achitoff, I would expect your answer to be,

25   "I agree," or, "I disagree factually with what was just

1    stated."  What I would not want you to do at this point -- it's

2    obvious what the implications might be or legal conclusions to

3    be drawn from an answer one way or the other, so it's in that

4    context that I'd like you to respond if you wish to.

5           **MR. ACHITOFF:**  Your Honor, plaintiffs are not in a

6    position to either verify or disagree with anything that has

7    just been said.  Clearly we don't have firsthand knowledge of

8    what either Ms. Bryson just said or Mr. Zirlin just said.  So,

9    to that extent, if that's all that the Court is interested in

10   hearing from plaintiffs on this question, that's all I can say.

11          If you'll indulge me for one or two minutes, I would

12   like to respond as well that -- well, that plaintiffs have been

13   involved in litigation concerning genetically engineered crops

14   for some time.  This is not the first case that we have been

15   involved in; and this is by no means the first incident, or the

16   second, third or fourth incident of unexpected release or

17   contamination that has occurred.

18          There is a long history of industry and the

19   government assuring the public and the courts that releases

20   will not happen, are extraordinarily remote; or if they do

21   happen, they'll never happen again.

22          And I would just simply direct the Court's attention

23   to the Gurian-Sherman declaration and the Howington declaration

24   and the exhibits thereto, which describe in detail the

25   extraordinary difficulty of containing genetically engineered

1    crops for any length of time and the many instances of similar

2    or different events despite standard operating procedures.

3            And one of the Court's later questions in this group

4    of questions specifically relates to a biological opinion that

5    the Fish and Wildlife Service drafted in another case that

6    plaintiffs have been involved in involving genetically

7    engineered bentgrass in which the Fish and Wildlife Service

8    commented on this case and said sugar beets, likewise, when

9    pollinated and were thought to be well controlled by the

10   growers using the product despite best management practices,

11   escape of transgenes occurred.

12           So it's no secret that these types of assurances do

13   not prevent contamination.

14           **THE COURT:**  All right.  Now, I regret that I gave

15   you that opportunity; but if you want, I will give you a brief

16   opportunity to respond.

17           **MR. PERRY:**  Thank you, Your Honor.  Phil Perry,

18   Monsanto.

19           Also, in the Casper Lehner declaration that

20   Mr. Zirlin alluded to are facts about this particular set of

21   stecklings.  They were 95 percent female without the capacity

22   to spread transgenes as Mr. Achitoff was suggesting; and there

23   was remediation taken to recapture them, to reacquire the peat

24   moss, and to visit those who had parted before and ensure that

25   there were no -- none of these stecklings actually growing.

1      And, in fact, if you look at Casper Lehner's

2  declaration, you'll find that he concluded, based on his

3  examination of all those plants, that there was almost no

4  chance that they could have spread any transgenes.  In any

5  event, they're all dead now because of the passage of time.  So

6  they don't present any kind of continuing threat.

7      And, as to Mr. Achitoff's citation to other genetic

8  engineered events, genetically engineered products have been

9  growing safely in the United States for 15, 20 years.

10      **THE COURT:**  Well, I'm going to cut you off now

11  because I don't want to unleash this because there's a lot of

12  information I need to get to for my own perspective.

13      So, let's move on to question number two with

14  respect to plant activities, which we now have a hearing on

15  remedies that will affect the production of future crops of

16  sugar beets.

17      **MR. KETELTAS:**  Thank you, Your Honor.  Gil Keteltas

18  on behalf of the growers and processors.

19      I'm going to attempt this answer on behalf of all

20  defendant intervenors and they'll keep my honest if I fail.

21      The seed for the 2011 group crop is fully planted.

22  All stecklings are in the ground in the Willamette Valley for

23  the seed that will then be used by my growers to grow root crop

24  in 2011; and, as to that seed, there are no activities planned

25  other than tending the fields.

1          The only other activities that they're engaged in

2    between now and June are planning activities.  They are

3    planning for future crops that will be produced, for example,

4    the seed crop that will be produced in 2011 for planting their

5    commercial root crop in 2012.  And that planting involves

6    deciding what hybrid crosses will be made, deciding what

7    existing stock seed will be planted, stock seed is that basic,

8    very pure seed that's used to multiply the seed plants; and

9    where our seed crops will be planted.  What land in the

10   Willamette Valley will be used so that planning process and

11   that planting process can go forward.  That's the answer on the

12   seed side.

13         On the grower/processor side, other than the beet

14   planting itself, the growers and processors will initiate their

15   annual trials of new varieties, and these varieties are entered

16   in each cooperative by the seed companies.

17         And, so, they will -- it takes -- it could take up

18   to three years for a seed crop, a specific seed variety, to be

19   approved in a growing region; and, so, these seed trials could

20   be in their first, second, or third year looking forward to the

21   future for what they may plant in the future.  Those are

22   planted at the same time generally as the root crop.

23         **THE COURT:**  Is this information in the record for

24   the Court?

25         **MR. KETELTAS:**  I believe that -- Your Honor, I'm not

1   sure.  I believe that much of it can be gleaned from the grower

2   and processor declarations.

3          **MS. BRYSON:**  And for the seed companies, the

4   timeline attached to Bryan Meier's declaration gives this

5   information.

6          **THE COURT:**  All right.  I assume that's the extent

7   of the answer.

8          Mr. Achitoff?

9          **MR. ACHITOFF:**  Briefly, Your Honor.

10          My review of the Lehner declaration that was

11   previously alluded to in the previous question said that the

12   transplanting of the stecklings for the seed crop this spring,

13   which is to produce seed for the 2011 root crop, will continue

14   at least until the, quote, middle of March.  So my

15   understanding, based upon that, is that the seed crops are

16   still in the late stages of being planted in the Willamette

17   Valley.

18          **THE COURT:**  All right.

19          **MR. KETELTAS:**  Your Honor, we have checked yesterday

20   with everyone.  Our understanding is that all those stecklings

21   are in the ground.

22          And one other point to make.  I think the

23   implication is that you could maybe plant different stecklings

24   and change the course of the future.

25          One of your later questions asks how much of this

1   crop is male or female, and the answer is upwards of

2   78 percent, meaning that planting different males doesn't

3   change anything for the majority of this crop because it will

4   not change the outcome of the seed produced.

5           **THE COURT:**  All right.  Ms. Bryson, do you want to

6   add anything?

7           **MS. BRYSON:**  I think Mr. Keteltas has covered it.

8           **THE COURT:**  All right.  Let's move on to question

9   number three having to do with the period between now and the

10  EIS, if there's any plans to increase the percentage of

11  genetically engineered sugar beets beyond the current

12  95 percent.

13          **MR. KETELTAS:**  The simple answer is, no; but, like

14  all simple answers, it requires a little explanation.  The

15  percentage is not driven by cooperatives or anybody else.  It's

16  driven by individual farmer choices of what to purchase.

17          That said, there are some natural reasons why we

18  wouldn't expect that percentage to rise.  There are growers who

19  need specific varieties with specific disease-resistance

20  packages that aren't available with the Roundup Ready seed, and

21  that's in Dave Berg's declaration at paragraph 12.

22          He states for American Crystal, one of the largest

23  growing areas, that 5 percent of their growers who plant

24  conventional seed requiring higher levels of Rhizomania disease

25  resistance, that's not available in the Roundup variety.  And

1    there are other areas of the country where Roundup Ready seeds

2    are not planted for one reason or another.

3            So we don't expect -- there are no plans to increase

4    that number, but we're kind of hostage to what our growers

5    choices are.

6            **THE COURT:**  All right.  Any other?

7            Okay.  Mr. Achitoff, do you wish to respond?

8            **MR. ACHITOFF:**  Yes, Your Honor.

9            While Mr. Keteltas characterized the intervenors as

10   being hostage to the growers, what the growers choose is a

11   function of what they are given the opportunity to choose.  And

12   where, as in this case, it is undisputed that there is a

13   certain amount of conventional seed, what the growers will

14   purchase will be dependent upon what options they are given.

15   They have the option to choose conventional seed.

16           There are certainly -- there's certainly room for

17   debate as to how much of that conventional seed is available,

18   but there is no room for debate that a significant amount is

19   available.

20           So the question is whether the market, in the sense

21   of whatever the growers may wish to plant in an ideal world, is

22   necessarily what they should be allowed to select.  And, of

23   course, the plaintiffs' opinion on that is obvious, that the

24   Court can exercise some control over that.

25           **THE COURT:**  All right.  Do you want to say anything

1   else?

2          **MR. KETELTAS:**  Your Honor, I didn't understand the

3   question to ask about availability of conventional seed

4   shortages.  I am certainly prepared to address that topic if --

5          **THE COURT:**  No.  I think I got the information I

6   need on that.

7          Let's move on to question number four, and I assume

8   we'll be hearing from Ms. Bryson on that, on the seeds, which

9   has to do with the seed producers, when the seed producers sort

10  their seeds and when they deliver their seeds to the root crop

11  farmers.

12         **MR. KETELTAS:**  Your Honor, Ms. Bryson is going to

13  give me moral support, but --

14         **THE COURT:**  All right.

15         **MR. KETELTAS:**  -- they're going to let me try one

16  more of these.

17         **THE COURT:**  All right.  Fair enough.  I wasn't

18  mandating her to speak, but I know she represents the seed

19  folks.

20         **MR. KETELTAS:**  Well, I'm going to go in reverse

21  order because we interact on these things.

22         To start with, what purchases have been made,

23  99.9 percent of the farmers have purchased their seed.  Every

24  grower who submitted a declaration in this case has ordered a

25  hundred percent of their seed, and you'll see that their seed

1  was purchased in no later than December but some in November as

2  well.

3              And, so, if we start on the back end, the orders

4  have been made and the orders start in September.

5              And, actually, if we could pull up slide 4A.

6              And if that's difficult to read, Your Honor, I do

7  have copies I can share with the Court if we could approach.

8         **THE COURT:**  Well, first, where in the record is

9  this?  So, is this in the record?

10        **MR. KETELTAS:**  It's a demonstrative drawn from

11 declarations.

12        **MS. BRYSON:**  Of Bryan Meier, the exhibit that we

13 mentioned in the previous response.

14        **THE COURT:**  Well, all right.

15        **MS. BRYSON:**  It's Exhibit A.

16        **THE COURT:**  Well, first of all, you've got to hand

17 it up; but I don't know the extent to which I'm going to

18 consider that because I generally -- I applaud your advocacy

19 and I like demonstratives but not necessarily in a hearing such

20 as this, because then it begins to be evidentiary in nature and

21 we have an unfair disadvantage to the opposing side.

22             But go ahead and make your argument.

23        **MR. KETELTAS:**  I understand, Your Honor.

24             This is drawn from the exhibit that is already in

25 the record.  I only show it to you to give you a sense of the

1    time frames and how we back up.

2            The seed cleaning and processing process, and by

3    "sorting," I assume you were trying to get at the processing

4    that occurs, which is many steps, but it ranges from 90 to a

5    120 days, and all of the seed companies are either finished

6    with that process or at the very last few days of that 90 to a

7    120 day lead time period.

8            You will see that shipments to grower regions have

9    been it says January through July.  Now, let me make clear what

10   happens.  Almost all of the seed, approximately 90 percent, is

11   delivered by the end of March.  The extended time period, some

12   growers have to do replants.  When there's cold weather and the

13   seed crop fails, they have to replant seed, and that's why you

14   see an extended delivery time.

15           In terms of percentage of shipments actually

16   delivered, shipments for initial planting have occurred for the

17   early planting regions and will be completed for all regions

18   throughout March.  For example, Betaseed has delivered

19   43 percent of the seed.  The rest will be delivered in the next

20   couple of weeks.

21           I think I've answered all the questions.

22           **THE COURT:**  All right.  Would you like to add

23   anything or did he do a good enough job for you?

24           **MS. BRYSON:**  No.

25           **THE COURT:**  All right.  Thank you.

1          Mr. Achitoff?

2          **MR. ACHITOFF:**  Thank you.

3          The only point I would like to make here is that,

4    according to an exhibit that we filed with our reply brief,

5    Exhibit 38, which was a communication from one of the seed

6    company intervenors, SESVanderHave, the beginning of the seed

7    ordering season begins in October.

8          So all or, in an abundance of caution, virtually all

9    seed ordering for this spring occurred after this Court's

10   summary judgment decision; and, also, all, or virtually all,

11   occurred after the growers were informed, at least by American

12   Crystal, that they had an adequate supply of conventional seed

13   for this spring's beet planting available and an adequate

14   supply of the necessary herbicides and other chemicals.

15         **THE COURT:**  Do you want to say anything about that

16   briefly?

17         **MR. KETELTAS:**  I do, Your Honor.

18         Counsel's interpretation of what American Crystals

19   documents say is not evidence, and it's not what those

20   documents say.

21         American Crystal is unique among the growers.

22   They're the only one with a seed division, and those documents

23   talk about the market share of its own seed division, which is

24   only 28 percent of its growers' needs.

25         You've seen the exhibits to Dr. Manning's

1   declaration.  They show that American Crystal, like all others,

2   face a shortfall.  It may not be as significant as the others

3   but they face a shortfall as well.

4          In terms of the ordering time period, the seed was

5   grown before in the ground, years before, your summary judgment

6   ruling and that purchase period varies but it does go from

7   September.

8          **MS. BRYSON:**  I'd just like to quickly add that the

9   orders that the growers made were based on the approved

10  varieties that the co-ops had selected as a result of the

11  trialing period, which is described in the Meier declaration.

12         **THE COURT:**  All right.  We're going to move on

13  because I think I know we have good advocates here as far as

14  I've had some argument leak out from the factual aspects, but

15  it does help because I now know where I need to go back and

16  review and determine what is the appropriate interpretation of

17  those documents.

18         Now let's go to question number five.

19         **MR. KETELTAS:**  Your Honor, because this information

20  is competitively sensitive, we collected it in the same way

21  Dr. Manning collected other information, and I'm going to talk

22  to you about the aggregate data.

23         **THE COURT:**  All right.

24         **MR. KETELTAS:**  We would have to submit a new

25  declaration from Dr. Manning if that is something the Court

1   needs.

2           THE COURT:  All right.

3           MR. KETELTAS:  And Dr. Manning called everyone

4   yesterday and determined that 78.6 percent of the seed crop

5   that is currently in the ground has the genetically engineered

6   trait of the male sterile or female nonpollinating plants.

7           In terms of increases for 2011, she was able to

8   determine that the seed companies expect that number will

9   increase but are unable to yet tell by what amount, but that

10   number will go up.

11           THE COURT:  All right.  Do you want to say anything

12   else?

13                   (No response.)

14           THE COURT:  Mr. Achitoff, do you want to add

15   anything here?

16           MR. ACHITOFF:  No, Your Honor.

17           THE COURT:  All right.  Very well.  Question

18   number --

19           MR. ACHITOFF:  Your Honor?

20           THE COURT:  Yes.  Go ahead.

21           MR. ACHITOFF:  I'm sorry.  I just want to make a

22   quick correction to something I said in terms of where in the

23   record something is.

24           THE COURT:  Very well.

25           MR. ACHITOFF:  That the seed ordering season begins

1    in October is in Exhibit 33.  The Exhibit 38 that I referenced

2    is actually the statement from the president of American

3    Crystal regarding the availability of conventional seed.

4            **THE COURT:**  All right.  Let's move on to question

5    number six and ask for the plaintiffs response in the first

6    instance.

7            **MR. ACHITOFF:**  Yes.  The plaintiffs do dispute that

8    sugar beets are grown in different parts of the Willamette

9    Valley and we would direct the Court's attention to the

10   declaration of Frank Morton that was filed, I believe, on

11   February 19th, 2010, which describes in some detail his viewing

12   on February 16th of this year of the pinning maps, both

13   northern and southern Willamette Valley, as of February 16th,

14   2010.

15           And he describes in that declaration the locations

16   of specific chard and table beet seed growing fields in the

17   Willamette Valley and their proximity to sugar beet seed

18   fields; and, particularly, in the Northern part of the Valley

19   where there are many sugar beet seed fields that are clustered

20   as close as a mile from a variety of chard and table beet

21   growers fields.

22           **THE COURT:**  All right.

23           **MR. KETELTAS:**  Your Honor, I won't get into the

24   scientific nature of Mr. Morton's approach of the

25   Willamette Valley, but I'm glad Mr. Morton has been identified

1   because we deposed him in Portland, Oregon, and we asked him

2   this exact question, and we have a brief clip that is cited in

3   our papers that I would like to show that contains his answer.

4           **THE COURT:**  Is this a video clip?

5           **MR. KETELTAS:**  It is, Your Honor.  It's a minute

6   long and it directly addresses this question.

7           **THE COURT:**  All right.  So what I want you to do is

8   if it's not manifested on the video deposition, you state the

9   page and line number.

10          And, also, to tell you, it's generally my practice

11  in evidentiary -- well, this is not an evidentiary hearing, but

12  in evidentiary hearings, not to have the court reporter take

13  down what is in a deposition because whatever is cited will be

14  part of the record.

15          **MR. KETELTAS:**  Thank you, Your Honor.

16          It's Exhibit A to -- included in Exhibit A to the

17  Turner declaration and it's the Morton declaration at page 149,

18  line 24, to 150, line 20.  The video lasts a minute thirteen

19  seconds.

20          **THE COURT:**  All right.  Go ahead.

21              (Video played but not reported.)

22          **THE COURT:**  Can you stop that?  I'm sorry.

23          I was going to ask that we turn the lights down a

24  bit.

25          Okay.  That's perfect.  Thank you.

1        Would you start it over again, sir?

2            (Video played but not reported.)

3        **MR. KETELTAS:**  Ms. Bryson, also has a response to

4    the declaration.

5        **THE COURT:**  Yes.

6        **MS. BRYSON:**  On the supplemental declaration of

7    Frank Morton, which is in the record, he refers to commercial

8    seed crops for the companies Dorsing Seed, Universal Seed, and

9    Weaver Seed.  Each of those three commercial seed companies

10   does produce red beet and chard.

11       They are members of the WVSSA.  They are full

12   participants in the pinning process, and we can demonstrate for

13   the Court through a supplemental declaration that all of the

14   fields that are pinned are consistent with the isolation

15   distances in the pinning rules.  There are -- and we will be

16   glad to provide that, but --

17       **THE COURT:**  Who would be the declarant?

18       **MS. BRYSON:**  It would be the West Coast Beet Seed

19   manager who has negotiated with the companies about this.

20       But the other thing I would point out, Your Honor,

21   is that none of these three companies are plaintiffs in this

22   suit or represented by the plaintiffs.

23       **THE COURT:**  All right.  Mr. Achitoff?

24       **MR. ACHITOFF:**  Yes.  Your Honor, I don't, frankly,

25   see how what either the deposition segment or Ms. Bryson's

1    statements in any way contradict anything that is in the Morton

2    declaration or, for that matter, are even responsive to it.

3           The Morton declaration, which was based on a --

4    literally a view of the pinning maps, directly reported in the

5    declaration as of February 16th, two weeks after this

6    deposition in which Mr. Morton made general statements about

7    general tradition within the Valley.  So the reality of who is

8    where is in the Morton declaration as of February 16th and

9    nothing has been said to contradict that.

10          **THE COURT:**  All right.  All right.  I will look at

11   that again.

12          Let's move on to the next question, question number

13   seven, with respect to the organic market for sugar beets.

14          **MR. ACHITOFF:**  Your Honor, plaintiffs do not contend

15   there is an organic market for sugar beets at this time to

16   their knowledge.

17          **THE COURT:**  All right.  I assume you agree with

18   that.

19          **MR. KETELTAS:**  We agree, Your Honor, and so does the

20   United States, which has it in the Environmental Assessment at

21   page 5.

22          **THE COURT:**  All right.

23          Okay.  Question number eight.

24          **MR. KETELTAS:**  I might add, Your Honor -- I'm sorry.

25          **THE COURT:**  Yes.

1          **MR. KETELTAS:**  -- there also has never been an

2     organic sugar beet market in the United States, and you will

3     get that from the APHIS response.  They looked and looked but

4     were never able to find one.

5          The myth of an organic market started at the Center

6     for Food Safety's comments to the proposed deregulation by Doug

7     Gurian-Sherman, who is one of the declarants in this case, back

8     in December 2004 who cited that.  I just wanted to make clear,

9     it's not just that there isn't one now.  There never has been.

10         **THE COURT:**  All right.  Let's move to question

11    number eight with respect to the statement in the *Geertson Seed*

12    case.

13         **MR. ACHITOFF:**  Yes.  Thank you, Your Honor.  My

14    response would be as follows:

15         Plaintiffs, promptly after filing this lawsuit more

16    than two years ago, negotiated a case management statement with

17    the federal defendants, who at that time were the only other

18    parties, and both of us agreed that the case should be

19    bifurcated into merits and remedy; and we agreed on a briefing

20    schedule for the merits briefing that called for prompt

21    resolution of the merits and then a remedies phase.  This

22    occurred in or around April almost two years ago.

23         We, in accordance with -- that case management

24    statement was, in fact, filed with the Court; and we believed,

25    as I have every reason to think the federal defendants believed

1   at that time, that the remedies issues would be complex and

2   time-consuming enough for the Court and the plaintiffs, as well

3   as the defendants, as they've proven to be, not to compound the

4   difficulty by also trying to establish plaintiffs' likelihood

5   of prevailing on the merits at the same time.

6          And plaintiffs also believed at that time, with

7   intervenors at that time filing motions to intervene, that it

8   was inappropriate to have industry involved in addressing the

9   likelihood of success on the merits, which was consonant with

10  the Court's subsequent determination that the intervenors were

11  not properly part of the merits part of this case.

12          In accordance with the discussions and the case

13  management statement that we, in fact, did negotiate,

14  plaintiffs in early June of 2008 filed their motion for summary

15  judgment in accordance with the briefing schedule; and then the

16  federal defendants unilaterally reneged on the briefing

17  schedule and refused to file their responsive brief, and

18  instead moved to continue the summary judgment hearing, which

19  at that time was scheduled for September of 2008, only eight

20  months after the case was filed, and they asked to move that to

21  accommodate the intervention motions that had been filed in

22  April.

23          So that on defendants' motion, the September MSJ

24  hearing was vacated, and the plaintiffs were in limbo until

25  November of 2008 when the Court set the summary judgment

1    hearing for April of 2009.

2              Now, frankly, had the plaintiffs known in November

3    of 2008 that we would not, in fact, have a merits determination

4    until September of 2009, would we have filed a motion for a

5    preliminary injunction at that time?  Very possibly we would,

6    Your Honor, with the benefit of hindsight if for no other

7    reason than the rhetorical value of saying, "Here.  We're

8    moving for a preliminary injunction for all of the reasons that

9    people do."

10             But at that time we believed that gearing up for

11   preliminary injunction, which, as we've seen, takes months of

12   intensive preparation and discovery in a case like this, we

13   didn't feel at that time that it made sense to do that if, in

14   fact, we were going to have a merits determination by April of

15   2009, maybe a month, two months after a preliminary injunction

16   hearing.

17             Once the hearing, which was kicked over again till

18   May of 2009, was vacated, the plaintiffs at that point didn't

19   know whether we would be getting a decision in a week or in a

20   month.  We didn't know.  And, so, yes, we were hesitant to go

21   embark on this remedies phase without knowing whether we were

22   going to be getting -- exactly when we were going to be getting

23   the merits determination.

24             Once the ruling was issued in September of 2009, we

25   urged the Court not to continue the October 30th case

1    management conference for the remedies phase, and we

2    specifically cited the April planting season, this was back in

3    October of last year, saying, "You know, please reconsider

4    moving the October 30th case management statement to

5    accommodate SESVanderHave's intervention motion because we're

6    concerned about the April planting season."

7            We were unsuccessful in preventing that conference

8    from being moved until the beginning of December.  And then at

9    the December conference we immediately said, after the Court

10   said, "Well, we'll have a hearing in June," we said, "You know,

11   that's too late.  We're concerned about that.  We need to move

12   for a preliminary injunction."

13           We announced that we were intending to move for a

14   preliminary injunction publicly.  It was published in all the

15   trade press.  All the growers knew it.  All the intervenors

16   knew it.  And, so, that was the way that it played out.

17           And I would just like to add that it's quite evident

18   from the intervenors' arguments and their papers that,

19   regardless of when plaintiffs might have moved for a

20   preliminary injunction over the past year, two years, whenever,

21   plaintiffs would have been met with the identical arguments

22   that we're being met with today.

23           The intervenors argued in their opposition to this

24   preliminary injunction motion that by 2007, before we filed the

25   lawsuit, the sugar beet industry had irretrievably committed to

1    Roundup Ready.  Now, we feel the evidence shows that that's

2    clearly false, but we would have been faced with the same

3    arguments.

4            And we feel that if the Court would have issued a

5    preliminary injunction a year ago or a year and a half ago or

6    even two years ago, there's no reason why it should not issue

7    one today.  The intervenors have the same options now that they

8    had a year ago, that they had a year before that.  They had a

9    certain amount of seed and they had an opportunity to generate

10   more seed if they chose to do so.

11           So really they had the same cost of mitigation that

12   they have now, they had then.  So, you know, in terms of

13   what -- the real impact on the intervenors of not having moved

14   for preliminary injunction, it's frankly negligible.

15           **THE COURT:**  All right.  Counsel?

16           **MR. KETELTAS:**  Your Honor, preliminary injunctions,

17   the need for them, isn't determined as a matter of hindsight.

18   Preliminary injunctions are about foresight.  If you believe

19   you are going to be harmed, you believe that harm is imminent,

20   you act.

21           There is one party in this room, a single party, who

22   is responsible for the timing of a preliminary injunction

23   motion.  It's not the Court's job to file one.  It's not our

24   job to file one.  It's the plaintiffs.  They hold the tools to

25   do that.

1              Now let's talk about foresight.

2              Would you pull up Exhibit 8C, which is paragraph 57

3    of the Complaint in this case?

4              And the last line of paragraph 57, which may be hard

5    to read with the ELMO.

6              **THE COURT:**  I don't have my glasses on.

7              **MR. KETELTAS:**  It says:  (reading)

8                   "There is an imminent and significant

9                   potential for GE sugar beet seed to contaminate

10                  non-GB sugar beet seed and seed of other related

11                  crops, because sugar beet seed production is

12                  primarily concentrated in the Oregon State

13                  Willamette Valley, and because sugar beet pollen

14                  can be spread over a wide area."

15             That is their position the day they filed the

16   Complaint, which, as you know, we believe already was years

17   later than it should have been filed.  They could have acted on

18   that very day and did not.

19             We also cite in your brief, from the deposition of

20   Frank Morton, a really interesting passage that covers this

21   same point.  It's cited in our brief at page 18, lines 18 to

22   19.

23             And what Mr. Morton admits is that his declaration

24   in support of this preliminary injunction, filed just weeks

25   ago, the grave imminent harm paragraph, is cut and pasted from

1    a declaration he did for the same court 18 months ago.  It's

2    the same words.  If that's the basis for a preliminary

3    injunction today, this injunction motion should have been filed

4    years ago.

5              The notion that we're in no different shape than we

6    were two years ago or in 2006 when Mr. Morton says, "My life

7    has changed because I now know that seed is growing, Roundup

8    Ready seed is growing in the Valley," is simply not true.

9              Had this motion been filed in 2006, had it been

10   filed in 2008, you would have had a different cast of

11   characters in this room because the stake of the growers, the

12   full transition to a 95 percent industry would not have

13   happened.

14             These aren't decisions that we made since this case

15   was filed.  The seed started growing in 2006.  Mr. Morton,

16   plaintiffs' key representative, knew that.  We cite that

17   language in the brief, what he says, "It would have dawned on

18   me at that moment that my life had just changed."  Those are

19   very decisive words.

20             There's one party in this room who held the keys to

21   the injunction.  It is the plaintiffs; and, by the way, the

22   same plaintiffs who were admonished in the *Geertson* case, if

23   they want an injunction, they've got to ask for one.

24             **THE COURT:**  Ms. Bryson, anything?

25             **MS. BRYSON:**  No.

1          **THE COURT:**  Would you like to respond?

2          **MR. ACHITOFF:**  Yes, Your Honor.

3          To the extent that we're being dragged back to

4     prefiling history, I think we have covered in our reply brief

5     adequately the fact that it wasn't until after the dates that

6     Mr. Keteltas is referring to, and not until mid to late 2007,

7     that it was clear to the public that the industry had accepted

8     Roundup Ready sugar beets.

9          So regardless of when some seed companies may have

10    started to plant Roundup Ready seed, the industry that actually

11    was going to use that seed did not embrace it until mid to late

12    2007.  And, in fact, American Crystal, the largest of the

13    grower processors, didn't even -- they announced that there

14    would be no, zero, Roundup Ready sugar beets in 2007.  And

15    their board didn't even authorize Roundup Ready sugar beets

16    until the middle of 2007, and that's in their 10(k), which is

17    in front of the Court in our reply brief.

18          So the history prefiling makes it very clear that it

19    wasn't until a few months before the plaintiffs filed this

20    lawsuit that it was clear that the industry had, in fact, begun

21    to embrace Roundup Ready sugar beets, regardless of when seed

22    companies were planting seed.  So that's the prefiling.

23          As far as the postfiling, yes, it is plaintiffs'

24    responsibility to seek a preliminary injunction.  Nobody is

25    saying that it's anybody else's.  However, I've tried to convey

1    that putting yourself in the plaintiffs' position with the

2    various scheduling issues that arose, that decision was not

3    frivolous.  It was based upon the situation that we were met

4    with at that time.  We did the best we could.

5            And in terms of what the options are, I continue to

6    maintain that the options have not changed for the industry.

7    They choose whether or not to grow more -- to grow conventional

8    seed or to plant conventional seed.  They chose not to after

9    the case was pending in 2008 and 2009, and now again in 2010,

10   even though they have not known when injunctive relief would

11   occur, if and when it would occur, although they knew that

12   sooner or later we'd be in this situation.

13           So they have made the choice to create this art

14   scarcity argument by their own business decision not to take

15   steps any time over the last two years to change that

16   situation, and they had that opportunity.

17           **THE COURT:**  All right.  Let's move on now.  I have

18   the information I need on that point.

19           Let's go to question number nine, and I think

20   subparts A through D would be answered in the first instance by

21   the intervenors and then, perhaps, the plaintiffs could discuss

22   the Navazio declaration.

23           So this, obviously, is the issue about what happens

24   if the genetically engineered seeds are mixed with conventional

25   seeds, what would have to happen, what is the process for

1    cleansing the crop from the -- separating those two out, and

2    then followup questions.

3              **MR. KETELTAS:**  Mr. Perry is going to address that

4    for us.

5              **THE COURT:**  Very well.

6              **MR. PERRY:**  Thank you, Your Honor.

7              There are two declarations that address this in

8    detail.  One is from J.R. Stander.  That's Docket 264.  The

9    other's from Paulette Pierson.  That's at 260.

10             The J.R. Stander declaration addresses this at

11   paragraphs 8 through 18.  And to summarize very briefly, there

12   are a number of tools that can be exercised within a single

13   growing season to eliminate any unwanted cross-pollination of

14   gene flow from the seed crop you're growing.  Those tools can

15   be used both for the basic seed and for the commercial seed.

16             They are a mix of identifying off types and using

17   very inexpensive methodology to create a genetic bottleneck so

18   the unwanted trait doesn't translate beyond those seed crops.

19   Mr. Stander describes it far better than I can.

20             Part of the question 9(b) asks about the root crop.

21   So I would refer to the Court there to a couple things.  One is

22   the Government's expert, Dr. Neil Hoffman, Docket 275, at

23   paragraph 38, where he says:  (reading)

24                  "There are no counties in the United States

25                  where sugar beet root crops and chard or table

1    beet seed crops are growing in the same county.

2         Thus, the chance of cross-pollination from a

3         bolter from a root crop is near zero."

4         Also, referring the Court to the Pierson declaration

5    at paragraphs 62 to 69, which explains why, even if there were

6    crops that could be cross-pollinated from the root crop nearby,

7    which they aren't, that type would be extremely unlikely

8    including bolting is rare.  Bolters, if they occur, are removed

9    from the field as a matter, of course, for agronomic reasons

10   and, essentially, have no chance, no realistic chance, of

11   creating an off type from another crop.

12             **THE COURT:**  All right.

13             **MR. ACHITOFF:**  Yes, Your Honor.

14        After receiving the Court's questions, I contacted

15   Dr. Navazio last night and drafted a declaration.  I provided

16   copies to counsel, and I would like to offer that declaration

17   which Dr. Navazio addresses all of the issues in question nine;

18   and, so, I would ask that I be able to submit that.

19             **THE COURT:**  Just so I understand, so this

20   declaration of Dr. Navazio addresses all of the subparts of

21   question nine, including the Court's question about his

22   statement impacting his paragraph 16?

23             **MR. ACHITOFF:**  Yes.

24             **THE COURT:**  All right.  I assume you object to it.

25             **MR. KETELTAS:**  Well, Your Honor, we've had it for

1  half an hour.

2          **THE COURT:**  Right.

3          **MR. KETELTAS:**  And, at the very least I would like

4  to be able to respond to it.  I will note that it's quite

5  different than the response that you identified from

6  Mr. Navazio in paragraph 16.

7          **THE COURT:**  Well, let me just say, I will physically

8  receive it.  What weight or what use the Court makes of it is

9  another matter.

10          If I find that it's material to the outcome, I may

11 very well, and it's something that could not have been

12 addressed in the first instance by the defendants or the

13 intervenors, then I will obviously give them an opportunity,

14 but I will certainly receive it at this point.  You can hand it

15 up to the clerk.

16          **THE CLERK:**  I think we can take it as a chambers

17 copy, but they need to e-file it.

18          **THE COURT:**  You need to e-file it as well after this

19 hearing.

20          **MR. KETELTAS:**  All right.

21          **THE COURT:**  All right.  So I'm not going to sit here

22 and read it right at this moment.

23          **MR. ACHITOFF:**  Sure.

24          **MR. KETELTAS:**  A procedural point on that,

25 Your Honor.

1      **THE COURT:**  Yes.

2      **MR. KETELTAS:**  Obviously when we prepared our

3  declarations, the ones I just mentioned, we were responding to

4  the prior Navazio declaration, which said essentially there is

5  no way for the farmer to remove the foreign DNA sequence from

6  his crop, which we've shown is not the case.  I believe that we

7  would want to respond to whatever else is in this new

8  declaration in some detail, if we could --

9      **THE COURT:**  All right.

10      **MR. KETELTAS:**  -- if you want the rely on it.

11      **THE COURT:**  Well, I think that's a fair point.  If

12  that becomes material to the Court's determination in any

13  respect, then I will provide you an opportunity to respond,

14  unless I believe that somehow the Court has enough information

15  and doesn't need additional information; but that certainly --

16  is there any more you want to say on that?

17      **MR. KETELTAS:**  No, Your Honor.

18      **THE COURT:**  All right.  Yes, Counsel?

19      **MS. LI:**  Your Honor, I'm Beverly Li for the federal

20  defendants.

21      Just to be clear, with the supplemental Navazio

22  declaration, the federal defendants would also appreciate an

23  opportunity to take a closer look and respond if necessary.

24      **THE COURT:**  All right.  Let me ask -- I don't want

25  to waste time, but maybe you can give us maybe a five-minute

1   synopsis of what's in there, just so it's in the record, what's

2   in the supplemental declaration.  So as I'm thinking about all

3   the questions, I can separate in my own mind what's important

4   for summarizing versus what was previously in the record.  I

5   guess you heard I'm not going to take the time to read this at

6   this point.

7          **MR. ACHITOFF:**  Certainly, Your Honor.  I will

8   summarize it.

9          Dr. Navazio says that the process of removing

10  contamination depends on whether the basic seed alone has been

11  contaminated or whether the commercial seed also has been

12  contaminated.

13         So the first issue is determining which happens to

14  be the case.  If it can be determined that the contamination is

15  confined to the basic seed and it has never gotten into the

16  commercial seed, then the issue becomes how to regenerate the

17  basic seed.

18         If there happens to be a stock of basic seed that

19  you know is not contaminated, that you can determine it through

20  testing or, perhaps, it preexisted the contamination and has

21  been stored somewhere else, then you can, in theory, destroy

22  the basic seed that's been contaminated and replace it with

23  another pure basic seed stock, and that is the simplest

24  situation that we could address.

25         If it happens that only the basic seed's been

1    contaminated but there is not an adequate supply of replacement

2    seed or, perhaps, it's a new variety and there never was

3    another supply of that variety, then the issue is you have to

4    regenerate the basic seed stock from the contaminated seed

5    stock.  And the way that's done very simply is, you take a

6    certain number of the seeds and you have to plant them out and

7    you sprout them.

8            Let's just say, for the sake of discussion, it's a

9    thousand seeds.  You plant them out.  They begin to sprout.

10   When they begin to sprout leaves, you take a sample of the

11   leaves and you subject them to tests to determine whether or

12   not they have the contamination.

13           This is a noninvasive test; in other words, you

14   can't destroy the seedling.  Because if you determine that this

15   particular seedling is not contaminated, that's going to be the

16   basis for regenerating your pure basic seed.  So you allow them

17   to grow so that you can create new seed from them.

18           And the ones that test positive for the

19   contamination trait, you cull those out and destroy them.  So

20   if you plant a thousand, you cull out a hundred.  You have 900

21   that are growing that you have tested.  They are pure.  You use

22   those to regenerate the next generation of pure seed.

23           How long that process takes depends upon how many of

24   these seeds you plant, how many of them are pure, how much

25   basic seed stock you need.  In other words, if you need -- the

1    more seed stock you need, the more seedlings you have to plant

2    to create it, and so forth.  It can take one generation, it can

3    take multiple generations depending on how much you need and

4    how many seedlings you plant.

5            If it gets into the commercial seed, that's a whole

6    different ballgame because you've shipped this seed out to who

7    knows how many different customers.  In the case of clients

8    that plaintiffs ship to, we're talking about hundreds or

9    thousands of customers who may receive commercial seed that may

10   have some level of contamination in them.

11           So the issue becomes tracing it, and you have to

12   find out where all of the seed went once it got out into the

13   marketplace and what became of it, what it's being used for.

14   Is it still in the bag?  Well, that's great.  Then you can find

15   it, locate it, destroy it.

16           But if you've got it in hundreds or thousands of

17   places that farmers are using, and some farmers that our

18   clients work with, they use seed to plant to create more seed,

19   so some of that seed is creating future generations already.

20           So if you can just imagine the sort of branches of

21   trying to track down all of the people that purchased the

22   commercial seed, finding out where all the seed is, and it's

23   not only in United States, but our clients ship

24   internationally, tracking it all down and making sure that it

25   has not been used to generate more seed, and so forth, that

1    task is monumental.

2              So it really depends on whether we're talking --

3    where the stage of contamination is and when you detected it.

4    If you detected it very quickly before it ever went out the

5    door, it's not so bad.  If not, then saying that it's

6    impossible is not much of an exaggeration.  It really depends.

7              If we're talking about the roots themselves, well,

8    if the roots have been harvested and they're put in a

9    warehouse, you're really not going to be able to tell one root

10   from another; but, on the other hand, those roots are going to

11   be processed.  They're not going to be used for seed

12   propagation, so that's not really a problem.

13             On the other hand, sugar beet roots are not always

14   harvested and put in warehouses.  Some of them are

15   intentionally or accidentally left in the ground, or they're

16   culled and they're put in culled piles by the side of the road,

17   or wherever.  Those do have some potential to sprout and

18   produce progeny.  What the percentage or the likelihood is, is

19   speculative but it can happen.  But the real problem is if it

20   gets into the commercial seed, tracking it down becomes

21   extraordinarily difficult.

22             **THE COURT:**  All right.  I understand your procedural

23   objection that you have.  Do you have --

24             **MR. PERRY:**  Right.

25             **THE COURT:**  -- anything else you want to say?

1          **MR. PERRY:**  Yes, I do, Your Honor.

2          I think that in the existing declarations and any

3    that we would submit, we would make a couple points in response

4    to what Mr. Achitoff said.

5          One, using appropriate seeds stewardship, the basic

6    seed --

7          **THE REPORTER:**  I'm sorry.  Can you slow down just a

8    little bit?

9          **THE COURT:**  What was that word, "using a...."?

10         **MR. PERRY:**  -- appropriate seed stewardship --

11         **THE COURT:**  Yes.

12         **MR. PERRY:**  -- at the basic seed level and at the

13   commercial level, you can, in ways described in the

14   declarations, address any of this type of harm before you got

15   to the situation before it was out the door.

16         All right.  That's what J.R. Stander lays out in his

17   declaration.  And if there's any need for us to lay that out in

18   greater detail, they're not expensive, they're normal, I

19   believe there's evidence in this case which we could submit in

20   a followup declaration that growers all over the United States,

21   even the organic growers, Mr. Sorenson we deposed, does the

22   same anything.

23         These are common techniques.  This can be managed,

24   and it's managed by the identification and removal of off types

25   and through different types of genetic testing, some of which

1    are not expensive at all.

2             THE COURT:  All right.  All right.  I understand and

3    I will consider the question of the reviewing or receiving

4    information in the supplemental declaration.

5             Let's move on -- did you want to say something else?

6                      (No response.)

7             THE COURT:  Okay.  Question number 10 is addressed

8    to the plaintiffs in the first instance.

9             MR. ACHITOFF:  Yes, thank you, Your Honor.

10            Dr. Navazio, because it is closely related to the

11   issues in question number nine, also addressed question number

12   10 in his declaration which I will summarize.

13            THE COURT:  Please do.

14            MR. ACHITOFF:  Yes.  Whether an off type is readily

15   identifiable is a function of the varieties that have been

16   cross-pollinated, the stage of the resulting plant's maturity,

17   and the generation of the plant, meaning first generation or a

18   later generation.  And I'll explain what I mean here.

19            If we're talking about a cross between, let's say, a

20   sugar beet and a red table beet, Dr. Navazio explains that it's

21   very likely that, as the resulting offspring matures, you will

22   be able to see that what should be a red table beet might be

23   pink and it will be identifiable.

24            However, at the early stages of the resulting

25   offspring's life cycle when it's a sprout, you will not see

1    that.  So the question becomes:  What is the use that a farmer

2    may have of a seed?

3              For example, if you have a contaminated seed that is

4    the result of a cross between sugar beet and a red table beet,

5    a farmer buys that.  He plants it.  Now, if he's going to be

6    growing it for the beet itself, sooner or later, yes, he's

7    likely to be able to see that this is pink.  This isn't the way

8    I want it.

9              But if he's growing it for a salad mix, which many

10   farmers do from my client's seed, they cut those leafs off when

11   they're two- to three- or four-inches long and some of the

12   farmers actually sprout what are called microgreens for salads

13   that are even younger.  Those are basically sprouts.  At that

14   level you're not going to be able to see an off type because

15   the phenotype just doesn't manifest itself until later in the

16   maturity of the plant in most cases.

17             Now, that's in sort of the clearest situation where

18   you have a color issue.  If you're talking about a cross

19   between, say, a sugar beet and a gold beet or a white beet,

20   then even at later stages of maturity you may not be able to

21   readily detect the difference.

22             If you're talking about a cross between a sugar beet

23   and Swiss chard, well, if it's red chard, again, you might

24   notice that.  If it's green chard with a white stem, you might

25   not.

1          As Dr. Navazio points out, the stem and leaf

2     characteristics of green chard and a sugar beet are somewhat

3     similar.  So it really depends on the stage of maturity and the

4     expertise of the person making the observation and the person's

5     familiarity with the specific varieties that are at issue here.

6          As far as the generation, a first generation cross,

7     let's say a genetically engineered sugar beet and a table beet,

8     the Roundup Ready trait in the first generation is likely to be

9     tied with traits that are visually identifiable.

10         In a later generation, you know, the second, third

11    generation, the Roundup Ready trait will likely separate from

12    other traits so that it will continue to be carried and

13    biologically active, but it will no longer carry with it the

14    visually distinguishing traits so that a second or third

15    generation table beet, for example, may carry the Roundup Ready

16    trait but will no longer be visually distinguishable as the

17    first generation might be.

18         So those are the issues that determine whether, in

19    fact, an off type is identifiable; and then you get into issues

20    of, assuming that it is, you know, how porous are the systems

21    in place for identifying off types and what people do with

22    them.

23         There are many farmers who notice off types, and

24    depending on the nature of the off type, they may sell it.

25    There's no reason for a farmer who sees a misshapen beet not to

1  see what he can get for it.  It may not be his prime product,

2  but he'll sell it.

3          On the other hand, if it's an organic grower and the

4  organic grower knows that there has been a genetic

5  contamination, then that grower is going to be motivated to

6  cull out those off types, but he's only going to do that if he

7  knows there's been that genetic contamination.  Otherwise,

8  he'll see an off type and he'll think, "Well, I don't know.

9  Maybe I can sell that.  I have a market for those."  So it

10  really depends on what the grower knows.

11          And then even those who know, if we're talking about

12  acres and acres, hundreds, thousands of acres, yes, farmers, as

13  a general rule, do look for off types.  They do cull them, but

14  it's not a perfect system.  It depends upon the motivation, the

15  expertise, the number of acres, and so forth.

16          So the statement that, yeah, they produce

17  identifiable off types is a gross oversimplification and

18  depends on many factors.

19          **MR. KETELTAS:**  Your Honor, a few refinements.  If a

20  sugar beet crosses with a table beet, you get a lighter color

21  beet, the pink beet.  This is the most typical example.  But

22  you also get red veins in the leaves of the beet.  It's not

23  just wait for the root and see what the root looks like.  The

24  veins of the beet are going to be red.

25          Second, if a sugar beet crossed with Swiss chard, it

1    would also be obvious.  First of all, you have a root where you

2    otherwise wouldn't have a root; second, the leaves of a sugar

3    beet are differently shaped and that would be obvious.

4           Now, we're talking hypotheticals but High Mowing

5    seeds, one of the actual plaintiffs in this case, in the

6    deposition talked about looking for just these kinds of off

7    types in the regular process they have.  It wasn't an issue in

8    the briefing we did.

9           We have a video clip, if you would like to see it

10   very quickly, that explains how he looks for off types.  And

11   this is 52 second clip from two pages, page 85, line 10,

12   through 85, line 24, and then continues at 86, line 10, through

13   86:13, and it's a clip.

14          **THE COURT:**  All right.  Would you lower the lights,

15   please?

16          **THE CLERK:**  Yes.

17          **THE COURT:**  Thank you.

18             (Video played but not reported.)

19          **THE COURT:**  All right.  Anything further?

20          **MR. KETELTAS:**  No, Your Honor.

21          **THE COURT:**  All right.  Mr. Achitoff, anything?

22          **MR. ACHITOFF:**  No.

23          **THE COURT:**  All right.

24          **MR. ZIRLIN:**  I'm sorry, excuse me, Your Honor.

25          **THE COURT:**  I'm sorry.  You did exactly what I asked

1    you to do.

2              **MR. ZIRLIN:**  I'm taking you up on your invitation.

3              **THE COURT:**  Thank you.

4              **MR. ZIRLIN:**  I would just like to point out,

5    Your Honor, that in Casper Lehner's declaration at paragraph 9

6    he says that:  (reading)

7                   "Betaseed has been harvesting sugar beet

8                   seed in Oregon for over 30 years, and I have

9                   been employed at Betaseed's Tangent, Oregon,

10                  facility for 18 years.  To my knowledge Betaseed

11                  has never received a single complaint from a

12                  vegetable seed grower about cross-pollination by

13                  a sugar beet seed dealer."

14             Now, of course, that has -- that doesn't -- the fact

15   that it's Roundup Ready or not doesn't change biology of the

16   plant as to whether it is more likely or less likely to

17   cross-pollinate with another beta-species.

18             And, as Mr. Achitoff points out, the organic growers

19   are concerned about off types as the sugar beet farmers are

20   and, yet, you know, you could talk about whether it's a perfect

21   system or not.  No system designed by human beings is perfect.

22             I think the question, obviously, before the Court

23   is:  Is there a likelihood of immediate imminent harm?  And the

24   record undisputed evidence in the case is that in the

25   Willamette Valley, these growers have been coexisting for 30

1   years and there have not been significant complaints about

2   cross-pollination from sugar beet, their crop, or, to tell you

3   the truth, from their crop to our crop.  Although we do

4   occasionally see off types and we row them and we say, you

5   know, "We didn't want that.  Gee."  You know, but they get rid

6   of it.  They deal with it.  They're farmers.  They understand

7   this process.

8          Thank you, Your Honor.

9          **THE COURT:**  Do you want to say anything else?

10         **MR. ACHITOFF:**  No.

11         **THE COURT:**  All right.  Question number 11 and,

12  quite honestly, I couldn't, in the amount of time allotted to

13  go over this, couldn't find exactly where the pin cite was.

14         **MR. ACHITOFF:**  Page 30 of the draft biological

15  opinion.

16         **THE COURT:**  All right.  Thank you.  It's a long

17  opinion, so --

18         **MR. ACHITOFF:**  Right.  I'm sorry.  It's the quote

19  that I read earlier, page 30.

20         **THE COURT:**  All right.  Very well.

21         All right.  What we're going to do now is we're

22  going take a short recess.  I want to consider the responses to

23  the questions and my notes, and see if I have any other

24  questions, and then I'll give you an opportunity to wrap up if

25  you wish.

 1            But, again, it's not an invitation for open argument

 2    or closing argument; but if there's something you think that

 3    was raised that needs to be addressed in the context of what

 4    we've been discussing, that will be your opportunity to do so.

 5            So let's take about 15 minutes.

 6            Yes?

 7            **MR. KETELTAS:**  Your Honor, I'd like to hand up -- we

 8    do have copies of the testimony shown.  I don't know if that's

 9    something --

10            **THE COURT:**  It's not necessary.  I have the

11    citations.  I can go right to the source.

12            Thank you.  15 minutes.

13                      (Recess taken at 10:50 a.m.)

14                   (Proceedings resumed at 11:07 a.m.)

15            **THE COURT:**  All right.  We're back on the record.

16            You know, I guess, it's a tribute to counsel that in

17    going over my notes I don't have any additional questions.

18            I will consider the question of the supplemental

19    Dr. Navazio declaration.

20            But upon reflection, is there anything that counsel

21    wish to say in closing that we haven't covered before the

22    matter is submitted?

23            **MR. PERRY:**  Your Honor, if I could just raise one

24    very brief point and it refers to something Mr. Achitoff said

25    earlier today.  He was talking about Frank Morton's

1    supplemental declaration in his reply brief and suggested that

2    Mr. Morton was attempting to identify the location of fields

3    for Dorsing or Universal Seed companies who are members of the

4    Willamette Valley Special Seed Association but who are not

5    plaintiffs in this suit.

6            The record shows, and including exhibits to the

7    Morton deposition, that both those companies consented to the

8    existing isolation distances in this case.

9            And I would make a short legal point as well that,

10   of course, since they're not plaintiffs under *Lewis v. Casey*,

11   and a string of other cases from the Supreme Court over the

12   last 15 years, including recently *Summers v. Earth Island*, they

13   cannot be the subject of relief in this case.

14           **THE COURT:**  All right.  Thank you very much.

15           Anything other defendants wish to say anything?

16           **MR. KETELTAS:**  Your Honor, just briefly.

17           Over the past few years of traveling around the

18   country to where sugar beet growers are, it's the green areas

19   where beet crops are grown; and we've met with a lot of farmers

20   and you've seen declarations from a lot of them in the record:

21   Russ Mauch, Duane Grant, John Snyder, Mike Hofer.  There's many

22   in the record.  And these are family farmers who've gone

23   through their beet checks and their field notes to produce

24   documents in the case.  They've taken the process very

25   seriously; and, frankly, they are all on pins and needles about

1    the upcoming days and weeks and even longer term than that.

2              My point is, there are thousands of these farmers.

3    We have selected, hand selected, a group that represents them.

4    And if this Court intends to take action that puts their

5    situations at risk, they want to come here and tell you their

6    stories and tell you about the work they do, the seeds they

7    grow, and how they have transitioned to Roundup Ready sugar

8    beets.

9              While these farms are across the country we don't

10   think pose any risk, the plaintiffs have identified from

11   growing the beet crop, pretty much with 100 percent certainty

12   these are the people who would bear the brunt of the injunction

13   plaintiffs ask for.

14             **THE COURT:**  Let me -- while you are up there, I want

15   to ask a question and then I'll get plaintiffs an opportunity

16   to both respond to the question and also say any final

17   statements they wish to make.

18             And it's something that was not, I guess you would

19   say, it was not on the take-home examine, it's kind of a pop

20   quiz question, and has to do with bond.  There's no discussion

21   in any of the papers about imposing of a bond.

22             We've heard, you know, say high numbers of billions

23   and billions here.  I assume that the defendants concede that,

24   given the nature of the allegations and the nature of the case,

25   because this is a case, an environmental case, involving NEPA,

1    that the usual rules with respect to posting of a bond do not

2    apply; is that correct?

3               **MR. KETELTAS:**  Your Honor, I cannot actually speak

4    to that.  We haven't discussed that possibility.

5               **THE COURT:**  All right.  Is there anybody on the

6    Defense side that wants to take a shot at that?  Because I'm

7    going to ask the plaintiffs about that.

8               Normally it's the plaintiffs' burden, but in a case

9    alleged -- a purported public interest case, such a requirement

10   could be waived but the statute does say, the FRCP section does

11   say, the Court shall, if the Court thus decides to issue a

12   preliminary injunction, shall issue a bond.

13              I know you cannot issue a bond -- this would not be

14   a bond against the defendants, obviously.  It would be required

15   to be posted by the plaintiffs, but let me hear.

16              Ms. Li, would you like to speak about that?

17              **MS. LI:**  Your Honor, just very quickly, the federal

18   government needs some time to confer on this issue as to

19   whether we would seek a bond in this case; but I have been

20   involved in other cases, other environment cases of this

21   nature, where the Court has issued a bond in connection with a

22   preliminary injunction.  So it's not unheard of even in NEPA

23   type of environmental cases.

24              **THE COURT:**  All right.  Mr. Achitoff, do you want to

25   say anything about that?

1           It's kind of interesting because nobody has -- it's

2      a little bit of the elephant in the room.  Nobody had mentioned

3      it.  Maybe nobody mentioned it because it doesn't apply to you,

4      but it's something that is typically discussed at these kind of

5      proceedings.

6           **MR. ACHITOFF:**  Yes.  And, Your Honor, plaintiffs do

7      take the position that a bond requirement should be waived or

8      at least be nominal, as is commonly the case in this type of

9      litigation.

10          If the Court wanted briefing on it, of course, we

11     could do that.

12          **THE COURT:**  All right.  Very well.  I think

13     that's -- I will certainly take that into account; but among

14     all of the issues that the Court has to resolve, that may not

15     be the biggest issue for me to resolve.  I will, if

16     appropriate, I will take you up on that unless it's something

17     the Court can determine on its own.  Thank you.

18          Anything further from anybody else?

19          All right.  The matter -- yes, Mr. Achitoff.  I

20     promised I'd give you an opportunity to respond.  I apologize.

21          **MR. ACHITOFF:**  Thank you.

22          I just want to briefly respond in that if the

23     intervenor defendants are going to be invoking the sort of salt

24     of the earth idea, I want to point out that, throughout this

25     case, the industry has adopted the posture that they basically

1    can do what they want and they can place the burdens of doing

2    what they want on the plaintiffs and the public.

3              If contamination occurs, of course, they assure us

4    that it won't.  When it does, they swear it won't happen again.

5    But they, you know, simply make these assurances that "Oh,

6    well, the plaintiffs should do testing.  Testing is

7    inexpensive."  Testing is not so inexpensive.  And relative to

8    my clients revenues, it's quite expensive, not relative to

9    Monsanto's revenues.  Growouts, regenerating seed stock,

10   repairing reputation, salvaging a small business, that's what

11   my clients are facing.

12             The industry has had options and our reply brief

13   mentions those options.  The industry could have, at any time

14   in this process, prevented any of the problems that we're

15   talking about here.  They chose not to.  For one reason, they

16   want to maximize their profits.  Well, their business says

17   they're entitled to maximize their profits; however, they

18   should not be putting the burden of that on the plaintiffs and

19   the rest of the public.

20             Industry wants to be able to grow the crop that they

21   want with impunity.  They are not providing tests to plaintiffs

22   and the public to test for contamination.  They are not

23   offering and, in fact, they vigorously resist any kind of

24   compensation for any contamination that may occur.

25             In fact, when contamination has occurred in the

1    past, Monsanto has sued the farmers who got contaminated.  So

2    it really unfairly burdens the plaintiffs and the public and it

3    also destroys the whole purpose of NEPA, which is to

4    investigate these issues and make sure that problems don't

5    arise before they happen.

6              And that's all I want to say about that.  Thank you.

7         **THE COURT:**  All right.  Does anybody feel the need

8    to respond?  Briefly please, because we're getting into what I

9    call the appropriately Fourth of July focus, which I'm not

10   meaning to demean the arguments but, obviously, these are the

11   policies that are underlying all this, but I'll hear you if you

12   like.

13        **MR. PERRY:**  Perhaps I should just object to what

14   Mr. Achitoff just said.

15        **THE COURT:**  Well, you know, the Court is mature

16   enough to be able to figure out argument from the law and

17   facts, so --

18        **MR. PERRY:**  There is one more point, though,

19   Your Honor.

20        **THE COURT:**  Yes.

21        **MR. PERRY:**  Center for Food Safety brought this case

22   after they litigated the alfalfa case at the District Court and

23   it went up on appeal.  The Supreme Court has granted our

24   petition for certiorari.  They've expedited the case.  Oral

25   argument will occur on April 27th, and it's likely that we'll

1  have a ruling from the Supreme Court there by the end of June.

2         **THE COURT:**  All right.  I understand that, and I

3  understand the issues that the Supreme Court has certified as

4  well.  I'm not sure all those issues are applicable to or

5  dispositive to this case.

6         All right.  Thank you very much, Counsel.

7         Yes?

8         **MR. ACHITOFF:**  It's not argument.  The issue -- we

9  have a briefing schedule currently in place for a June hearing.

10 I think -- at least we would like to know, and I would assume

11 Defense would like to know as well, what the Court's feeling is

12 about whether we should be proceeding with a brief, if I'm not

13 mistaken, next week with respect to a permanent injunction

14 hearing.

15        **THE COURT:**  I think I would -- the briefing should

16 proceed because there is going to be a remedy.  No matter what

17 the Court does, there is going to be a permanent remedies

18 phase.  The Court has, you know, made its rulings on summary

19 judgment on the merits, and that is going to drive remedies,

20 permanent remedies.  There are going to be permanent remedies

21 in this case.

22        So the only thing I would say without prejudging

23 that, because I haven't seen anything on that, is that you

24 should continue with that.  Hopefully -- not hopefully, the

25 Court will expeditiously rule on the motion, but it does not in

1  any way interfere with what you're going to be doing.  I don't

2  want in any way to jeopardize that briefing schedule, because I

3  want the hearing to take place and I want a ruling to come

4  down.

5          All right.  Does that answer your question?  Proceed

6  with the briefing schedule.  If your question was, should we

7  delay it, the answer is no.

8          **MR. ACHITOFF:**  Thank you.

9          **THE COURT:**  If the question is, the implication

10  question, "Get a move on Court and write your order" --

11          **MR. ACHITOFF:**  No.  That's not -- it was more the

12  former than the latter.

13          **THE COURT:**  All right.  Thank you very much.  The

14  matter is submitted.

15          **MR. ACHITOFF:**  Thank you.

16              (Proceedings adjourned at 11:18 a.m.)

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, KELLY BRYCE, Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 08-0484 JSW, Center for Food Safety, et al. versus Charles Connor, et al., were reported by me, a shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

*Kelly Bryce*

Kelly Bryce, Court Reporter

Sunday, March 20, 2010