PAIGE M. TOMASELLI, State Bar No. 237737
KATERYNA L. RAKOWSKY, State Bar No. 246248
Center for Food Safety
2610 Mission Street, Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Email: ptomaselli@icta.org
       kateryna@icta.org

PAUL H. ACHITOFF (Admitted Pro Hac Vice)
Earthjustice
223 South King Street, Suite 400
Honolulu, HI 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: pachitoff@earthjustice.org

GREGORY C. LOARIE, State Bar No. 215859
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
T: (510) 550-6725 / F: (510) 550-6749
Email: gloarie@earthjustice.org

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR FOOD SAFETY, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>TOM VILSACK, *et al.*,<br><br>Defendants,<br><br>and<br><br>MONSANTO COMPANY; SYNGENTA SEEDS, INC.; AMERICAN SUGARBEET GROWERS ASS'N, *et al.*; BETASEED, INC.; and SESVANDERHAVE USA, INC.,<br><br>Defendant-Intervenors. | Case No.: 3:08-cv-00484-JSW<br><br>PLAINTIFFS' MEMORANDUM IN SUPPORT OF PERMANENT INJUNCTION<br><br><br><br><br><br>Date: July 9, 2010<br>Time: 9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Place: Courtroom 11 |

# DOCUMENTS SUBMITTED UNDER SEAL

**TABLE OF CONTENTS**

Page

I. INTERVENORS' STRATEGIC EFFORT TO BURDEN THE PUBLIC
WITH THE COSTS OF INJUNCTIVE RELIEF IS INEQUITABLE ...................... 1

II. ISSUING A PERMANENT INJUNCTION IS IN THE PUBLIC INTEREST ........ 4

    A. The Public Interest In Enforcing Congress's Intent In Enacting NEPA ........ 5

    B. The Public Interest In A Competitive Market ................................................ 6

    C. The Public Interest In Preventing Crop Disease ........................................... 7

    D. The Public Interest In Avoiding Genetic Contamination And Preserving
The Choice To Grow And Consume Non-Genetically Engineered Crops .... 9

    E. The Public Interest In Preserving The Choice To Avoid Sugar and Other
Sugarbeet Byproducts Derived From An Unlawfully Deregulated
Product ......................................................................................................... 11

    F. The Public Interest In Preventing Further Development of
Herbicide-Resistant Superweeds And Increased Use Of Herbicides .......... 12

III. THE DEREGULATION DECISION SHOULD BE VACATED .......................... 14

VI. CONCLUSION ....................................................................................................... 15

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Assoc. Gen. Contractors of California v. California State Council of Carpenters,*
    459 U.S. 519 (1983)..................................................................................................6

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944)..................................................................................................5

*National Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001)....................................................................................5

*Northern Cheyenne Tribe v. Hodel,*
    851 F.2d 1152 (9th Cir. 1988)..................................................................................6

*Oregon Natural Resources Council v. Goodman,*
    505 F.3d 884 (9th Cir. 2008)....................................................................................5

*Sammartano v. First Judicial Dist. Court,*
    303 F.3d 959 (9th Cir. 2002)....................................................................................4

*Sierra Club v. Marsh,*
    872 F.2d 497 (1st Cir. 1989)....................................................................................6

*Sligh v. Kirkwood,*
    237 U.S. 52 (1915)..................................................................................................11

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001)..................................................................................................5

*Young v. Community Nutrition Institute,*
    476 U.S. 974 (1986)................................................................................................11

**UNPUBLISHED CASES**

*In re Genetically Modified Rice Litigation,*
    No. 4:06 MD 1811 CDP, 2010 WL 716190 (E.D.Mo. Feb. 24, 2010)..................10

*Geertson Seed Farms v. Johanns,*
    No. C 06-01075 CRB (N.D. Cal. March 12, 2007)................................................15

**UNITED STATES CODE**

5 U.S.C. § 706(2)(A)......................................................................................................15

7 U.S.C. § 7701(1)......................................................................................................7, 8

42 U.S.C. § 4331(b)(4)....................................................................................................5

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 1502.14........................................................................................................5

| | Page |
|---|---|
| **CODE OF FEDERAL REGULATIONS (Cont.)** | |
| 40 C.F.R. § 1502.2(g) | 5 |
| 40 C.F.R. § 1506.1(a) | 6 |
| 40 C.F.R. § 1508.8 | 11 |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF PERMANENT INJUNCTION

The Court was persuaded that the economic effects that intervenors claimed would result if they were precluded from planting Roundup Ready ("RR") sugarbeet and seed crops in 2010 weighed against preliminary relief. 3/16/2010 Order. Given that:

(1) RR sugarbeets were unlawfully deregulated without substantial review of environmental or socioeconomic impacts, 9/21/2010 Order at 13-14;

(2) continued planting of the genetically engineered variety is likely to cause irreparable harm, 3/16/2010 Order at 3-4;

(3) continued planting of RR sugarbeets will harm the public interest in numerous ways, described below;

(4) intervenors have had two and half years lead time since suit was filed, as well as six months between summary judgment and the Court's fair warning of its inclination "to order the Intervenor-Defendants to take all efforts, going forward, to use conventional seed," *id.* at 7; and

(5) it will likely be several more years until an EIS is completed;

the equities and public interest now weigh heavily against allowing intervenors to continue to do as they please and place all of the costs on plaintiffs and the public. The Court should protect the public interest by enjoining all further use of the crop until the EIS process has been completed.

I. INTERVENORS' STRATEGIC EFFORT TO BURDEN THE PUBLIC WITH THE COSTS OF INJUNCTIVE RELIEF IS INEQUITABLE

Although intervenors had yet to plant commercial RR sugarbeet acreage when this litigation was filed, they began arguing immediately that growing ever again the crop they grew profitably for many decades would be catastrophic. Intervenors conflate their preference, based on private economic interests, with the public interest. Moreover, the economic effects to themselves and the public of enforcing NEPA are not the necessary result of this lawsuit or an injunction, but of intervenors' strategic litigation decisions to maximize the impacts of resuming conventional planting to avoid injunctive relief. There is nothing equitable about such cynical brinksmanship.

Plaintiffs' Memorandum in Support of
Permanent Injunction
No. 3:08-CV-0484-JSW

1

Intervenors have known for over two years that they likely would have to produce more conventional seed. Since an EIS may take years, they have long known they might need conventional seed not only in 2010, but in 2011 and 2012. AC346, 331, 203 ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████ It is wholly implausible that other intervenors, as sophisticated and pragmatic businesses concerned that the industry might be precluded from planting RR sugarbeets, had no such plans or capabilities.[2]

Producing conventional seed may not maximize intervenors' profits,[3] but preparing for an injunction would never have been extraordinarily costly relative to these companies' resources, and complying with an injunction in the future will not usher in the Apocalypse. ████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

[1] All American Crystal documents are attached to the Confidential Achitoff declaration as Exh. 1.

[2] Intervenor Syngenta has 26,000 employees operating in over 90 countries, earned a gross profit of over $5.4 billion last year on sales of $11 billion, and produces seed all over the world. 12/2009 Annual Report (Exh.1 to Achitoff decl.) at 2, 20,78.

[3] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Plaintiffs' Memorandum in Support of Permanent Injunction
No. 3:08-CV-0484-JSW

2

REDACTED

Plaintiffs' Memorandum in Support of
Permanent Injunction
No. 3:08-CV-0484-JSW

3

1 [REDACTED]

2 [REDACTED]

3 [REDACTED]

4  All of the seed companies, had they wanted to, could have mitigated any potential economic impact by planting some, if not all, of their seed acreage in 2008, 2009, and/or 2010 to produce conventional seed, and thereby been prepared to plant conventional crops. They strategically chose not to, celebrating their good fortune as the hearing dates were delayed.[4] As American Crystal's beet seed manager remarked at the end of 2009:



AC2089 (emphasis added). Thus, even after the decision on the merits, intervenors exploited the planting schedules and shifting litigation hearing dates to postpone conventional seed production. Intervenors went to court with their pockets pulled inside out so they could slide past the preliminary injunction and the spring planting season without cost to themselves. Instead, the public will pay.

II.  ISSUING A PERMANENT INJUNCTION IS IN THE PUBLIC INTEREST

The effect of an injunction on the public interest is a critical consideration separate from the equities as between the parties. *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Defendants seek to blur this distinction by emphasizing an injunction's impacts on the public. But what is profitable for intervenors is not necessarily in the public interest; the claimed adverse economic effects are the incidental result of intervenors strategically shifting the costs of NEPA enforcement away from those who profit from the unlawfully deregulated technology— themselves—to the public, which does not. It is not in the public interest to force the public to further subsidize the already heavily subsidized sugar industry[5] by bearing the costs of allowing

---

[4] *See* Exh. 39 to 2/19/10 Achitoff decl., quoting ASGA spokesman Luther Markwart in December 2009 ("Clearly, if you don't have a remedies hearing until June, it's pretty difficult to affect this (2010) year's crop.")

[5] Subsidies cost consumers billions. "The U.S. sugar program uses price supports, domestic marketing allotments, and tariff-rate quotas (TRQs) to influence the amount of sugar available to the

intervenors to plant their preferred crop without restraint pending mandated environmental review. There are a host of such public costs and impacts.

### A. The Public Interest In Enforcing Congress's Intent In Enacting NEPA.

Although district courts enjoy "sound discretion" to tailor injunctive relief to the "necessities of the public interest," in the statutory context, Congress defines the public interest. *Hecht Co. v. Bowles*, 321 U.S. 321, 329-31 (1944). The choice before courts sitting in equity is "whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001).

Allowing continued planting undermines the public interest in having a law enforced to protect the environment. "Where an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001). *See also, Oregon Natural Resources Council v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2008) ("[T]he risk of permanent ecological harm outweighs the temporary economic harm that [industry intervenors] may suffer pending further study…. Here, the public's interest in preserving the environment favors injunctive relief.")

Importantly, in this case defendants seek to eliminate federal defendants' practical ability to select any alternative other than RR sugarbeets, making a sham of the EIS process, which is intended to facilitate informed choice, and forcing the patented sugarbeet variety on the general public. NEPA specifically seeks to "maintain … an environment which supports diversity and variety of individual choice." 42 U.S.C. § 4331(b)(4). In the EIS, the agency must "[r]igorously explore and objectively evaluate" all reasonable alternatives, including a "no action" alternative, 40 C.F.R. § 1502.14, and not justify decisions already made. *Id.* § 1502.2(g). Consequently, the applicable regulations provide that during the preparation of an EIS, "<u>no action</u> concerning the [agency's]

---

U.S. market. The program supports U.S. sugar prices above comparable levels in the world market." Exh. 2 to Achitoff decl. at 1. *See also* Exh. 3 to Achitoff decl. (world refined sugar prices); Exh. 4 to Achitoff decl. (U.S. wholesale refined beet sugar prices); Exh. 5 to Achitoff decl. (Joshua Zumbrun, *Sugar's Sweet Deal,* Forbes (June 30, 2008)).

proposal shall be taken which would … [h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a) (emphasis added). Only an injunction can preserve this choice of alternatives. *See Sierra Club v. Marsh*, 872 F.2d 497, 503 (1st Cir. 1989) ("Given the realities, the farther along the initially chosen path the agency has trod, the more likely it becomes that any later effort to bring about a new choice, simply by asking the agency administrator to read some new document, will prove an exercise in futility"); *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) (noting "[b]ureaucratic rationalization and bureaucratic momentum are real dangers," particularly where the agency would be aware on remand of investments made by industry).

B. The Public Interest In A Competitive Market.

Prevention of "free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect." *Assoc. Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 528 (1983). This is pertinent here, where the Court has found that "[a] federal action that eliminates a farmer's choice to grow non-genetically engineered crops, or a consumer's choice to eat non-genetically engineered food, is an undesirable consequence," and that "[a]n action which potentially eliminates or … greatly reduces the availability of a particular plant ... has a significant effect on the human environment." 9/21/2009 Order (quoting *Geertson Seed Farms v. Johanns*, 2007 WL 518624, *8, 9 (N.D. Cal. Feb. 13, 2007). It is even more pertinent where a crop is being replaced by a patented version.

Intervenors do not represent the concerns of all sugarbeet growers, let alone organic and conventional farmers and the general public. The interests of intervenor seed patent and license holders exercise tremendous influence on the market, and the growers, whose preferences are not necessarily identical to Monsanto's,[6] must have the choice to grow conventional varieties (whether or not they argue for it in this litigation), for at least two reasons. First, as Monsanto charges more and more for the privilege of planting its patented seed, growers are already becoming more

---

[6] "High pressure seed sales tactics" are not required where the grower's interests are fully aligned with those of the seed companies. Exh. 32 to 2/19/2010 Achitoff decl. at 1.

Plaintiffs' Memorandum in Support of
Permanent Injunction
No. 3:08-CV-0484-JSW

6

1   interested in conventional varieties. ████████████████████████████████

2   ████████████████  But the impacts of patented seed dominating the market extend far beyond

3   grower preference, and affect the public interest in competition. As the practical options become

4   limited to varieties patented by Monsanto, it is not surprising that there are effects on the price of the

5   seed, the price of the sugarbeets, the price of the sugar derived from them, and the cost to the public

6   of groceries, most of which contain sugar.

7   And those effects certainly have been noticed. Last August, the Department of Justice

8   announced it will investigate anticompetitive conduct in the seed industry, the recent ability to patent

9   seed having led to unprecedented seed industry concentration. 4/9/2010 Harl decl., para. 5. Major

10  seed companies set out to acquire ownership of, or control over, smaller firms, leading to the number

11  of corn seed producers, for example, dropping from over 300 to a handful of large firms able to

12  muster the capital for genetic manipulation through laboratory operations. It has been estimated that

13  Monsanto can exercise influence in pricing and vending practices for over 90 percent of the

14  germplasm of corn and soybeans, even though the market share is in the 30 to 40 percent range for

15  those two major crops. The introduction of RR sugar beets further exacerbates Monsanto's

16  influence over seed prices and market consolidation. The general public is adversely affected, as

17  increased seed prices are reflected in the cost of food. *Id.*, paras. 10, 12, 15. Concentration of the

18  seed industry "affects virtually every farmer in the country and in a very vital way," and has drawn

19  large crowds at unprecedented hearings scheduled by the Antitrust Division of the Department of

20  Justice and defendant USDA this year. *Id.*, para. 16. *See also* William Neuman, *Rapid Rise in Seed*

21  *Prices Draws U.S. Scrutiny*, N.Y. TIMES B1 (March 12, 2010) (Exh. 6 to Achitoff decl.).

22   C.   The Public Interest In Preventing Crop Disease.

23  A second reason the ability to choose conventional sugarbeets must be preserved is that

24  elimination of the conventional crop will promote crop disease.[7] Research has shown clearly that

25  the presence of the glyphosate resistance gene in RR crops reduces the absorption and utilization of

---

[7] *See, e.g.*, Plant Protection Act: "Congress finds that the detection, control, eradication, suppression, prevention, or retardation of the spread of plant pests or noxious weeds is necessary for the protection of the agriculture, environment, and economy of the United States." 7 U.S.C. § 7701(1).

Plaintiffs' Memorandum in Support of
Permanent Injunction                                                                           7
No. 3:08-CV-0484-JSW

nutrients by the crop, especially the essential micronutrient manganese. Manganese is critical for important plant functions, including photosynthesis; the plant's production of carbohydrates, plant hormones, and proteins; and secondary metabolism involved in all aspects of the plant's growth and resistance to diseases. Scientific studies and agronomic trials show clearly that RR sugarbeets are more susceptible to several serious sugarbeet diseases. These problems affect not only the RR crop, but also other crops grown on the same field in subsequent years. 4/9/2010 Huber decl., paras. 9-16.

Application of glyphosate to RR and other crops has been shown to increase the prevalence and severity of numerous serious plant diseases, including root, crown, and foot rot of cereals such as wheat, as well as "take-all" and Fusarium head scab, a class of soil-borne fungi that not only cause plant disease, but also produce potent toxins that are associated with reproductive disorders and other diseases in livestock and human beings. Glyphosate stimulates the growth of Fusarium and other soilborne fungi. This in turn makes infection of the plant more likely, and leads to increased virulence, with subsequent increased disease severity. *Id.* These problems have been the subject of numerous peer-reviewed articles and an international symposium. Tsuioshi Yamada, et al., *Glyphosate interactions with physiology, nutrition, and diseases of plants: Threat to agricultural sustainability?* 31 Eur. J. Agron. 111-113 (2009) (Exh. 7 to Achitoff decl.).

It is contrary to the public interest to allow conventional sugarbeets to be replaced throughout the U.S. with a variety likely to increase disease in both the sugarbeets and subsequent crops, before mandated assessments are performed. Moreover, although the above problems have been established, intervenors have aggressively undermined independent researchers' ability to fully investigate their patented crops' performance in other ways. Huber decl., paras.17-18; Emily Waltz, *Under Wraps*, 27 Nature Biotechnology 880, 882 (2009) (Exh. 8 to Achitoff decl. at 2) ("Negotiations in 2008 between Monsanto and two universities—North Dakota State University and the University of Minnesota—broke down when Monsanto insisted on approving publication of any data on its newly commercialized transgenic sugar beets, according to Durgan. The university had proposed 'the general type of research our faculty would conduct with any new crop variety,' she says. 'Monsanto wanted the right to approve all publications, and we said that was not possible,' she says. As a result, no sugar beet research was conducted by Minnesota or North Dakota State

University in the 2008 growing season.") The public interest does not favor allowing such a crop to so completely dominate the market before it has been thoroughly assessed.

D. The Public Interest In Avoiding Genetic Contamination And Preserving The Choice To Grow And Consume Non-Genetically Engineered Crops.

Giving intervenors free rein also puts at risk the ability of farmers to grow conventional or organic Swiss chard and table beets, which the Court found are likely to be contaminated, and consumers' choice to consume them.[8] 3/1/6/10 Order at 3-4. This, again, is not an issue only for these farmers, but for the public interest. Genetically engineered sugarbeets can and will contaminate these crops despite intervenors' best efforts to contain RR sugarbeets, and this will only increase over time. Contamination occurs through many different means. 3/16/2010 Order at 3. Widespread contamination has become prevalent in corn, cotton and soy despite contractual best practices. 1/19/2010 Gurian-Sherman decl., para. 23. Tests prove that after a few years of RR production, 50% or more of the certified non-GE corn, cotton and soybean seed had become contaminated with GE. Gurian-Sherman decl., para 23. ("It is important to understand that the seed tested … was certified, i.e., grown under conditions that limit the likelihood of contamination, yet this seed was widely contaminated by transgenes at easily detectable levels.")

A similar pattern of contamination is likely to occur between sugarbeets and other Beta species over time. Gurian-Sherman decl., para. 23; 1/19/2010 Howington decl., para. 16. In fact, Beta crops are more susceptible to contamination from GE sugarbeets than most other crops. 1/19/2010 Fagen decl. para. 9. Once contamination occurs, removing it may be virtually impossible. 3/5/2010 Navazio decl., paras. 9-20; Gurian-Sherman decl., paras. 28-29. The economic consequences of genetic contamination can be devastating. Howington decl., paras. 2-10 (over $1 billion in damages to rice farmers from a single contamination event.); *see In re Genetically Modified Rice Litigation*, No. 4:06 MD 1811 CDP, 2010 WL 716190, *1 (E.D.Mo. Feb. 24, 2010)

---

[8] Although the interests at stake in this case extend far beyond organic farming, the scope of relief granted should be consistent with congressional purpose as established by the Organic Foods Production Act (OFPA), to "facilitate interstate commerce" in organically produced food, in part by establishing a regulatory program to "assure consumers that organically produced products meet a consistent standard[.]" 7 U.S.C. § 6501(2)-(3). Continued widespread planting of genetically

1  ("Approximately seven thousand plaintiffs—rice farmers and others in the rice business—have filed
2  suit claiming that they were damaged because of the 2006 contamination of the long-grain rice
3  supply by Bayer's unapproved genetically modified rice.").[9]
4      While the risk of contamination exists everywhere sugarbeet and seed is grown, the risk is
5  especially high in the Willamette Valley. 1/19/2010 Fagen decl. para. 11 ("In the Willamette Valley,
6  Oregon, many seed crops are in close proximity and are grown in high density. Therefore, despite
7  cooperation among seed growers in the valley, risk of contamination is especially high.") The
8  isolation distances used in the Willamette Valley are inadequate, controversial and not consistent
9  with other Beta seed growing areas, such as Washington. *Id.* ("[The isolation distances for the
10 Willamette Valley] are significantly shorter than the isolation distances required further north, in
11 Washington state."); 1/19/2010 Navazio decl., para. 15 ("[The Puget Sound Seed Growers
12 Association has] long recognized that a 5 mile minimum isolation is necessary between different
13 crop types (e.g. table beets and Swiss chard) and they even use this 5 mile minimum isolation
14 between different colored types within the same group (e.g. red beet and gold beets or red and green
15 chard.") The Willamette Valley isolation distances are not adequate to prevent contamination in this
16 area, with more than 50% of the world market for chard and table beet seed and 80% of the domestic
17 market. 1/19/2010 Fagen decl., para. 13; 1/19/2010 Navazio decl., para. 20.
18     (1)    <u>Genetic Contamination In The Willamette Valley Has Been Widespread</u>.
19     Despite intervenors' stewardship, intervenors allowed contamination last year from RR
20 stecklings. Intervenors also have been aware for years that seed contamination in the Willamette
21 Valley from cross-pollination not only is likely, but is established fact. [REDACTED]
22 [REDACTED]
23 [REDACTED]
24 [REDACTED]
25
26 engineered sugar beets imposes massive risk and uncertainty on the continued viability of organic table beets and chard farming.
27 [9] Contamination of long grain rice led to severe market losses although the genetic material was found at a rate of only 0.06 percent, or six out of 10,000 rice kernels. Christina Verderosa,
28

Plaintiffs' Memorandum in Support of
Permanent Injunction
No. 3:08-CV-0484-JSW

10

1
2
3
4
5
6
7

E. The Public Interest In Preserving The Choice To Avoid Sugar and Other Sugarbeet Byproducts Derived From An Unlawfully Deregulated Product.

Continued RR sugarbeet planting also will force those who prefer to avoid genetically engineered foods to consume sugar and other products extracted from RR sugarbeets. Since all refined sugar is commingled, 2/12/10 F. Defs' Opp. at 18, consumers will have no practical choice but to consume, against their will, a product that has not lawfully been put on the market. *See* 1/19/10 Burkam decl., paras. 4-11. At least until a policy decision has been made—lawfully—that consumers must be deprived of their choice to avoid this product, it is not in the public interest to make that choice subservient to intervenors' preference. Until independent studies have been done, intervenors' arguments that their product is safe remain self-interested rhetoric. The Court has long recognized that "ensur[ing] the purity of the Nation's food supply" is one of the most important functions of government in protecting the public interest. *Young v. Community Nutrition Institute*, 476 U.S. 974, 976 (1986); *Sligh v. Kirkwood*, 237 U.S. 52 (1915).[10]

In addition to sugar, sugarbeets also produce molasses, which in turn is used to make citric acid, vinegar, yeast, antibiotics and pharmaceuticals. Exh. 10 to Achitoff decl. at 3. Beet pulp is "widely used in the feeding of cattle and sheep destined for meat packing plants," and is exported in substantial quantities to Japan and Europe for this purpose. *Id.* The safety of such products remains

---

*County Farmers Irritated About Genetic Rice Flap*, DeWitt Era-Enterprise, Aug. 30, 2006. Exh. 9 to Achitoff decl. at 1.

[10] Moreover, NEPA is intended to protect the public from harms other than proven economic and bodily injury. *See* 40 C.F.R. § 1508.8 (for purposes of NEPA, "effects" of an action that must be assessed include "ecological … aesthetic, historic, cultural, economic, social, or health" effects, "whether direct, indirect, or cumulative.")

Plaintiffs' Memorandum in Support of Permanent Injunction
No. 3:08-CV-0484-JSW

11

controversial at best; science suggests serious health hazards. *E.g.,* 1/19/10 Kimbrell decl., paras. 5-6 (RR corn had significant adverse effects on kidney and liver function in rats.) This Court will not assess safety—that is federal defendants' job, which they have yet to perform—but it is neither equitable nor in the public interest for the public to be used as guinea pigs so that pending required review, intervenors may maximize their profits, while putting out of reach any meaningful ability to later reverse course.

F. The Public Interest In Preventing Further Development of Herbicide-Resistant Superweeds And Increased Use Of Herbicides.

Allowing continued planting of RR sugar beets also will accelerate the development of glyphosate resistant weeds. Again, this affects the public interest as well as plaintiffs. The widespread adoption of RR sugar beets will increase the use of glyphosate-based herbicides and cause irreparable harm to the environment by increasing the development of glyphosate-resistant weeds. "Once deregulated and after a few years of use, RR sugar beets will result in dramatic increases in glyphosate applications per acre per crop year, just as we have seen with Roundup Ready corn, cotton and soybeans." 1/19/2010 Benbrook decl., para. 10.

Glyphosate was introduced in 1976. Yet, despite its considerable use for 20 years, glyphosate-resistant weed populations were rare until the introduction of RR crops in 1996. 3/9/2010 Radosevich decl., paras. 6-7. Now, glyphosate resistance is an industry-wide epidemic adversely affecting farmers across the U.S. *See* 1/19/2010 Feldman decl. para. 10 ("In general, in regions of the U.S. where RR crops dominate, there are now evolved glyphosate-resistant populations of economically-damaging weed species.").

By encouraging overreliance on glyphosate, RR crops have driven the rapid evolution of glyphosate-resistant weeds. Radosevich decl., para. 6. While farmers ultimately decide what tactics to use to manage weeds, this decision is heavily influenced by marketing campaigns used to sell proprietary traits and herbicides. *See* Radosevich decl., para. 6 ("Monsanto sponsored advertising in farm journals that assured farmers that continual use of glyphosate with Roundup Ready Crops, year after year, would not lead to evolution of resistant weeds.") Since 2000, glyphosate-resistant weeds have expanded from one species on several thousand acres in one state to 10 species on up to 11.4

million acres in 22 states. Radosevich decl., para. 7. In just the past month, three new populations of resistant weeds have been reported in Kansas and Canada. *See* Radosevich decl., para. 9. A leading weed scientist recently warned that loss of glyphosate as a tool due to resistance poses "a looming threat to global cropping and food production." Stephen B. Powles, *Gene amplification delivers glyphosate- resistant weed evolution*, Commentary, Proc. Nat. Acad. of Sciences 107: 955-956 (2010) (Exh. 11 to Achitoff decl. at 1). According to Dr. Michael Owen of Iowa State University: "Right now, we are on the edge of a precipice that we could step off [of] in the next two years." Gil Gullickson, *Reeling from resistance: Weed resistance to glyphosate and other modes of action increase*, Successful Farming, Jan. 26, 2010 (Exh. 12 to Achitoff decl. at 2).

      Glyphosate-resistant Palmer amaranth, the most competitive and rapidly growing species of pigweed, can render land unusable for agriculture, as is the case with 10,000 acres of cotton fields abandoned due to resistant pigweed in Georgia. Radosevich decl., para. 8. Once controlled by glyphosate alone, farmers now use a toxic cocktail of six to eight herbicides to battle infestations, and some resort to the preindustrial practice of weeding by hoe. Radosevich decl., para. 8.

      Farmers are simultaneously suffering from an increase in weed management costs and loss of agriculture's most important herbicide. "In regions where farmers are combating glyphosate-resistant (GR) weeds, especially Palmer amaranth and horseweed in the south, university experts are projecting increases of up to $80.00 per acre in costs associated with [herbicide tolerant] crops in 2010." 1/19/2010 Benbrook decl., para. 18. Coupled with loss of an herbicide that can kill a broad spectrum of different weed species, glyphosate-resistant weeds threaten world food production. *See* Steven O. Duke & Steven B. Powles, *Glyphosate Resistant Weeds and Crops*, 64 Pest Manag.Sci. 317 (2008) (Exh. 13 to Achitoff decl. at 1).

      Intervenor Monsanto and its competitors are well aware that the herbicide itself is at risk of becoming obsolete. Monsanto recently announced the availability of a new formulation of acetochlor for the 2010 growing season, introducing this herbicide to battle glyphosate-resistant weed populations in areas where weed resistance is most common in RR cotton and soybean production, namely the Midwest, Southeast and mid-South. On both crops, glyphosate-based herbicides are heavily used. 1/19/2010 Benbrook decl., para. 8.

Companies are also developing intensive, "stacked" GE crops, such as the recently approved eight-trait stacked corn variety "SmartStax," offering resistance to multiple herbicides, to further delay weed resistance. Such crops are being developed as a short-sighted "fix" for glyphosate resistance, and are needed only because RR crops are dramatically increasing glyphosate-resistant weeds. These new herbicides and stacked GE crops do not address the root cause of the problem— the unfettered expansion of RR crops is creating glyphosate-resistant weeds. *See* Feldman decl., para. 10; Radosevich decl., para. 6.

Contrary to intervenors' assertions, sugar beet fields are unquestionably at risk of developing glyphosate-resistant weeds. Kansas State University recently confirmed that five Kansas populations of kochia, one of the worst weeds in sugar beets, are glyphosate-resistant. Radosevich decl., para 9. Kochia, also called fireweed, is a highly adaptable, drought-tolerant weed capable of spreading seed over long distances as a "tumbleweed." *Id.* It is present in almost every state, but is particularly problematic where sugar beets are grown in the Northern plains, Intermountain and Western states. *Id.* Introduction of RR sugar beets will contribute to the establishment of glyphosate-resistant populations in these areas.

It is beyond genuine dispute that glyphosate resistance leads to an overall increase in herbicide use, increasing a crop's overall impact on the human environment. Once a farmer is plagued with resistant weeds, he often resorts to using more glyphosate, more toxic herbicides such as paraquat and 2,4-D, or combining more toxic herbicides with glyphosate. *See* 1/19/2010 Gurian Sherman decl., para. 20; 1/19/2010 Benbrook decl., para. 13. For example, use of carcinogenic 2,4-D in soybeans increased by 112% from 2005 to 2006. Exh. 1 to 1/19/2010 Benbrook decl. at 59. RR sugar beets will substantially increase the irreparable environmental harm caused by glyphosate-resistant weeds.

III. THE DEREGULATION DECISION SHOULD BE VACATED

In its decision on the merits, the Court held that APHIS's decision to deregulate Roundup Ready sugar beets violated NEPA and that "APHIS must prepare an[] EIS before approving the petition to deregulate Roundup Ready sugar beets." 9/21/2009 Order at 14 n.4. This follows from

the APA's requirement that where an agency action has been adopted "without observance of procedure required by law," the court "shall … hold unlawful and set aside" the agency action. 5 U.S.C. § 706(2)(A) (emphasis added). Accordingly, the Court should formalize its vacatur of APHIS's previous decision to deregulate Roundup Ready sugar beets and declare the genetically engineered beets to be once again a regulated article until the agency completes the NEPA process. *See Geertson Seed Farms v. Johanns*, No. C 06-01075 CRB (N.D. Cal. March 12, 2007) at 4 ("federal defendants' June 2005 decision deregulating Roundup Ready alfalfa is VACATED and Roundup Ready alfalfa is once again a regulated article.").

IV.   CONCLUSION

The societal costs of replacing a crop throughout the country with a patented, genetically engineered variety that has never been subjected to legally mandated review, and that is known to pose serious environmental, economic and health risks, are severe. This Court can, and should, protect the public interest by enforcing the law designed to prevent public harm of this nature, and thereby preserve the public's right to know, to participate, to choose, and to have its interests fully considered. It is not too late, although it soon will be.

DATED: Honolulu, Hawai'i, April 9, 2010.

/s/ Paul H. Achitoff
PAUL H. ACHITOFF (Pro Hac Vice)
Earthjustice
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: achitoff@earthjustice.org

PAIGE M. TOMASELLI, State Bar No. 237737
KATERYNA L. RAKOWSKY, State Bar No. 246248
Center for Food Safety
2610 Mission Street, Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Email: ptomaselli@icta.org
          kateryna@icta.org
Counsel for Plaintiffs