1    LATHAM & WATKINS LLP
        Holly J. Tate (Bar No. 237561)
2        holly.tate@lw.com
     505 Montgomery Street, Suite 2000
3    San Francisco, California  94111-2562
     Telephone:  (415) 391-0600
4    Facsimile:  (415) 395-8095

5    LATHAM & WATKINS LLP
        Philip J. Perry (Bar No. 148696)
6        philip.perry@lw.com
        Janice M. Schneider (DC Bar No. 472037) (*pro*
7    *hac vice* granted)
        janice.schneider@lw.com
8    555 11th Street, N.W., Suite 1000
     Washington, D.C.  20004
9    Telephone:  (202) 637-2200
     Facsimile:  (202) 637-2201
10
     HOWREY LLP
11      Gilbert S. Keteltas (DC Bar No. 421236) (*pro hac*
     *vice* granted)
12      keteltasg@howrey.com
        John F. Bruce (DC Bar No. 1578) (*pro hac vice*
13   granted)
        brucej@howrey.com
14      Christopher H. Marraro (DC Bar No. 395152) (*pro*
     *hac vice* granted)
15   1299 Pennsylvania Avenue, N.W.
     Washington, D.C. 20004-2402
16   Telephone: (202) 783-0800
     Facsimile: (202) 383-6610
17
     Intervenor-Defendants American Sugarbeet Growers
18   Association, et al.

19   [Complete list of Parties on signature page]

20                **UNITED STATES DISTRICT COURT FOR THE**
                     **NORTHERN DISTRICT OF CALIFORNIA**
21                       **SAN FRANCISCO DIVISION**

22   Center for Food Safety, *et al.*,          CASE NO. C-08-0484 JSW

23              Plaintiffs,                      **DEFENDANT INTERVENORS'**
                                                 **OPPOSITION TO PLAINTIFFS' MOTION**
24         v.                                    **FOR PERMANENT INJUNCTION AND**
                                                 **OPENING REMEDIES BRIEF**
25   Thomas J. Vilsack, *et al.*,
                                                 **(Honorable Jeffrey S. White)**
26              Defendants.
                                                  Date:  July 9, 2010
27                                                Time:  9:00 a.m.
                                                 Place:  Courtroom 11
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

SUMMARY OF ARGUMENT .............................................................................................iv

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT .....................................................................................................................5

I.      REMAND TO USDA-APHIS IS THE PROPER REMEDY. ..................................5

II.     PLAINTIFFS LACK STANDING TO SEEK THE RELIEF THEY
        PROPOSE. .................................................................................................................6

III.    PLAINTIFFS CANNOT DEMONSTRATE THAT CROSS-
        POLLINATION OR MIXING OF SEED IS LIKELY TO CAUSE
        IRREPARABLE HARM. ..........................................................................................7

IV.     THE ADDITIONAL CONCERNS PLAINTIFFS IDENTIFY DO
        NOT SUPPORT THE INJUNCTION THEY SEEK. ..............................................10

        A.      Plaintiffs Cannot Show Any Harm From Glyphosate Resistance Caused By
                The Root Crop. ...........................................................................................10

        B.      Plaintiffs' Remaining Concerns Provide No Basis For Injunctive Relief. ..........11

V.      THE STARK IMBALANCE OF EQUITIES BARS THE
        REQUESTED RELIEF. ...........................................................................................12

VI.     THE SCOPE OF ANY REMEDY SHOULD BE LIMITED. .................................14

VII.    THE BROAD INJUNCTION PLAINTIFFS PROPOSE MAY NOT
        ISSUE WITHOUT AN EVIDENTIARY HEARING. ............................................15

# TABLE OF AUTHORITIES

## CASES

*eBay, Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006) ..................................................................................... 6

*Florida Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ..................................................................................... 5

*Geertson Seed Farms v. Johanns,*
  No. C 06-01075, 2007 U.S. Dist. LEXIS 14533 (N.D. Cal. Feb. 13, 2007) ............ 4

*Gonzales v. Thomas,*
  547 U.S. 183 (2006) ..................................................................................... 6

*High Sierra Hikers Association v. Blackwell,*
  390 F.3d 630 (9th Cir. 2004) ....................................................................... 14

*INS v. Ventura,*
  537 U.S. 12 (2002) ................................................................................... 5, 6

*Lewis v. Casey,*
  518 U.S. 343 (1996) ..................................................................................... 6

*Metropolitan Edison Co. v. People Against Nuclear Energy,*
  460 U.S. 766 (1983) ................................................................................... 11

*Nebraska HHS v. HHS,*
  435 F.3d 326 (2006) ............................................................................ 10, 14

*Oakland Tribune Inc. v. Chronicle Publishing Co.,*
  762 F.2d 1374 (9th Cir. 1985) ..................................................................... 14

*Price v. City of Stockton,*
  390 F.3d 1105 (9th Cir. 2004) ..................................................................... 15

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ....................................................................................... 5

*Safe Air for Everyone v. EPA,*
  488 F.3d 1088 (9th Cir. 2007) ................................................................ 6, 14

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ..................................................................... 12

*Sugar Cane Growers Cooperative of Florida v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ....................................................................... 15

*Summers v. Earth Island Institute,*
  129 S. Ct. 1142 (2009) ................................................................................. 6

*United States v. Afshari,*
  426 F.3d 1150 (9th Cir. 2005) ..................................................................... 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................................. 15

*Winter v. NRDC*,
    129 S. Ct. 365 (2008) ........................................................................ v, 2, 7, 12, 15

**REGULATORY MATERIALS**

64 Fed. Reg. 18360 (Apr. 14, 1999) ........................................................................... 4

## SUMMARY OF ARGUMENT

Plaintiffs propose an immediate ban on "any and all further planting, cultivation, processing, or other use of Roundup Ready sugar beets (RRSB) or Roundup Ready sugar beet seeds, including but not limited to allowing any Roundup Ready sugar beet seed crop to flower." This unjustified request would cause significant and needless harm to an industry that, in full view of plaintiffs, completely transitioned to RRSB in good faith reliance on the Government's 2005 deregulation. While plaintiffs' across-the-board proposal is not tailored to specific, likely risks of irreparable harm, it will with one-hundred percent certainty harm thousands of RRSB farmers and the industry and rural communities they support. In 2011-2012 alone, eight sugarbeet processing facilities will close (likely forever), more than 5,500 jobs will be lost, farming communities will suffer losses exceeding $2 billion and the U.S. sugar program will be dramatically affected. In a word, a substantial restructuring of the sugarbeet industry is likely.

The appropriate remedy in this case is *not* an injunction, but a remand (without vacating) to the USDA so APHIS can apply its expert judgment and implement interim relief in the first instance under its statutory authority. Chief Justice Roberts explained this straightforward matter of administrative procedure in last week's argument in the Roundup Ready alfalfa case: "[T]he way the APA works, this [matter] is sent back to the agency. If the agency wants to partially deregulate, it can do it and then [plaintiffs] can challenge it under the normal APA procedures."

Alternatively, if the Court considers a permanent injunctive relief, it must apply the strict injunction factors and narrowly tailor any relief consistent with *Winter v. NRDC*, 129 S. Ct. 365, 375-76 (2008), which instructs that a *mere possibility or risk* of harm *cannot* justify an injunction. A careful analysis is critical here, where the categorical statements of plaintiffs' declarations are at odds with the videotaped testimony of the witnesses who signed them. While plaintiffs ask this Court to embrace a "zero tolerance" standard for RRSB, the organic industry— represented by six of plaintiffs' declarants and a who's who of U.S. organic retailers—has developed a consensus standard that ***specifically allows*** traces of RRSB and other biotech crops in organic products and ***does not require "zero tolerance."*** In short, plaintiffs ask this Court to order an extreme remedy that even plaintiffs' representatives do not support in the real world.

**INTRODUCTION**

At summary judgment, this Court held that the U.S. Department of Agriculture's Animal and Plant Health Inspection Service (USDA or APHIS) had not adequately examined whether Roundup Ready sugarbeet (RRSB) seed crops, the vast majority of which are grown in Oregon's Willamette Valley, could cause environmental harm by crossing with red beet or chard crops. 9/21/09 Order at 13-14 (Doc. #139).   At the preliminary injunction stage, defendants and intervenors established, and plaintiffs conceded, that: (1) no cross-pollination of plaintiffs' red beet or chard had *ever* occurred over multiple years of RRSB production in the Valley with existing stewardship measures; (2) advances in seed production technologies over recent years— resulting in the Roundup Ready gene on many female non-pollinating plants rather than male pollinators—have reduced any risk of cross-pollination of any of plaintiffs' fields by RRSB to *almost zero*; and (3) RRSB root crop fields across the country pose *zero risk* for red beet or chard seed production.  After balancing the harms, the court denied the preliminary injunction

Focusing on the record then before the Court, the Court also referred to several allegations in plaintiffs' then-untested declarations that mixing of seed through human error or other means (mechanical mixing) may cause irreparable harm.  Testimony by these declarants has since shown that their allegations were either plainly false or unsupported.  *See infra* Section III & Appendix A.  And the issue of whether a possibility of cross-pollination or mixing of Roundup Ready crops with organics could constitute cognizable irreparable harm is squarely before the Supreme Court in *Monsanto Co. v. Geertson Seed Farms* (09-475).  A decision by the Supreme Court is expected this June.  *See* Oral Arg. Tr. at 42:8-9, No. 09-475 (Apr. 27, 2010) (Turner Decl. Ex. G)  ("This is not the end of the world, it really isn't." (Scalia, J.)).

Plaintiffs now argue that the "public interest"  favors an all-encompassing injunction for reasons never pled in their Complaint—focusing on crops not at issue in this case, alleged antitrust violations and theories previously rejected by multiple Federal agencies. These red herrings aside, Supreme Court precedent requires a remand to USDA to formulate a proper remedy in the first instance.

Even if plaintiffs had standing to seek nationwide relief (they do not) and this Court

could enter a permanent injunction (rather than remanding), the Supreme Court has carefully defined a court's role in crafting the "extraordinary remedy" of permanent injunction. *Winter*, 129 S. Ct. at 375-76. Plaintiffs must establish a "likelihood" of "irreparable harm" specifically related to the case at issue—***not a conjectural "possibility" or "risk" of harm***—and must also establish that all the other prerequisites for injunctive relief are met. *Id.* As discovery continues to confirm, they have not done so:

- More than a million acres of RRSB seed and root crops have been grown for multiple years without causing ***any*** harm. Any risk of cross-pollination of plaintiffs' red beet or chard seed crops is ***remote*** at best, and in the unlikely event outcrossing did occur, it could have only minimal and ***fully reparable*** financial impacts (at most) and would not cause environmental harm. Major participants in the U.S. organic industry confirmed as much in a recent collaborative standard that expressly ***allows*** traces of RRSB in organic crops;

- There is no realistic risk that RRSB seeds will mix with any red beet or chard seed. No seed producers in the Willamette Valley grow both RRSB and red beet/chard or use the same equipment or facilities for both. Seed companies' "identity preservation" measures have prevented inadvertent mixing of RRSB and conventional sugarbeet seed crops in the past and will continue to make any such mixing highly unlikely in the future;

- There is ***zero chance*** that conventional sugarbeet seed will cease to exist for farmers who choose to grow it in the future. All sugarbeet seed companies maintain foundation seed for conventional varieties and breeding lines that can be multiplied over time to produce conventional sugarbeet crops in the future; and

- Plaintiffs' proposed permanent relief—banning the RRSB crop entirely and halting all use of sugar derived from the crop—would unjustifiably cause environmental harm and over $2 billion in damages to thousands of farmers and other interests across the nation. Sexton Decl. ¶ 8. *See* Appendix A for citations to relevant evidence.

Plaintiffs cannot establish any "likelihood of irreparable harm" or demonstrate the equity of their proposed ban. Indeed, a remand to APHIS is required by law to formulate interim measures in the first instance. Nevertheless, intervenors would be willing to consider *consenting* to an appropriately-tailored order, pending APHIS's completion of any NEPA obligations, with specific scientifically supported measures appropriate to ensure that continued RRSB cultivation only poses a remote risk of genetic transmission to any other crop. It would be reversible error for this Court to enter a broad injunction not founded on specific evidence of likely irreparable harm, or to ignore proposed measures that permit more narrowly-tailored relief. *Winter*, 129 S. Ct. at 375-76. And before entering any order that would halt cultivation of RRSB, a full evidentiary hearing is required to address the multiple material factual disputes before the Court.

## BACKGROUND

The benefits from genetically engineered biotechnology (GE or "biotech") crops have been widely acknowledged. Smith Decl. (Doc. #277) ¶ 9; Brookes Decl. ¶¶ 7-10. The Clinton, Bush and Obama Administrations each recognized these benefits, and adopted policies supporting "coexistence" with conventional and organic crops—in which farmers work together and with local authorities to manage issues involving varietal purity. Smith Decl. (Doc. #277) ¶ 9; Phillips Decl. ¶¶ 14-15. Over the past 15 years, biotech crops—and Roundup Ready crops in particular—have become a mainstay of American agriculture, creating significant yield gains for farmers and substantially increasing agricultural production nationwide. *See* Smith Decl. (Doc. #277) ¶ 7 (for example, biotech varieties accounted for 91% of soybean, 85% of corn, and 88% of cotton acreage in the U.S. in 2009). Farmers across the country have chosen to grow biotech crops. *Id.* And this substantial growth in biotech **has not** eliminated or threatened organic farming or the availability of organic products. The opposite is true; while biotech has grown, the organic market has flourished.[1] No conventional or organic crop varieties have *ever* become extinct or unavailable due to cross-pollination or mixing with biotech crops. No organic farmer has lost (or could lose) organic certification due to unintended cross-pollination or mixing with biotech crops.[2] Indeed, major players in the organic industry, including Whole Foods, have collaboratively developed the "Non-GMO Project Standard" which sets thresholds for biotech traits in organic products, specifically allowing a low level of cross-pollination or mixing between biotech and organic crops.[3]

---

[1] *See, e.g.*, Navazio Dep. at 57:8-14 (Turner Decl., Ex. A) (organic share is "growing despite the presence of genetically engineered crops")); Stearns Dep. at 19:7-18 (Turner Decl., Ex. B) (increased demand for organic seed and food)); Clarkson Dep. at 48:20-52:8; 58:2-18 (Turner Decl., Ex. D) (growth in demand for premium-priced identity-preserved crops).

[2] Kershen Decl. (Doc. #250) ¶¶ 15-19; Morton Interview, Vol. I, at 15:13-23 (Turner Decl. Ex. C) (noting that even if biotech plants "are detected in his [crop], it's still organic"); Clarkson Dep. at 44:5-10 (plaintiffs' declarant admitting that the National Organic Program is a "process standard" not a "contamination standard").

[3] Phillips Decl. ¶¶ 17-19 & Exs. B (Non-GMO Project Board of Directors, including key organic industry members), C (Non-GMO Project Standard). "GMO" refers to Genetically Modified Organisms, another term for biotech crops. Notably, at least one of plaintiffs' declarants, an organic seller, disagrees with the Non-GMO Project Standard *because it is too strict.* Clarkson Dep. at 20:8-21:24, 84:12-20 (advocating for 0.9% threshold for biotech in organic seed)).

1   Since 1986, FDA, EPA and USDA have regulated biotechnology through a "Coordinated

2   Framework."  Schneider Decl. (Doc. #33) ¶¶ 10-16.  To date, eleven Roundup Ready crops—

3   crops with a gene conferring resistance to glyphosate (the active ingredient in Roundup

4   herbicides)—have been thoroughly reviewed by all three agencies.  For each Roundup Ready

5   crop, the EPA approved application of glyphosate, and FDA concluded that the crop is safe for

6   human and animal consumption.[4]  Plaintiffs do not challenge the EPA or FDA determinations,

7   and there is no genuine issue regarding the safety of this crop.  *See Geertson Seed Farms v.*

8   *Johanns*, No. C 06-01075, 2007 U.S. Dist. LEXIS 14533, at *25 (N.D. Cal. Feb. 13, 2007)

9   (Judge Breyer "accept[ing], as [he] must, the agency's determination that Roundup Ready alfalfa

10  does not have any harmful health effects on humans or li[v]estock").  The processed sugar from

11  RRSB is identical to sugar from other sugarbeets and sugarcane; it contains no genetic material

12  from RRSB.  Hoffman Decl. (Doc. #275) ¶ 38; Baker Decl. (Doc. #238) ¶¶ 7-8.

13  The nature of RRSB seed and root crops are addressed in detail in Intervenors' Amicus

14  Brief at 6-11 (Doc. #121), Intervenors' Memorandum in Opposition to Preliminary Injunction at

15  4-9 (Doc. #237), and the Declaration of Paulette Pierson at ¶¶ 11-36 (Doc. #260).  In short:

16  • Sugarbeet seed crops are grown predominantly in Oregon's Willamette Valley, and have
    been grown there since World War II.  In the Valley, sugarbeet, red beet, and chard seed

17  growers cooperate through a "world class" organization for managing seed production
    efforts—the Willamette Valley Specialty Seed Association (WVSSA).[5]  Although a limited

18  acreage of chard and red beet seed crops is also grown at the margins of the Valley (Morton
    Dep. at 149:24-150:10), the vast majority of chard and red beet seed crops are grown in

19  Washington or California, far from any sugarbeet crop.  Pierson Decl. (Doc. #260) ¶ 40 &
    Exs. E, F.  No RRSB seed producers use the same equipment or facilities as table beet or

20  chard seed producers.  Peters Decl. ¶ 4; Meier Decl ¶ 13; Anfinrud Decl. ¶ 6.  Thus, the risk
    of mechanical mixing of RRSB and table beet or chard seed is remote at best.  *Id.*

21

22  • In the recent 2010 RRSB seed crop planting, more than 78% of fields in the Willamette
    Valley were planted with a technique called cytoplasmic male sterility, meaning that the

23

24  [4] In 1999, the EPA approved the use of glyphosate over-the-top of RRSB and established a safe
    tolerance level for glyphosate on sugarbeets.  64 Fed. Reg. 18360 (Apr. 14, 1999).  In 2004, the

25  FDA determined RRSB was safe for consumption for humans and livestock.  *See* Letter from
    Laura M. Tarantino, Dir., Office of Food Additive Safety, FDA, to Ronald W. Schneider (Aug.

26  17, 2004), *available at* www.fda.gov/Food/Biotechnology /Submissions/ucm155747.htm.

27  [5] *See* Morton Dep. at 63:17-21 (Turner Decl., Ex. E) ("[T]he Willamette Valley is considered a
    world-class place to grow seed because it has an effective industry-wide system for

28  establishing pollen isolation[.]").

Case Number:  C 08-0484 JSW 05-07-2010
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION

Roundup Ready gene is only on the female plant and presents no realistic risk of RRSB cross-pollination.  Tr. at 25:3-10 (Doc. #326); *see also* Hovland Decl. (Doc. #249) ¶¶ 5, 14; Anfinrud Decl. ¶ 5.  The pollinators for these hybrid crops are conventional sugarbeets.  Anfinrud Decl. ¶ 20.  None of the remaining fields with RRSB male pollinators were planted within 4 miles of any other beet or chard field.  Meier Decl. (Doc. #257) ¶¶ 32-34.  Although RRSB seed crops have been grown in the Valley for at least four years, plaintiffs' genetic testing has never identified any cross-pollination by RRSB of table beet or chard crops.  Morton Dep. at 99:16-18; Harris Decl. (Doc. #247) ¶ 19.

- RRSB root crops, grown by thousands of family farms in 11 states across the country on over a million acres, provide nearly half the nation's sugar.  Sugarbeet *root* crops are not grown in the same counties as sugarbeet, red beet or chard *seed* crops.  Pierson Decl. (Doc. #260) ¶¶ 30-31, 65.  Thus, RRSB root crops have no chance to cross-pollinate or mix with beet or chard seed crops.  Hoffman Decl. (Doc. #275) ¶¶ 46-47.

Plaintiffs are advocacy groups that oppose all biotech crops as a public policy matter.[6]  Here they seek a broad ban on RRSB in furtherance of a public policy goal to advance "zero tolerance" for biotech traits in organic crops.  In the real world, there is a consensus standard for "non-GMO" products among major organic industry participants, including several of plaintiffs' declarants, that shows that "zero tolerance" standards are not necessary or desirable.[7]

## ARGUMENT

## I.    REMAND TO USDA-APHIS IS THE PROPER REMEDY.

Upon finding a violation of the Administrative Procedure Act (APA)—such as a failure to consider an issue sufficiently under NEPA—the proper course is to remand to the agency.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *SEC v. Chenery Corp.*, 318 U.S. 80 (1943).  Under this "ordinary remand requirement," the agency can determine how to remedy the procedural violation and whether to set any interim measures.  *INS v. Ventura*, 537 U.S. 12, 17 (2002).  A reviewing court "seriously disregard[s] the agency's legally-mandated role" if it denies an agency the "opportunity to address the matter in the first instance in light of its own

---

[6] *See, e.g.*, Turner Decl., Ex. F; Navazio Dep. at 51:7-11 (opposing all biotech crops).

[7] Several of plaintiffs' members and supporters (along with many prominent players in the organic industry) are affiliated with the Non-GMO Project, which *does not* require a "zero tolerance" standard.  Phillips Decl. ¶¶ 17-19.  Indeed, plaintiff Organic Seed Alliance is still considering whether to support the Non-GMO Project Standard.  Navazio Dep. at 183:1-8.  The publicly available Non GMO Project Standard identifies a 0.25% tolerance for genetically engineered sugarbeet genetic material, and defines genetically engineered sugarbeets as "low risk."  Phillips Decl. ¶ 18 & Ex. C at 25, 34.

1  expertise." *Id.*; *see also Gonzales v. Thomas*, 547 U.S. 183, 187 (2006); *Safe Air for Everyone v.*

2  *EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007).  Highlighting this settled law in last week's oral

3  argument in *Geertson*, Chief Justice Roberts explained: "[T]he way the APA works, this [matter]

4  is sent back to the agency.  If the agency wants to partially deregulate, it can do it and then

5  [plaintiffs] can challenge it under the normal APA procedures."  Oral Arg. Tr. at 7:25-8:3.  A

6  remand would permit APHIS to develop interim measures pending completion of a full EIS.  As

7  this Court concluded only that unconditional deregulation under the existing EA violated NEPA,

8  APHIS on remand can address whether partial deregulation or other interim measures (like

9  mandatory stewardship) are appropriate pending completion of APHIS's NEPA review.

10  **II.     PLAINTIFFS LACK STANDING TO SEEK THE RELIEF THEY PROPOSE.**

11         An organizational plaintiff bears the burden of showing that "at least one identified

12  member" faces "imminent and concrete harm."  *Summers v. Earth Island Inst.*, 129 S. Ct. 1142,

13  1150-51 (2009); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  "[T]he

14  threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to

15  the challenged action of the defendant; and it must be likely that a favorable judicial decision

16  will prevent or redress the injury."  *Summers*, 129 S. Ct. at 1149.  Neither "generalized harm to

17  the ... environment," nor the "deprivation of a procedural right without some concrete interest

18  that is affected by the deprivation—a procedural right *in vacuo*—[is] []sufficient to create Article

19  III standing."  *Id.* at 1149, 1151;  *Lewis v. Casey*, 518 U.S. 343, 358 (1996).

20         Discovery in this case has confirmed that plaintiffs do not satisfy the core standing

21  requirements.  First, in the Willamette Valley where RRSB seed crops are grown, plaintiffs

22  acknowledge that none of their members has suffered any harm from cross-pollination.  Morton

23  Dep. at 98:25-99:18 (*repeated tests over multiple years finding* **no Roundup Ready trait**);

24  Westgate Decl. (Doc. #267) ¶ 22 (risk of cross pollination in Valley is "infinitesimally small").

25  Second, even if the potential for gene flow in the Willamette Valley presented a sufficiently

26  concrete risk, this localized concern does not confer standing to seek nationwide injunctive

27  relief.  *Summers*, 129 S. Ct. at 1150.  Plaintiffs face no realistic threat of harm from the RRSB

28  root crop, either due to cross-pollination or from use of glyphosate.  Hoffman Decl. (Doc. #275)

¶¶ 42-47.  Indeed, plaintiffs admit that they do not use glyphosate.  Morton Dep. at 196:8-9; Navazio Dep. at 51:1-2.   Rather, plaintiffs' principal representative Frank Morton has acknowledged that a halt in glyphosate use would result in use of a series of chemical herbicides with "greater acute toxicity."  Morton Dep. at 195:25-196:1.

Nor can plaintiffs' concern with the source of sugarbeet sugar confer standing.  First, plaintiffs have zero evidence to rebut the Government's scientific conclusion that the sugar from RRSB is *identical* to sugar derived from any other sugarbeets.  Hoffman Decl. (Doc. #275) ¶ 38. Second, plaintiffs acknowledge that they have alternatives to RRSB-derived sugar.  The Institute for Responsible Technology and plaintiff Center For Food Safety have informed "millions of consumers" of the readily available alternatives to sugarbeet sugar and other biotech-derived sweeteners.   Burkam Dep. at 58:5-20 (Turner Decl., Ex. H).   Even plaintiffs' choices in sweeteners have not been impaired.  Morton Dep. at 165:20-166:1; Stearns Dep. at 98:1-99:1.

## III.   PLAINTIFFS CANNOT DEMONSTRATE THAT CROSS-POLLINATION OR MIXING OF SEED IS LIKELY TO CAUSE  IRREPARABLE HARM.

The Supreme Court's *Winter* decision was important not only because it clarified how a court must properly balance equities in formulating a NEPA-related injunction.  *Winter* also left no doubt that a mere "possibility of irreparable harm" could not justify the "extraordinary remedy" of injunctive relief, and that a court *must* consider proposed *mitigation measures* in narrowly tailoring an injunction.  129 S. Ct. at 375-76 (holding that district court erred when it "did not reconsider the likelihood of irreparable harm in light of the four restrictions not challenged by the Navy").  Plaintiffs admit that it is their burden to establish that "irreparable harm" to the environment is *more likely than not* during the time that APHIS completes its NEPA review.  Reply Br. Supp. Mot. Prelim. Inj. (Doc. #282) at 17 n.28 ("'Likely' means having a better chance of existing or occurring than not.").

Here, evidence presented by defendants and intervenors establishes that: (1) the breeding techniques for RRSB seed  in the Willamette Valley (with the RRSB gene for many crops only on the female non-pollinator) have further reduced any potential for gene flow, and demonstrate that the existing isolation requirements are increasingly protective; (2) mechanical mixing

between RRSB and red beet or chard seed crops is extremely unlikely, as different equipment and facilities are employed for each crop; (3) there is no chance that mixing will eliminate the conventional sugarbeet crop; (4) there is no risk of cross-pollination of red beet and chard seed by the RRSB root crop; and (5) even if cross-pollination occurred, it would not cause any harm, much less any irreparable, environmental harm.  *See* Appendix A.

While plaintiffs' written declarations contend otherwise, unvarnished deposition testimony of those declarants to date has told a very different story.   Indeed, untested allegations in declarations referenced in the Court's preliminary injunction ruling—including allegations in a declaration submitted the very morning of the argument on that motion—are either plainly false or unsupported.  As set forth in Appendix A:

- **Most chard or table beet seed is grown outside the Willamette Valley.**  Plaintiffs own expert, Navazio, testified that ***the vast majority of chard and table beet seed is actually grown in Washington State, and not in Oregon, as plaintiffs claim***.  Navazio Dep. at 108:19-109:3 (recognizing plaintiffs' "mistake"); *see also* Pierson Decl. (Doc. #260) ¶ 40 & Exs. E, F.  Indeed, the limited red beet and chard seed crops in the Willamette Valley are grown in the northern end and margins of the Valley.  Morton Dep. at 149:24-150:10.

- **There has been no gene flow to plaintiffs' crops.**  Despite plaintiffs' claims, their witnesses admit that repeated genetic testing over multiple years has shown *no evidence* of any cross-pollination from RRSB crops.  Morton Dep. at 98:25-99:18; Navazio Dep. at 139:12-16.  Indeed, neither plaintiffs nor their customers require testing, and no plaintiffs presently intend to require testing.  Morton Dep. at 38:13-21; Stearns Dep. at 147:6-12.[8]

- **Gene on the female virtually eliminates any risk of gene flow.**  Plaintiffs admit that any risk of cross-pollination is virtually eliminated by the use of the RRSB gene on only the non-pollinating female plant, a technique now employed on nearly 80% of RRSB seed fields in the Willamette Valley.  Morton Interview, Vol. I, at 15:13-23; Navazio Dep. at 29:9-17.

- **The current isolation distances are appropriate.**  For the remaining 20% of crops with male RRSB pollinators, the red beet and chard seed producers in the Valley—including the lead plaintiff in this case—explicitly consented to a 3-mile isolation distance, ***which is less than the current 4-mile requirement.***  Morton Dep. at 173:3-4, 175:16-22 & Exs. 22, 23 (indicating that "Universal Seed and others would like to see the distance between different

---

[8] With no evidence of cross-pollination to plaintiffs' own crops, plaintiffs now misrepresent the results of tests performed by one company on certain lots of conventional sugarbeet seed harvested in 2007, making the outrageous claim that "genetic contamination in the Willamette Valley has been widespread."  Pls.' Mem. at 10-11.  Those test results, however, show that all lots of that sugarbeet seed complied with the 0.1% standard for the company at issue (Anfinrud Decl. ¶ 16)—lower than the tolerance for traces of RRSB in organic crops established by the organic industry (as discussed above).  These results only confirm that production of RRSB has had no impact on the production of other seed crops, including conventional sugarbeet seed.  *Id.*

groups changed to within three miles" and Frank Morton's assent that this three-mile isolation distance "works for me"). Plaintiffs' expert Navazio conceded that local growers were "in the best position to judge … the appropriate isolation distance" as they have "experience growing Beta seed crops in that particular environment because it does vary so much from place to place." Navazio Dep. at 126:19-127:1, 135:23-136:24.

- **The root crop poses no risk of gene flow.** Plaintiffs expert **assumed** that there could be cross-pollination from the root crop without researching the issue. Navazio Decl. ¶ 17; Navazio Supp. Decl. ¶ 20. Navazio *has visited a sugarbeet field only once*, over ten years ago, for half an hour; he has never seen a sugarbeet cull pile like that described in his declaration (because they do not exist); and he has never visited a processing facility or been involved in any sugarbeet cultivation. Navazio Dep. at 249:5-250:6, 253:10-254:6.

- **There is no risk of irreparable harm through mechanical mixing.** As plaintiffs' own declarant Clarkson acknowledges, proper "identity preservation procedures" have been effective to minimize any risk of mixing. Clarkson Dep. at 45:6-50:19. *Unlike RRSB*, both the Starlink and Liberty Link incidents (which are totally irrelevant to this case and involved no environmental harm) identified by plaintiffs involved crops **unapproved** for human consumption that were later found in food sources. Phillips Decl. ¶ 27. Both events have been remedied, and the organic markets have thrived in the wake of these events. *Id.* ¶¶ 37-38. Even the organic industry agrees, having already adopted standards making clear that traces of RRSB traits in an organic crop are permitted, and thus cannot be "irreparable harm." *Id.* ¶ 18 & Ex. C at 34 (setting a 0.25% tolerance for RRSB). Indeed, gene flow to plaintiffs' crops from mechanical mixing is *extremely unlikely*, as RRSB and table beet or chard seeds are grown by different growers, harvested with different equipment and processed in different facilities. Peters Decl. ¶ 4; Meier Decl ¶ 13; Anfinrud Decl. ¶ 6.

- **Unwanted outcrossing between sugarbeet and red beet or chard seed crops can be readily identified and inexpensively addressed.** Plaintiffs' expert Navazio admits that: (1) seed producers closely inspect all their seed plants, including by pulling them, inspecting the root and replanting before seeds are produced (Navazio Dep. at 241:4-15); (2) red beet/sugarbeet hybrids are easy to detect (*id.* at 73:4-74:10); and (3) he was unaware when he prepared his day-of-hearing declaration of available inexpensive testing kits ($1- $3 per test) for the Roundup Ready trait (*id.* at 193:3-14). Although Navazio suggests that it might be harder to detect a sugarbeet/green chard hybrid, *he is not sure he has in fact ever seen a hybrid chard/sugarbeet, and thus cannot be certain.* Navazio Dep. at 254:7-255:22. By contrast, experienced sugarbeet seed grower J.R. Stander and Government expert Neil Hoffman explain that these sugarbeet hybrids *are easy to spot.* Stander Decl. (Doc. #264) ¶ 11; Hoffman Decl. (Doc. #275) ¶¶ 68-72.[9]

In short, Plaintiffs' claims do not withstand scrutiny. The record does not support a finding of

likely, irreparable, environmental harm necessary to sustain any injunctive relief based on the

---

[9] Moreover, there is *zero* chance that conventional seed would be eradicated through mixing or outcrossing, as seed companies preserve and maintain foundation seed for their conventional seed varieties and breeding lines. Peters Decl. ¶ 20; Meier Decl. ¶ 15-17; Anfinrud Decl. ¶ 17. Plaintiffs' only asserted harm—the alleged time and expense of proper testing and stewardship to maintain crop purity (Navazio Supp. Decl. ¶ 9)—is purely economic and not environmental.

1    narrow NEPA violation.

2    **IV.      THE ADDITIONAL CONCERNS PLAINTIFFS IDENTIFY DO NOT SUPPORT
3             THE INJUNCTION THEY SEEK.**

4         **A.      Plaintiffs Cannot Show Any Harm From Glyphosate Resistance Caused By
                  The Root Crop.**

5         The sole NEPA violation found by this Court was limited to potential gene flow from the

6    RRSB seed crop in the Willamette Valley.  9/21/09 Order at 13-14 (Doc. #139).  It would be an

7    abuse of discretion and error of law to grant injunctive relief for alleged violations arising out of

8    the RRSB root crop—particularly here, as plaintiffs identify no harm arising out of the root

9    crop.[10]   As indicated above, the root crop poses no risk of gene flow.  Hoffman Decl. (Doc.

10   #275) ¶¶ 46-47.  And plaintiffs' concerns about increased weed resistance to glyphosate from

11   RRSB (Mem. at 12-14), remain unfounded.  The record shows that use of glyphosate on the

12   RRSB root crop does not meaningfully increase any risk of weed resistance.  Sugarbeets account

13   for a small fraction (0.7%) of the nation's glyphosate use.  Cole Decl. ¶ 52.  RRSB are rotated

14   with other crops to minimize development of weed resistance.  Kniss Decl. ¶¶ 14-16; Wilson

15   Decl. ¶¶ 49-52; *see also, e.g.*, Petersen Decl. ¶ 10; Schlemmer Decl. ¶ 11; Snyder Decl. ¶ 12.

16   Experts have thus deemed it "highly unlikely" that glyphosate use on RRSB would result in

17   resistant weeds while additional NEPA analysis is performed, Kniss Decl. ¶ 11; Wilson Decl. ¶

18   53—a conclusion consistent with the fact that weed resistance concerns have not been realized

19   during the three years in which RRSB have been widely grown.[11]   *See, e.g.*, Mauch Decl. ¶ 5;

20   Wettstein Decl. ¶ 12.  Plaintiffs' purported expert on these topics recently admitted that he has

21   "no knowledge about sugarbeets" (Radosevich Dep. at 33:19-36:13, 56:3-59:9, 116:3 (Turner

22   Decl., Ex. I)), acknowledged that "crop rotation is an important factor" in minimizing weed

23   resistance (*id.* at 49:12-16), and ***expressly rejected*** plaintiffs' notion that "glyphosate weed

---

[10] It is noteworthy that plaintiffs address weed resistance as a public interest concern, effectively conceding that the alleged "harm" exceeds the scope of the NEPA violation at issue, they have no irreparable harm relating to this issue, and they lack standing to raise any such harm.

[11] Moreover, addressing weed resistance does nothing to "remedy the specific harm shown"— here a failure to adequately consider cross-pollination—and is thus beyond the scope of injunctive relief.  *Neb. HHS v. HHS*, 435 F.3d 326, 330 (2006).

resistance is a ...threat to global cropping" (*id.* at 158:6-159:17).

In fact, plaintiffs' proposed relief would not benefit the environment. Plaintiffs admit that a return to conventional sugarbeet farming would require use of a mixture of different, higher-risk herbicides with "greater acute toxicity" than glyphosate. Morton Dep. at 195:25-196:1; Kniss Decl. (Doc. #251) ¶ 14. Plaintiffs would, perversely, force the use of these higher-risk herbicides to fulfill their public policy goals of eliminating biotechnology.

**B.    Plaintiffs' Remaining Concerns Provide No Basis For Injunctive Relief.**

The antitrust issues plaintiffs next raise (Pls.' Mem. at 6-7) are unfounded, and in any event, purely economic issues. They are entirely beyond NEPA's (and this hearing's) scope. Indeed, the Supreme Court cautions against using NEPA to challenge "virtually any consequence of a governmental action that someone thought 'adverse.'" *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983).

Plaintiffs' contentions about the effect of glyphosate on micronutrient uptake and fungal growth (Pls.' Mem. at 7-9), are similarly misplaced. First, all available scientific evidence contradicts plaintiffs' hypotheses. Larson Decl. ¶¶ 5-14; Sammons Decl. ¶¶ 9-21; Murdock Decl. ¶¶ 6-21; Mauney Decl. ¶¶ 7-16. Second, USDA has rejected these contentions. Carson Decl. ¶¶ 22-23; USDA-APHIS Environmental Assessment (Mar. 4, 2005) (Tate Decl. (Doc. #47), Ex. B).[12] Third, there is no evidence of these effects in the real world; to the contrary, growers have not seen these alleged effects in their varietal approval processes or elsewhere. *See, e.g.*, Gerstenberger Decl. ¶¶ 11, 14; Hofer Decl. ¶¶ 12, 15.

Plaintiffs' concerns about consumer choice (Pls.' Mem. at 11), similarly ignore the record. They incorrectly assume that all refined sugar contains RRSB. This is not true. All refined *sugarbeet* sugar is commingled. Pierson Decl. (Doc. #260) ¶¶ 71-80. But as plaintiffs' own declarant shows, even where consumers do not accept that all refined sugar is the same, they

---

[12] Plaintiffs' implication that Monsanto inhibited research into these concerns is also misplaced. Discussions with North Dakota State University and the University of Minnesota began shortly before the 2008 growing season and were not completed in time for these universities to grow RRSB that year. The parties agreed to use a third-party panel as a peer review board for studies regarding RRSB, and these universities commenced research in 2009. Nixon Decl. ¶¶ 19-23.

1    have many alternatives, including cane sugar.  Burkam Dep. at 58:14-20.[13]

2          Finally, although plaintiffs' brief couches these new arguments as invoking the public

3    interest prong of the injunction standard, that prong of the test cannot itself confer standing.

4    Plaintiffs cannot now add new and different remedies to this case neither sought by the

5    Complaint nor contemplated by the Court's Summary Judgment Order.  And plaintiffs ignore

6    entirely the benefits of RRSB (and other biotech crops):

7    •   RRSB permit use of glyphosate, a reduced risk herbicide, instead of a cocktail of herbicides
         and tillage practices that harm soil and cause erosion (Wilson Decl. ¶¶ 16-21);[14]

8    •   RRSB permit sugarbeet growers a $226 net gain per acre—gains that are essential to the
         small communities in which sugarbeet processors are located (Kniss Decl. ¶ 25);

9

10   •   As RRSB are nearly half of the domestic sugar market, a ban would cause sugar prices to
         skyrocket, costing consumers $5.6 billion in 2011.  Colacicco Decl. (Doc. #274) ¶¶ 8, 27.

11   A full and fair review of the public implications of plaintiffs' proposed relief shows that the

12   public interest too disfavors the broad ban plaintiffs seek.

13   **V.    THE STARK IMBALANCE OF EQUITIES BARS THE REQUESTED RELIEF.**

14         To qualify for a permanent injunction, plaintiffs must show that the "balance of equities"

15   favors the relief they seek.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)

16   (quoting *Winter*, 129 S. Ct. at 374).  Plaintiffs ask this court for a complete bar on "any and all

17   further planting, cultivation, processing, or other use of Roundup Ready sugar beets or Roundup

18   Ready sugar beet seeds"—a complete reversal of the status quo.  Pls.' Proposed Order.

19         While plaintiffs have not established that any harm, let alone irreparable harm, is likely to

20   result from the activities they seek to bar, intervenors, rural communities, and the U.S. economy

21   face certain, imminent, and ruinous harm from the sweeping relief plaintiffs propose.  The seed

22   crop used to plant the 2011 root crop was almost entirely planted when this Court granted

23   plaintiffs' summary judgment motion.  As a result, there is a severe shortage of acceptable

24

25   [13] Plaintiffs tack on unfounded concerns about the safe use of RRSB pulp as feed.  Pls.' Mem. at
     11-12.  In chastising the government for failing to "assess safety," plaintiffs ignore that the FDA
26   has done exactly that—review and authorize Roundup Ready crops, including RRSB, as safe for
     use as food or feed.  Schneider Decl. (Doc. #33) ¶ 12; *see also* Farmer Decl. (Doc. #242) *passim*.
27   And the study on which plaintiffs' fearmongering relies is unsound.  Hammond Decl. ¶¶ 6-18.

28   [14] *See also, e.g.*, Grant Decl. ¶¶ 8-10; Snyder Decl. ¶¶ 6-7; Steinbeisser Decl. ¶¶ 4-5.

conventional seed for 2011 in six of eight processing regions.   Manning Decl. ¶ 20.  The relief

plaintiffs seek would cause massive, widespread harm:

- Many processors would not have sufficient beets to maintain operations in 2011.  *Id.*  At least 8 of 21 U.S. sugarbeet factories would close.  Over 5,500 full-time and seasonal jobs would be lost in rural communities where sugarbeets are planted, and total economic losses would exceed $2 billion in 2011-12 alone.  Sexton Decl. ¶¶ 8-22.  This shortage would also have a detrimental effect on the U.S. sugar supply and price.  Gregory Decl. (Doc. #246) ¶ 5.

- Individual growers who have been 100% Roundup Ready for years would lose investments in their processing cooperatives and companies.  For most growers, these shares collateralize or finance their farming operations.  *See* Bowen Decl. ¶¶ 4, 5, 16; Gerstenberger Decl. ¶¶ 2, 8; Grant Decl. ¶¶ 6, 15; Hofer Decl. ¶ 6; Mauch Decl. ¶¶ 2, 8; Petersen Decl. ¶¶ 2, 6; Schlemmer Decl. ¶¶ 2, 6; Snyder Decl. ¶ 4; Steinbeisser Decl. ¶ 6; Wettstein Decl. ¶¶ 9-10.

- Even those few growers who could procure sufficient conventional sugarbeet seed may not be able to procure the necessary chemicals to cultivate a crop and/or they could be forced to plant seed with several less desirable traits or not approved in their growing regions, and face significant losses due to increased production costs, plant disease and lower sucrose yields.  *See* Kniss Decl. ¶ 25; Wilson Decl. ¶¶ 22, 58. Manning Decl. ¶¶ 23-28; Gerstenberger Decl. ¶ 5; Grant Decl. ¶¶ 8, 18; Hofer Decl. ¶¶ 8, 14; Mauch Decl. ¶¶ 4, 9.

- The seed and technology companies likewise would lose approximately $200 million per year in the form of lost Roundup Ready seed sales and accompanying technology fees. Meier Decl. ¶ 26; Enright Decl. (Doc. #241) ¶¶ 5-6; Fritz Decl. ¶¶ 4-11; Nixon Decl. ¶ 11.

- Given limited amounts of conventional seed and the full transition of some growing regions to RRSB, a ban on RRSB would destroy portions of the industry and would restructure the remainder of the U.S. sugar industry in 2011 and beyond.  Certain communities would never again grow sugarbeets, while other processors elsewhere may survive at the expense of those communities.  In other words, this Court would create winners and losers though no evidence supports a need for winners and losers.  Sexton Decl. ¶¶ 8, 23-36; Bowen Decl. ¶¶ 12-16.

By contrast, plaintiffs face no serious threat of harm.  In four years of RRSB seed crops,

plaintiffs have not identified a single instance of gene flow to their chard or table beet crops.

The only concrete "injury" that plaintiffs identify is the cost of testing for the presence of the

Roundup Ready trait.  But they are (at best) misleading about those costs.  Morton Dep. at 97:6-

97:8; 124:13-24; Stearns Dep. at 47:24-48:15.  And, as plaintiffs' declarant admits, this is no

injury, as plaintiffs "charge a premium" for organic products that "exceed[s] the additional cost"

of providing such products.  Clarkson Dep. at 57:5-8.  Organic certification does not require

testing of seed crops for presence of biotech materials, and growers do not lose certification due

to unintentional cross-pollination from a biotech crop.  Kershen Decl. (Doc. #250) ¶¶ 15-19.

Moreover, in light of plaintiffs' long delay in filing suit—here, at least one year after

1   discovering the basis for their suit—or, thereafter, seeking any injunctive relief further tips the

2   equities in favor of intervenors.  Despite learning that the seed industry would be growing RRSB

3   seed in the Valley on December 8, 2006 (Morton Dep. at 17:10-12), plaintiffs waited another

4   year to file suit.  Then, fully informed by the intervenors' motion to intervene that the industry

5   was in the midst of a full transition to RRSBs (a motion plaintiffs *opposed* as premature),

6   plaintiffs took no action to stop that transition *until it was complete.*  *Oakland Tribune Inc. v.*

7   *Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (delay "implies a lack of urgency and

8   irreparable harm").  Now plaintiffs seek to turn back a transition of years in an instant, casually

9   ignoring the enormity of the change in the sugarbeet industry.[15]  Even plaintiffs' own expert

10  candidly acknowledged that multiple years of breeding would be required for the sugarbeet seed

11  companies to reproduce the same high quality varieties of conventional sugarbeet seed if the

12  Court bans RRSB.  Navazio Dep. at 280:10-17 (noting that a restart would take 3 to 4 years).

13  The balance of the equities tilts decisively against the relief plaintiffs seek.[16]

14  **VI.     THE SCOPE OF ANY REMEDY SHOULD BE LIMITED.**

15          The proper remedy for the NEPA violation is remand to "allow [APHIS] the first

16  opportunity" to address the violation.  *Safe Air for Everyone*, 488 F.3d at 1101.  This Court need

17  not—and should not—order a vacatur.  Vacatur is an equitable remedy, *Neb. HHS*, 435 F.3d at

18  330, and courts have broad discretion to "do equity and to mould each decree to the necessities

19  of the particular case" rather than "mechanically [award relief] … for every violation of law."

20  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982).  For that reason, "remand without

21  vacatur has long been supported by … precedent."  *United States v. Afshari*, 426 F.3d 1150,

22  1156 (9th Cir. 2005); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir.

---

[15] Plaintiffs even go one step further and accuse intervenors of "cynical brinkmanship" by
continuing to plant and grow Roundup Ready sugarbeets.  Plaintiffs refuse to accept that their
delayed lawsuit did not suspend APHIS's deregulation decision, that intervenors were entitled to
rely upon APHIS's decision, and that intervenors' actions were and remain completely within the
law.  And, as previously noted, plaintiffs' hearsay interpretation of American Crystal's
documents is incorrect and inadmissible. Berg Decl. (Doc. #308) ¶¶ 4-12.

[16] The equities also counsel remand to APHIS to address RRSBs while the agency completes the
NEPA review.  *See, e.g.*, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641-45 (9th Cir.
2004) (allowing activity to proceed under specified conditions while NEPA violations are cured).

2002) ("Appellants insist that we have no discretion in the matter; [an APA violation] must be vacated.  But that is simply not the law.").  If the Court is considering vacatur, it should stay any such order to permit APHIS to implement an interim remedy under its own authority.

Plaintiffs have not met the requirements for injunctive relief.  *See supra* Section III.  But if the Court deems injunctive relief proper, it must defer to APHIS's expertise for the scope of any injunctive relief and "reconsider the likelihood of irreparable harm in light of the" measures the Government proposes. *Winter*, 129 S. Ct. at 376.  Any "injunction must be narrowly tailored … to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).[17]

Although intervenors do not believe an injunction is justified in this matter, intervenors would consider *consenting* to an order that permitted continued cultivation of RRSB, subject to stewardship measures, pending USDA's completion of its NEPA review for RRSB deregulation. An agreeable Order could be structured to require APHIS, pursuant to its statutory authorities, to:

- mandate compliance with isolation distances through the Willamette Valley Specialty Seed Association Seed Crop Pinning System;
- mandate compliance with appropriate measures designed to prevent mechanical mixing of RRSB seed and other seed;
- require intervenors to commit not to grow RRSB in the Washington State counties in which the majority of the nation's table beet and chard seed crops are grown; and
- obligate seed companies to maintain foundation seed for conventional sugarbeets so that a return over time to conventional seed production can be accomplished in the future.

## VII.   THE BROAD INJUNCTION PLAINTIFFS PROPOSE MAY NOT ISSUE WITHOUT AN EVIDENTIARY HEARING.

As set forth in Defendant Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. #237), intervenors contend that granting the proposed injunction—or any broad ban on RRSB planting—without an evidentiary hearing would constitute an abuse of discretion.

---

[17] **POSITION OF SESVANDERHAVE**: Should the Court decide to impose a remedy designed to alleviate an alleged "likelihood" of "irreparable harm" resulting from cross-pollination, SESVanderHave submits that such a remedy should be "narrowly tailored" and therefore should not apply to female-side RRSB production.  *See* Order Granting SESVanderHave's Motion to Intervene (Doc. #174) at 4-5.  SESVanderHave submits that the record cannot support a finding that female-side production of RRSB seed crops creates a likelihood of irreparable harm from cross-pollination.  Hovland Decl. (Doc. #249) ¶¶ 5-14; Anfinrud Decl. ¶ 5; Navazio Decl. ¶ 5.

Case Number:  C 08-0484 JSW 05-07-2010
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION

1  | Dated: May 7, 2010                          Respectfully Submitted,

2  |                                                    /s/  Holly J. Tate
   | PHILIP J. PERRY (CA Bar No. 148696)         HOLLY J. TATE (Ca. Bar No. 237561)
3  | JANICE M. SCHNEIDER (DC Bar No.             LATHAM & WATKINS LLP
   | 472037) (*pro hac vice* granted)            505 Montgomery Street, Suite 1900
4  | LATHAM & WATKINS LLP                        San Francisco, California 94111-2562
   | 555 11th Street, N.W., Suite 1000           Telephone: (415) 391-0600
5  | Washington, D.C. 20004                      Facsimile: (415) 395-8095
   | Telephone: (202) 637-2200                   Email: holly.tate@lw.com
6  | Facsimile: (202) 637-2201
   | Email: phil.perry@lw.com
7  | Email: janice.schneider@lw.com

8  |

9  | STANLEY H. ABRAMSON (DC Bar No. 217281)
   | (*pro hac vice* granted)
10 | RACHEL G. LATTIMORE (DC Bar No.450975)
   | (*pro hac vice* granted)
11 | ARENT FOX LLP
   | 1050 Connecticut Avenue, N.W.
12 | Washington, D.C. 20036-5339
   | Telephone: (202) 857-6000
13 | Facsimile: (202) 857-6395
   | Email: abramson.stanley@arentfox.com
14 | Email: lattimore.rachel@arentfox.com

15 |                      Attorneys for Intervenor-Defendant Monsanto Company

16 |                                                    /s/ Gilbert S. Keteltas
   | JOANNE LICHTMAN (Ca. Bar No. 137300)        GILBERT S. KETELTAS (DC Bar No.
17 | HOWREY LLP                                  421236)
   | 550 South Hope Street, Suite 1100           (*pro hac vice* granted)
18 | Los Angeles, California 90071-2627          JOHN F. BRUCE (DC Bar No. 1578) (*pro hac
   | Telephone: (213) 892-1800                   vice* granted)
19 | Facsimile: (213) 892-2300                   CHRISTOPHER H. MARRARO (DC Bar No.
   | Email: lichtmanj@howrey.com                 395152) (*pro hac vice* granted)
20 |                                             HOWREY LLP
   |                                             1299 Pennsylvania Avenue, N.W.
21 |                                             Washington, D.C. 20004-2402
   |                                             Telephone: (202) 783-0800
22 |                                             Facsimile: (202) 383-6610
   |                                             Email: keteltasg@howrey.com
23 |                                             Email: brucej@howrey.com
   |                                             Email: marraroc@howrey.com
24 |
   |          Attorneys for Intervenor-Defendants American Sugarbeet Growers Association, Ervin
25 |       Schlemmer, Mark Wettstein, Duane Grant, John Snyder, Jr., United States Beet Sugar
   |     Association, American Crystal Sugar Company, The Amalgamated Sugar Company LLC,
26 |                                  Western Sugar Cooperative
   |                               and Wyoming Sugar Company LLC
27 |

28 |

Case Number:  C 08-0484 JSW 05-07-2010
INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION

1

2   DAVID J. LAZERWITZ (Cal. Bar. No.
    221349 – admitted)
3   FARELLA BRAUN + MARTEL LLP
    235 Montgomery Street, 17th Floor
4   San Francisco, CA 94104
    Telephone: (415) 954-4400
5   Facsimile: (415) 954-4480
    Email: dlazerwitz@fbm.com

6

7
        _/s/ Nancy Bryson_____
    NANCY BRYSON (DC Bar No. 913673) (*pro
    hac vice* granted)
    HOLLAND & HART LLP
    975 F Street, N.W., Suite 900
    Washington, D.C.  20004
    Telephone:  (202) 654-6921
    Facsimile:  (202) 747-6567
    Email:  nbryson@hollandhart.com

Attorneys for Intervenor-Defendant Syngenta Seeds, Inc.

8   DANIEL M. ABUHOFF (NY Bar No.
    1227057) (*pro hac vice* granted)
9   HARRY ZIRLIN (NY Bar No. 2315737) (*pro
    hac vice* granted)
10  DEBEVOISE & PLIMPTON LLP
    919 Third Avenue
11  New York, NY  10022
    Telephone:  (212) 909-6000
12  Facsimile:  (212) 909-6836
    Email:  dmabuhof@debevoise.com
13  Email:  hzirlin@debevoise.com

14
        _/s/ Daniel Murphy_____
    DANIEL MURPHY (Ca. Bar No. 141006)
    W. ALLAN EDMISTON (Ca. Bar No.
    228246)
    LOEB & LOEB LLP
    10100 Santa Monica Blvd., 22nd Floor
    Los Angeles, California  90067
    Telephone:  (310) 282-2000
    Facsimile:  (310) 282-2200
    Email:  dmurphy@loeb.com
    Email:  aedmiston@loeb.com

Attorneys for Intervenor-Defendant Betaseed, Inc.

15

16  SARAH G. FLANAGAN (CA Bar No. 70845 –
    admitted)
17  PILLSBURY WINTHROP SHAW PITTMAN
    LLP
18  50 Fremont Street
    P.O. Box 7880
19  San Francisco, CA 94120-7880
    Telephone:  (415) 983-1000
20  Facsimile:  (415) 983-1200
    Email:  sarah.flanagan@pillsburylaw.com

21

22

        _/s/ Daniel Bukovac_____
    DANIEL BUKOVAC (Mo. Bar No. 33456)
    (*pro hac vice* granted)
    STINSON MORRISON HECKER LLP
    1201 Walnut Street, Suite 2900
    Kansas City, Missouri 64106
    Telephone:  (816) 842-8600
    Facsimile:  (816) 412-1051
    Email:  dbukovac@stinson.com

Attorneys for Intervenor-Defendant SESVanderHave USA, Inc.

23

24

25

26

27

28

17