# REDACTED

1    PAIGE M. TOMASELLI State Bar No. 237737
     KATERYNA L. RAKOWSKY State Bar No. 246248
2    Center for Food Safety
     2601 Mission St., Suite 803
3    San Francisco, CA 94110
     T: (415) 826-2770 / F: (415) 826-0507
4    Emails: ptomaselli@icta.org
              kateryna@icta.org
5
     PAUL H. ACHITOFF (Pro Hac Vice)
6    Earthjustice
     223 South King Street, Suite 400
7    Honolulu, Hawai'i 96813
     T: (808) 599-2436 / F: (808) 521-6841
8    Email: achitoff@earthjustice.org

9    *Counsel for Plaintiffs*

10

                    UNITED STATES DISTRICT COURT
11            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
12

13

14   CENTER FOR FOOD SAFETY, *et al.*,      )   Case No.: 3:08-cv-0484-JSW
                                            )
15              Plaintiffs,                 )   **PLAINTIFFS' OPPOSITION AND  REPLY
                                            )   IN SUPPORT OF MOTION FOR
16        vs.                               )   PERMANENT RELIEF**
                                            )
17   THOMAS J. VILSACK, *et al.*,           )
                                            )   Date: July 9, 2010
18              Defendants.                 )   Time: 9:00 a.m.
                                            )   Judge: Hon. Jeffrey S. White
19                                          )   Place: Courtroom 11
                                            )
20   ─────────────────────────────         )

21

22

23              **MOTION FILED UNDER SEAL**

24

25

26

27

28   Opposition and Reply in Support of Plaintiffs' Motion for Permanent Relief
     No. 3:08-cv-00484-JSW

# REDACTED

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.  VACATUR IS THE STANDARD REMEDY FOR ARBITRARY AND
    CAPRICIOUS AGENCY ACTION AND DEFENDANTS FAIL TO MEET
    THEIR BURDEN FOR LESSER RELIEF. ........................................................... 2

II. NEPA'S STATUTORY PURPOSES OF ENVIRONMENTAL PROTECTION
    AND INFORMED DECISIONMAKING MANDATE VACATUR. ...................... 4

III. THE ALLEGED CONSEQUENCES OF STOPPING THE PLANTING DO NOT
     WARRANT WITHHOLDING VACATUR. .......................................................... 6

    A.  The Type of "Harm" Alleged Does Not Warrant Remand Without
        Vacatur. ...................................................................................................... 6

    B.  The Economic Harm Alleged Is Overblown and Self-Created. ................ 7

IV. THE STATUS QUO HARMS PLAINTIFFS AND THE PUBLIC INTEREST. ..... 11

    A.  Plaintiffs Are Irreparably Harmed by the Fundamental Loss of Choice and
        Reasonable Alternatives. ......................................................................... 12

    B.  Intervenors Concede Transgenic Contamination Is an Unavoidable and
        Accepted Part of Producing RRSB. ........................................................ 13

    C.  Plaintiffs and the Public Interest Are Harmed by the Continued Spread of
        Glyphosate-Resistant Weeds. ................................................................. 17

    D.  Plaintiffs and the Public Interest Are Harmed by the Increased Risk of
        Crop Disease from Continued Planting. .................................................. 18

V.  DEFENDANTS' REQUESTS FOR CONTINUED PLANTING UNDER A
    DEFACTO PARTIAL DEREGULATION AND STAY OF THE VACATUR
    SHOULD BE DENIED. ....................................................................................... 19

CONCLUSION ................................................................................................................ 20

# REDACTED

1

## TABLE OF AUTHORITIES

<u>Page(s)</u>

2

### CASES

3   *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)..................................2

4   *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987).................................... 2, 11, 15

5   *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)...................................................15

6   *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943 (N.D. Cal. 2009)...............................15

7   *Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292 (D. Mont. 1992) ............................16

8   *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)........................................12

9   *Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009) ...............................................2

10  *Ctr. for Biological Diversity v. FWS*,
    No. C04-04324 WHA, 2005 WL 2000928 (N.D. Cal. August 15, 2005) ...................................4

11

12  *Ctr. for Food Safety v. Vilsack*,
    No. C 08-00484 JSW, 2009 WL 3047227 (N.D. Cal. September 21, 2009)....................4, 5, 13

13  *Ctr. for Food Safety v. Vilsack*,
    No. C 08-00484 JSW, 2010 WL 964017 (N.D. Cal. March 16, 2010)....................... ...............7

14

15  *FCC v. Nextwave Pers. Commc'ns*, 537 U.S. 293 (2003) .............................................4

    *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250 (10th Cir. 2003)...........................16

16
    *Home Builders Ass'n of Northern California v. FWS*,
17  268 F. Supp. 2d 1197 (E.D. Cal. 2003)............................................................4, 5

18  *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363 (D.C. Cir. 2004).......................................3

19  *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d (D.D.C. 2007) ................................5

20  *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995)......................................3, 6

21  *In re Core Commc'ns, Inc.*, 531 F.3d 839 (D.C. Cir. 2008) ......................................3, 20

22  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)................................................1

23  *Md. Pharm., Inc. v. DEA*, 133 F.3d 8 (D.C. Cir. 1998) ............................................2

24  *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) .....................................6

25  *Nat'l Ass'n of Home Builders v. Norton*, 2001 WL 1876349 (D. Ariz. 2001) ........................6

26  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) .................2

27  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)........................4

28

# REDACTED

*Nat'l Wildlife Fed. v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994)..........................16

*Nat'l Wildlife Fed. v. NMFS*, 422 F.2d 782 (9th Cir. 2005) .......................................18

*Nken v. Holder*, 129 S.Ct. 1749 (2009)...........................................................3

*NRDC v. DOI*, 275 F. Supp. 2d 1136 (C.D. Cal. 2002) ...........................................4

*NRDC v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007) ...................................................5

*NRDC v. EPA*, 676 F. Supp. 2d 307 (S.D.N.Y. 2009)........................................6, 11

*NRDC v. EPA*,
    No. 09 Civ. 4317 (DLC), 2010 WL 431885 (S.D.N.Y. February 8, 2010) .......................20

*Safe Air for Everyone v. EPA*, 488 F.3d 1088 (9th Cir. 2007) ......................................3

*Save Our Ecosystems v. Clark*, 747 F.2d 1240 (9th Cir. 1983) .....................................13

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ..........................................4

*Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002)......................6

*W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803 (9th Cir. 1980) .......................................5, 6

*Winter v. NRDC*, 129 S.Ct. 365 (2008)..........................................................19

## STATUTES

5 U.S.C. § 706.................................................................................2, 3
7 U.S.C. § 7701...................................................................................5
42 U.S.C. § 4331(b)(4) ..........................................................................13
Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 ...............19

## REGULATIONS

7 C.F.R. § 340.0(a)(2) .............................................................................1
7 C.F.R. § 340.1 ..................................................................................1
7 C.F.R. § 340.6 ..................................................................................1
40 C.F.R. § 1502.14 ..............................................................................12
40 C.F.R. § 1506.1 ...............................................................................12
40 C.F.R. § 1508.8 ...............................................................................13
40 C.F.R. § 1508.27(a)............................................................................15

## FEDERAL REGISTER NOTICES

75 Fed. Reg. 29969-72 (May 25, 2010)..............................................................5

# REDACTED

INTRODUCTION

"[E]very right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison,* 5 U.S (1 Cranch) 137, 147, 2 L. Ed. 60 (1803). Plaintiffs seek an injunction and vacatur reaching one basic result: the immediate halt of the planting, use and sale of Roundup Ready sugar beets ("RRSB").[1] Plaintiffs have introduced evidence—and here introduce further evidence—that continued RRSB planting pending the EIS presents serious risks of harming Plaintiffs and the public interest in a number of ways. Federal Defendants and Intervenors ask this Court to flout the Administrative Procedure Act and deny any meaningful relief for their NEPA violation. Instead, they ask the Court to place its imprimatur on continued planting without any record basis or interim rule-making. In their view, the Court-ordered NEPA analysis is an empty exercise in predetermined hoop-jumping; the assurances of Intervenors' paid declarants should be a sufficient substitute for the legally mandated process. If this were all a defendant needed to do to carry out an action to the point of irrevocability following a failure to comply with NEPA, the statute would be completely meaningless. These risks must be thoroughly evaluated independently, with opportunity for public (and other agency) comment, before the action has progressed to the point that there are no practical alternatives.[2]

Plaintiffs have met their burden for injunctive relief, and just as crucially, Defendants

---

[1] It is undisputed that vacating the arbitrary and capricious deregulation decision will return RRSB to their previous status as a "regulated article," halting their planting, use and sale. APHIS regulations govern "organisms and products altered or produced through genetic engineering …." 7 C.F.R. §§ 340.0(a)(2) n.1, 340.6. These "regulated article[s]" may not be "introduce[d]" into the environment or "release[d]" or "moved in interstate commerce" absent explicit approval. *Id.* § 340.1. *See* Defendants' Opposition to Plaintiffs' Motion for Permanent Injunction ("Defs.") at 1 (acknowledging that vacatur would "by itself ... make further planting or commercial use of RRSB unlawful").

[2] Contrary to Defendants' claim (Defs. at 1), Plaintiffs are not arguing APHIS should be enjoined from taking interim action based on a record, with NEPA compliance, after a remand and vacatur. In the interests of equity, Plaintiffs also do not request the Court retroactively classify previously processed RRSB sugar as a regulated article. Plaintiffs request only prospective relief: that there be no further planting of RR seed or sugar beet, and that any future planting and use of RRSB be enjoined and considered a regulated article. *See* Plaintiffs' Proposed Order filed contemporaneously herewith.

# REDACTED

1  have failed to meet their burden to demonstrate why the Court should not vacate the

2  deregulation.

3                                    ARGUMENT

4  I.    VACATUR IS THE STANDARD REMEDY FOR ARBITRARY AND CAPRICIOUS
       AGENCY ACTION AND DEFENDANTS FAIL TO MEET THEIR BURDEN FOR
5      LESSER RELIEF

6
7        No party disputes the traditional standard for injunctive relief applies.  *See Amoco Prod.*

8  *Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987).  A different standard applies to vacatur, and

9  Federal Defendants and Intervenors (jointly, "Defendants") tell only half that story, at best.

10 Vacatur is the standard remedy for an APA violation.  The APA provides that if, based on a

11 review of the administrative record, a Court concludes an agency action is "arbitrary, capricious,

12 an abuse of discretion, or otherwise not in accordance with law," or the action has been adopted

13 "without observance of procedure required by law," the reviewing court "*shall . . . hold unlawful*

14 *and set aside*"—vacate — the agency action.  5 U.S.C. § 706(2)(A) (emphasis added); *Comcast*

15 *Corp. v. FCC*, 579 F.3d 1, 10  (D.C. Cir. 2009) (Randolph, J., concurring) ("Section 706(2)(A)

16 of the APA could not be clearer: a court faced with an arbitrary and capricious agency rule ...

17 'shall hold unlawful and set aside' that agency action. 'Set aside' means vacate, according to the

18 dictionaries and the common understanding of judges") (quoting 5 U.S.C. § 706(2)(A)).

19       The D.C. Circuit has repeatedly characterized vacatur as the "ordinary result," *Nat'l*

20 *Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), the

21 "normal[]" approach to APA review, *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084

22 (D.C. Cir. 2001), and the courts' usual "responsibility under the APA" when they determine an

23 agency action has been adopted in violation of federal law. *Md. Pharm., Inc. v. DEA*, 133 F.3d

24 8, 16 (D.C. Cir. 1998).  In fact, there is an ongoing judicial debate concerning whether or not the

25 APA's statutory command to "set aside" unlawful agency actions simply requires vacatur of *all*

26 agency actions that are flawed in the ways described in 5 U.S.C. § 706(2). *See, e.g., In re Core*

27 *Commc'ns, Inc.*, 531 F.3d 849, 862-63 (D.C. Cir. 2008) (Griffith, J., concurring) (discussing

28

---

Opposition and Reply in Support of Plaintiffs' Motion for Permanent Relief
No. 3:08-cv-00484-JSW                                                    2

# REDACTED

1   caselaw).  In the Ninth Circuit the vast majority of cases simply vacate the underlying arbitrary

2   and capricious agency action as part of the remand.  Those few that discuss the issue recognize

3   vacatur as the usual remedy.  *See, e.g.*, *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405 (9th

4   Cir. 1995) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the

5   regulation is invalid.").  Accordingly, Intervenors' claims that the "proper" or "settled law"

6   remedy for an APA violation is a naked remand *without also vacatur* are grossly misleading.[3]

7   The case Intervenors cite, *Safe Air for Everyone v. EPA*, *did* vacate the agency action.  488 F.3d

8   1088, 1101-02 (9th Cir. 2007) ("EPA's approval VACATED; REMANDED to EPA").

9          Given that vacatur is the usual (if not presumptive) remedy, the *burden is on the*

10  *Defendants*, not Plaintiffs, to support any remedy that allows for more activity than vacatur and

11  remand.  *Monsanto Co. v. Geertson Seed Farms*, 09-475,  Supreme Court Oral Arg. Tr. at 6:19-

12  24, April 27, 2010 ("And *under the vacatur*, the normal APA remedy is a remand to the agency.

13  In fact there are some courts that say that you can't get anything else.  But whether you can or

14  can't, it's clear that *the burden is on you* [Defendants] to get something short of a complete

15  remand.") (Roberts, C.J.) (emphases added) (attached as Ex. F to Tomaselli Decl.).  Moreover,

16  for the Defendants' preferred "interim measures" injunction (a *defacto* partial deregulation that

17  would allow continued planting) that burden includes a showing of irreparable harm, as does

18  their burden for a stay of the vacatur.  *Nken v. Holder*, ___ U.S. ___, 129 S.Ct. 1749, 1761

19  (2009); *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1375 (D.C. Cir. 2004) (Randolph, J.,

20  concurring) ("[T]he agency must establish that the standards for a stay are satisfied, including

21  that there "will be irreparable harm without the stay….").

22         Finally, in determining whether to vacate an agency action, the Court should consider,

23  *inter alia*: (1) the purposes of the statute under which the agency was acting, (2) the

24  consequences of invalidating or enjoining the action, and (3) potential prejudice to those affected

25

26  [3] *See* Intervenors' Opposition to Plaintiffs' Motion for Permanent Injunction ("DIs.") at v, 6 &
       14.

27

28

# REDACTED

1   by maintaining the status quo. The Court must also consider the extent of the administrative

2   error. *See, e.g.*, *Home Builders Ass'n of Northern California v. FWS*, 268 F. Supp. 2d 1197,

3   1236-1237 (E.D. Cal. 2003); *see also NRDC v. DOI,* 275 F. Supp. 2d 1136, 1144 (C.D. Cal.

4   2002); *Ctr. for Biological Diversity v. FWS*, 2005 WL 2000928, *16 (N.D. Cal. 2005). All of

5   these factors weigh in favor of Plaintiffs.

6

7   II.   NEPA'S STATUTORY PURPOSES OF ENVIRONMENTAL PROTECTION AND
         INFORMED DECISIONMAKING MANDATE VACATUR

8

9       As this Court noted, NEPA "was intended to reduce or eliminate environmental damage

10  and to promote the understanding of ecological systems" through informed decision-making.

11  *Ctr. for Food Safety v. Vilsack*, 2009 WL 3047227, *4 (N.D. Cal. 2009) (internal quotes

12  omitted); *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 n.18 (9th Cir.

13  2001) (In NEPA cases, "the requisite harm is the failure to follow the appropriate procedures");

14  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034 (9th Cir. 2007) (that "harm is compounded by the

15  added risk to the environment that takes place when governmental decisionmakers make up their

16  minds without having before them an analysis (with public comment) of the likely effects of

17  their decision on the environment."). Remanding without vacating the deregulation would

18  negate NEPA's basic purpose, as would allowing the government's partial deregulation without

19  vacating and requiring APHIS to first go through the mandated administrative process. *See, e.g.*,

20  *NRDC v. EPA*, 676 F. Supp. 2d 307, 317 (S.D.N.Y. 2009) ("Vacating the EPA's registrations of

21  this potentially harmful insecticide furthers the environmental and agricultural interests FIFRA

22  aims to protect and vindicates FIFRA's procedural requirements.").

23      Federal Defendants point out that the Court did not reach the PPA claims and argue that

24  remand without vacatur is warranted because, after the EIS, it is possible APHIS "will again"

25  approve deregulation (Defs. at 13). That the Court did not reach the PPA claims is irrelevant.

26  *FCC v. Nextwave Personal Commc'ns*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal

27  courts to set aside federal agency action that is ''not in accordance with law,'' which means, of

28

# REDACTED

1  course, *any* law, and not merely those laws that the agency itself is charged with administering.")

2  (emphasis added).  Virtually all NEPA actions are based on underlying agency actions taken

3  pursuant to some other statute.  To the extent Federal Defendants predict the outcome of the EIS

4  process, APHIS is once more showing it considers its statutory mandate an empty exercise.  In

5  any event, Plaintiffs' substantive PPA claims must still be addressed.  The PPA's purpose of

6  protecting U.S. agriculture and the environment is no less served by vacatur.  *See* 7 U.S.C. §

7  7701(1); *NRDC v. EPA,* 489 F.3d 1250, 1261-62 (D.C. Cir. 2007) (where a reviewing court has

8  invalidated a rule without reaching additional "potentially meritorious challenges" to it, vacatur

9  is appropriate).

10     Federal Defendants' claim that, because NEPA is procedural in nature, vacatur is not

11  warranted, is similarly flawed.  (Defs. at 12).  Courts routinely vacate based on procedural errors

12  such as the lack of notice and comment, to say nothing of the failure to adequately analyze

13  impacts, as here.  *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("Ordinarily a

14  failure to comply with the APA requirements of prior notice and comment would invalidate such

15  designation.").  NEPA's uniquely procedural context weighs even *more* heavily in favor of

16  vacatur.  *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) ("[V]acating a

17  rule or action promulgated in violation of NEPA is the standard remedy.").

18     Nor was the extent of the NEPA violation "limited" to cross-pollination in the Willamette

19  Valley (DIs. at 10).  The Court did not find the agency's analysis adequate in any respect, and

20  APHIS' legal errors permeated its assessment.  *See* Pls.' PI Reply at 22-23 & n.6 (and cases

21  therein); *see* Defs.' Sum. Jud. Br. at 16-17, 22, 24, 25, 28, 29 (arguing that APHIS was *not*

22  *required* to assess numerous impacts, not that their assessment was sufficient), and *Center for*

23  *Food Safety*, 2009 WL 3047227 at *n.3 (rejecting that argument).  The potential impacts the

24  agency will cover in the EIS are extensive.  *Home Builders Ass'n of Northern California*, 268 F.

25  Supp. 2d at 1236-1237 (extensiveness of error a factor in determining vacatur); APHIS, *EIS*

26  *Scoping Notice on RRSB*, 75 Fed. Reg. 29969-72 (May 25, 2010) (lengthy list of issues EIS will

27  analyze).

28

# REDACTED

III.   THE ALLEGED CONSEQUENCES OF STOPPING THE PLANTING DO NOT
WARRANT WITHHOLDING VACATUR

     A.   <u>The Type Of "Harm" Alleged By Defendants and Intervenors Does Not Warrant
Remand Without Vacatur</u>

In rare instances when courts in this Circuit have declined to vacate after an APA

violation, they have cited environmental protection, *not* economic harm as alleged by Defendants

and Intervenors.  *See Idaho Farm Bureau*, 58 F.3d at 1405 ("In the present case, concern exists

regarding the potential extinction of an animal species"); *W. Oil and Gas*, 633 F.2d at 813; *see

also NRDC v. DOI*, 275 F. Supp. 2d at 1143-44 (both cases "expressed special concern for the

potentially one-sided and irreversible consequences of environmental damage prompted by

vacating defective rules during remand"); *see also Nat'l Ass'n of Home Builders v. Norton*, 2001

WL 1876349, *3 (D. Ariz. 2001) (Vacatur proper in absence of "evidence suggesting that

significant harm to the species is likely to occur if the critical habitat designation is vacated

pending remand."); *NRDC v. DOI*, 275 F. Supp. 2d at 1146 n.21 (noting "difference in character

between the potential harm to the listed species and the disruption to the defendant-intervenors

and related plaintiffs").[4]

Federal Defendants' cited extra-circuit precedent (Defs. at 13) represents a line of cases

declining to vacate because "vacatur would not actually undo the agency action."  *See NRDC v.

EPA,* 676 F. Supp. 2d at 312; *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 98

(D.C. Cir. 2002) ("the egg has been scrambled and there is no apparent way to restore the status

quo ante."); *see also Milk Train, Inc. v. Veneman,* 310 F.3d 747, 756 (D.C. Cir. 2002) (monies

previously distributed were not recoverable).  These are inapposite: to "restore the status quo

ante" here the Court need simply vacate the unlawful deregulation and allow use only of

---

[4]That these exceptions are environmental harm cases show their public interest nature.  *NRDC v.
EPA*, 489 F.3d at 1265 (Rodgers, J., concurring in part and dissenting in part) ("[T]he court
has traditionally not vacated the rule if doing so would have serious adverse implications for
public health and the environment.").  As Plaintiffs discussed at length in their opening brief,
the public interest rests with Plaintiffs, not Intervenors, in this case.

# REDACTED

conventional beets.

   B.   The Economic Harm Alleged Is Overblown And Self-Created.

   Defendants argued that preliminarily enjoining the 2010 RRSB crop would have devastating economic consequences because they lacked sufficient conventional seed, although Intervenors have had years to produce it.  The Court denied preliminary relief but notified Intervenors of its inclination to require them "to take all efforts, going forward, to use conventional seed" while awaiting the EIS.  *Ctr. for Food Safety v. Schafer*, 2010 WL 964017, *5 (N.D. Cal. 2010).

   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  The evidence contradicts this rhetoric.  Defendants never adduced any evidence of unwarranted pre-filing delay.  *See* Pls.' PI Reply at 3-6.[5]  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Intervenors—assisted, sadly, by Federal Defendants—seek to maintain their preference by eliminating practical alternatives, and with them, the EIS's value.

   Although all of their claims of harm rest on an alleged lack of conventional seed, Intervenors offer *no* admissible, reliable supporting evidence.  Instead, they try to circumvent their critical burden by having a declarant regurgitate unsubstantiated hearsay, none of which is placed before the Court for review, and claim there exists a shortfall.  Susan Manning is not an expert in any relevant field and offers no actual expert testimony.  *See* Blue Decl. ¶¶ 9-10, 24.

---

[5] Additionally, as the Court noted in its PI Order, the issue of Plaintiffs' timing is not as significant in the context of permanent, as opposed to preliminary, relief.  *Ctr. for Food Safety*, 2010 WL 964017 at *4-5; *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir 1985).

# REDACTED

1  She is merely a conduit for extremely unreliable, hidden hearsay from interested parties.

2  Plaintiffs therefore have moved to strike her testimony.  *See* Plaintiffs' Motion to Strike (filed

3  contemporaneously herewith).  Federal Defendants' economist does offer an estimate of an

4  injunction's purported economic effects, but he relies entirely on Manning's inadmissible and

5  unverified seed availability guesstimate.  Colacicco Decl. ¶ 28 (Dkt. No. 393) (predicating

6  analysis on Manning's claimed ███████████ shortfall in 2011), Blue Decl. ¶¶ 11, 16-19.

7       Defendants have no basis to deny the industry can plant a full conventional beet crop in

8  2012.  Colacicco Decl. ¶ 30, Manning Decl. ¶ 29 (Dkt. No. 374 █████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 █████████████████████████████████

14      Even if the seed availability figures were accurate, Colacicco suggests only that sugar

15 prices might spike temporarily by 24%—to a level *lower than the February 2010 price*—a

16 fluctuation less than what regularly occurs.  Blue Decl. ¶¶ 16-19; *see* Colacicco Decl. ¶ 11 (U.S.

17 sugar price dropped 65% in early 2010), ¶ 15 (57% spike in 2005), ¶ 16 (46% spike in 2008), ¶

18 29 (predicting 24% spike).

19      But there is good reason to believe Manning's seed availability assumptions are *not*

20 accurate, and that any 2011 shortfall will be smaller than she claims.  ████████████████

21 ——————————————

22 [6]SESVanderHave also claims its RR seed inventory will gradually lose some germination
    potential while it awaits the EIS.  Fritz Decl. ¶10.  This assumes that the EIS will not be
23     issued until 2014, *id.* ¶11—a claim directly contradicted by the government's 2012 estimate.
    Smith Decl. ¶10 (Dkt. No. 395).  ████████████████████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████  Further, SVH's argument also assumes an
  ultimate outcome of deregulation.  If the industry is not allowed to plant RR seed after the
26 EIS is issued, any harm will have been caused by its decision to produced RR seed
  throughout this litigation.

27

28

REDACTED

[redacted]

According to internal documents, another of the four seed companies, Syngenta, also has sufficient stores of conventional seed. [redacted]

The large disparity between the facts and Manning's "shortfall" may be due to several factors. Not being an expert in the sugar beet industry, Manning was perhaps uninformed. [redacted]

---

[7] [redacted]

—

—

[REDACTED]

Also, the seed companies concealed their inventory and capacities from Manning and thus from the Court, and Manning played along. [REDACTED]

[REDACTED] This is hardly the kind of "evidence" on which to base denying Plaintiffs relief.

---

[8] Indeed, Syngenta, with over $10 billion in annual sales and 25,000 employees in over 90 countries, advertises: "Due to Syngenta's global presence, it can engage in seed production year-round and reduce weather related seed production risk. In addition, because its facilities are located in both the northern and southern hemispheres, Syngenta can shorten the time from breeding seed to commercial production so that it can produce marketable quantities more quickly than if it were dependent on only one growing season." Tomaselli Decl. Ex. S (Syngenta 2009 10-K).

[9] [REDACTED]

—

—

—

—

—

# REDACTED

The Court gave Intervenors fair warning, and they have profited enough from their illegally approved product.  As another court reasoned recently in vacating a pesticide's approval:

> As for the product's commercial success, if the product merits registration it should survive FIFRA's notice and comment period and reexamination by the EPA, and it will return to the market.  If it does not, then it should never have been registered and sold.  The fact that Bayer has already begun reaping the rewards of the outcome of a flawed regulatory process does not prevent the EPA's registration from being vacated and that regulatory error from being corrected.

*NRDC v. EPA*, 676 F. Supp. 2d at 316-17.  This is fundamentally an environmental case, and the balance of harms rests with Plaintiffs.  *Amoco*, 480 U.S. at 545.

## IV.   THE STATUS QUO HARMS PLAINTIFFS AND THE PUBLIC INTEREST

In sharp contrast to Intervenors' overblown and self-created economic claims, permitting planting to continue despite APHIS's violation will prejudice Plaintiffs and the public in a plethora of significant ways.  In addition to flouting the law and turning the EIS into a legal nullity without reasonable alternatives (*see* Section II *supra*), continued planting will lead to substantive harms as a result of action taken without meaningful NEPA analysis.  This includes the loss of choice for farmers and consumers, contamination of organic and conventional crops, cumulatively increasing superweeds and use of toxic chemicals, crop disease, and increasing control of the food supply by a single patent holder.[10]  These harms establish both prejudice for purposes of the vacatur and sufficiently likely irreparable harm for purposes of the injunction.[11]

---

[10]Defendants fail to address the anticompetitive impacts on the public interest of Monsanto's patents, or the incongruity of the government investigating them while supporting Monsanto's effort in this case to extend them.  Yet such impacts are well within the Court's power to enjoin pending NEPA compliance.

[11]Intervenors' standing argument (DIs. At 6-7) is just as meritless as it was previously.  *See* Pls.' PI Reply at 16-17; *see also* Decls. of Carmen (Dkt. No. 91), Hoffman (Dkt. No. 93), Morton (Dkt. No. 98), Macdonald (Dkt. No. 95), Martenson (Dkt. No. 97), Stearns (Dkt. No. 99), Dillon (Dkt. No. 92), Kimbrell (Dkt. No. 94), Burd (Dkt. No. 90), Des Marets (Dkt. No. 96), and Tipping (Dkt. No. 100).  Intervenors misconstrue the nature of public interest environmental litigation.  *National Min. Ass'n*, 145 F.3d at 1409 ("[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are

# REDACTED

A.    Plaintiffs are Irreparably Harmed by the Fundamental Loss of Choice and Reasonable Alternatives.

Defendants acknowledge (Defs. at 11) that, during the pendency of an EIS, CEQ regulations prohibit agency actions that would have an "adverse environmental impact" or "limit the choice of reasonable alternatives."  40 CFR § 1506.1; *see* 40 C.F.R. § 1502.14 (alternatives analysis is the "heart" of an EIS).  Defendants' argument that continuing to plant will not limit alternatives, even as the industry insists it has no alternatives to planting RRSB, (DIs. at 12, Defs. at 6-7), defies reason.  *See, e.g., Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292, 1295, 1297 & n.7 (D. Mont. 1992) (cancellation of oil and gas leases issued in violation of NEPA was only remedy that would ensure NEPA goal of guaranteeing meaningful alternatives analysis).  To the extent the only commercially available seed is RR, farmers have no choice.

The existence of a last-ditch seed bank (Defs. at 8) is beside the point; farmers (as opposed to researchers) have no meaningful access to it.  *See* Bretting Decl. ¶¶ 11, 19 (Dkt. No. 392).

Intervenors' rhetoric about "co-existence" is misplaced: legal products cannot co-exist with illegal ones that displace or contaminate legal choices.  Defendants would force farmers to defend against contamination and relegate consumers to a list of limited alternatives—a relatively miniscule subset of packaged foods with labels clearly declaring the type of sugar contained in the product—while all restaurant food, food prepared by others, and all products with the simple ingredient of "sugar," would be off limits.  Meanwhile, Intervenors would continue to maximize profits derived from an unlawfully deregulated product.[12]  This loss of

vacated—not that their application to the individual petitioners is proscribed.").  Relief will redress the procedural harm suffered by Plaintiffs, ameliorate the harm to farmer and consumer Plaintiffs from loss of choice, and protect Plaintiffs from transgenic contamination and the spread of superweeds.

[12]Intervenors attempt to cabin NEPA to only health impacts (DIs. at 12) but NEPA's cognizable harms are broad, and include cultural, environmental, aesthetic and socioeconomic impacts. 40 C.F.R. § 1508.8.  NEPA is fundamentally about choice.  42 U.S.C.§ 4331b(4).  Nor does FDA's voluntary consultation process having averred to RRSB's safety excuse APHIS's

# REDACTED

1    choice is inequitable and irreparable. Decls. Of Lively ¶ 19, Behar ¶¶ 15-16, Siemons ¶¶ 27-30,

2    Funk ¶¶ 17-18, Potter ¶ 10, Hammond ¶ 17, Squire ¶ 16, and Falck ¶ 9.

3          B.    <u>Intervenors Concede Transgenic Contamination Is an Unavoidable and Accepted Part of Producing RRSB.</u>

4

5          In its PI Order, the Court found irreparable harm sufficiently likely. *Ctr. for Food Safety*,

6    2010 WL 964017 at *2. Discovery has uncovered further conclusive evidence that

7    contamination is not only likely, but a common and continuing occurrence, and that Intervenors'

8    containment efforts are ineffective. *See infra* pp. 13-14 and Appendix A. Due to competitive

9    constraints and the inability to stop gene flow, contamination has become an *accepted* part of

10    seed growing. Seed companies have not been able to isolate the sources of the contaminants

11    entering their own fields, and it is impossible to know how many other farmers' crops they have

12    contaminated. Stewardship techniques and pinning guidelines—which Intervenors tout and

13    APHIS espouses as proposed "protective measures"—have repeatedly proven ineffective:



25

26    NEPA duty to assess health impacts. *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1248 (9th Cir. 1983); Pls. Opp to Amicus at 13-14 (listing cases); *see* APHIS, EIS Scoping Notice on RRSB, 75 Fed. Reg. 29971-72 (listing, *inter alia*, impacts on food and feed, and on health).

27

28

# REDACTED

1      ███████████████████████████████████████████████

2

3 • **Pollen routinely flows between table beet, chard, and sugar beet seed fields.**
Contamination of sugar beet seed fields by *beta* species seems to be an even greater

4 problem for seed companies, and "roguing" off-types (hand-weeding), isolation
distances, and other measures have not stopped contamination from occurring year

5 after year, dating back at least as far as 2006. See, e.g.,



12                       Thus, *if sugar beet seed fields are being contaminated by red*

13 *beets and chard pollen, red beet and chard seed fields are being contaminated by*

14 *sugar beet pollen.* ███████████



16 • **Demonstrated flaws in the pinning process ensure that contamination continues.**

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22      Moreover, the whole history of GE crops is littered with one contamination event after

23 another, *see* Tomaselli Decl. Exs. A, M, despite vigorous assurances of their impossibility for

24 this or that reason. What's past is prologue.

25      Some of the harms may be monetized, but this is ultimately an environmental case, not a

26 commercial dispute. *See Amoco*, 480 U.S. at 545 (Environmental harms are often if not

27 presumptively irreparable). Transgenic contamination is akin to an invasive species, a classic

28

**REDACTED**

1  environmental harm.  The cumulative increased load on the environment due to increased

2  pesticide use on GE crops like RRSB also illustrates the environmental nature of the harm.

3  Benbrook Decl. ¶¶ 10-14, Feldman Decl. (Dkt. No. 212).  Moreover, the organic system is an

4  ecologically beneficial standard.  Decls. Of Behar ¶¶ 4-7, Loiselle ¶ 3, Siemons ¶¶ 21-26, Lively

5  ¶¶ 16-18, Hammon ¶¶ 14-15, Funk  ¶¶ 15-16, and Dillon ¶ 15.  Harm to organic markets and

6  farmers *is* harm to the environment.

7       In the real world, contamination in the field and chain of production is both difficult and

8  expensive to detect, as well as extremely difficult to impossible to ameliorate.  Decls. of Morton

9  ¶¶ 4-8, 11-12, 20-22, Navazio ¶¶ 8-10, Clarkson ¶¶ 3-6, Dillon ¶¶ 11-13, and Fagan ¶¶ 4-15.

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████; *see also* Decls. of

12 Clarkson Decl. ¶¶ 3-6 , Morton ¶¶ 8, 21, and Navazio ¶¶ 4-6, 9-13.  And the harm will continue

13 to spread.  Contrary to Federal Defendants' claims (Defs. at 8), contaminated table beet and

14 chard seed will produce not only contaminated vegetables, but contaminated seed as well.  Many

15 people buy such seed to grow, and then sell the seed itself, leading to continued unintentional

16 distribution of contaminated seed, beyond any ability to remove it.  Decls. of Tipping ¶¶ 1-3,

17 Morton ¶¶ 13-16, 20-21, Campbell ¶¶ 1-4, and Navazio ¶¶ 7-9.

18      Federal Defendants' extreme position that only species-level effects can constitute

19 irreparable harm (Defs. at p.5 n. 3) is based on two outlier, non-NEPA cases and defies decades

20 of NEPA jurisprudence.  An action may require an EIS even if it has only *local* effects on the

21 *human* environment.  40 C.F.R. § 1508.27(a); *Anderson v. Evans*, 371 F.3d 475, 490 (9th Cir.

22 2004) (local effects on whale population trigger need for EIS regardless of impact on entire

23 species).  An environmental injury significant enough to trigger the EIS requirement is not

24 legally incapable of supporting injunctive relief while the EIS is being prepared.  *Greater*

25 *Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1261 (10th Cir. 2003) (threats to the "primary

26 breeding area for bald eagles in the Greater Yellowstone area" qualified as irreparable injury to

27 plaintiffs' interests under NEPA even if plaintiffs did not "establish harm to the species as a

28

# REDACTED

1  whole"); *Nat'l Wildlife Fed. v. Burlington N. R.R.*, 23 F.3d 1508, 1511 n. 8 (9th Cir. 1994) ("We

2  are not saying that a threat of extinction to the species is required before an injunction may

3  issue.").

4      Of course, the economic harm to Plaintiffs can also be irreparable when it involves the

5  loss of their goodwill, reputation, and customer trust.  *See, e.g.*, *Apple Inc. v. Psystar Corp.*, 673

6  F. Supp. 2d 943, 948 (N.D. Cal. 2009); *see also* Decls. of Morton ¶¶ 7, 15, Dillon ¶¶ 14-15,

7  Lively ¶ 10, Hammond ¶ 10, Falck ¶ 8, Behar ¶ 14, Funk ¶ 10-12, Potter ¶ 3, and Clarkson ¶¶ 11-

8  12.  Intervenors know how devastating contamination even by other *beta* species can be to

9  business goodwill.

10

11

12

13      Organic businesses are particularly, but not exclusively, at risk.  Decls. of Clarkson ¶¶ 8,

14  10, 16, Lively ¶ 10, and Potter ¶ 7; *see generally* Decls. Of Siemons, Hammond, Falck, Funk and

15  Dillon.  Defendants wrongly claim no organic crop market has ever been eliminated because of

16  contamination; the Canadian canola GE crop contamination wiped out organic canola in that

17  country.  *See generally* Decls. of Loiselle, Robbins; *see also* Blue Decl. ¶ 23.  For organic

18  consumers, farmers and businesses, *organic means GE-free*.  Decls. of Dillon ¶¶ 13-15, Siemon.

19  ¶¶13-18, Clarkson ¶¶ 12-14, Falck ¶¶ 12-14, Funk ¶¶ 8-11, Behar ¶¶ 11-13, Thompson ¶¶ 11, 13,

20  ¶¶ 7-8, Blue ¶ 22, and Lively ¶ 9.  There is *no* tolerance for transgenic contamination in USDA

21  organic standards.  *Id.*  The market-based effort cited by Defendants is in agreement with this

22  entirely, with its ultimate mission being a 100% GE-free standard.  Thompson Decl ¶¶ 5-7.

23  Unfortunately, widespread contamination has currently made that exceedingly difficult, leading

24  some to temporary measures and all to burdensome testing.  Decls. of Thompson at ¶¶ 9, 13-14,

25  Lively at ¶¶ 14-15, Siemon; ¶¶ 16-20, Clarkson at ¶ 19, Morton ¶ 15, Potter ¶¶ 8-9, Falck ¶ 7,

26  Funk ¶¶ 13-14, Hammon ¶¶ 12-13, Blue ¶ 21, and Fagan ¶¶ 4-15.  Regardless, the *consensus* is

27  that organic products with any level of GE contamination risk market rejection.  Decls. of Lively

28

# REDACTED

1  ¶¶ 9-13, Siemons ¶¶ 17-18, Potter ¶¶ 5-7, Funk ¶¶ 10-13, Thompson ¶ 13, Hammond ¶ 8-10, and

2  Behar ¶¶ 11-12.

3        C.     <u>Plaintiffs and the Public Interest Are Harmed by the Continued Spread of</u>

                  <u>Glyphosate-Resistant Weeds.</u>

4

5        Glyphosate-resistant (GR) weeds are legion, infesting ten million acres in twenty-two states,

6  with the continuous use of glyphosate on Roundup Ready crops a major cause of this epidemic.

7  Benbrook Decl. ¶¶ 15-19, Van Acker ¶¶ 3-4, 7-11.  Defendants complain that the potential harm

from glyphosate used on RRSB is "exaggerate[d]" by Plaintiffs (Defs. at 9), but their own

8  experts disagree:

9
10      •    USDA recently offered "critical issues" funding to address GR weeds as an emerging
          plant pest that requires immediate attention.  Tomaselli Decl. Ex. W.

11      •    Intervenor Syngenta projects GR weeds will expand four-fold to infest thirty-eight
          million acres by 2013, admitting: "It's a fact that acres are becoming infested with

12            glyphosate-resistant weeds at an alarming rate." Tomaselli Decl. Ex. K.

13      •    In a recent grant proposal to USDA, Intervenors' weed science expert, Dr. Kniss,
          foresees "near total reliance" on glyphosate by RRSB growers," which "will almost

14            surely lead to glyphosate resistant weeds," leaving growers "few acceptable management
          options." Tomaselli Decl. Ex. G.  This assessment directly contradicts his declarations in

15            this case.  *See* First Kniss Decl. ¶9 (Dkt. No. 251); Second Kniss Decl. ¶11 (Dkt. No.
          371) ("It is highly unlikely that the use of glyphosate in connection with GR sugar beet

16            will result in the same conditions that have led to GR weeds in other GR crops.").

17        GR weeds will evolve rapidly in RRSB, which are treated with two to three applications

18  of glyphosate per season.  *See* Snyder Decl. (Dkt. 389) ¶7, Mauch  Decl. (Dkt. 375)¶7.  GR

19  populations of kochia, the worst sugar beet weed, were confirmed in March 2010, demonstrating

20  the strong potential for this weed to become glyphosate-resistant in sugarbeets.  Van Acker Decl.

21  ¶ 9.  Although RRSB sugar beet growers practice crop rotation (Defs. at 9), the predominance of

22  GR corn and soybeans in such rotations (*see* Intervenors' declarants Mauch Decl. ¶10, Petersen

23  Decl. (Dkt. 381) ¶¶5, 10) means *continual* glyphosate use over years, a usage that, according to

24  the National Research Council's recent report, fosters rapid evolution of GR weeds.  Benbrook

25  Decl. ¶¶ 8, 11, 28-31 & Ex. G at pp. 2-17, 2-21.  GR weed seed can spread for miles on the wind

26  to colonize new areas, including fields of non-GR crop growers, who will suffer the

27  consequences of GR weeds (*e.g.*, increased herbicide expenditures) they had little or no hand in

28

# REDACTED

1  fostering.  Tomaselli Decl. Ex. I; Van Acker Decl. ¶ 12.

2

3         D.      <u>Plaintiffs and the Public Interest are Harmed by the Increased Risk of Crop Disease from Continued Planting.</u>

4

5       Defendants focus on the results of one 2006 study (DIs. at 11, Defs. at 10), but fail to

6  acknowledge the numerous public, peer-reviewed studies documenting the effects of the

7  glyphosate-resistance gene and/or application of glyphosate on micronutrient status of plants

8  compared with their non-glyphosate resistant parents.  Huber Decl. ¶¶ 9, 16 .  These studies

9  confirm that the presence of the Roundup Ready gene complex (RR complex) reduces the

10  efficiency in uptake and physiological functioning for manganese in both corn and soy compared

11  with their parental cultivars.  *Id.* at ¶ 30.  They also show that the RR complex has a much more

12  extensive impact on plant physiological functions, including effects on the soil microbial

13  communities important in natural (biological) disease control and nutrient availability in soil.

14  Huber Decl. ¶¶ 68, 89-90.  Defendants also rely on the findings in APHIS's EA to suggest safety,

15  but the Court rejected the EA as inadequate.  *See Nat'l Wildlife Fed. v. NMFS*, 422 F.3d 782,

16  798-99 (9th Cir. 2005) (government erred in relying on arbitrary and capricious Biological

17  Opinion).  APHIS itself concedes that further analysis is needed on a new record.  Cindy Smith

18  Decl. ¶5(o) (Listing increased disease susceptibility as an issue for EIS).

19       Despite Intervenors' claims, scientific research conducted according to the strictures of

20  their technology patents is vastly different from the standard approach to peer-reviewed research.

21  Nixon Decl. ¶¶14-18, Huber Decl. ¶ 15, 18, 29.  The "common practice" requiring researchers

22  to obtain approval from Monsanto and other financially interested parties changes the very

23  nature of peer-reviewed science, degrading scientific integrity and increasing the risk of

24  unknown and untested harm.  *See* Nixon Decl. ¶ 16; Tomaselli Decl. Exs. C, D, E.

25

26

27

28

# REDACTED

V.      DEFENDANTS' REQUESTS FOR CONTINUED PLANTING UNDER A DEFACTO
        PARTIAL DEREGULATION AND STAY OF THE VACATUR SHOULD BE
        DENIED

        Federal Defendants argue that the Court must allow deregulation to continue under its

proposed interim measures (Defs. at 14),[13] but they cannot meet their burden to show irreparable

harm to themselves and Intervenors absent this permissive injunctive approach.[14]  Plaintiffs and

the public would be significantly prejudiced by this circumvention.  Any such proposed

measures must be preceded by vacatur and remand for a new agency decision, accompanied by a

new NEPA document, subject to the public's right to challenge its adequacy.  As Chief Justice

Roberts explained in *Geertson*: "Well, you're short-circuiting notice and comment ....  The

agency is acting without the benefit of any input on the partial deregulation.").  Oral Arg. Tr.

18:6-11.

        Harm is still sufficiently likely using APHIS's proposed measures.  *Winter v. NRDC*, 129

S.Ct. 365, 375-76 (2008).  APHIS's litigation-created *ipse dixit* "protections" are unprecedented

and unsupported by any administrative process or record.  The Court owes them no deference.

*See* Pls.' PI Reply at 17-18 (and cases therein).  APHIS's containment track record with *field

trials* is terrible, to say nothing of the wide-scale planting at issue here.  Government reports

have analyzed numerous past contamination incidences and repeatedly criticized APHIS's

oversight.  Tomaselli Decl. Exs. A (2008 GAO report at 3 ("the ease with which genetic material

from crops can be spread makes future releases *likely*"), *see also id.* Ex. B.  APHIS's record is so

poor that Congress enacted new oversight mandates in the 2008 Farm Bill, which APHIS has so

far ignored.  Pub. L. No. 110-246, Tit. X § 10204, 122 Stat. 1651, 2105 (2008).  Moreover, the

proposed measures are similar to what seed contracts already require, yet contamination occurs

---

[13]The admission that these measures are necessary at all belies Defendants' claim that there is no
     sufficiently likely risk of irreparable harm from continued unconditional planting.
     Defendants do not quarrel that an injunction should issue; they just ask it be their preferred
     injunction, not Plaintiffs'.

[14]APHIS' consent to vacatur if it misses the proposed EIS deadline could also be interpreted as
     seeking a stay of the vacatur.

# REDACTED

1  routinely.  *See* Appendix A; *see also infra* pp.13-14 (documenting episodes of GE contamination

2  of conventional seed or *beta* species contamination of sugar beet seed—or both types of

3  contamination—for every year of production since 2006).  Federal Defendants point out that

4  chard and table beets are grown in certain areas where they would create GE-free zones (Defs. at

5  4), but that does not help those contaminated outside these zones, or prevent such contamination

6  from spreading everywhere through seed mixing.  Decls. of Morton ¶ 10, Campbell ¶ 1, Tipping

7  ¶¶ 1-3, Clarkson ¶¶ 5,6, and Navazio ¶ 9.  Nor do the measures offer any protection whatsoever

8  from the other forms of harm here, *see supra* pp.11-18.

9        Finally, the length of Defendants' requested stay in the alternative—nine months—is

10  unprecedented, and continued planting during that time would continue the harm to Plaintiffs and

11  the public.  Defendants have had years to prepare for vacatur of RRSB deregulation, and if they

12  have deprived themselves of better options, Plaintiffs should not pay the penalty.[15]  Nor is any

13  temporary economic harm to Intervenors during that time irreparable.  *NRDC v. EPA*, No. 09

14  Civ. 4317 (DLC), 2010 WL 431885 (S.D.N.Y. February 8, 2010) (denying motion for stay of

15  pesticide registration vacatur).

16  CONCLUSION

17        For the foregoing reasons, the Court should grant Plaintiffs' Motion for Permanent

18  Relief.  Harm is sufficiently likely and continued planting in any form sans administrative

19  process will significantly prejudice Plaintiffs and gut the Court's NEPA decision.  The public

20  interest and balance of equities weigh heavily in Plaintiffs' favor.  Neither Intervenors' hearsay-

21  based complaints of alleged hardship nor their mischaracterizations of the evidence and

22  standards of law can support denying Plaintiffs their proper redress in this case.

23

24

---

25  [15]A vacatur order provides the agency with much stronger impetus to remedy the defects in a
       decision than a remand-only remedy, which allows the agency to continue to act under its
26     defective rule, creating troubling ex ante incentives.  *See In re Core Commc'ns, Inc.*, 531
       F.3d at 862 (Griffith, J., concurring).
27

28

# REDACTED

Respectfully submitted this 4th day of June, 2010.


_____/s/_____
PAIGE M. TOMASELLI State Bar No. 237737
KATERYNA L. RAKOWSKY State Bar. No. 246248
Center for Food Safety
2601 Mission St., Suite 803
San Francisco, CA 94110
T: (415) 826-2770 / F: (415) 826-0507
Emails: ptomaselli@icta.org
         kateryna@icta.org


PAUL H. ACHITOFF (*Pro Hac Vice*)
Earthjustice
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436 / F: (808) 521-6841
Email: achitoff@earthjustice.org

*Counsel for Plaintiffs*