IGNACIA S. MORENO
Assistant Attorney General
BEVERLY F. LI
LUTHER L. HAJEK
Trial Attorneys, U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel.: (202) 353-9213 (Li)/ (202) 305-0492 (Hajek)
Facsimile: (202) 305-0506
Email: Beverly.Li@usdoj.gov
         Luke.Hajek@usdoj.gov

TONY WEST
Assistant Attorney General
JOHN R. GRIFFITHS
Assistant Director, Federal Programs Branch
JOHN R. COLEMAN (Va. Bar # 70908)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8460
Email: John.Coleman3@usdoj.gov

Attorneys for Federal Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR FOOD SAFETY., et al. )<br><br>       Plaintiffs, )<br><br>     v. )<br><br>THOMAS J. VILSACK, et al., )<br><br>       Defendants. ) | Case No. C-08-00484 JSW<br><br>**DEFENDANTS' REPLY BRIEF REGARDING PERMANENT INJUNCTION**<br><br>(UNREDACTED)<br><br>Date:   July 9, 2010<br>Time:  9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Place: Courtroom 11 |

1

**<u>TABLE OF CONTENTS</u>**

2   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4       I.     THE COURT SHOULD NOT ISSUE A PERMANENT INJUNCTION . . . . . . 1

5           A.    Plaintiffs Have Not Shown That They Have Suffered Irreparable
Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6

7               1.    Plaintiffs Cannot Show Irreparable Harm Arising from Gene
Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

8                   a.    Gene Flow Has Not Occurred and Is Unlikely to
Occur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

9

10                  b.    Plaintiffs Cannot Show Irreparable, Environmental Harm
Even if Inadvertent Gene Flow Occurred to Isolated
Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11

12                  c.    Plaintiffs Cannot Rely on Alleged Harm to Organic
Businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

13              2.    Plaintiffs Cannot Show Irreparable Harm from Alleged Loss of
Choice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14

15              3.    Plaintiffs Cannot Show Irreparable Harm from Alleged Loss of
Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16              4.    Plaintiffs Fail to Show Irreparable Harm from Glyphosate-Resistant
Weeds Arising from RRSB or from an Increased Risk of Crop

17                  Disease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18          B.    The Balance of the Equities and Public Interest Weigh Against Granting the
Injunction Plaintiffs Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

19

20      II.    A Remand Without Vacatur is Appropriate Under the Circumstances of this
Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21          A.    The Purposes of the National Environmental Policy Act ("NEPA") Do Not

22              Mandate Vacatur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23          B.    The Possibility that APHIS May Issue a Determination of Non-Regulated
Status Regarding RRSB Following Remand and the Completion of an EIS
Supports a Remand Without Vacatur . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24

25          C.    The Potential Economic Disruption Caused by Vacating APHIS's
Determination Supports a Remand Without Vacatur . . . . . . . . . . . . . . 14

26          D.    APHIS's Determination Should Remain in Effect for a Limited Time While
an EIS Is Prepared Subject to Conditions on RRSB Use . . . . . . . . . . . 15

27

28

III.    IF THE COURT WERE TO VACATE AND REMAND, IT SHOULD STAY THE DATE OF VACATUR TO AVOID UNDUE HARDSHIP . . . . . . . . . . . . . . . . 17

IV.    An Evidentiary Hearing on Certain Issues May Be Appropriate . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

<u>Albertson v. FCC,</u>
     182 F.2d 397 (D.C. Cir. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>A.L. Pharma, Inc. v. Shalala,</u>
     62 F.3d 1484 (D.C. Cir. 1995)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

<u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,</u>
     988 F.2d 146, 150 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Am. Medical Ass'n v. Reno,</u>
     57 F.3d 1129 (D.C. Cir. 1995)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Amoco Prod. Co. v. Village of Gambell,</u>
     480 U.S. 531 (1987)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Anacostia Riverkeeper, Inc. v. Jackson,</u>
     Civ. No. 09-0098, 2010 WL 2070309 (D.D.C. May 25, 2010)   . . . . . . . . . . . . . . . . . 18

<u>Anderson v. Evans,</u>
     371 F.3d 475 (9th Cir. 2004)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Balt. Gas Co. v. Natural Res. Def. Council,</u>
     462 U.S. 87 (1983)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19

<u>Chamber of Commerce of U.S. v. SEC,</u>
     443 F.3d 890 (D.C. Cir. 2006)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Cheyenne Tribe v. Norton,</u>
     503 F.3d 836 (9th Cir. 2007)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Coastal Conservation Ass'n v. Gutierrez,</u>
     512 F. Supp. 2d 896 (S.D. Tex. 2007)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Comcast Corp. v. FCC,</u>
     579 F.3d 1 (D.C. Cir. 2009)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>County of Los Angeles v. Shalala,</u>
     192 F.3d 1005 (D.C. Cir. 1999)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Fertilizer Inst. v. EPA,</u>
     935 F.2d 1303 (D.C. Cir. 1991)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Friends of the Earth v. Laidlaw Envt'l Servs.,</u>
     528 U.S. 167 (2000)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Fund for Animals v. Frizzell,</u>
     530 F.2d 982 (D.C. Cir. 1975)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Greater Yellowstone Coal. v. Flowers,</u>
     321 F.3d 1250 (10th Cir. 2003)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Haw. Longline Ass'n v. NMFS,
      288 F. Supp. 2d 7 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

High Sierra Hikers Ass'n v. Blackwell,
      390 F.3d 630 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Idaho Farm Bureau Fed'n v. Babbitt,
      58 F.3d 1392 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Idaho Watersheds Proj. v. Hahn,
      307 F.3d 815 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

In re Core Commc'ns,
      531 F.3d 849 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

eBay Inc. v. MercExchange,
      547 U.S. 388 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Marsh v. Or. Natural Res. Council,
      490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

Milk Train, Inc. v. Veneman,
      310 F.3d 747 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-14

Natural Res. Def. Council v. EPA,
      489 F.3d 1250 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Natural Res. Def. Council v. U.S. Dep't of the Interior,
      275 F. Supp. 2d 1136(C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Nat'l Audubon Soc'y v. Dep't of Navy,
      422 F.3d 174 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Nat'l Cotton Council v. EPA,
      553 F.3d 927 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Or. Natural Res. Council Fund v. Goodman,
      505 F.3d 884 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Orantes-Hernandez v. Thornburgh,
      919 F.2d 549 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11

Sierra Club v. Bosworth,
      510 F.3d 1016 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sierra Club v. Penfold,
      857 F.2d 1307 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SKF USA, Inc. v. United States,
      254 F.3d 1022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Sugar Cane Growers Coop. of Fla. v. Veneman,
      289 F.3d 89 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Trujillo v. Gen. Elec. Co.,
        621 F.2d 1084 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Water Keeper Alliance v. Dep't of Def.,
        271 F.3d 21 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Winter v. Natural Res. Def. Council,
        129 S. Ct. 365 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATUTES**

7 U.S.C. § 7712(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**REGULATIONS**

7 C.F.R. Part 340 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7 C.F.R. § 340.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7 C.F.R. § 340.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7 C.F.R. §§ 205.2 205.105(e), 205.301(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

40 C.F.R. § 1506.1(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

65 Fed. Reg. 80548, 80556 (Dec. 21, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

70 Fed. Reg. 13007, 13008 (Mar. 17, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

75 Fed. Reg. 29, 969 (May 28, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

**INTRODUCTION**

Plaintiffs continue to argue that the Court should vacate the U.S. Department of Agriculture ("USDA") Animal and Plant Health Inspection Service's ("APHIS") determination of non-regulated status of Roundup-Ready sugar beets ("RRSB"), and issue a permanent injunction against future planting of RRSB seed and root crops in addition to the vacatur.  Under the circumstances at issue here, the broad remedy Plaintiffs seek is unwarranted.  Given the widespread disruption to the sugar market and harm to third parties who have relied upon the deregulation of RRSB, the equities and public interest weigh in favor of not vacating the Agency's determination.  Rather, the Court should allow APHIS's determination to remain in effect for a limited time while an Environmental Impact Statement ("EIS") and a new Record of Decision ("ROD") are being prepared.  While the EIS is being prepared, the Court should  impose the Agency's proposed conditions under which deregulated RRSB activities may occur during that time.  APHIS proposes to have its existing determination stay in effect only until May 31, 2012[1/] when the new EIS and ROD are expected to be issued, after which the existing determination would be vacated absent further order of this Court.  In the alternative, if the Court is inclined to vacate and remand, it should do so without entering an injunction and should stay its vacatur until March 1, 2011 to allow APHIS time to implement appropriate interim regulatory measures.

**ARGUMENT**

**I.      THE COURT SHOULD NOT ISSUE A PERMANENT INJUNCTION**

**A.      Plaintiffs Have Not Shown That They Have Suffered Irreparable Injury**

The Court should not issue a permanent injunction because Plaintiffs have failed to show that they have suffered irreparable harm, or that the balance of equities and public interest weighs in their

---

[1/]      Consistent with the timeline for preparing an EIS set forth in the Second Smith Declaration at ¶ 6.b, the Notice of Intent to prepare an EIS for RRSB was published in the Federal Register on May 28, 2010.  75 Fed. Reg. 29,969 (May 28, 2010).  APHIS continues to expect that the EIS will be completed by May 31, 2012.

1    favor.[2]/  See eBay Inc. v. MercExchange, 547 U.S. 388, 391 (2006).

2                **1.      Plaintiffs Cannot Show Irreparable Harm Arising from Gene Flow**

3                    *a.      Gene Flow Has Not Occurred and Is Unlikely to Occur*

4        Plaintiffs fail in their efforts to show irreparable injury from gene flow.  Pls. Reply at 13-17.

5    Plaintiffs have provided no evidence of any positive tests for the presence of genetic material from

6    RRSB in their organic *Beta*[3]/ crops, and their latest submission regarding genetic testing only further

7    confirms the absence of any genetic material.  Tipping Decl. ¶ 3 (Dkt. No. 420); see Fagan Depo.

8    at 110:19-111:1 (Ex. B to 4th Li Decl.); Morton Depo. at 34:12-34:16, 36:16-36:17, 43:21-44:1,

9    44:7-44:12, 57:24-58:2, 99:6-99:18 (Ex. A to Li Decl. (Dkt. No. 273)).  As Defendants demonstrated

10   in our opening brief, Def. Opp. at 3-5 (Dkt. No. 384), the risk of gene flow from RRSB is

11   exceedingly low, whether from the RRSB root crop or from the RRSB seed crop with the 4-mile

12   isolation distances in place in the Willamette Valley in Oregon.  And the industry's use of

13   cytoplasmic male sterility for most RRSB seed production further reduces the slim chances of cross-

14   pollination.

15       Plaintiffs contend without foundation that any unintentional gene flow will be perpetuated

16

17   ───────────────────

18   [2]/     The injunctive relief Plaintiffs now request differs from what they requested at the time of
     their opening remedy brief.  Yet the relief they request in their reply brief does not square with the
19   language of their latest proposed order.  In their reply brief, Plaintiffs "do not request the Court
     retroactively classify previously processed RRSB sugar as a regulated article" and "request only
20   prospective relief: that there be no further planting of RR seed or sugar beet, and that any future
     planting and use of RRSB be enjoined and considered a regulated article."  Pls. Reply at 1 n.2.  In
21   Plaintiffs' proposed order accompanying their reply brief, they seek to enjoin only the further
     planting of RRSB or RRSB seed crops (not further cultivation or processing of RRSB or RRSB seed
22   crops).  Pls. Proposed Order at 3, ¶ 5 (Dkt. No. 413-1).  Also, Plaintiffs in their proposed order ask
     the Court to declare that RRSB "are once again REGULATED ARTICLES" pursuant to the PPA
23   [Plant Protection Act] and its regulations at 7 C.F.R. Part 340, but go on to ask that "[f]or purposed
     [sic] of this order, RRSB planted before the date of this Order will not be considered an introduction.
24   7 C.F.R. § 340.1."  Pls. Proposed Order at 3, ¶ 3 (Dkt. No. 413-1).  The meaning of this language
     in Paragraph 3 is unclear, but Defendants will interpret it to mean that RRSB planted before the date
25   of the Court's Order should not be considered a regulated article under the PPA or the Part 340
     regulations.  For purposes of this reply, Defendants will reconcile any inconsistencies by assuming
26   that Plaintiffs seek to enjoin only those RRSB-related activities indicated in their latest proposed
27   order.

28   [3]/     *Beta* crops include swiss chard, sugar beets, table beets, and fodder beets.

     Fᴇᴅ. Dᴇғs.' Rᴇᴘʟʏ Bʀ. Rᴇɢᴀʀᴅɪɴɢ Pᴇʀᴍᴀɴᴇɴᴛ Iɴᴊᴜɴᴄᴛɪᴏɴ                                    2

1   because *Beta* seeds are grown not only for their vegetable but also for seed by small scale seed-

2   savers. Pls. Reply at 15; Morton Decl. ¶¶ 5, 15 (Dkt. No. 422). First, as discussed above, Plaintiffs

3   have presented no evidence that there has been, or is likely to be, any genetically-engineered ("GE")

4   presence in table beet or swiss chard seed that may be grown for seed. Second, a grower who is

5   sensitive to a trace amount of GE presence in seed that she is growing could take precautions, such

6   as ensuring that the seed has been tested and does not contain any GE material before it is planted,

7   learning to better identify offtypes, maintaining isolation distances from GE crops, and using seeds

8   produced in the RRSB-free zone for table beet and chard seed production areas that would exist

9   under Defendants' proposed conditions. See Third Hoffman Decl. ¶ 3. Defendants previously

10  established that any offtypes produced from cross-pollination between RRSB and swiss chard or

11  table beets would be readily detectable through visual inspection or testing, First Hoffman Decl. ¶¶

12  18, 45, 69-72; Second Hoffman Decl. ¶¶ 29-31 (Dkt. No. 401); First Cordts Decl. ¶ 23 (Dkt. No.

13  394). Indeed, Plaintiffs' own expert has admitted that it is common practice for plant breeders to

14  identify and cull plants with undesirable traits. Navazio Depo. at 31:1-4, 45:17-19, 62:17-64:4,

15  64:20-65:2, 74:7-10, 142:6-150:22, 215:9-16, 239:4-16, 240:18-241:8, 246:15-23.[4] Accordingly,

16  Plaintiffs' assertions about any inadvertent gene flow being perpetuated are mere speculation and

17  should be rejected.

18      Plaintiffs' reliance on past "contamination" events involving other crops to argue that gene

19  flow will occur from RRSB is misplaced. Pls. Reply at 14. The instances they cite, Tomaselli Decl.,

20  Exs. A, M, almost all deal with crops that are grown for their seed, unlike *Beta* crops that are

21  primarily grown for their vegetable or root. First Cordts Decl. ¶ 8 (Dkt. No. 394); Second Cordts

22  Decl. ¶ 5. Unlike crops that are grown for their seed, if pollen containing GE material moves to a

23  compatible *Beta* vegetable crop field, the leaves and roots of the *Beta* plant do not become GE as

24  a result of contact with GE pollen; thus, no GE material enters the commodity stream for *Beta*

25  vegetable crops. First Cordts Decl. ¶ 8. This fundamental difference between *Beta* crops and seed

26

27  [4]     Although Plaintiffs' expert John Fagan stated that sugar beet-swiss chard or sugar beet-table beet offtypes were not visually discernible, Fagan Decl. ¶ 14 (Dkt. No. 426); Fagan Depo. at 227:13-

28  227:16, he admitted at his deposition that he has never seen such an offtype and has no experience in roguing chard or table beet crops. Fagan Depo. at 227:17-228:6.

crops like rice, corn, canola, or soybeans makes Plaintiffs' arguments based on past contamination events of little relevance to *Beta* crops.

> **b.**     *Plaintiffs Cannot Show Irreparable, Environmental Harm Even if Inadvertent Gene Flow Occurred to Isolated Plants*

As Defendants previously established, Def. Opp. at 5 n.3, even if there were any instances of gene flow from RRSB to individual, non-GE *Beta* plants, such instances cannot give rise to a showing of irreparable harm. Fund for Animals v. Frizzell, 530 F.2d 982, 986-987 (D.C. Cir. 1975); accord Water Keeper Alliance v. Dep't of Def., 271 F.3d 21, 34 (1st Cir. 2001). Any finding of irreparable injury to Plaintiffs must rest upon a likelihood of harm that is "permanent or at least of long duration, *i.e.*, irreparable," Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). Any gene flow to isolated plants among fields of widely-planted *Beta* crops do not constitute irreparable injury.

Plaintiffs cite two inapposite cases to argue that they need not show more than isolated instances of harm. Pls. Reply at 15. In Anderson v. Evans, 371 F.3d 475, 490 (9th Cir. 2004), the court was discussing whether the effects of hunting a localized group of whales in an area off the coast of Washington state triggered the need for an EIS. Here, however, the issue now before the Court is not whether an EIS should be prepared, but whether Plaintiffs have shown irreparable harm that warrants injunctive relief. Anderson was not addressing injunctive relief and the requisite showing of irreparable harm. Thus, Anderson is not on point.

Plaintiffs' reliance on Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1261 (10th Cir. 2003), is also misplaced. Greater Yellowstone Coalition dealt with the issue of a claim of irreparable harm based on potential effects to a threatened species in a particular area, specifically "the primary breeding area for bald eagles in the Greater Yellowstone area." Id. at 1257. Unlike Greater Yellowstone Coalition, Plaintiffs here have asserted only a concern with the production and consumption of non-GE *Beta* crops generally, not any specific population of a non-GE *Beta* plant that would be forever lost if the planting of RRSB were to continue. In the unlikely event that gene flow were to occur, gene flow can be rectified. Stander Decl. ¶ 8; Pierson Decl. ¶¶ 54-61; Navazio Depo. at 233:16-19. Moreover, non-GE *Beta* plants are capable of being replicated from seed

1    sources that are not affected by pollen containing GE traits.  Various sources will remain available

2    to provide non-GE *Beta* seed, including the USDA germplasm bank, as well as the conventional

3    seed stock that seed producers use to produce conventional pollinators or their basic and

4    foundational seed.  First Bretting Decl. ¶¶ 9-15 (Dkt. No. 392); Second Bretting Decl. ¶ 7; Peters

5    Decl. ¶ 20 (Dkt. No. 380); Meier Decl. ¶¶ 15-16 (Dkt. No. 377); Anfinrud Decl. ¶ 17 (Dkt. No. 359).

6    Thus, <u>Greater Yellowstone Coalition</u> is readily distinguishable, and Plaintiffs cannot rely on that

7    case to assert that they have shown the requisite level of irreparable harm in the *Beta* crops context.

8                   *c.    Plaintiffs Cannot Rely on Alleged Harm to Organic Businesses*

9            Plaintiffs' arguments that organic businesses will suffer harm if there is no injunction against

10   future planting of RRSB are exaggerated.  Pls. Reply at 16.  As Defendants previously established,

11   Def. Opp. at 5 n.4, any inadvertent gene flow would not cause organic growers to lose their organic

12   certifications or make their organic products unsaleable under the process-based USDA National

13   Organic Program ("NOP").  65 Fed. Reg. 80548, 80556 (Dec. 21, 2000); 7 C.F.R. §§ 205.2,

14   205.105(e), 205.301(f).  In the absence of a specific NOP threshold for genetically-modified

15   organisms ("GMO"), other entities like the Non-GMO Project have established thresholds for trace

16   amounts of GE presence.  <u>See</u> Non-GMO Project Working Standard 2.6, *available at*

17   http://www.nongmoproject.org (attached as Ex. E to 3rd Li Decl.) (Dkt. No. 388); Phillips Decl. ¶¶

18   17-19 & Exs. C (Dkt. No. 382).  The Non-GMO Project's thresholds are accepted by leaders

19   representing all sectors of the organic industry, including a number of Plaintiffs' own declarants.

20   Fagan Depo. at 61:22-62:8, 77:3-80:6 (noting the participation of Frank Morton, Matthew Dillon,

21   Tom Stearns, Dag Falck, and Charles Benbrook with the Non-GMO Project); Siemon Decl. ¶ 16

22   (Dkt. No. 423) (CROPP Cooperative is part of the Non-GMO Project); Falck Decl. ¶ 8 (Dkt. No.

23   417) (Nature's Path Foods is part of the Non-GMO Project); Squire Decl. ¶ 11 (Dkt. No. 431) (Good

24   Earth Natural Foods supports the Non-GMO Project); Potter Decl. ¶ 2 (Dkt. No. 436) (Eden Foods,

25   Inc.'s founder, chairman, president, and sole shareholder is a board member of the Non-GMO

26   Project).  Indeed, Dr. Fagan admits that the "participants in the Non-GMO Project" represent a

27   veritable "who's who of American organic and natural agricultural products."  Fagan Depo. at

28   62:14-62:19. The organic industry's overwhelming support of the Non-GMO Project demonstrates

1    that even if trace amounts of inadvertent gene flow were to occur, organic businesses might not

2    suffer any harm from lost sales.

3        As Defendants' opening remedy brief established, Def. Opp. at 5, Plaintiffs' claims of harm

4    to organic businesses if the planting of RRSB were to continue are also undermined by the long

5    history of GE crops coexisting alongside conventional and organic crops, even when the GE crops

6    have become predominant in the market.  First Smith Decl. ¶ 9; Second Smith Decl. ¶¶ 13-15, 17,

7    22.  Contrary to Plaintiffs' assertion, Pls. Reply at 16, the organic canola crop in Canada was not

8    "wiped out" by the GE canola crop.  An organic canola industry continues to exist in Canada, as

9    well as in the United States.  Second Cordts Decl. ¶ 11.  Here, Plaintiffs have presented no evidence

10   to contradict the fact that sales of organic chard and table beet seeds have increased since RRSB was

11   granted non-regulated status five years ago.  Morton Depo. at 68:15-68:18, 69:5-69:17; see also

12   Navazio Depo. at 56:19-25.  Thus, there is no reason to think that the planting of RRSB cannot

13   continue to coexist with the growth of organic *Beta* seeds and crops.

14       Lastly, Plaintiffs cannot show that an injunction is warranted based on organic businesses'

15   purported need to test for GE presence in related *Beta* crops.  Pls. Reply at 16.  The costs associated

16   with genetic testing are neither environmental in nature nor irreparable, as they are compensable

17   monetarily.[5]/

18       In short, Plaintiffs have not shown that irreparable harm will result from the extremely low

19   potential for gene flow from RRSB.

20                **2.    Plaintiffs Cannot Show Irreparable Harm from Alleged Loss of Choice**

21       Plaintiffs contend that they will be irreparably harmed by a loss of choice and reasonable

22   alternatives, but these arguments are unavailing.  Pls. Reply at 12-13.  First, as discussed above,

23

24   [5]/    The amount of genetic testing expenses estimated by Plaintiffs, Fagan Decl. ¶¶ 7-9, 12 (Dkt.
       No. 426), is an exaggerated figure, as the deposition testimony of Dr. Fagan demonstrates.  Fagan
25   Depo. at 225:9-225:11 (stating that "tests for [the] CP4 [gene] are widely available on a commercial
       basis"); id. at 232:6-13 (assuming a 1% level of contamination based solely on his "personal
26   experience"); id. at 234:7-235:1 (reaching cost projects for genetic testing of chard and table beet
       seed without speaking to organic growers who have tested their crops at much lower expense); id.
27   at 235:22-236:10 (making cost projections on a 95% confidence level, but approving a less
       burdensome 90% confidence level as a member of the Non-GMO Project's Board of Directors);
28   Third Hoffman Decl. ¶¶ 10-13.

those farmers who do not want GE material in their crops can take actions that will avoid gene flow from RRSB.  In addition, APHIS's proposed conditions, if they are adopted by the Court, will further minimize any risk of cross-pollination from RRSB.

Second, the existence of USDA Agricultural Research Service's germplasm bank demonstrates that non-GE *Beta* seeds will continue to be available to farmers.  First Bretting Decl. ¶¶ 9, 11, 15-16, 19; Second Bretting Decl. ¶ 5.  Plaintiffs characterization of the germplasm bank as a "last ditch" effort that cannot be meaningfully accessed is simply not the case.  Pls. Reply at 12. The USDA germplasm bank has been in existence since1952.  Second Bretting Decl. ¶ 6.  The seeds in the germplasm bank are available not only to researchers but also to any person who has a valid reason for requesting the seed, including commercial growers.  First Bretting Decl. ¶¶ 11, 19; Second Bretting Decl. ¶ 5.  The germplasm bank stores many varieties of seed, including over 1,722 genetically unique accessions of cultivated beet crops.  First Bretting Decl. ¶ 15.  USDA is willing to add other varieties of *Beta* seeds to its collection, such as Frank Morton's golden beet varieties. Id. ¶ 17; Second Bretting Decl. ¶ 7.  Thus, the germplasm bank is a means of ensuring that farmers' choice will always remain.[6]/

As for the issue of preserving consumers' choice, Defendants previously demonstrated that those consumers who prefer non-GE crops can avoid products derived from RRSB by using cane sugar or alternative sweeteners, or by relying on a number of resources including a non-genetically-modified sugar beet registry, a non-genetically modified organism shopping website, or the Non-GMO Project's labeling.  Def. Opp. at 8-9.  In light of these significant resources, Plaintiffs cannot show that they are likely to suffer irreparable harm due to lack of choice if an injunction does not issue.

### 3. Plaintiffs Cannot Show Irreparable Harm from Alleged Loss of Alternatives

Just as farmer and consumer choice will not disappear if the Court allows the planting and

---

[6]/     In addition to USDA's germplasm bank, Intervenors have explained that sugar beet seed companies keep conventional foundational and basic lines from which they propagate commercial seed, whether GE or conventional.  Intv's Opp. at 9 n.9 (Dkt. No. 358).  These sources are another reason to find that conventional seed will not disappear if an injunction does not issue.

FED. DEFS.' REPLY BR. REGARDING PERMANENT INJUNCTION                                          7

1   processing of RRSB while an EIS is prepared, the alternatives available to APHIS on remand will

2   not be limited.  See 40 C.F.R. § 1506.1(2); see also Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d

3   174, 203 (4th Cir. 2005).  As stated in APHIS's Notice of Intent, the Agency is not prejudging the

4   outcome of the EIS process.  See 75 Fed. Reg. at 29971 (noting that APHIS will include a range of

5   alternatives, including regulation of RRSB).  During the process of preparing an EIS and

6   determining whether RRSB should be deregulated, APHIS remains free to determine that RRSB

7   should be regulated as posing a plant pest risk, notwithstanding any potential adverse economic

8   impacts that would accompany such a decision.  Thus, Plaintiffs' fears about limiting reasonable

9   alternatives while the EIS is prepared are unfounded.

10       **4.**  **Plaintiffs Fail to Show Irreparable Harm from Glyphosate-Resistant Weeds Arising from RRSB or from an Increased Risk of Crop Disease**

11

12    Plaintiffs erroneously continue to argue irreparable harm based on the development of

13   glyphosate resistance in weeds and effects on crop disease.  Pls. Reply at 17-18.  But these issues

14   cannot properly form the basis of a narrowly-tailored injunction when the Court did not rule on the

15   merits of those issues.[7/]  See Friends of the Earth v. Laidlaw Envt'l Servs., 528 U.S. 167, 193 (2000)

16   (courts should ensure "the framing of relief no broader than required by the precise facts"); Orantes-

17   Hernandez v. Thornburgh, 919 F.2d 549, 558 (9th Cir. 1990) ("[A]n injunction must be narrowly

18   tailored to give only the relief to which plaintiffs are entitled.").  Even if the Court were to reach

19   beyond the deficiencies it found on summary judgment to consider Plaintiffs' assertions regarding

20   glyphosate resistance and crop disease, Plaintiffs have overstated the potential for RRSB to cause

21   these alleged harms.

22    

23   [7/] While Plaintiffs argue that the scope of the EIS that APHIS plans to prepare in response to the Court's summary judgment decision is a concession by the Agency that other portions of the EA

24   were inadequate, Plaintiffs misconstrue the Agency's actions.  Pls. Reply at 18.  In the course of preparing an EIS, it is entirely within APHIS's prerogative to consider additional effects for which

25   the Court did not find a violation.  "Administrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to

26   reconsider."  Trujillo v. Gen. Elec. Co., 621 F.2d 1084, 1086 (10th Cir. 1980) (citing Albertson v.

27   FCC, 182 F.2d 397, 399 (D.C. Cir. 1950)); see SKF USA, Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 20010) ("agency may request a remand (without confessing error) in order to reconsider

28   its previous position").  Doing so, however, does not constitute an admission that there were additional deficiencies beyond what the Court found.

1    Plaintiffs mischaracterize the arguments in Defendants' opening remedy brief, Def. Opp. at

2    9, regarding glyphosate-resistant weeds. Pls. Reply at 17. As APHIS's expert has concluded, it is

3    unlikely that the use of RRSB will lead to glyphosate resistant weeds in the time APHIS needs to

4    complete an EIS. Second Hoffman Decl. ¶¶ 21, 23. The fact that sugar beets are only one crop of

5    several in a three or four-year crop rotation – regardless of whether the other rotated crops are also

6    glyphosate-resistant varieties – further reduces the potential for glyphosate-resistant weeds to

7    develop because of differences in herbicide application and farming practices between crops.

8    Second Hoffman Decl. ¶ 24; Cole Decl. ¶ 38 (Dkt. No. 364); Kniss Decl. ¶¶ 14-16 (Dkt. No. 371);

9    Wilson Decl. ¶¶ 40, 47-52 (Dkt. No. 398); see Radosevich Depo. at 43:7-16, 44:25-45:8, 49:8-11,

10   78:11-16, 106:9-107:5, 114:13-21, 192:10-15 (attached as Ex. D to 3rd Li Decl.) (Dkt. No. 388).

11   Further, Plaintiffs continue to ignore Defendants' arguments that glyphosate is less toxic than other

12   herbicides, and using glyphosate may result in decreased use of more toxic herbicides and tillage

13   practices with negative environmental consequences. Def. Opp. at 9; Third Hoffman Decl. ¶ 5.

14   Plaintiffs still cannot establish irreparable harm based on their assertions regarding crop

15   disease. Pls. Reply at 18. Plaintiffs have no response to Defendants' expert's scientific explanation

16   that the 2006 study relied upon by Plaintiffs' expert is not applicable to the current varieties of

17   RRSB. Def. Opp. at 10; Second Hoffman Decl. ¶ 6. Plaintiffs continue to overlook the fact that

18   RRSB growers test RRSB varieties for disease resistance through field trials before a particular

19   RRSB is commercially planted, thereby overcoming the concerns that Dr. Huber raises.

20   Gerstenberger Decl. ¶ 14 (Dkt. No. 367); Grant Decl. ¶¶ 18-20 (Dkt. No. 368); Hofer Decl. ¶ 12

21   (Dkt. No. 370); Mauch Decl. ¶ 14 (Dkt. No. 375); Peterson Decl. ¶ 13 (Dkt. No. 381); Schlemmer

22   Decl. ¶ 13 (Dkt. No. 386); Snyder Decl. ¶ 16 (Dkt. No. 389); Steinbeisser Decl. ¶ 12 (Dkt. No. 391);

23   Wettstein Decl. ¶ 15 (Dkt. No. 397); Second Hoffman Decl. ¶ 9 (Dkt. No. 401); Third Hoffman

24   Decl. ¶ 4. With respect to the micronutrients issue, even if plants having the glyphosate-resistant

25   gene did result in a decrease in the level of micronutrients in the soil, the simple solution to such an

26   occurrence would be to add more of the particular micronutrient. Second Hoffman Decl. ¶ 11; Third

27   Hoffman Decl. ¶ 4. The ability to readily adjust the micronutrient balance makes any potential

28   environmental harm from decreased micronutrient levels reparable. Id. And, as the RRSB EA

concluded, studies on disease susceptibility do not indicate an increased disease risk from glyphosate use.  AR 812.

For these reasons, Plaintiffs have no basis to rely on potential effects on crop disease or glyphosate-resistant weeds to assert irreparable injury.  In sum, because Plaintiffs have not established irreparable harm, the Court should not enter the injunction they request.

**B.**   **The Balance of the Equities and Public Interest Weigh Against Granting the Injunction Plaintiffs Request**

The balance of the equities and the public interest do not weigh in favor of the broad injunction Plaintiffs seek.  If the Court were to grant the relief Plaintiffs now request, the U.S. sugar market would suffer harm in the form of significantly higher sugar prices for consumers and manufacturers.  The sugar beet industry would also face harm from disruption, such as the potential for certain facilities to close and jobs to be lost, as Intervenors have attested.  Intv. Opp. at 12-14. As a result, the balance of the equities and public interest do not favor injunctive relief.

Plaintiffs' requested injunction prohibiting future planting of RRSB would cause a price spike in the U.S. sugar market and have serious ramifications for sugar processors, sellers, and consumers.  Second Colacicco Decl. ¶¶ 23-33; Third Colacicco Decl. ¶ 3.  The injunction would allow the already-planted 2010 RRSB root crop to be harvested and processed into sugar and allow the already-planted 2010 seed crop to be harvested, but it would not allow any future planting of RRSB, meaning that the seed crop harvested in 2010 could not be planted in the spring of 2011. Pls. Proposed Order at 3.  An injunction on the planting of RRSB in the spring of 2011 would greatly restrict planting of sugar beet root crops in 2011 due to the limited availability of conventional seed. Second Colacicco Decl. ¶ 28.  The reduction in sugar beet crop would lower beet sugar production by an estimated 1.6 million tons in FY 2012.  Id.  The FY 2012 U.S. refined sugar price would be expected to rise from 33 cents/lb. to 41 cents/lb., resulting in roughly $700 million in losses to growers and processors and costing sugar users and consumers an additional $1.6 billion in FY 2012. Second Colacicco Decl. ¶ 29.  This 24% spike in sugar prices would be a severe increase, on par with the disasters of 2005 and 2008.  Second Colacicco Decl. ¶ 29; Third Colacicco Decl. ¶ 4. In the past ten years, the price of refined sugar has exceeded 40 cents/lb. only five percent of the

1   time.  Id.  The U.S. government has only limited ability to respond to the drastic supply disruption

2   that an injunction would cause because differences in product quality and packaging prevent U.S.

3   sugar users from easily switching to refined sugar from the world market.  Third Colacicco Decl.

4   ¶ 6.  This is due in part to the fact that.  Id.  Because of the severe effect that Plaintiffs' requested

5   injunction would have on U.S. sugar markets, sugar consumers and manufacturers, as well as the

6   sugar beet industry, the equities and public interest do not weigh in favor of an injunction.

7   **II.     A Remand Without Vacatur is Appropriate Under the Circumstances of this Case**

8         There is ample precedent for remand without vacatur in the Ninth Circuit and other circuits.

9   See Def. Opp. at 11-12.  The cases cited by Plaintiffs do not refute the availability of this form of

10  remedy.  See Pls. Reply at 2-4.  Indeed, the recent D.C. Circuit case law cited by Plaintiffs

11  demonstrates that remand without vacatur is appropriate in certain circumstances.  See Comcast

12  Corp. v. FCC, 579 F.3d 1, 8 (D.C. Cir. 2009) ("An inadequately supported rule . . . need not

13  necessarily be vacated.") (quoting Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d

14  146, 150 (D.C. Cir. 1993)); see also In re Core Commc'ns, 531 F.3d 849, 861 (D.C. Cir. 2008)

15  (explaining that the court had previously remanded without vacating an FCC rule).  Accordingly,

16  it is within the Court's discretion to remand APHIS's determination without vacating it.

17        The criteria for determining whether remand without vacatur is appropriate have been set

18  forth in a number of cases.  See Def. Opp. at 12-13.  As articulated by the D.C. Circuit, "[t]he

19  decision whether to vacate depends on the seriousness of the [rule's] deficiencies (and thus the

20  extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim

21  change that may itself by changed."  Comcast Corp., 579 F.3d at 8 (quoting Allied-Signal, 988 F.2d

22  at 150-51).  Courts that have considered the issue have not specifically stated whether the

23  government must meet a particular burden or show irreparable harm.  Rather, courts have relied on

24  their discretion to determine whether remand without vacatur is appropriate.  See, e.g., Idaho Farm

25  Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the

26  regulation can be left in place while the agency follows the necessary procedures.").

27        Because the decision to remand without vacatur is an equitable one, courts may consider a

28  number of factors, including the purposes of the statute at issue and the potential prejudice to those

affected by leaving the agency determination in place pending remand. <u>See</u> Def. Opp. at 12. Based on these considerations, remanding to APHIS without vacating APHIS's determination of non-regulated status pending the completion of the EIS would be appropriate.

### A. The Purposes of the National Environmental Policy Act ("NEPA") Do Not Mandate Vacatur

Plaintiffs argue that, in order to vindicate the purpose of NEPA, the Court must immediately vacate APHIS's determination. Pls. Reply at 4. That is not so. <u>See</u> Def. Opp. at 10-11. Indeed, the Supreme Court has made clear that in a NEPA case, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." <u>Winter v. Natural Res. Def. Council</u>, 129 S. Ct. 365, 381 (2008). Rather, a court finding a NEPA violation "has many remedial tools at its disposal, including declaratory relief or an injunction tailored to the preparation of an EIS." <u>Id.</u> Thus, NEPA does not require the Court to vacate APHIS's determination.

Furthermore, it is not uncommon for courts to leave an agency action undisturbed either wholly or in part while an agency conducts further analysis under NEPA. <u>See</u> Def. Opp. at 11-12 (citing <u>N. Cheyenne Tribe v. Norton</u>, 503 F.3d 836, 844-45 (9th Cir. 2007); <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d 630, 638, 642-43 (9th Cir. 2004); <u>Idaho Watersheds Proj. v. Hahn</u>, 307 F.3d 815, 833-34 (9th Cir. 2002). In addition, the Court in NEPA cases should consider the effects that a permanent injunction would have on ongoing activities. <u>See</u> Def. Opp. at 12 (citing <u>Sierra Club v. Bosworth</u>, 510 F.3d 1016, 1034 (9th Cir. 2007); <u>Or. Natural Res. Council Fund v. Goodman</u>, 505 F.3d 884, 898 (9th Cir. 2007)); <u>see also</u> <u>Sierra Club v. Penfold</u>, 857 F.2d 1307, 1316-17 (9th Cir. 1988) (upholding a district court's decision to defer the effective date of invalidity of a mining regulation because the regulation had been in effect for several years and mining companies had commenced operations in reliance on the regulation).

### B. The Possibility that APHIS May Issue a Determination of Non-Regulated Status Regarding RRSB Following Remand and the Completion of an EIS Supports a Remand Without Vacatur

In analyzing the first <u>Allied-Signal</u> factor – the seriousness of the deficiencies in the agency's determination – the Court should consider whether the same regulatory scheme could be in place following a remand. <u>See</u> <u>Milk Train, Inc. v. Veneman</u>, 310 F.3d 747, 755-56 (D.C. Cir. 2002). As

1   explained in <u>Milk Train</u>, "In our view, there is at least a 'serious possibility' that the Secretary on

2   remand could explain her use of the 1999 funds in a manner that is consistent with the statute or

3   choose an allocation method to correct the problem, a factor that favors remanding rather than

4   vacating." <u>Id.</u> at 756.  In this case, APHIS determined that RRSB should not be regulated.  That

5   determination was based on findings by the Agency that RRSB would not pose a plant pest risk

6   under the PPA.  <u>See</u> 70 Fed. Reg. 13007, 13008 (Mar. 17, 2005) (AR 795-96); 7 U.S.C. § 7712(a);

7   7 C.F.R. § 340.6.  The fact that the Court did not make any findings under the PPA is relevant

8   because, if the Court had made such a determination, that might have decreased the likelihood that

9   the same determination could be made after remand and the completion of the EIS.

10      Plaintiffs incorrectly argue that the procedural nature of the violation found by the Court is

11   not a factor in determining whether to remand without vacatur.  <u>See</u> Pls. Reply at 5.  As explained

12   by the D.C. Circuit, "We have previously remanded without vacating when the agency failed to

13   follow notice-and-comment procedures."  <u>See</u> <u>Sugar Cane Growers Coop. of Fla. v. Veneman</u>, 289

14   F.3d 89, 98 (D.C. Cir. 2002) (citing <u>Fertilizer Inst. v. EPA</u>, 935 F.2d 1303, 1312 (D.C. Cir. 1991);

15   <u>American Medical Ass'n v. Reno</u>, 57 F.3d 1129, 1135-36 (D.C. Cir. 1995); <u>County of Los Angeles</u>

16   <u>v. Shalala</u>, 192 F.3d 1005, 1023 (D.C. Cir. 1999)).  The fact that APHIS's determination may

17   survive on remand supports remand without vacatur.  <u>See</u> <u>Natural Res. Def. Council v. U.S. Dep't</u>

18   <u>of the Interior</u>, 275 F. Supp. 2d 1136, 1145 (C.D. Cal. 2002) ("Where the existing rule is more likely

19   to fall during remand, the courts are more reluctant to enforce that rule in the intervening period.").

20      Indeed, one of the cases relied upon by Plaintiffs illustrates this point.  <u>See</u> <u>Natural Res. Def.</u>

21   <u>Council v. EPA</u>, 489 F.3d 1250 (D.C. Cir. 2007).  In that case, the plaintiffs challenged regulations

22   issued by EPA under the Clean Air Act.  <u>See</u> <u>id.</u> at 1253-54.  The court determined that EPA's

23   regulations conflicted with the statute and therefore vacated the regulations.  <u>Id.</u> at 1261.

24   Responding to the dissent, the court explained why it did not remand without vacatur: "As a result

25   of our decision today, neither of the two Rules survives remand in anything approaching

26   recognizable form."  <u>Id.</u>  The court distinguished earlier case law remanding EPA rules without

27   vacating because the decisions in those cases did not "foreclose EPA from promulgating the same

28   standards on remand."  <u>Id.</u> at 1262.  Similarly, APHIS is not foreclosed from making the same

determination regarding non-regulated status following a remand and further NEPA analysis.

Defendants are not arguing, as Plaintiffs assert, that the determination on remand is a foregone conclusion or that remand without vacatur would always be appropriate in NEPA cases. See Pls. Reply at 5.  APHIS will make a determination regarding the status for RRSB only after a thorough NEPA review.  See Def. Opp. at 11; Notice of Intent to Prepare EIS, 75 Fed. Reg. 29969 (May 28, 2010).

### C.    The  Potential  Economic  Disruption  Caused  by  Vacating  APHIS's Determination Supports a Remand Without Vacatur

As Defendants demonstrated in our opening brief, immediate vacatur would inflict severe economic disruption on the U.S. sugar market, industries that make products using sugar, and sugar consumers.  See Def. Opp. at 6-7, 12-13.  Plaintiffs argue that economic disruption, regardless of the extent, is not a permissible grounds on which to base a remand without vacatur.  See Pls. Reply at 6.  They are incorrect.  While environmental concerns may support keeping a rule in place during remand, the potential for significant economic harm may also serve as a basis for remand without vacatur.  See Milk Train, 310 F.3d at 756 (economic harm to dairy farmers); Sugar Cane Growers, 289 F.3d at 97-98 (economic harm to sugar cane growers, processors, and refiners); A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (economic harm to producer of an animal drug).

Plaintiffs attempt to distinguish these cases on the basis that vacatur would not have restored the status quo ante.  See Pls. Reply at 6.  But their argument supports refraining from vacatur.  For example, in Sugar Cane Growers, a sugar cane industry group challenged USDA's implementation of a payment-in-kind program which paid sugar cane growers for destroying their crops.  289 F.3d at 91-92.  The court declined to vacate because the program had already been carried out for the year at issue and therefore "the egg has been scrambled and there is no adequate way to restore the status quo."  Id. at 97.  Similarly, in this case, the Court cannot return to the status quo ante of 2005 (prior to the determination of non-regulated status for RRSB) with the stroke of a pen.  RRSB growers and processors have made decisions and committed funds that can never be recouped if the Court vacates APHIS's determination.   Simply vacating the existing determination would result in severe economic harm to RRSB growers, including potential closures of facilities in certain communities

and significant job loss.  See Def. Opp. at 6.

Morever, as a matter of equity, the Court should take into consideration that, by not bringing suit until 2008, three years after APHIS's determination of non-regulated status was made, Plaintiffs permitted the industry to develop to the point that it was 95% RRSB.  Id. at 12-13; Second Colacicco Decl. ¶ 8.  Many growers and processors have relied on APHIS's determination and the fact that it was in place for three years before it was challenged.  Therefore, it should not be immediately vacated.  See A.L. Pharma, 62 F.3d at 1492 ("[V]acating the rule approving the [animal drug] would prove disruptive to Philips Roxane, which has relied on it in good faith for over thirteen years.").

### D.   APHIS's Determination Should Remain in Effect for a Limited Time While an EIS Is Prepared Subject to Conditions on RRSB Use

The Court should keep in place APHIS's determination of non-regulated status until May 31, 2012 and place protective measures under which deregulated activities may occur.  The Court should give deference to APHIS's proposed measures because of APHIS's regulatory experience involving sugar beets, which makes the Agency well-suited to offer proposed conditions while it prepares an EIS, and because APHIS's proposed conditions are based on the reasonable conclusions of its experts.  See, e.g., Idaho Watersheds Proj., 307 F.3d at 831 (upholding district court's decision to reject "drastic" remedy urged by plaintiffs and defer to agency expertise in adopting interim remedy crafted by the agency); see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) ("[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts."); Balt. Gas Co. v. Natural Res. Def. Council, 462 U.S. 87, 101, 103 (1983).  While Plaintiffs argue that deference should not be given because of past incidents of improper containment of field trials, Pls. Reply at 19, there have been very few compliance incidents of significance related to loss of confinement from field trials.  Second Cordts Decl. ¶ 12.  APHIS notes only 19 such incidents, despite the issuance of over 29,000 permits or notifications at over 200,000 sites through the United States since field trial permitting began in 1987.  Id.  As for Plaintiffs' arguments based on the 2008 Farm Bill and the reports by the USDA Office of Inspector General and by the U.S. Government Accounting Office, none of these documents called into question APHIS's science-based principles for making assessments of plant

1  pest risks. Abel Decl. ¶¶ 9, 18, 22.  APHIS has taken action regarding the recommendations in the

2  reports and the direction to APHIS in the Farm Bill.  Id. ¶¶ 10-16, 19-20, 23-25.

3       APHIS's proposed conditions would: (1) establish a zone in California and Western

4  Washington where no RRSB could be planted, thereby protecting the primary areas for swiss

5  chard and table beet seed production,[8]/ (2) make mandatory the 4-mile isolation distance that

6  applies to RRSB and related *Beta* seed crops in the Willamette Valley,[9]/ (3) require that growers

7  of RRSB male fertile seed crops inform APHIS of the location of their fields so that growers of

8  non-GE *Beta* seed crops can be informed about their proximity to such crops, (4) require that

9  RRSB seed producers follow protocols to ensure that mixing of RRSB and conventional *Beta*

10  seeds does not occur, (5) require that contractual measures be in place that require immediate

11  destruction of any bolters in RRSB root crop fields and in outdoor sugar beet piles, and (6)

12  require third party auditing to ensure compliance with certain measures.  Second Smith Decl. ¶

13  45; Third Smith Decl. ¶ 5.[10]/  Each of these measures exceeds protections under the status quo.

14  The RRSB-free zone and the requirement that RRSB growers inform APHIS of the location of

15  their fields are both new concepts.  Even though there are currently isolation distances in the

16  Willamette Valley and protocols used by the seed producers, APHIS's proposed measures would

17  make those isolation distances and protocols mandatory, and further impose third party auditing

18  to ensure compliance with the isolation distances and protocols.  Second Smith Decl. ¶ 45.

19  APHIS's measures will minimize the already minuscule risk of gene flow from RRSB, thereby

20

21  [8]/    Although Plaintiffs argue that the RRSB-free zones do not help those outside the zones, Pls.
22  Reply at 20, Plaintiffs have not refuted the fact that the proposed RRSB-free zones are where about
   95% of the U.S. table beet and swiss chard seed production occurs.  See Second Hoffman Decl. ¶
23  35.

24  [9]/    Even the Non-GMO project has approved isolation distances between sugar beets and
   compatible crops. Fagan Depo. at 179:19-180:7; Phillips Decl. Ex. C (Dkt. No. 382) (Spring 2010
25  Non-GMO Project Working Standard, § 2.7.3.2 & Appx. C).

26  [10]/   Contrary to Plaintiffs' assertion, Pls. Reply at 19, in proposing these conditions, APHIS has
27  not conceded that an injunction should issue. Plaintiffs seek both vacatur and an onerous permanent
   injunction.  APHIS maintains that the Court should not vacate but impose time-limited conditions
28  on the use of RRSB while an EIS is prepared.  If the Court were to vacate, no injunction should
   issue.

assuaging any concerns about farmers' and consumers' choice while an EIS is prepared.[11]/

Indeed, Professor Carol Mallory Smith at Oregon State University has expressed support for

APHIS's proposed conditions, stating that they will provide "significant safeguards" for growers

of *Beta* seed crops while the EIS is being prepared by APHIS.  Second Mallory-Smith Decl. ¶¶

4, 7-8.  Therefore, the Court should impose APHIS's reasonable proposed measures pending the

completion of the EIS.

**III.   IF THE COURT WERE TO VACATE AND REMAND, IT SHOULD STAY THE DATE OF VACATUR TO AVOID UNDUE HARDSHIP**

      If the Court is inclined to vacate APHIS's determination of non-regulated status of

RRSB, the Court should exercise its equitable discretion by staying the vacatur[12]/ until March 1,

2011 to allow APHIS time to implement appropriate interim regulatory measures concerning the

future planting, harvesting, and processing of all regulated RRSB.  Second Smith Decl. ¶¶ 46-48;

Third Smith Decl. ¶ 6.  APHIS would conduct a NEPA analysis for any interim regulatory

measures, and would base its decision on an administrative record in accordance with the

Administrative Procedure Act.[13]/  Second Smith Decl. ¶ 47.  A stay of vacatur of this duration

would pose no risks of cross-pollination between RRSB and non-GE *Beta* crops because the

RRSB seed crop would not flower within this time period and the root crop would not yet be

planted.  Third Smith Decl. ¶¶ 4, 7.

      While Plaintiffs assert that a nine-month stay of vacatur would be unprecedented, they

cite no authority for that proposition.  Pls. Reply at 20.  On the contrary, courts have allowed

---

[11]/     Plaintiffs contend that APHIS's proposed conditions do not offer protection against the development of glyphosate-resistant weeds or risk of increased crop disease.  Pls. Reply at 20.  But because Plaintiffs' asserted harms about gene flow and choice are the only ones that could form a proper basis for a narrowly-tailored injunction, APHIS appropriately did not propose any measures related to those issues that the Court should not consider in the remedy phase.

[12]/     Plaintiffs' proposed order suggests that they would not object to a stay of vacatur with respect to already-planted RRSB crops so that such crops could be harvested and processed without being subject to regulation.  Pls. Proposed Order at 3, ¶ 3; Third Smith Decl. ¶¶ 7-8.

[13]/     Plaintiffs indicate that they are open to an interim regulatory measure, so long as it is accompanied by NEPA analysis and supported by an administrative record.  Pls. Reply at 19; Pls. Proposed Order at 3, ¶ 6.

1    stays of vacatur for years, or several months.  See Nat'l Cotton Council v. EPA, No. 06-4630,

2    Order (6th Cir. June 8, 2009) (unpublished) (attached as Ex. A to 4th Li Decl.) (staying mandate

3    in Nat'l Cotton Council v. EPA, 553 F.3d 927 (6th Cir. 2009), for two years to delay vacatur of

4    regulation in order to avoid disruption to Clean Water Act permitting process); In re Core

5    Commc'ns, 531 F.3d 849, 861 (D.C. Cir. 2008) (staying vacatur of interim rules for 6 months to

6    allow time for agency to provide explanation of legal basis for the rules); Chamber of Commerce

7    of U.S. v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006) (staying mandate for 90 days to avoid

8    disruptive effects to industry); Anacostia Riverkeeper, Inc. v. Jackson, Civ. No. 09-0098, 2010

9    WL 2070309, at *4-5 (D.D.C. May 25, 2010) (staying the effect of vacatur for 1 year for tier one

10   pollution limits, for 2½ years for tier two pollution limits, and for 6½ years for tiers three and

11   four pollution limits); Coastal Conservation Ass'n v. Gutierrez, 512 F. Supp. 2d 896, 902 (S.D.

12   Tex. 2007) (staying vacatur of final rule that was part of a complex plan involving

13   interconnected programs and measures, and ordering agency to approve red snapper rebuilding

14   plan within 9 months); Haw. Longline Ass'n v. NMFS, 288 F. Supp. 2d 7, 12 (D.D.C. 2003)

15   (staying the effect of order for five months to allow agency to conduct further studies).

16        In issuing a stay for multiple years, the Anacostia Riverkeeper court stated that it could

17   not discern any reason to doubt the agency's representations of the process it would need to

18   undertake and the time estimated for completing the agency's actions.  2010 WL 2070309, at *4.

19   Here, there is no basis to contradict APHIS's estimate that approximately nine months would be

20   needed to establish interim regulatory measures.  Second Smith Decl. ¶¶ 46-48; Third Smith

21   Decl. ¶ 6.  The time APHIS requests for a stay of vacatur is consistent with prior court decisions.

22   Thus, under the circumstances of this case, if the Court were to vacate and remand, it should

23   exercise its equitable discretion by staying the vacatur until March 1, 2011 to allow APHIS time

24   to establish appropriate interim regulatory measures.

25   **IV.   An Evidentiary Hearing on Certain Issues May Be Appropriate**

26        Regarding Intervenors' request for an evidentiary hearing, Intv's Opp. at 15, Defendants

27   would support Intervenors' request for an evidentiary hearing, to the extent the hearing addresses

28   only those issues that are outside the scope of the Agency's knowledge and expertise, such as the

1  availability of conventional seed or certain disputed factual questions regarding the harms

2  Plaintiffs have asserted.  But on scientific or regulatory matters for which the Court should defer

3  to the Agency, such as the extremely minute likelihood of gene flow, no evidentiary hearing is

4  necessary.  Marsh, 490 U.S. at 378; Balt. Gas, 462 U.S. at 101, 103.

5  **CONCLUSION**

6  For the foregoing reasons and the reasons set forth in Defendants' opening remedy brief, the

7  Court should deny Plaintiffs' Motion for a Permanent Injunction, decline to vacate the determination

8  of non-regulated status until May 31, 2012 while APHIS prepares an EIS and a new ROD, and adopt

9  the interim protective measures proposed by APHIS.  In the alternative, if the Court is not inclined

10  to withhold vacatur and adopt APHIS's proposed conditions, the Court should: vacate and remand

11  to APHIS for further administrative action but stay the vacatur until March 1, 2011 to allow APHIS

12  time to establish appropriate interim regulatory measures for RRSB.

13  Respectfully submitted this 18th day of June, 2010.

14

15  IGNACIA S. MORENO
    Assistant Attorney General

16  /s/   Beverly F. Li

17  BEVERLY F. LI
    LUTHER L. HAJEK
    Trial Attorneys

18  U.S. Department of Justice
    Environment and Natural Resources Division

19  Natural Resources Section
    P.O. Box 663

20  Washington, D.C.  20044-0663
    Tel.: (202) 353-9213 (Li)/ (202) 305-0492 (Hajek)

21  Facsimile: (202) 305-0506
    Beverly.Li@usdoj.gov

22  Luke.Hajek@usdoj.gov

23  TONY WEST
    Assistant Attorney General

24  JOHN R. GRIFFITHS
    Assistant Director, Federal Programs Branch

25  JOHN R. COLEMAN (Va. Bar # 70908)
    Trial Attorney, U.S. Department of Justice

26  Civil Division, Federal Programs Branch
    20 Massachusetts Ave., N.W., Room 6118

27  Washington, D.C. 20530
    Telephone: (202) 514-4505

28  Facsimile: (202) 616-8460

1    Email: John.Coleman3@usdoj.gov

2    Attorneys for Federal Defendants

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28